SUPREME COURT OF THE STATE OF NEW YORK,
COUNTY OF NEW YORK

| | |
|---|---|
| FTE NETWORKS, INC., | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : Index No. |
| | : |
| SUNEET SINGAL; TTP8, LLC; FIRST CAPITAL | : **SUMMONS** |
| MASTER ADVISOR, LLC; MAJIQUE LADNIER; | : |
| DANISH MIR; KHAWAJA ZARGHAM BIN | : DATE FILED: |
| AAMER; THOMAS COLEMAN; INNOVATIV | : |
| MEDIA GROUP, INC.; JOSEPH F. | : Plaintiffs designate New York |
| CUNNINGHAM; PETER K. GHISHAN; STEPHEN | : County as the place of trial |
| M. GOODWIN; AND BRUCE M. FAHEY, | : |
| | : |
| Defendants. | : |
| | : |

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiffs' attorneys within 20 days after the service of this summons, exclusive of the day of service (or within thirty (30) days if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the amended complaint.

Dated: New York, New York
       May 11, 2022

**WHITE AND WILLIAMS LLP**

By: _____
Shane R. Heskin
7 Times Square
New York, NY 10036
(215) 864-7165
*Attorneys for Plaintiffs*

TO:    Suneet Singal
       512 Alta Vista Court
       El Dorado Hills, California 95762

28884623v.1

Majique Ladnier
512 Alta Vista Court
El Dorado Hills, California 95762

TTP8, LLC
2355 Good Meadow Way, Suite 160
Gold River, California 95670

First Capital Master Advisor
2355 Good Meadow Way
Suite 160
Gold River California 95670

Innovativ Media Group, Inc.
12021 Wilshire Boulevard
Suite 450
Los Angeles, California 90025

Thomas Coleman
9601 Wilshire Boulevard, Suite 1109
Beverly Hills, California 90210

Bruce M. Fahey
85 11th Street
Garden City, New York 11530

Joseph F. Cunningham
1350 Promontory Drive
El Dorado Hills, California 95762

Peter K. Ghishan
275 Hill Street, 3rd Floor
Reno, Nevada 89501

Danish Mir
1350 Broadstone Parkway
Folsom, California 95630

Khawaja Zargham Bin Aamer
3230 Fieldcrest Drive
Sacramento, California 95821

Steven M. Goodwin
1350 Broadstone Parkway
Folsom, California 95630

-2-

28884623v.1

Case 1:22-cv-05960-PGG Document 1-1 Filed 07/13/22 Page 3 of 222

SUPREME COURT OF THE STATE OF NEW YORK,
COUNTY OF NEW YORK

---

FTE NETWORKS, INC.,

:
:
Plaintiffs,            :
:
v.                     :
:
SUNEET SINGAL; TTP8, LLC; FIRST CAPITAL      :      Index No.
MASTER ADVISOR, LLC; MAJIQUE LADNIER;        :
DANISH MIR; KHAWAJA ZARGHAM BIN              :
AAMER; THOMAS COLEMAN; INNOVATIV            :
MEDIA GROUP, INC.; JOSEPH F.                 :
CUNNINGHAM; PETER K. GHISHAN; STEPHEN        :
M. GOODWIN; AND BRUCE M. FAHEY,              :
:
Defendants.          :
:

---

## COMPLAINT

Plaintiff FTE Networks, Inc. ("FTE"), by and through its undersigned counsel, files this

Complaint against Suneet Singal ("Singal"), TTP8, LLC ("TTP8"), First Capital Master Advisor,

LLC ("FCMA"), Majique Ladnier ("Ladnier"), Danish Mir ("Mir"), Khawaja Zargham bin Aamer

("Aamer"), Thomas Coleman ("Coleman"), Innovativ Media Group, Inc. ("Innovativ"), Joseph F.

Cunningham ("Cunningham"), Peter K. Ghishan ("Ghishan"), Stephen M. Goodwin ("Goodwin"),

and Bruce M. Fahey ("Fahey"), and, alleges as follows:

### NATURE OF THE ACTION

1.      This is an action seeking to stop habitual fraudster Suneet Singal and his co-

conspirators (the "Enterprise") from continuing to defraud innocent investors across the country

through their pattern of fraud and racketeering.

2.      Nothing has stopped the Enterprise and its mastermind, Singal, from terrorizing

their innocent victims to date. Not Singal's $7 million fine by the U.S. Securities and Exchange

Commission ("SEC") in 2021. Not his ten-year expulsion from the securities industry. And not

28884623v.1

even Singal's recent federal indictment by the U.S. Attorney for the Eastern District of California, charging him with multiple counts of felony wire and mail fraud. As detailed herein, his fraud and racketeering schemes continue unabated.

3.     Undeterred by facing up to 20 years in prison for his most recent predicate acts of wire and mail fraud, Singal's fraud and racketeering schemes are long running, wide ranging and continue through today.

4.     Although the number of victims and the depths of Singal's fraud and racketeering are yet to be unearthed, what has already been exposed is disturbing and telling of an unrepentant criminal who will continue to terrorize victims unless permanently enjoined by this Court.

5.     Singal's fraud and racketeering know no bounds. The web of companies used to further his scheme is a tangled one. His co-conspirators and enablers are numerous. The damage he continues to cause is endless. And his victims are countless.

6.     On December 13, 2019, the SEC was the first to expose Singal's fraud and racketeering schemes when it charged Singal with a series of securities frauds against two public companies—a common target of the Enterprise:

> This case is about two separate frauds Suneet Singal perpetrated that involved two public companies—a real estate investment trust ("FC REIT") and a business development company ("BDC")—between September 2015 and at least March 2018. In the fraud involving FC REIT, Singal purported to contribute 12 hotels that he did not own to close a business deal related to FC REIT that personally benefitted him. He then made numerous material misrepresentations in public SEC filings concerning FC REIT's ownership of the hotels. As part of the deal, Singal received consideration valued at more than $15 million for the hotels. Singal's sham contribution diluted the value of FC REIT's shares and resulted in FC REIT selling shares at inflated prices to unsuspecting investors. With respect to the BDC, Singal engaged in a course of fraudulent conduct while he was a director and investment adviser to the BDC, and he owed a fiduciary duty to the BDC. As a fiduciary, Singal had a duty to act in the best interests of the BDC, to employ reasonable care to avoid misleading the BDC, and to not engage in self-dealing. Instead, and in breach of that duty, Singal lied about his conflicts of interest and misappropriated money

28884623v.1

Case 1:22-cv-05960-PGG    Document 1-1    Filed 07/13/22    Page 5 of 222

that the BDC lent—as its largest investment—to a company he secretly controlled ("Company A").[1]

7.      Just two months before being charged by the SEC, Singal had already spun his next web of fraud and lies to terrorize an even broader range of victims—the shareholders of FTE, at the time a publicly traded company on the New York Stock Exchange ("NYSE").

8.      Singal's first act was to dupe FTE into giving him approximately 20% of the common shares of FTE in exchange for retiring a portion of FTE's debt. In inducing FTE to give up these shares, Singal never had any intention of paying for the debt.

9.      His second, and far broader fraudulent act, was to pitch FTE on a portfolio of real estate properties, which Singal fraudulently represented to FTE and its shareholders were worth more than $350 million.

10.     In pitching this opportunity to FTE, Singal knew that the portfolio of properties was poisoned with unlimited underlying liability to state attorneys general and consumer protection groups nationwide but knowingly and intentionally misrepresented the severity of these liabilities.

11.     In duping FTE to continue with this transaction even in the face of his recent SEC charges, Singal conspired with the owners of the real estate portfolio, Alex and Antoni Szkaradek (the "Szkaradeks"), to fraudulently conceal Singal's true participation and interest in the transaction by falsely representing that Singal was a mere broker and would have nothing to do with the transaction upon completion. This representation was knowingly and intentionally false, for Singal was always lurking in the shadows and calling the shots in the background, all while his co-conspirators actively hid his active involvement.

12.     To further this fraudulent concealment, the Szkaradeks and others conspired with Singal to violate a provision and prohibition in the transaction closing documents that no shares of

---

[1] *See* Ex. A, Securities and Exchange Commission Complaint against Suneet Singal, dated December 13, 2019.

-3-

28884623v.1

Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 6 of 222

FTE would be transferred to Singal, and that 11,031,688 FTE shares purportedly earned by Singal

for his "broker fee" would never touch his hands, and instead would be transferred to the victims

of his earlier fraud—the shareholders of the First Capital Real Estate Investment Trust (the "FC

REIT"). That representation, like so many others, was knowingly and intentionally false, as Singal,

the Szkaradeks and the other co-conspirators have known and hidden all along.

13.     To be clear, *to this day*, Singal, the Szkaradeks and their other co-conspirators have

refused to transfer the 11,031,688 FTE shares to his FC REIT victims.

14.     Instead, Singal, the Szkaradeks and their co-conspirators, including past and

present FTE directors and officers, have used those very 11,031,68 shares to further their ongoing

fraud and racketeering conspiracy to take over control of FTE. In addition to refusing to transfer

the 11,031,688 FTE shares as required by the closing documents, Singal has also acquired

additional shares of FTE through various other ruses and fraudulent transfers to companies he

controls.

15.     On February 3, 2022, Singal, the Szkaradeks and their co-conspirators, including

past and present FTE directors and officers, acted on their fraud and racketeering scheme by

attempting a coup to take over control of FTE through a purported amendment to its bylaws. *See*

Ex. B.

16.     Singal's fraud and racketeering do not get more brazen. Among other co-

conspirators, the purported bylaws amendment was signed by Singal himself, his wife Majique

Ladnier, Defendant TTP8 (owned and controlled by Singal and his wife), and Defendant Innovativ

(a company owned and controlled by Defendant Thomas Coleman).

17.     Incredibly, Singal even conspired with FTE's former officer, Stephen M. Goodwin,

and two other directors of FTE, Peter K. Ghishan and Joseph F. Cunningham.

-4-

28884623v.1

18.     That is not all. Apparently, the depth of Singal's fraud and racketeering shares a common thread of mail and wire fraud going back many years. Besides the 2015 to 2018 fraud scheme charged by the SEC, on April 7, 2022 a federal grand jury indicted Singal for a series of wire and mail fraud committed by Singal in 2017 through his use of two other companies he claimed to own or control. As alleged in the indictment, Singal stole over $800,000 from other purported investors in the receivables of those companies. *See* Ex. C.

19.     Undeterred by the charges brought by the SEC and the U.S. Attorney, Singal continues his unlawful scheme against FTE by now conspiring with other shareholders, directors and officers of FTE to overtake control of the company.

20.     FTE now brings this action seeking a judgment and order: (i) permanently enjoining Singal from any involvement in the affairs of FTE; (ii) enjoing Singal from receiving any of the 11,031,688 FTE shares designated for the FC REIT; (iii) directing the return all of Signal's FTE shares to FTE; (iv) directing the return of all FTE shares possessed by Singal's affiliates and co-conspirators; and (v) awarding compensatory damages, treble damages and attorney's fees.

## THE PARTIES

21.     Plaintiff FTE Networks, Inc. is a corporation duly organized under the laws of Nevada with its principal place of business located in New York, New York.

22.     Defendant Suneet Singal is an individual residing at 512 Alta Vista Court, El Dorado Hills, California 95762.

23.     Defendant Majique Ladnier is Singal's wife and also resides at 512 Alta Vista Court, El Dorado Hills, California 95762.

24.     Defendant TTP8 is a limited liability company duly organized under the laws of Delaware with its principal place of business located at 2355 Good Meadow Way, Suite 160, Gold River, California 95670.

-5-

28884623v.1

25.     Defendant First Capital Master Advisor is a limited liability company duly organized under the laws of Delaware with its principal place of business located at 2355 Good Meadow Way, Suite 160, Gold River, California 95670.

26.     Defendant, Innovativ Media Group, Inc. is a corporation duly organized under the laws of Wyoming with its principal place of business located at 12021 Wilshire Blvd., Suite 450, Los Angeles, California 90025.

27.     Defendant Thomas Coleman is an individual residing at 9601 Wilshire Boulevard, Suite 1109, Beverly Hills, California 90210.

28.     Defendant Bruce M. Fahey is an individual residing at 85 11th Street, Garden City, New York 11530.

29.     Defendant Joseph F. Cunningham is an individual residing at 1350 Promontory Drive, El Dorado Hills, California 95762.

30.     Defendant Peter K. Ghishan is an individual residing at 275 Hill Street, Third Floor, Reno, Nevada 89501.

31.     Defendant Danish Mir is an individual residing at 1350 Broadstone Parkway, Folsom, California 95630.

32.     Defendant Khawaja Zargham bin Aamer is an individual residing at 3230 Fieldcrest Drive, Sacramento, California 95821.

33.     Defendant Stephen M. Goodwin is an individual at 1350 Broadstone Parkway, Folsom, California 95630.

## **JURISDICTION**

34.     This Court has subject matter jurisdiction because this dispute arises from tortious and unlawful conduct occurring within the State of New York.

-6-

28884623v.1

35.     Each Defendant is subject to the personal jurisdiction of this State because each Defendant purposely availed itself of the jurisdiction of this State by committing tortious and unlawful conduct within this State, and/or by directing their tortious and unlawful conduct against Plaintiff within this State.

36.     Venue is proper within this County because Plaintiff resides within this County, and the facts giving rise to the claims at issue occurred primarily within this County.

## FACTS

37.     In or around February 2019, FTE was hit with the bombshell that its former Chief Executive Officer ("CEO"), Michael Palleschi, and its former Chief Financial Officer ("CFO"), David Lethem had orchestrated a fraudulent scheme to hide the deteriorating financial condition of the company, and to embezzle millions of dollars to pay for private jet use, luxury automobiles, personal credit cards, unauthorized wire transfer, stock issuances and unauthorized salary increases.[2]

38.     FTE's troubles caught the attention of fraudster and racketeer Suneet Singal, who would soon find himself in SEC hot water and ultimately under federal criminal indictment.[3]

39.     Striking when FTE was at its most vulnerable, Singal, working in concert with the Szkaradeks and others, hatched their own fraudulent scheme to (i) shed a portfolio of underwater properties that were plagued with state regulatory and consumer liabilities, (ii) secure tens of millions of dollars from FTE for a portfolio of properties that was overleveraged; and (iii) shirk the Szkaradeks' many millions of dollars of personal debt obligations onto the back of FTE.

---

[2] Both former officers were ultimately charged by state and federal prosecutors with numerous felonies on July 15, 2021. *See* https://www.cnbc.com/2021/07/15/fte-networks-executives-charged-with-securities-fraud-conspiracy.html; https://www.sec.gov/litigation/complaints/2021/comp-pr2021-127.pdf
[3] *See* https://www.sec.gov/litigation/litreleases/2021/lr25145.htm ("SEC Obtains Final Judgment for More Than $7 Million and Bars Former CEO and Board Chairman from the Securities Industry"); https://www.justice.gov/usao-edca/pr/el-dorado-hills-man-indicted-fraud-against-merchant-cash-advance-companies ("El Dorado Hills Man Indicted for Fraud Against Merchant Cash Advance Companies").

-7-

28884623v.1

40.     On October 10, 2019, the Commonwealth of Pennsylvania filed a Complaint against the Szkaradeks, their company Vision Property Management, LLC ("Vision") and a series of other Szkaradek related companies, accusing them of luring consumers into "rent to own" agreements on poorly maintained, foreclosed houses. Among other fraudulent practices, the Pennsylvania Attorney General ("AG") alleged that the Szkaradeks and their companies failed to disclose that these agreements provided no ownership rights to consumers unless they exercised an overpriced option, and that consumers faced immediate eviction if they fell behind on payments. The Pennsylvania AG further alleged that certain provisions in Vision's agreements making consumers responsible for expensive repairs required to make the homes safe to live in were unlawful. It was further alleged that Vision utilized an "Agreement for Deed" and other contract formats that were unfair, deceptive and/or unlawful.

41.     In response to the Pennsylvania AG's lawsuit and a swelling of similar consumer complaints across its portfolio of over 3,000 properties among 46 states, the Szkaradeks contemplated bankruptcy and met with their own bankruptcy counsel in mid-October 2019.

42.     Rather than file for bankruptcy (which could not shield them from the looming onslaught of state AG and consumer lawsuits due to their underlying fraud), the Szkaradeks instead hatched a scheme with Singal to unload their liabilities, while simultaneously reaping millions of dollars for their own personal benefit.

43.     Their target was FTE, a publicly traded company that (i) was reeling from its own public fraud scandal, (ii) suffered from ballooning short-term and long-term debt obligations, and (iii) was about to install a new board of directors and management team to right a sinking ship stricken by fraud.

-8-

28884623v.1

44.    The scheme was to pitch the portfolio of liability laden properties onto FTE's new board and management under the false premise that the properties were worth hundreds of millions of dollars and would allow FTE to recover from the damage caused by its former CEO and CFO.

45.    Less than two weeks after Vision had been sued by the Pennsylvania AG, Singal had already begun to spin his scheme with the Szkaradeks by attending the first meeting of FTE's newly appointed board on October 22, 2019. At this board meeting, Singal – along with his closest associates, Defendants Mir and Aamer, and also his hand-picked cronies on FTE's board – introduced FTE to the Szkaradek portfolio and pitched a potential acquisition of the problematic Vision properties. In making his pitch to FTE's new board, Singal represented that Vision's portfolio of properties had a then existing book value in excess of $350 million, and that with minimal rehabilitation, the properties would be worth in excess of $500 million. As a further inducement to acquire the Vision portfolio and further garner support from FTE's new board members, Singal offered to retire millions of dollars of debt and promised to help facilitate a new fundraising channel through the exchange of FTE stock.

46.    On December 16, 2019, just days before the Vision portfolio was scheduled to close, FTE learned that the SEC had filed securities fraud charges against Singal for, among other things, selling properties that he did not own.[4]

47.    As a result of the SEC's fraud charges against Singal – who through his affiliates was a roughly 20% shareholder – FTE immediately instituted a "firewall" between itself and Singal, directing all members of FTE's board and management not to have any communications with Singal, either directly or through affiliates, regarding the company's business affairs.

---

[4] *See* https://secinvestigations.org/2019/12/16/sec-charges-suneet-singal-first-capital-real-estate-investments-llc-first-capital-real-estate-advisors-lp-and-first-capital-real-estate-trust-inc/

28884623v.1

Case 1:22-cv-05960-PGG    Document 1-1    Filed 07/13/22    Page 12 of 222

48.    Despite these troubling charges by the SEC, the Szkaradeks remained resolute in closing on the Vision portfolio. However, and in light of the "firewall," the Szkaradeks represented to FTE and its board members that Singal was merely a broker, and would not be involved in the transaction after its close. This was a lie and a fraud, as is now abundantly clear.

49.    Indeed, the Szkaradeks insisted that Singal be compensated for his so-called finder's fee through the transfer of $100 million of *their* to-be-received FTE stock (later changed to 11,031,688 FTE shares). In pushing for this purported fee, the Szkaradeks promised that the stock would not be distributed either to them or to Singal, but rather, directly to the victims of Singal's SEC fraud, the shareholders of the FC REIT.

50.    To be sure, on December 20, 2019, Singal issued his own press release announcing the acquisition of the Vision portfolio by FTE, and the concomitant pledge of $100 million in FTE shares (later changed to 11,031,688 FTE shares) to the victims of his SEC fraud – the FC REIT.[5]

### A.    General Background of Plaintiffs' Business and Financial Trouble

51.    FTE Networks is a corporation duly organized under the laws of Nevada. Prior to its relationship with the Szkaradeks, FTE primarily provided innovative, technology-oriented solutions for smart platforms, network infrastructures and buildings. The company provided end-to-end design, construction management, build and support solutions for state-of the art networks, data centers, residential, and commercial properties and services for Fortune 100/500 companies. After meeting Singal and the Szkaradeks, FTE sought to reposition itself as a real-estate company, owning and operating properties in the single-family residential market.

---

[5]    https://apnews.com/press-release/pr-newswire/business-lifestyle-residential-real-estate-fte-networks-inc-af0f7f4e57a009a9faf934eff686282e

28884623v.1

Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 13 of 222

### B.    The Purchase Agreement with the Szkaradeks

52.    In the wake of the embezzlement scandal involving its former CEO and CFO, FTE formed a new board of directors consisting of Michael P. Beys, Richard de Silva, Defendant Joseph F. Cunningham, and Defendant Peter K. Ghishan.

53.    Two of the directors, Defendants Cunningham and Ghishan, had close business ties with Singal, who was purporting to act as a financial advisor to the newly appointed FTE Board. The other two directors, Beys and de Silva, were not aware of the full extent of those close business ties.

54.    During the first board meeting on October 22, 2019, Singal, acting in concert with the Szkaradeks, recommended to the board that it appoint Defendant Stephen M. Goodwin as the interim CEO of FTE. Goodwin likewise had a close business relationship with Singal. In all, Goodwin, Cunningham and Ghishan all had close business ties to Singal, the full extent of which were unknown to Beys and de Silva.

55.    The Board accepted and acted upon Singal's recommendation.

56.    As a result, Defendants Cunningham, Ghishan, and Goodwin effectively were Singal's secret operatives on the FTE board.

57.    During the same board meeting, Singal made numerous financial proposals to rehabilitate and reinvent FTE. Specifically, Singal promised to help raise tens, if not hundreds, of millions of dollars for the company.

58.    As part of Singal's fundraising promises, one of the proposals was for Singal to purchase and retire several million dollars' worth of existing FTE debt in exchange for conversion of that debt into 5,468,379 shares of FTE stock (later reduced to 4,193,684 shares of FTE stock in order to fall below the applicable 20% NYSE and SEC threshold), which the board approved.

-11-

28884623v.1

Case 1:22-cv-05960-PGG    Document 1-1    Filed 07/13/22    Page 14 of 222

59.     During the same meeting, Singal presented the FTE Board with the portfolio of properties owned and managed by the Szkaradeks, through Vision Property Management, LLC and VPM Holdings, LLC (collectively "Vision"). At the time of the meeting, the Vision portfolio consisted of approximately 3,500 properties across 46 states and, according to Singal and his co-conspirators, was valued at over $350 million, including $82 million of debt.

60.     On December 9, 2019, the FTE board learned that the share issuance to Singal was never registered or disclosed, as required by NYSE listing rules, and that the shares issued by then-CEO Stephen M. Goodwin exceeded the 20% threshold of then-outstanding shares of FTE, another violation of NYSE listing rules.

61.     Consequently, FTE immediately terminated Goodwin, replacing him with Beys, a former Assistant U.S. Attorney for the Eastern District of New York, and contacted the NYSE to disclose the share issuance improprieties.

62.     On December 11, 2019, the NYSE suspended trading of FTE stock because of the improprieties.

63.     On December 16, 2019, the SEC issued a press release announcing a series of securities fraud charges against Singal for defrauding investors of First Capital Real Estate Investments LLC, First Capital Real Estate Advisors LP, and First Capital Real Estate Trust Inc. (collectively, the "FC REIT").[6]

64.     The two directors of FTE *without* ties to Singal had absolutely no knowledge of the SEC's newly announced charges against Singal, or that he had been under investigation. And while Defendants Cunningham, Ghishan and Goodwin – the directors and officers of FTE *with*

---

[6] *See* https://secinvestigations.org/2019/12/16/sec-charges-suneet-singal-first-capital-real-estate-investments-llc-first-capital-real-estate-advisors-lp-and-first-capital-real-estate-trust-inc/

-12-

28884623v.1

preexisting ties to Singal – *claimed* they were not aware of the charges or investigation, hindsight now suggests otherwise. They were his co-conspirators all along.

65.     Nevertheless, in light of the serious SEC fraud charges against Singal – who through his affiliates was a roughly 20% shareholder – FTE immediately instituted a "firewall" between itself and Singal, with all FTE directors and managers agreeing not to have any communications with Singal, either directly or through affiliates, regarding the company's business affairs. While the "firewall" has remained in place ever since then, it is now abundantly clear that Singal's secret operatives on FTE's board and in senior management, namely Defendants Cunningham, Ghishan and Goodwin – directly and through the Szkaradeks and other co-conspirators – fraudulently concealed their ongoing relationship and communications with the racketeer, passing highly confidential information to him to help him perpetrate his fraud and racketeering scheme.

66.     On the back of the SEC charges against Singal and the share issuance improprieties (also to Singal), the NYSE commenced the de-listing procedure of FTE stock on the following day, December 17, 2019.

67.     Despite the pending SEC charges against Singal, the "firewall" and the de-listing of FTE stock, the Szkaradeks nevertheless insisted that they wanted to complete the Vision portfolio transaction, which was to be largely paid for by FTE's soon-to-be de-listed stock.

68.     The Szkaradeks represented to FTE that Singal was merely a broker, and that Singal would not be further involved in the Visions transaction. The Szkaradeks insisted, however, that Singal be paid a whopping $100 million finder's fee for the Vision transaction (later changed to 11,031,688 FTE shares) from the stock of FTE that they would receive.

28884623v.1

69. Over the next two weeks until closing on December 30, 2019, the Vision deal was restructured to ensure that no consideration would go from FTE to Singal, his family members or his affiliates. Rather, any amounts payable to Singal would instead be paid directly to the victims of Signal's SEC fraud, the FC REIT and its shareholders.

70. As part of the due diligence, FTE relied on a report from Collateral Analytics, which had been introduced to FTE by the Szkaradeks, and which was based on comparisons from the geographic areas of the properties. The report, however, did not take into account material information known to and concealed by the Szkaradeks, namely, the extent of the state AG and local-level liabilities attached to the properties due to, among other wrongdoings, the fraudulent rent-to-own scheme perpetrated by the Szkaradeks.

71. Among other things, the Szkaradeks did not disclose the number and volume of consumer complaints that had been lodged against Vision throughout various states, including open state AG and consumer fraud investigations into Vision's lease-to-own agreements and business practices.

72. The existence of these liabilities effectively rendered the properties radioactive from a market perspective.

73. Without knowing the full extent of Vision's then existing and future liabilities (which were known to the Szkaradeks but willfully misrepresented and purposefully concealed from FTE), FTE closed on the Vision portfolio on December 30, 2019.[7]

74. Section 3.4, <u>Capitalization; Indebtedness</u>, stated in pertinent part:

(a)    The Equity Interests are free and clear of all Liens.

75. Notably, Section 3.14 of the Purchase Agreement, <u>Litigation</u>, provided:

---

[7] A true a correct copy of the Purchase Agreement is attached hereto as Ex. D.

28884623v.1

(a)    [S]ince January 1, 2015 there have not been any Legal Proceedings pending or, to the Knowledge of the Sellers, threatened (i) against or by the Company, (ii) against or by the Sellers relating to the Company or regarding any of their assets or properties, or (iii) against or by the Sellers or the Company that challenges or seeks to enjoin, prevent or otherwise delay, the Transaction or the other transactions contemplated by this Agreement or any of the Transaction Documents. To the Knowledge of the Sellers, no event has occurred or circumstance exists that could reasonably be expected to give rise to, or serve as the basis for, any Legal Proceeding.

(b)    [S]ince January 1, 2015 the Company is not and has not (i) been in default under or in breach of any Order, (ii) received any written notification or communication from any Governmental Body asserting that the Company is not in compliance with any Order or (iii) been party or subject to any Order. There are no unsatisfied judgments, penalties or awards affecting the Company or any of its properties, rights, or assets.

76.    Moreover, Section 3.15, <u>Compliance with Laws; Permits</u>, stated in pertinent part:

(a)    [T]he Company and the Business are, and since January 1, 2015 has complied with, in each case in all material respects, all applicable Laws, including without limitation with respect to mortgage lending, consumer protection, seller financing, installment sale contract, purchase money mortgage, contract for deed, and lease with option to purchase Laws...[S]ince January 1, 2015, none of the Companies has received any written notification or communication from any Governmental Body asserting that the Company is not in compliance with any applicable Law, including without limitation with respect to mortgage lending, consumer protection, seller financing, installment sale contract, purchase money mortgage, contract for deed, and lease with option to purchase Laws.

77.    With those provisions of the Purchase Agreement in mind, the Szkaradeks consummated the transaction and professed that their business and portfolio was not subject to any liens, pending or threatened litigation, and that they had complied with all applicable Laws.

78.    In connection with the closing, the Szkaradeks conspired with Singal to knowingly misrepresent and/or intentionally conceal the following:

a.    Although the brick-and-mortar value of the portfolio was arguably $350 million – based on a valuation report arranged by Vision – it was not disclosed that the majority of properties in the portfolio, which were subject to a national lease-to-own scheme orchestrated by the Szkaradeks, were

-15-

                unsellable and virtually impossible to collect rent from. These properties actually provided a negative value to the portfolio;

b.      The Szkaradeks falsely represented that they were nearing a settlement with the Pennsylvania AG for pending claims when in reality no such agreement was remotely close;

c.      No disclosure was made of pending homeowner complaints in Michigan, Ohio, and numerous other states to their respective AGs, which were known precursors to private class actions and state regulatory actions filed by the AGs;

d.      No disclosure of the massive tax obligations and utility deficiencies owed by Vision;

e.      Fraudulently misrepresented that Singal was merely a one-time broker in the transaction, while concealing the very basis of the relationship between the Szkaradeks and Singal as partners and co-conspirators.

79.      Moreover, in or around October of 2019, the Szkaradeks consulted with a bankruptcy attorney, Michael Beal, demonstrating that the Szkaradeks knew that the Vision portfolio properties had little to no value, and were effectively underwater.

80.      Among the persons aware of Vision's liabilities prior to the closing are Eric Taylor (then existing property manager), John Pincelli, Esq. (attorney for Vision), and Todd Merson.

81.      As part of the transaction, the Szkaradeks were paid $250,000 in cash (which was paid directly to settle a Vision legal matter) and were provided a promissory note of $9.75 million to be paid by January 2020.

28884623v.1

82.     The Szkaradeks also received $228 million of preferred FTE shares, on the basis that the trading of FTE stock, once re-listed, would properly price the value of the transaction.

### C.     The Conspiracy to Return Unencumbered Properties to the Szkaradeks

83.     In order to facilitate the closing of the initial transaction, FTE formed US Home Rentals, LLC ("USHR") to run the portfolio of properties purchased from the Szkaradeks.

84.     As part of the original transaction, FTE had agreed to return a subset of approximately 280 properties to another Szkaradek entity named FixPads.

85.     On September 25, 2020, upon the insistence of the Szkaradeks, FTE hired Munish Bansal as the CEO of USHR. As several co-conspirators knew but fraudulently concealed, Singal had identified Bansal and pushed him through the Szkaradeks and their cronies in FTE's board and management to have Bansal take over USHR and eventually FTE. Thus, Bansal's hiring was a key part of the second act of Singal and the Szkaradeks' fraudulent scheme: to (i) take control of FTE's Board and management; (ii) expedite the transfer of the most favorable FixPads properties to the Szkaradeks; and (iii) push FTE into bankruptcy so that the Szkaradeks could take back its properties free and clear of their liabilities.

86.     Around the time that Bansal took over as CEO of USHR, Vision's former property manager, Eric Taylor, attempted to inform FTE that Vision's portfolio was grossly underwater, and was not worth what had been previously represented by the Szkaradeks and Singal.

87.     Bansal and other Singal-planted board members disputed Taylor's allegations, and Bansal retaliated by firing Taylor on November 23, 2020.

88.     In addition to firing Taylor, Bansal continuously pressed to transfer desirable, lien-free FixPads properties to the Szkaradeks. Defendants Cunningham, Ghishan and Goodwin pressed as well.

-17-

28884623v.1

Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 20 of 222

89.     Ultimately, when FTE refused, the Szkaradeks systematically began transferring FixPads properties owned by USHR/FTE without the authorization of FTE, fraudulently claiming that they had authorization. Defendants Cunningham, Ghishan and Goodwin likely knew about the fraudulent FixPads transfers, as discovery will likely show.

90.     In fraudulently transferring these properties, the Szkaradeks were not only pocketing the equity in the properties, but in some cases, they failed to obtain the consent of FTE's largest creditors, who had security interests in the majority of the Vision properties. In doing so, the Szkaradeks, with the knowledge and participation of their co-conspirators in FTE's board and management, irreparably damaged FTE's relationship with such creditors.[8]

91.     At one point, to accomplish their fraudulent transfers of these properties, the Szkaradeks opened bank accounts at TD Bank, fraudulently signing for FTE and its subsidiary USHR, and failing to provide FTE with access to these accounts.[9]

92.     In addition to firing Taylor, Bansal actively sabotaged rehab efforts of USHR's properties to the point that employees questioned Bansal's decision-making and motives.

93.     On December 30, 2020, as a direct result of the actions taken by the Szkaradeks, FTE's largest creditor exercised its managerial security interests in the majority of the portfolio purchased from the Szkaradeks.

94.     In early 2021, FTE began selling a small portion of the properties purchased from the Szkaradeks to help cover the expenses needed to run the portfolio. At that time, FTE soon realized that the properties it had purchased from the Szkaradeks were effectively radioactive to

---

[8] However, in some cases, creditors allowed these unauthorized, fraudulent transactions by providing payoff letters and applying the proceeds of these sales to pay down debt owed to them, thereby benefitting themselves and the Szkaradeks at FTE's expense.
[9] See Ex. E (Attachments from email by M. Fernandez to A. Szkaradek, dated May 18, 2021)

-18-

28884623v.1

the market due to the fraudulent rent-to-own scheme, and the growing number of state AG and consumer fraud complaints.

95.     Specifically, FTE learned that it could not sell a vast majority of the properties due to injunctions, stop orders, and other actions taken by state AGs and consumer protection groups in several states, including Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania and Wisconsin.

**D.      The April 2021 Amendment and Conspiracy to Take Over FTE Management**

96.     As originally intended, the Vision transaction was to be paid through an exchange of FTE common stock, with FTE always maintaining the controlling voting rights of the company. FTE, however, was ultimately de-listed.

97.     On April 2, 2021, FTE and the Szkaradeks therefore amended the consideration paid to the Szkaradeks as follows:

a.      The promissory note of $9.75 million was increased to approximately $10.7 million to account for accrued interest and certain debt paydowns made to FTE's creditors (by way of FixPads sales made without FTE's consent);

b.      40% of the common equity in FTE, which equated to 22,063,376 shares (half of which, or 11,031,688, were designated for the vicitims of Singal's SEC fraud, the FC REIT and its shareholders); and

c.      $20 million of preferred shares, which could be converted into another 9% of common shares, which would provide up to 49% total equity in FTE.

98.     The amendment also required FTE to deed back all of the FixPads properties to the Szkaradeks free and clear, which were approximately 220 at the time, down from nearly 280.

28884623v.1

99.     Importantly, as a material part of the amendment – and as part of the overriding Singal "firewall" in effect since December 2019 – the Szkaradeks were prohibited from transferring any of their shares to Singal, family members or affiliates.[10]

100.    Yet, true to form, in furtherance of the conspiracy with Singal, the Szkaradeks have attempted to transfer *all* of their consideration from the transaction – debt, preferred equity and common equity of FTE – to Singal's affiliates and family members, including Singal's wife Majique Ladnier and Defendant Innovativ (owned and controlled by Defendant Thomas Coleman), in direct violation of the April 2021 Amendment and the "firewall".[11]

101.    Also true to form, these fraudulent transfers would not have been possible without the knowledge and participation of Singal's cronies in FTE's board and management – Defendants Cunningham, Ghishan and Goodwin – and other co-conspirators, all of whom were in direct communication with Singal and each other, passing on highly confidential information about FTE to a known racketeer and fraudster.

102.    Indeed, the scheme to take control of FTE began as early as April 2020 when Singal sought to transfer 500,000 of his shares in a private secondary transaction to Defendant Innovativ (owned and controlled by Defendant Thomas Coleman), which at the time, did not sound off any alarm bells and was approved by FTE.

103.    But later events would reveal that this was just one step in a long-orchestrated fraud and racketeering scheme by Singal, the Szkaradeks, Coleman, Innovativ and the other co-conspirators to take over control of FTE.

---

[10] A true a correct copy of the April 2021 Amendment is attached hereto as Ex. F.
[11] To hide their fraudulent transfers to Singal and his affiliates, the Szkaradeks and their co-conspirators made the transfers in ways designed to avoid detection, including the use of a Wyoming shell company.

-20-

Case 1:22-cv-05960-PGG Document 1-1 Filed 07/13/22 Page 23 of 222

104.    In October 2019, Singal first acquired approximately 20% of FTE's then outstanding common shares due, in part, to his knowingly false representations that he would secure further future financing for FTE. Specifically, on October 22, 2019, the FTE Board approved the issuance of 4,193,684 shares of FTE common stock to TTP8, an entity owned and controlled by Singal, in connection with the conversion of approximately $2 million in unsecured debt (a large portion of this unsecured debt belonged to Chris Ferguson, a former member of FTE's board of directors).[12]

105.    In early 2020, pursuant to a Court Order issued by the Common Pleas Court of Allegheny County, Pennsylvania (the venue of a pending suit in which the Szkaradeks and certain affiliated entities were sued for, among other things, having allegedly engaged in a series of fraudulent practices involving Pennsylvania consumers), the Szkaradeks were enjoined from transferring any consideration received in connection with the Vision Purchase Agreement and agreed to assign any proceeds or consideration received in connection with the Vision Purchase Agreement into an escrow account controlled by the Pennsylvania AG.

106.    Shortly after the injunction was issued, Singal and TTP8 proceeded to transfer nearly all of their preexisting FTE common shares to affiliates.

107.    In or around May 2020, TTP8 transferred 702,000 of its 4,193,684 shares of FTE common stock to Defendant Khawaja Zargham bin Aamer, a TTP8 employee, purportedly as payment for certain deferred compensation. The parties to the transfer provided FTE with an opinion of counsel as to why this transfer qualified for an exemption under Securities laws. This opinion was rendered by Ronald J. Logan with Logan Law Firm PLC.

---

[12] On information and belief, Singal and TTP8 have not paid any of the unsecured debt holders any money for the debt Singal and TTP8 acquired from them.

28884623v.1

-21-

108.    In or around May 2020, TTP8 transferred 891,566 of its 4,193,684 shares of FTE common stock to Defendant Danish Mir, another TTP 8 employee, also purportedly as payment for certain deferred compensation. Again, the parties to the transfer provided an opinion of counsel to FTE as to why this transfer qualified for an exemption under Securities laws. This opinion was also rendered by Ronald Logan.

109.    In or around May 2020, TTP8 "distributed" 1,790,118 of its 4,193,684 shares of FTE common stock to Singal's wife, Majique Ladnier, pursuant to a stock distribution agreement. Ronald Logan noted that this distribution did not amount to a change in beneficial ownership, as Singal and Ladnier were spouses and, as such, held an undivided interest in TTP8.

110.    Finally, in or around May 2020, TTP8 transferred 500,000 of its 4,193,684 shares of FTE common stock to Defendant Innovativ (owned and controlled by Defendant Coleman), purportedly in satisfaction of debt owed to Innovativ. An opinion as to why this transfer qualified for an exemption under Securities laws was also rendered by Ronald Logan.

111.    Singal, by and through TTP8, retained only 310,000 shares of the original 4,193,684 shares of FTE common stock.

112.    While these transfers were taking place, FTE and the Szkaradeks discussed amending the Vision Purchase Agreement to reflect FTE's current circumstances. For many months, however, Alex Szkaradek refused to amend the agreement until one of his key demands was met – the appointment of Munish Bansal as the CEO of USHR, the real-estate subsidiary of FTE and its main asset.

-22-

Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 25 of 222

113.    On September 25, 2020, after six months of deliberations and discussions (spearheaded by Ghishan on an almost daily basis, and supported by Goodwin and Cunningham), FTE appointed Munish Bansal as USHR's CEO.[13]

114.    On numerous occasions and as part of FTE's overriding "firewall" of Singal, Bansal was expressly directed not to have any contact with Singal, as were other members of the Board and management of FTE, and Bansal repeatedly claimed to understand and comply with this directive. Nevertheless, FTE recently learned that Singal, Bansal and the Szkaradeks were separately convening calls and exchanging emails through at least December 2020.[14]

115.    With Bansal's appointment in hand, the Szkaradeks were prepared to resume their discussions with FTE regarding an amendment to the Vision Purchase Agreement.

116.    On April 2, 2021, after more than 18 months of negotiations in which Cunningham, Ghishan, Goodwin and Bansal were advocating strenuously for the Szkaradeks, FTE finally executed an amendment to the Vision Asset Purchase Agreement.

117.    As with FTE's overriding "firewall" of Singal, the April amendment to the Vision Purchase Agreement also contained an express prohibition on any transfers of FTE stock to Singal, his family members or affiliates.[15]

118.    Despite this prohibition, a few months later the Szkaradeks began to do just that – to transfer their FTE stock to Singal and his affiliates, namely his wife, Defendant Ladnier, and

---

[13] As part of the fraud and racketeering scheme, Bansal, the Szkaradeks and other co-conspirators – particularly Defendants Cunningham, Ghishan and Goodwin, then members of FTE's board and management – all lied that Bansal had never communicated with Singal, when they all then and there well knew that Singal had identified Bansal and was communicating with him regularly. Fraud and racketeering – particularly by the "independent" directors of a public company – simply do not get more brazen.

[14] It is becoming increasingly clear that Defendants Cunningham and Ghishan were also speaking to Singal during all relevant time periods, without disclosing their communications to FTE.

[15] Several weeks later, Defendant Ghishan began negotiations to resign from the FTE board, and a resignation agreement was executed in August 2021. Similarly, Defendant Goodwin ceased to participate in FTE's board meetings, or in management, shortly after the signing of the April amendment to the Vision Purchase Agreement.

-23-

28884623v.1

Case 1:22-cv-05960-PGG    Document 1-1    Filed 07/13/22    Page 26 of 222

Defendant Innovativ (owned and controlled by Defendant Coleman) – though in a way designed to avoid detection.

119.    Specifically, on October 7, 2021, Erik Doerring, the Szkaradeks' attorney informed FTE that the Szkaradeks were transferring the common stock, preferred stock and promissory notes received in connection with the Vision transaction to Redemption SPV, LLC, a newly formed Wyoming LLC, owned and controlled by the Szkaradeks.[16]

120.    On November 12, 2021, FTE received another email from Doerring attaching copies of (i) a common stock purchase and sale agreement, dated November 10, 2021, between the Szkaradeks and Innovativ (owned and controlled by Defendant Coleman) (the "Innovativ Agreement"), to which Singal and TTP8 transferred 500,000 FTE shares in May 2020, and (ii) a membership interest purchase agreement, dated November 10, 2021, between the Szkaradeks and EEME LLC, an entity controlled by Defendant Majique Ladnier, Singal's wife (the "Ladnier Agreement").[17]

121.    The Innovativ Agreement purported to transfer 11,031,688 shares of FTE common stock to Innovativ in exchange for 7,545,600 units of membership interest of CF RE-CPC SPV II LLC, a Wyoming entity owned by Innovativ.

---

[16] On October 22, 2021, FTE received an email from Doerring attaching the memorialized agreement between the Szkaradek's and the FC REIT in connection with the transfer of 11,031,688 shares to the FC REIT, as required in the April amendment to the Vision Purchase Agreement. However, as of today, the transfer of these shares from the Szkaradeks to the FC REIT has not occurred – to the contrary, Singal, the Szkaradeks and other co-conspirators named herein are refusing to turn over the shares designated for the earliest known victims of Singal's fraud and racketeering, the sharehlders of the FC REIT. In fact, as set forth throughout this complaint, Singal, the Szkaradeks and other coconspirators continue to exercise control over these shares as if they were their own.

[17] Doerring had represented the Szkaradeks in connection with the April amendment to the Vision Purchase Agreement just several months earlier and actively participated in the drafting of the documents and negotiation of all relevant terms and provisions. Without any doubt, Doerring was keenly aware of the express prohibition on transfers to Singal and his affiliates. He was keenly aware of the Singal "firewall" policy underlying that prohibition. And above all, Doerring knew there was a court-ordered prohibition on any transfers of the Szkaradeks' Vision transaction consideration as a result of applicable litigation with the Pennsylvania AG.

-24-

28884623v.1

122.    The Ladnier Agreement purported to transfer the promissory notes and preferred stock in exchange for 1,454,400 units of membership interest of CF RE-CPC SPV II LLC, the same Wyoming entity owned by Ladnier, EEME LLC.

123.    As Singal, the Szkaradeks and their co-conspirators (and even their attorneys) there and then well knew, these transfers and agreements violated several provisions of law including, among other things: (i) the Singal prohibition under the amended Vision Asset Purchase Agreement; and (ii) a Pennsylvania court order which enjoined the Szkaradeks from transferring or otherwise disposing of the consideration received in connection with the Vision Asset Purchase Agreement. What is more, as hindsight now shows, these transfers were part of Singal, the Szkaradeks' and the other co-conspirators' fraud and racketeering conspiracy to illegally take control of FTE.

124.    Just a few weeks after the purported, fraudulent transfers of FTE stock and debt, on December 21, 2021 FTE received a letter from Barry Kazan, an attorney representing Defendant Thomas Coleman, the CEO of Defendant Innovativ, one of Singal's original transferees, demanding to inspect FTE's books and financial records. FTE informed Mr. Kazan that, upon advice from FTE's Nevada counsel, Defendant Coleman was not entitled to inspect FTE's financial records given his holdings fell below 1% of FTE's issued and outstanding stock.

125.    Just over a month later, on February 3, 2022, it became abundantly clear that Innovativ, Singal, his other affiliates, the Szkaradeks, and their co-conspirators, including their appointees to the Board and management of FTE, had been working together – in secret – all along.

126.    Specifically, FTE received a letter from Defendant Innovativ's Nevada counsel (who has since confirmed that he also represents Singal), containing a written consent purporting to amend FTE's bylaws. The 17 signatories to this purported written consent included Singal, the

28884623v.1

Szkaradeks and all their aforementioned (attempted or purported) transferees and co-conspirators, as follows:

- a. Majique Ladnier (signing in her individual capacity);
- b. Danish Mir (signing in his individual capacity);
- c. Khawaja Zargham bin Aamer (signing in his individual capacity);
- d. First Capital Master Advisor, LLC (signed by Singal in his capacity as Manager);
- e. Alex Szkaradek (signing in his individual capacity);
- f. Antoni Szkaradek (signing in his individual capacity);
- g. Stephen Goodwin (signing in his individual capacity);
- h. Peter Ghishan (signing in his individual capacity);
- i. Joseph Cunningham (signing in his individual capacity);
- j. TTP8, LLC (signed by Majique Ladnier in her capacity as an authorized signatory);
- k. Innovativ Media Group, Inc. (signed by Thomas Coleman in his capacity as CEO); and
- l. Chris Ferguson, from whom Singal and TTP8 first acquired FTE common stock through the aforementioned conversion of unsecured debt (an unsigned signature block).

127.    Notably, the shareholders signing the written consent claimed to speak for, and thereby exercise control over, the 11,031,688 shares designated for the initial victims of Singal's fraud and racketeering, the shareholders of the FC REIT. But in fact, the FC REIT categorically and vehemently denies any participation in the written consent and claims that its FTE shares are being used without its authorization and unlawfully – yet another act of fraud by these unrepentant fraudsters.[18]

128.    Immediately upon receiving the written consent, the general counsel for FTE sent an email to Defendant Cunningham, a current director, asking him how his signature appeared on the written consent, and other FTE personnel also confronted him.

---

[18] The FC REIT is attempting to intervene in ongoing litiations in Pennsylvania and Nevada in order to stop Singal, the Szkaradeks and their co-conspirators from using the 11,031,688 shares designated for the FC REIT, as their own. The FC REIT will likely seek to join in this action as well.

129.     Cunningham admitted that he had been speaking with Defendant Coleman of Innovativ, and it became unmistakably clear that he had been passing highly confidential information to Singal, Coleman, the Szkaradeks and other co-conspirators.

130.     Similarly, in a March 17, 2022 affidavit submitted in a related litigation in Nevada, Defendant Coleman himself lays the fraud and racketeering conspiracy bare, admitting in his sworn statement that Cunningham – a sitting director of FTE – had been passing through highly confidential information to other members of the conspiracy.

131.     It is now unmistakably clear that Singal, the Szkaradeks, Cunningham, Ghishan, Goodwin and Coleman, among other co-conspirators, were acting in concert and on behalf of their brazen fraud and racketeering scheme, much to the detriment of FTE's other shareholders and the countless of their other criminal and tortious acts.

## FIRST CAUSE OF ACTION
### (RICO: 18 U.S.C. § 1962)

132.     Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

**A.**     **The Unlawful Activity**

133.     The Enterprise consists of a series of associated-in-fact entities whose common purpose is to defraud innocent private and public investors out of money using the means of wire and mail fraud. The Enterprise is controlled and manipulated by Singal. As demonstrated by Singal's recent indictment for mail and wire fraud, the existence of the Enterprise began by at least 2017 and continues through today.

**B.**     **Culpable Person**

134.     Singal is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is an individual capable of holding a legal interest in property.

135.    At all relevant times Singal was, and is, a person that exists separate and distinct from the Enterprise.

136.    Singal is the mastermind of the Enterprise.

**C.      The Enterprise**

137.    Singal and TTP 8, First Capital Advisor and Innovative ("the Companies") constitute an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

138.    Singal and the Companies are associated in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise through a common scheme designed to defraud both private and public investors.

139.    The Enterprise's conduct constitutes "fraud by wire" and "fraud by mail" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

140.    Singal and the Companies have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of defrauding investors as follows:

**i.       Suneet Singal**

141.    Singal is the mastermind of the Enterprise. He is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which fraudulent schemes the Enterprise will devise, how the schemes will be performed, which of the Companies will participate and how the proceeds of the unlawfully obtained funds will be disbursed among the Enterprise members, including to Singal himself.

142.     In his capacity as the mastermind of the Enterprise, Singal is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes.

143.     Singal has taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise, including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to take unlawful actions, and executing legal documents in support of the Enterprise.

144.     Singal has ultimately benefited from the Enterprise's funneling of the unlawfully obtained proceeds to the Companies and Singal further benefits from the receipt of distributions and commissions by the Companies.

ii.     **TTP8**

145.     TTP8 maintains officers, books, records, and bank accounts independent of Singal and the other Enterprise members. TTP8 is owned on paper by Singal and his wife, Majique Ladnier.

146.     Directly and through Singal and its other agent employees, TTP8 has been an active participant and central person in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's scheme to defraud investors. TTP8 has been and continues to be responsible for acting as a conduit to funnel and disguise unlawfully obtained funds and proceeds of the Enterprise.

147.     In this case, TTP8 was used to funnel: (i) 4,193,684 shares of FTE (which amounted to approximately 20% of the outstanding shares of FTE) to itself in late 2019 by way of conversion of unsecured promissory notes; (ii) 702,000 shares of FTE to Defendant Khawaja Zargham bin Aamer in May 2020 (a TTP8 employee); (iii) 891,566 shares of FTE to Defendant Danish Mir in

May 2020; (iv) 1,790,118 shares of FTE to Singal's wife, Defendant Majique Ladnier, in May 2020; and (v) 500,000 shares of FTE stock to Defendant Innovativ in May 2020.

148.    TTP8 ultimately benefits from the Enterprise's unlawful activity by receiving proceeds from the Enterprise's unlawful schemes.

### iii.    Innovativ

149.    Innovativ maintains officers, books, records, and bank accounts independent of Singal and the other Enterprise members. It is owned on paper by Defendant Thomas Coleman.

150.    Directly and through Singal and its other agent employees, Innovativ has been an active participant and central person in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's scheme to defraud investors. Innovativ has been and continues to be responsible for acting as a conduit to funnel and disguise unlawfully obtained funds and proceeds of the Enterprise.

151.    In this case, Innovativ was used to: (i) acquire 500,000 shares of FTE stock for the Enterprise in May 2020; (ii) purportedly acquire 11,031,688 shares of FTE common stock for the Enterprise on November 10, 2021; (iii) send a records demand letter to FTE via U.S. Mail on December 21, 2021; and (iv) execute a purported amendment to FTE's bylaws on February 3, 2022.

152.    Innovativ ultimately benefits from the Enterprise's unlawful activity by receiving proceeds from the Enterprise's unlawful schemes.

### iv.    First Capital Master Advisor ("FCMA")

153.    FCMA maintains officers, books, records, and bank accounts independent of Singal and the other Enterprise members. On information and belief, it is controlled by Singal.

154.    Directly and through Singal and its other agent employees, FCMA has been an active participant and central person in the operation and management of the Enterprise and its

affairs, and in the orchestration, perpetration, and execution of the Enterprise's scheme to defraud investors. FCMA has been and continues to be responsible for acting as a conduit to funnel and disguise unlawfully obtained funds and proceeds of the Enterprise.

155.    In this case, FCMA was used to: (i) acquire 308,305 shares of FTE stock for the Enterprise; and (ii) execute a purported amendment to FTE's bylaws on February 3, 2022.

156.    FCMA ultimately benefits from the Enterprise's unlawful activity by receiving proceeds from the Enterprise's unlawful scheme.

### D.    Engagement in Interstate Commerce.

157.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

158.    Specifically, the members of the Enterprise maintain offices in California, Utah and Nevada, and use personnel in those offices to further the affairs of the Enterprise involving investor victims throughout the United States via the extensive use of interstate emails, telephone calls, wire transfers and bank withdrawals processed electronically. The members of the Enterprise also use interstate mail to further the common goals of the Enterprise.

159.    In the present case, all communications between the Enterprise and Plaintiff were by interstate email, telephone calls, wire transfers or other interstate wire communications. Specifically, the Enterprise used interstate emails and telephone calls to originate, transfer, and collect upon the unlawful proceeds, consisting of, among other things, securities, stock, and cash.

### E.    Causation and RICO Injury

160.    FTE has and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

161.    The injuries to FTE directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(c) include, but are not limited to, the loss

-31-

28884623v.1

of its stock, monetary damages on monies paid to the Enterprise, diminution in value of its business, loss of goodwill, and opportunity costs due to the lost value of its money and stock.

162.    Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

163.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

164.    Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

165.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

166.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the affairs of the Enterprise, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to engage in a pattern of mail and wire fraud in violation of 18 U.S.C. § 1962(c).

167.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire and mail fraud in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose,

-32-

28884623v.1

namely, the orchestration, planning, preparation, and execution of the scheme to defraud private and public investors across the nation.

168.     Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire and mail fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

169.     The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

170.     By way of specific facts establishing the conspiracy among Defendants:

**Suneet Singal/TTP8:**

    i.    10/22-23/19 – Singal is present at the first (and only in person) meetings of the new FTE board, along with his associates, in New York, NY;

    ii.    10/22/19 – At Singal's direction, the FTE Board appoints Cunningham and Ghishan as "independent" directors and also Goodwin as interim CEO of FTE, with Singal effectively controlling three fifths of FTE's board;

    iii.    10/22/19 – Singal induces the FTE board (which he controlled) to allow him to acquire approximately 20% of the company's common stock through a transaction approved on the same day;

    iv.    10/22/19 – Singal introduces the Vision transaction to the board (which he controlls) of FTE of which he is a 20% shareholder;

    v.    12/11-12/19 – Singal's appointee as Interim CEO, Stephen M. Goodwin, steps down because of the improper share issuance to Singal, and is replaced by Michael Beys;

    vi.    12/16/19 – Singal is charged by the SEC in an unrelated securities fraud scheme for selling real estate assets he did not own;

    vii.    12/17/19 – the improper share transfer to Singal is the impetus for the NYSE commencing delisting proceedings against FTE;

    viii.    12/17/19 – FTE institutes a Singal "firewall," prohibiting FTE's board and management from having any business dealings with Singal, including as to the Vision transaction;

-33-

28884623v.1

ix.    12/30/19 – Singal-originated Vision real estate portfolio is sold to FTE and involves numerous fraudulent misrepresentations about the status of the portfolio;

x.    4/17-5/19/20 – Singal's entity TTP8 purports to transfer 500,000 shares of FTE stock to Innovativ Media Group (owned and controlled by Defendant Coleman), for which attorney Ronald J. Logan provides the legal opinion (4/17/20);

xi.    7/13/21 – Singal enters into a consent judgment with the SEC, agreeing to a 10-year bar from the securities industry and approximately $7M in restitution payments;

xii.    2/3/22 – Singal orchestrates a purported amendment of FTE's bylaws through Innovativ's Nevada counsel;

xiii.    4/7/22 – Singal is indicted by for a separate wire and mail fraud scheme, and the indictment is unsealed on 4/18/22;

**Steven M. Goodwin, ex Interim CEO of FTE**

i.    2/9/16 – Goodwin has long-standing ties to Singal, having been his partner in the controversial Township Nine project in Sacramento, CA (https://www.prnewswire.com/news-releases/first-capital-real-estate-trust-incorporated-acquires-92-interest-in-a-78-million-development-site-300217220.html);

ii.    1/31/19 – Goodwin is named as trustee of an unrelated Singal Trust, with a recent litigant noting that he is a "friend and business partner of Singal" (https://casetext.com/case/red-lion-hotels-franchising-inc-v-first-capital-real-estate-invs-2);

iii.    10/22-23/19 – Goodwin is present at the first (and only in person) meeting of the new FTE board, in New York, NY;

iv.    10/22/19 – Goodwin is named interim CEO of FTE, and controls 3/5ths of the FTE board along with his close friends Cunningham and Ghishan; (his bio was forwarded to FTE on 10/18/19 by Defendant Aamer, the Director of Strategy of Defendant FCMA);

v.    10/22/19 – Goodwin causes FTE, as the new board's first order of business, to approve a transaction whereby Singal and TTP8 are set to acquire 20% of the company's common stock;

vi.    10/22/19 – Goodwin starts to promote the Vision transaction to FTE and to advocate on behalf of the Szkaradeks – continuously – until April 2021 when the transaction is formally amended;

-34-

vii. 12/11/19 –Goodwin steps down as interim CEO after it is discovered that the Singal share acquisition transaction violated NYSE rules;

viii. 12/11/19 – Goodwin remains as Executive Vice President of Operations of FTE and is invited to all FTE board meetings as an observer until approximately April or May 2021;

ix. 12/17/19 – Goodwin is subject to the Singal "firewall" policy, prohibiting FTE's board and management from having any business dealings with Singal, including as to the Vision transaction, though he fraudulently conceals repeated violations of it;

x. 12/30/19 – Singal-originated Vision real estate portfolio, which Goodwin supports and advocates for, is sold to FTE and involves numerous fraudulent misrepresentations about the status of the portfolio;

xi. 1/20 – Goodwin's main role starting in 2020 and through the first quarter of 2021 is to negotiate *on behalf of FTE* with the Szkaradeks, though in fact, with the benefit of hindsight, the opposite occurs and Goodwin's sole motivation is to advance the goals and interests of Singal, the Szkaradeks and the fraud and racketeering conspiracy (fraudulently concealing that he was speaking with Singal);

xii. 2/12/21 – Goodwin is issued 250,000 shares of FTE common stock pursuant to his employment agreement;

xiii. 04/ 21 – Goodwin continuously attends FTE board meetings as an observer up until this point, with the signing of the Second Amendment to the Vision Purchase Agreement;

xiv. 2/3/22 – Goodwin is a signatory to the purported bylaws amendment, sent through Innovativ's Nevada counsel;

xv. 3/16/22 – Goodwin's employment is formally terminated;

**Joseph F. Cunningham, current director of FTE, and Peter Ghishan, ex director of FTE**

i. 9/20/14 – Ghishan, an attorney, is the registered agent in Nevada for First Capital Partners LLC (part of the family of Singal's First Capital companies), which he co-manages with Singal, using the same address (https://www.bizapedia.com/nv/first-capital-partners-llc.html);

ii. 10/18/19 – Cunningham and Ghishan, both of whom had long-standing ties to Singal, are appointed to the FTE board on Singal's recommendation (https://d1io3yog0oux5.cloudfront.net/_ec27a35eced2f2e95bb2e8193e18a ed2/ftenet/news/2019-10-18_FTE_Networks_Receives_Notice_of_Noncompliance_159.pdf);

-35-

28884623v.1

iii.   10/22-23/19 – Cunningham and Ghishan are present at the first (and only in person) meetings of FTE's new board in New York, NY, and vote in favor of all Singal-related matters on that date, including the appointment of Goodwin as interim CEO, the Singal acquisition of FTE common shares transaction and the decision to pursue the Vision purchase transaction;

iv.   12/17/19 – Cunningham and Ghishan are subject to the Singal "firewall" policy, prohibiting FTE's board and management from having any business dealings with Singal, including as to the Vision transaction, though they fraudulently conceal repeated violations of it;

v.   12/30/19 – Singal-originated Vision real estate portfolio, which Cunningham and Ghishan support and advocate for, is sold to FTE and involves numerous fraudulent misrepresentations about the status of the portfolio;

vi.   1/20 – Almost immediately from the start of 2020, Cunningham and Ghishan, along with Goodwin as a shadow director, control the board of FTE and, with the benefit of hindsight, clearly seek to advance the interests of the RICO enterprise and the goals of the conspiracy over the interests of any other constituency; among other things, they seek to infiltrate the management of FTE by hiring Munish Bansal, fraudulently concealing the fact that Singal had identified and recommended him; they seek to gain more FTE shares on behalf of Singal and other members of the conspiracy; they advocate exclusively for the interests of the Szkaradeks whose Vision transaction was at the heart of the fraud and racketeering conspiracy; they unlawfully seek to recuse another director from all FTE board decisions, at the behest of Singal and the Szkaradeks; and finally, they continuously seek to put FTE and all its subsidiaries into bankruptcy even when there is no legitimate interest in, or legal basis to, do so;

vii.   1/30/20 – Email correspondence shows that Munish Bansal has first contact with Singal;

viii.   2/20 – Cunningham and Ghishan promote Munish Bansal as future CEO of FTE, fraudulently concealing that Singal has identified and recommended him and stating instead that they and Alex Szkaradek have identified him;

ix.   3/25/20 – Ghishan email describes his conversation with Bansal, saying he would be a "good fit;"

x.   4/16/20 – Email correspondece shows Singal reaching out to an FTE shareholder about Bansal (and forwarding the underlying 1/30/20 email to him);

xi.   4/17/20 – Cunningham and Ghishan are privy to and support Singal and TTP8's transfer of 500,000 shares of FTE common stock to Defendant

-36-

Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 39 of 222

Innovativ (owned and controlled by Defendant Coleman), for which attorney Ronald J. Logan provides the legal opinion (4/17/20);

xii.    9/25/20 – Bansal's employment commences after months of advocacy by Cunningham, Ghishan and Goodwin;

xiii.   10/1/20 – Bansal's employment announced on Form 8K. (https://www.sec.gov/Archives/edgar/data/1122063/000149315220018679/for_m8-k.htm); in his short time, Bansal works almost exclusively to advance the interests of Singal, the Szkaradeks and the fraud and racketeering conspiracy and manages to fire employees not loyal to them, namely Eric Taylor, among myriad other acts designed to sabotage the company;

xiv.    11/ /20 – Cunningham, Ghishan and Goodwin (and at times Bansal) begin to negotiate an amendment of the initial Vision transaction, always seeking to recuse other FTE directors and advocating for the interests of the Szkaradeks and other members of the conspiracy over those of other FTE shareholders;

xv.     2/12/21 – Cunningham and Ghishan are issued 150,000 shares of FTE common stock each;

xvi.    4/2/21 – The Second Amendment to Vision Purchase Agreement is signed, after months of negotiations by Cunningham, Ghishan and Goodwin on behalf of the the Szkaradeks and other members of the conspiracy;

xvii.   4/15/21 Bansal's separation is announced (https://www.sec.gov/Archives/edgar/data/1122063/000149315221009575/for m8-k.htm);

xviii.  5/3/21 – Cunningham, Ghishan and Goodwin, on their own initiative, organize meeting with potential Nevada bankruptcy counsel for FTE, which only they attend, where they and Harris advocate to put FTE, and all its subsidiaries, into bankruptcy, despite there being no legitimate interest in, or legal basis to, do so;

        (Cunningham continues to advocate for bankruptcy even after countless attorneys and other advisors counsel against it);

xix.    7/13/21 – After months of Cunningham, Ghishan and Goodwin stating that Singal was about the settle with the SEC on very favorable terms, Singal enters into a consent judgment with the SEC, agreeing to a bar from the securities industry and approximately $7M in restitution payments;

xx.     8/25/21 – Ghishan resigns from FTE board pursuant to separation agreement (attached);

28884623v.1

xxi.    11/10/21 – Cunningham, the last of the three initial co-conspirators remaining on the board, is told of the Szkaradeks' attempts to transfer their FTE common shares, preferred equity and promissory notes to other members of the conspiracy, namely, Defendant Innovativ and Defendant Majique Ladnier (Singal's wife);

xxii.   12/21/21 – Cunningham is told of Innovativ's demand to inspect FTE's books and records;

xxiii.  1/ 22 – Starting in early 2022, Cunningham is aware that FTE is preparing to sue Singal and the Szkaradeks (and possibly Innovativ) and to erect defenses to any countersuit and discloses these facts to Tom Coleman, Innovativ's President, and other members of the conspiracy;

xxiv.   1/28/22 – Cunningham participates in a highly confidential FTE board call where litigation with Singal, the Szkaradeks and other members of the conspiracy is discussed and discloses this highly confidential information to Coleman and other members of the fraud and racketeering conspiracy, as Cunningham himself admits on February 3, 2022 and Coleman also admits in a sworn affidavit on March 17, 2022;

xxv.    2/3/22 – Cunningham and Ghishan are signatories to the purported bylaws amendment, sent through Innovativ's Nevada counsel;

**Innovativ/Tom Coleman Fraudulent Conduit for Singal**

i.      4/12/19 – Tom Coleman, President of Innovativ, has preexisting relationship with Singal, as shown in an LOI's Notices provision (https://contracts.justia.com/companies/global-tech-industries-group-inc-6687/contract/66625/);[19]

ii.     4/17-5/19/20 – Innovativ and Coleman receive 500,000 FTE common shares from Singal's entity TTP8, for which attorney Ronald J. Logan provides the legal opinion;

iii.    11/10/21 – Innovativ and Coleman attempt to receive 11,031,688 shares from the Szkaradeks as a part of a series of transactions also involving

---

[19] The LOI also demonstrates an important, preexisting connection between Coleman, Singal and another co-conspirator, Defendant Ghishan, FTE's former director.  Specifically, Defendant Ghishan's "Massey Oaks" development project in Houston, Texas, which he owns and manages through Massey Oaks LLC, a Nevada company (https://opencorporates.com/companies/us_nv/E0279802017-4), is listed on Exhibit B of the LOI as one of the real estate assets to be contributed to the transaction with Coleman and Singal.  Upon information and belief, Singal and others acting in concert with the charged Enterprise, along with several other named co-conspirators, are currently working together on the "Massey Oaks" project in Houston, presumably using many of the same fraud and racketeering tactics they have brought to bear on FTE.  FTE's investigation as to defendant Ghishan's "Massey Oaks" development project is continuing.

-38-

Singal's wife, Defendant Majique Ladnier, and all of the Szkaradeks' common and preferred equity and debt of FTE;

iv.     12/21/21 – Innovativ and Coleman make demand to inspect FTE's books and records;

v.      1/22 – As set forth in Coleman's March 17, 2022 affidavit, Innovativ and Coleman receive highly confidential information from Cunningham from FTE's board meeting in mid-January 2022, including one meeting in particular on January 28, 2022, forming the basis for the purported bylaws amendment 4 business days later;

vi.     2/3/22 – Innovativ, speaking for purported majority of FTE shareholders, purports to amend FTE's bylaws to prohibit certain corporate acts, which Cunningham, a sitting FTE director and co-conspirator who had been privy to FTE's highly confidential decision-making, had unlawfully disclosed to him;

vii.    3/17/22 – Coleman provides an affidavit in a related litigation in Nevada, in which he admits that Cunningham provided highly confidential information to him. *See* Ex. G.

**Bruce Fahey**

i.      Fahey has a criminal history of bribery: https://www.buchwaldcapital.com/PDF/McCann_article_Deal_032906.pdf https://www.nytimes.com/1998/03/27/nyregion/bid-rigging-case-engulfs-an-elite-who-built-the-interiors-of-offices.html;

ii.     He is at it again;

iii.    Fahey holds 400,000 shares of FTE common stock pursuant to a purported consulting agreement given to him by Palleschi and Lethem (both of whom are currently under indictment in the Southern District of New York for their own defrauding of investors and embezzlement);

iv.     In late 2019, the FTE board nullified the consulting agreement (and the underlying shares); Fahey was advised of this nullification but has refused to return the shares;

v.      On May 4, 2022, Fahey, in an attempt to extort money from Plaintiff in violation of the Hobbs Act, 18 U.S.C. § 1951, sends the following email to the CEO of FTE, Michael P. Beys (a former Assistant U.S. Attorney for the Eastern District of New York):

"We are shareholders of FTE Networks Inc. FTE has not updated it's required 10ks and10Qs, along with no apparent concern or responsibility for same... Creating, once again, the need for shareholders to suspect new

-39-

wrongdoings. The promises and projections you made after the acquisition of US Home Rentals, have resulted in nothing, along with no followup, leaving shareholders with no liquid value. The March 25, 2022 communication referenced legal issues and ,once again, provided essentially no details. Is the clawback of [one prior FTE] asset one of those issues? ... We have also learned, not from you, but rather from publicly available information, that FTE is defaulting on obligations. Additionally, in Pennsylvania a receiver may be appointed. this ongoing shareholder abuse and complete lack of corporate governance creates an atmosphere of suspicion and we will not be denied accountability. ... We, along with of other shareholders. totaling millions of shares, demand financials and a shareholder meeting."

vi.   On May 6, 2022, Fahey, once again in an attempt to extort money from Plaintiff in violation of the Hobbs Act, 18 U.S.C. § 1951, sends the following email to two FTE shareholders threatening them with baseless personal civil litigation:

"You are soon to learn that you are named by the plaintiff in the Nevada lawsuit vs FTE. The term I am told is co conspirator. I believe that is specific to you []. The [Nevada] plaintiff is deep pocketed and planning to take very aggressive and well planned measures to cause the liquidation of FTE . You [] will now be swept up in this and need to defend yourselves in Nevada and everywhere else you will be pursued. i.e. Federal bankruptcy court. This process is also going to have press coverage. Personally, I will have no problem watching you pay for your never-ending defense and continued exposure, including depositions and the press. Actually, I will get a good laugh out of it. ... There is however a potential for a global solution ,which will allow you [] to continue with your agreement. ... It's fairly simple, [you] must give up all [your] interest in FTE. This would allow the abused shareholders a chance at small recovery through the liquidation process. ... My relationship with the [Nevada] plaintiff and my specific skill sets makes this path only available through me as adviser/ consultant. ... If interested , each of you will pay a 250k fee to me. 75k each as deposit the balance at settlement closing. ... Otherwise, you guys can continue as defendants and knock the crap out of each other for years to come. I am good either way."

vii.   On information and belief, Fahey's extortionate and unlawful threats above were made in conspiracy with, and at the direction of, Singal and other co-conspirators.

171.   Plaintiff has been and will continue to be injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d).

Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 43 of 222

172.    The injuries to the Plaintiff directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, the loss of its stock, monetary damages on monies paid to the Enterprise, diminution in value of its business, loss of goodwill, and opportunity costs due to the lost value of its money and stock.

173.    Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

174.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages, plus costs and attorneys' fees from the Defendants.

### THIRD CAUSE OF ACTION
### (Fraudulent Inducement and Fraud)

175.    Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

176.    Singal in conjunction with the Szkaradeks have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to fraudulently induce Plaintiff into entering into the Vision Purchase Agreement (originally and as amended).

177.    By and through each of the Szkaradeks' business relationships with one another and Singal, their close coordination with one another in the affairs of the Vision portfolio, each knew the status and nature of the Vision portfolio, including liens, encumbrances, and ongoing litigation. Moreover, through the same connections and coordination, each knew that each other were engaged in a conspiracy to fraudulently induce Plaintiff into the Vision Purchase Agreement (originally and as amended) providing negative equity.

178.    The Szkaradeks, in conspiracy with Singal, agreed to facilitate, conduct, and participate in the conduct, management, or operation of Vision's affairs in order to procure millions of dollars in exchange for a portfolio of extremely compromised properties. In particular, the Szkaradeks, in conspiracy with Singal, were a knowing, willing, and active participant in

-41-

28884623v.1

Vision and its affairs, and each shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit and collect upon their fraudulent misrepresentations, including the Purchase Agreement.

179.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of Vision's affairs in order to commit fraud.

180.    The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

181.    Plaintiff has been and will continue to be injured in their business and property by reason of the Defendants' fraud, in an amount to be determined at trial.

182.    The injuries to Plaintiff were directly, proximately, and reasonably caused by these fraudulent misrepresentations and conspiracy to commit fraud.

183.    Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' unlawful activities.

## FOURTH CAUSE OF ACTION
### (Tortious Interference with Contract)

184.    Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

185.    The Vision Purchase Agreement expressly provides that no FTE stock may be transferred directly or indirectly to Singal, his family members, or his affiliates.

186.    The April 2021 Amendment included a similar prohibition, consistent with FTE's long-standing "firewalling" of Singal because of the SEC's securities fraud charges against him.

187.    Singal was at all relevant times fully aware of these contractual prohibitions and the "firewall."

188.    Despite these clear prohibitions, the Szkaradeks and Singal conspired with each other to tortiously interfere with these contracts by surreptitiously transferring 11,031,688 shares

28884623v.1

of FTE (which were promised to be transferred to the primary victims of Singal's SEC fraud, the shareholders of the FC REIT), to Singal, his family and/or his affiliates through the use of sham Wyoming shell companies, as well as Defendants Innovativ and TTP8.

189.    Specifically, the Szkaradeks, in conspiracy with Singal, have agreed to transfer 11,031,688 of their own FTE common shares to Defendants Innovativ and Coleman, co-conspirators of Singal that are acting in concert with Singal, his family members and/or affiliates.

190.    The transfer of these FTE shares is a direct breach of both the Purchase Agreement, the April 2020 Amendment and the general "firewalling" of Singal resulting from the SEC's serious securities fraud charges against him.

191.    If Singal, his affiliates, and family members are not disgorged of these FTE shares and/or enjoined from receiving any further FTE shares, FTE and its shareholders will be irreparably harmed by allowing Singal to possess and/or control a contractually prohibited equity interest in FTE, even though he is currently under a federal indictment for wire and mail fraud, has been banned from the securities industry for a period of ten years, and is prohibited from acting as an officer or director of a public company. Simply put, Singal and his affiliates must not be allowed to have any association with or control over the affairs of FTE.

## FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty as against Goodwin, Ghishan and Cunningham)

192.    Plaintiff repeats and re-alleges the allegations above.

193.    As officers and/or directors of FTE, a fiduciary relationship existed between FTE, Goodwin, Ghishan and Cunningham.

194.    As officers and/or directors of FTE, the parties had a relationship of trust and confidence whereby Goodwin, Ghishan and Cunningham were bound to exercise the utmost good faith and undivided loyalty toward FTE throughout the relationship.

-43-

28884623v.1

195.    As described in detail above, Goodwin, Ghishan and Cunningham breached their fiduciary duties to FTE.

196.    As a direct result of these breaches of fiduciary duty, FTE was proximately damaged by, among other things, the loss of its stock, monetary damages on monies paid to Defendants, diminution in value of its business, loss of goodwill, and opportunity costs due to the lost value of its money and stock.

197.    In addition, FTE has suffered damages by incurring attorneys' fees and costs associated with the breaches of fiduciary duty.

### PRAYER FOR RELIEF

**WHEREFORE**, FTE demand judgment in its favor against Defendants, jointly and severally, and seek a judgment:

a)    Enjoining Singal, his affiliates, and family members from receiving any of FTE common or preferred shares of stock;

b)    Enjoining Singal from transferring any FTE common or preferred shares of stock to Innovativ, his family members, or affiliates;

c)    Disgorging all FTE shares of stock possessed by Singal, his family members, and affiliates and directing those shares to be returned to FTE;

d)    Disgorging all FTE shares of stock possessed by all Defendants, and directing those shares to be returned to FTE;

e)    Awarding compensatory, direct, consequential, and treble damages, including prejudgment interest, in an amount to be determined at trial;

c)    Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

d)    Any further relief deemed appropriate by the Court.

-44-

28884623v.1

Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 47 of 222

Dated: May 11, 2022

**WHITE AND WILLIAMS LLP**

By: _____

Shane R. Heskin, Esq.
7 Times Square, Suite 2800
New York, NY 10036
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for FTE Networks, Inc.*

-45-

28884623v.1

## VERIFICATION

I, Michael P. Beys, Chief Executive Officer of FTE Networks, Inc., am an attorney at law and am authorized to execute this Verification.  I hereby certify that on behalf of FTE, I have read the Complaint that has been drafted by my counsel.  The factual statements contained therein are true and correct to the best of my knowledge, information and belief although the language is that of my counsel, and, to the extent that the foregoing document is that of counsel, I have relied upon counsel in making this Verification.

I affirm that the foregoing statements are true under penalty of perjury.


_____
Michael P. Beys


Dated: May 11, 2022_____

-46-

Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 49 of 222

# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 05/11/2022 12:43 PM
INDEX NO. 652225/2022
NYSCEF DOC. NO. 113
RECEIVED NYSCEF: 05/11/2022

Case 1:22-cv-03960-PGG   Document 1-1   Filed 07/13/22   Page 50 of 222

SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v...., 2019 WL 6827346...

2019 WL 6827346 (S.D.N.Y.) (Trial Pleading)
United States District Court, S.D. New York.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Suneet SINGAL, First Capital Real Estate Trust Inc., First Capital Real Estate Advisors, LP, and First Capital Real Estate Investments, LLC, Defendants.

No. 1:19-CV-11452.
December 13, 2019.

**Complaint**

Derek S. Bentsen (DB-8369), Joshua E. Braunstein (pro hac to be filed), Matthew F. Scarlato (pro hac to be filed), Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, Telephone: (202) 551-6426 (Bentsen), Email: BentsenD@sec.gov, for plaintiff.

JURY TRIAL DEMANDED

Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), files this Complaint against Defendants Suneet Singal ("Singal"), First Capital Real Estate Trust Inc. ("FC REIT"), First Capital Real Estate Advisors, LP ("FC REIT Advisor"), and First Capital Real Estate Investments, LLC ("FC Private"), and alleges as follows:

*SUMMARY*

1. This case is about two separate frauds Suneet Singal perpetrated that involved two public companies—a real estate investment trust ("FC REIT") and a business development company ("BDC")—between September 2015 and at least March 2018.

2. In the fraud involving FC REIT, Singal purported to contribute 12 hotels *that he did not own* to close a business deal related to FC REIT that personally benefitted him. He then made numerous material misrepresentations in public SEC filings concerning FC REIT's ownership of the hotels. As part of the deal, Singal received consideration valued at more than $15 million for the hotels. Singal's sham contribution diluted the value of FC REIT's shares and resulted in FC REIT selling shares at inflated prices to unsuspecting investors.

3. With respect to the BDC, Singal engaged in a course of fraudulent conduct while he was a director and investment adviser to the BDC, and he owed a fiduciary duty to the BDC. As a fiduciary, Singal had a duty to act in the best interests of the BDC, to employ reasonable care to avoid misleading the BDC, and to not engage in self-dealing. Instead, and in breach of that duty, Singal lied about his conflicts of interest and misappropriated money that the BDC lent—as its largest investment—to a company he secretly controlled ("Company A").

4. Singal further breached his fiduciary duty by failing to monitor and provide advice about the BDC's investments as required by the advisory contract. Singal failed to disclose the deteriorating financial condition of Company A, which he directly caused by misappropriating more than $2 million from it and by taking out fraudulent loans against it. His misconduct drove Company A into bankruptcy, resulting in a total loss of the BDC's investment. Singal also made material omissions in SEC public filings concerning his relationship with Company A.

5. By engaging in the fraudulent conduct described in this Complaint, Singal and the Defendant entities named above violated the federal securities laws as set forth in the Claims Section below.

6. Unless permanently restrained and enjoined, Defendants are reasonably likely to continue to violate the federal securities laws. For that reason, the Commission seeks the equitable and monetary relief set forth below.

### JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)]; Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]; Section 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-14], Section 44 of the Investment Company Act of 1940 ("Company Act") [15 U.S.C. § 80a–43]; and 28 U.S.C. § 1331.

8. Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. s 80b-14], and Section 44 of the Company Act [15 U.S.C. § 80a–43], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged herein occurred within this judicial district. For example, during all relevant times, FC REIT's principal office was located in New York, New York, and Singal engaged in many of the acts described in this Complaint there.

9. In connection with the transactions, acts, practices, and courses of business alleged in this Complaint, Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange.

### DEFENDANTS AND RELEVANT ENTITIES

#### I. Defendants

10. **Suneet Singal** ("**Singal**"), age 41, resides in El Dorado Hills, California. Singal is the Chief Executive Officer ("CEO") and chairman of FC REIT's board of directors, as well as the beneficial owner and CEO of FC REIT Advisor. In addition, Singal owned a 24.9% beneficial ownership interest in the BDC's investment adviser ("BDC Advisor") from October 12, 2016, to April 2, 2017, and was the sole beneficial owner of the BDC Advisor from April 3, 2017, to March 2018. Singal served on the BDC Advisor's investment committee from at least December 2016 to March 2018 and was, during various periods, a director, as well as the Acting CEO and Chief Financial Officer ("CFO") of the BDC. Singal is the sole member and manager of FC Private.

11. **First Capital Real Estate Trust, Inc.** ("**FC REIT**") is a public, non-traded REIT incorporated in Maryland, with its principal office located in New York, New York. Generally, a REIT, or real estate investment trust, is a company that owns income-producing real estate or real estate-related assets. The income-producing real estate assets owned by a REIT may include real assets such as a hotel, an apartment, or commercial building.

12. FC REIT does not have any employees; nor does it have a class of securities registered under Section 12(b) or 12(b) of the Exchange Act; but it is subject to the Exchange Act's reporting obligations pursuant to Section 15(d) because it filed a registration statement that became effective August 15, 2012, and several post-effective amendments that later became effective, the last one on May 8, 2015. FC REIT has been delinquent in its periodic filings with the SEC since the quarter that ended September 30, 2015, but has continued to file current reports on Forms 8-K. FC REIT offered and sold securities—*i.e.*, shares of common stock to the public pursuant to a registration statement filed with the SEC—between August 2012 and April 2016.

13. FC REIT generally does not directly own real estate, but rather owns interests in its operating partnership. FC REIT's operating partnership in turn holds FC REIT's real estate and real estate related assets. The value of FC REIT's operating

partnership interests or units and the common shares it issues to investors are economically equivalent. The REIT's operating partnership sometimes acquires property by issuing operating partnership units ("OP Units") to the seller, as it did with Singal.

14. **First Capital Real Estate Advisors, LP** ("**FC REIT Advisor**") is a Delaware limited partnership headquartered in New York, New York that serves as the external adviser to FC REIT. FC REIT Advisor manages the day-to-day operations of FC REIT and FC REIT's operating partnership, including, among other things, assisting FC REIT in preparing, reviewing and filing all documents FC REIT is required to file with the SEC. Singal beneficially owns FC REIT Advisor.

15. **First Capital Real Estate Investments, LLC** ("**FC Private**"), is a single member California limited liability company, founded by Singal in 2008, that operates as a commercial and residential real estate investment firm and acts as a private holding company for several of Singal's businesses. Singal is the CEO, founding principal, sole member and sole manager of FC Private. Singal conducted most of the business transactions at issue in this Complaint through FC Private.

## II. Relevant Entities

16. **The BDC** was, at all relevant times, an externally managed, non-diversified, closed-end management investment company that elected to be regulated as a business development company under the Company Act. BDCs are deemed to be registered closed-end funds with respect to certain provisions of the Company Act. The BDC was incorporated in Maryland in 2014, and it began operating on February 16, 2017. The Company Act requires a majority of a BDC's directors to be independent directors. Singal served as an interested member of the BDC's board of directors from March 30, 2017 to March 13, 2018, including serving as chairman from March 30, 2017, to September 12, 2017. Singal served as the BDC's acting CFO from June 21, 2017, to March 13, 2018, and as the BDC's acting CEO from September 12, 2017, to March 13, 2018. The BDC offered and sold securities—*i.e.*, shares of common stock to the public pursuant to a registration statement filed with the SEC—between approximately February 3, 2017, and April 28, 2017.

17. **The BDC Advisor** was at all relevant times an unregistered private advisory firm that served as the external investment adviser to the BDC. The BDC had no employees and relied on the BDC Advisor to provide the BDC's executive officers and to manage the BDC's day-to-day investment and administrative operations pursuant to a written investment advisory agreement. Through FC Private, Singal acquired 24.9% ownership interest in the parent company that owned the BDC Advisor on October 12, 2016, with an option to acquire a controlling interest at a later date. Singal, through FC Private, acquired the remaining ownership interest in the parent company that owned the BDC Advisor on April 3, 2017. The only two investments that the BDC made before Singal acquired a 100% beneficial ownership interest in the BDC Advisor were in Company A, and they were made at Singal's recommendation.

18. Singal was a member of the BDC Advisor's three-person investment committee, which was responsible for approving and managing all BDC investments. The BDC Advisor was compensated under the terms of the advisory agreement for its services through a base asset management fee and an incentive fee based on performance. For example, during 2017, the BDC paid the BDC Advisor more than $28,000 in management fees for its services. Singal sold the BDC Advisor to an unrelated third party on or about March 13, 2018.

19. **Company A**, at all relevant times, was a Nevada limited liability company headquartered in California that owned and operated franchised fast food locations that sold baked goods. Singal, through FC Private, owned 100% of the membership interests in Company A until February 23, 2017, at which point Singal sold 100% of the membership interests to the person who had been managing the day-to-day operations of the business for him (the "Company A Manager") in exchange for an $11.5 million promissory note. Company A filed for bankruptcy on September 14, 2017.

20. **Company B** was, at all relevant times, a Nevada limited liability company that provided human resources and operations services to FC Private and its subsidiaries, including Company A—both before and after the sale. Singal (through FC Private) owned a 50% interest in and controlled, as managing member, Company B. Singal continued to control Company A through

Company B after he sold Company A. An employee of Company B (the "Controller") performed cash management and accounting functions for both Company A and FC Private. This arrangement continued after the sale of Company A until approximately August 2017 and allowed Singal to continue to have the power to exercise a controlling influence over the management and policies of Company A. Company B has since been dissolved.

### FACTS

### I. Fraudulent Conduct Relating to FC REIT

### A. Singal Fraudulently Purported to Contribute Certain Hotels that He Did Not Own to FC REIT as Part of his Purchase of FC REIT Advisor

21. On September 15, 2015, in connection with his purchase of FC REIT Advisor, Singal, acting through FC Private, purported to contribute to FC REIT certain real estate assets, contract rights, and associated debt with an overall net asset value of $41,777,402. In exchange for this purported contribution, FC REIT issued 3,344,868 OP Units, at a price of $12.49 per OP Unit. At that time, the OP Unit price represented the stated value of a share of FC REIT's common stock.

22. Singal did not have sufficient cash to buy FC REIT Advisor. Consequently, the seller of FC REIT Advisor agreed to have Singal contribute sufficient additional property to enable him to buy FC REIT Advisor without requiring him to pay substantial cash at closing.

23. Singal needed the seller to believe he owned all of the property the parties contemplated he would contribute. That is because Singal would not otherwise have had enough property to contribute to FC REIT, and he would not otherwise have been able to buy FC REIT Advisor.

24. However, Singal did not own some of the properties that he purported to contribute to FC REIT—specifically 12 limited service hotels with an assigned net equity value of approximately $15.2 million ("the Hotels"). For several months, Singal had been in negotiations with the principals of the entities that owned the Hotels at issue (the "Hotel Principals") to buy the Hotels, but Singal had not succeeded in acquiring the Hotels as of September 15, 2015.

25. The Hotels, some of which were in bankruptcy, could not be sold to Singal without the consent of the investors in the entities that owned the Hotels, the Hotel lenders, and, for the Hotels in bankruptcy, the bankruptcy court.

26. On September 15, 2015, at Singal's urging, and on very short notice, the Hotel Principals travelled from Texas to FC REIT's New York offices; but they left that evening without signing any documents or assigning their interests in the Hotels to Singal's private company.

27. On September 15, 2015, Singal, acting through FC Private, nonetheless purported to contribute the Hotels to FC REIT on that same day by executing several "Assignment and Assumption of Membership Interest" agreements that falsely represented that FC Private "own[ed] 100% Percent of the Membership Interests" in the entities that owned the Hotels, and that title to the Hotels was "good and marketable."

28. The assignment agreements, which Singal signed on behalf of FC Private, also falsely represented that the membership interests were "owned entirely by" FC Private and that FC Private had "full power and authority" to execute the assignments.

### B. The Day After He Purported to Contribute the Hotels to FC REIT, Singal Signed a Side Letter Agreement Detailing Necessary Steps for His Private Company to Actually Acquire the Hotels

29. Unaware that Singal had executed the assignment agreements and purportedly contributed the Hotels to FC REIT the night before, one of the Hotel Principals wrote to Singal early on the morning of September 16, 2015 about the conditions the Hotel Principals had for assigning rights to the Hotels. He stated that he "heard mention of assignment in one of the phone conversations" the previous night, and that "[i]f [they] are to assign [their] rights as managers *subject to consents of all parties*, [they would not do] that as long as [any of them were] liable on any underlying debt." (emphasis added.)

30. Later on the morning of September 16, 2015, one of the Hotel Principals wrote to Singal and others stating that they needed "a reasonable time to review and comment on documents" and that "[o]bviously it's subject to lender, bankruptcy and shareholder consent...." The Hotel Principal added that obtaining the consents of certain lenders and the bankruptcy courts might be "challenging" and that they had "to convince them in First Capital's ability and commitment to execute...." Singal did not tell the Hotel Principals that he had already executed the assignment agreements.

31. The Hotel Principals returned to FC REIT's offices, located in this District, mid-morning on September 16, 2015, and entered into a side letter agreement (the "Side Letter Agreement") "to memorialize the understanding of the parties...." Singal and one of the Hotel Principals signed the Side Letter Agreement, thereby binding both parties.

32. The Side Letter Agreement detailed the necessary steps that the parties agreed had to occur in order for Singal, or a Singal-related entity, to buy the Hotels. The steps included that a Singal-related entity had to pay $250,000 on or before September 22, 2015, to an entity affiliated with the Hotel Principals. After this happened, the Hotel Principals would use their "diligent, best efforts to obtain all necessary or appropriate bankruptcy court approvals, lender approvals and investor approvals…as soon as practicable...."

33. The Side Letter Agreement further provided that, subject to the bankruptcy court, lenders, and investors approving the transaction, the Hotel Principals and a Singal-related entity "shall enter into a definitive purchase and sale agreement for the acquisition of the [Hotels]...." with a purchase price of $85,650,000, proof of funds for an earnest money deposit of $750,000, and an agreement to indemnify the Hotel Principals for any deficiency on the Hotel loans.

34. After they signed the Side Letter Agreement, the Hotel Principals also signed agreements purporting to assign their interests in the Hotels on September 16, 2015, to FC Private. All the parties knew or were reckless in not knowing that the assignments would not have any effect until Singal first satisfied the conditions in the Side Letter Agreement.

35. Unbeknownst to the Hotel Principals, who had already left FC REIT's New York offices, the assignments of the Hotels from the Hotel Principals to FC Private were later notarized, and the notarization was backdated by one day without their permission or knowledge.

36. Singal did not tell the Hotel Principals that he, acting through FC Private, had already purported to have assigned interests in the Hotels to FC REIT on September 15, 2015.

37. The Hotel Principals later sent multiple email messages to Singal reflecting their understanding they had entered into an agreement to sell the Hotels to FC Private once the conditions in the Side Letter Agreement were met, and that no sale had yet occurred. Singal's emails to the Hotel Principals also reflected his understanding that the negotiations to buy the Hotels were ongoing. Despite his continued assurances that he would do so, Singal never met the conditions in the Side Letter Agreement.

### C. Singal and FC REIT Made Material Misrepresentations and Omissions in FC REIT's Form 8-K Filed on September 21, 2015, and the Amended Form 8-K Filed on September 24, 2015

38. A public REIT is required to file a Form 8-K when an important transaction or certain other types of significant events occur.

39. In a Form 8-K filed on September 21, 2015, FC REIT and Singal knowingly or recklessly, and negligently, misrepresented to shareholders that FC REIT—through its operating partnership—owned, in whole or in part, the Hotels and had assumed the associated debt of the Hotels. The Form 8-K included false statements that: (1) Singal and his related entities had contributed assets with an overall net equity value of $41,777,402—a figure which included the net equity from the Hotels—in exchange for the issuance of 3,344,868 units of FC REIT's operating partnership at a price of $12.49 per OP Unit; and (2) that Singal and his related entities had contributed "18 hotels" representing "$24,095,024 in net equity."

40. Among the list of assets that had supposedly been transferred, FC REIT specifically identified the Hotels by their addresses; and the Form 8-K falsely represented in various charts that FC REIT's operating partnership owned interests in the Hotels by virtue of Singal's FC Private contribution which purportedly ranged from 65 percent to 100 percent.

41. FC REIT also falsely represented that FC REIT's operating partnership owned a 65 percent interest in the entities that owned certain of the Hotels and that FC REIT "thereby control[ed] [the entities]...."

42. Singal signed the filing as the CEO and chairman of the board of directors of FC REIT, even though he knew, or was reckless in not knowing, and should have known, that: (1) several conditions precedent for FC Private to acquire the hotels—let alone for FC Private to have successfully assigned them to FC REIT—remained outstanding; and (2) Singal was still negotiating with the Hotel Principals to acquire the properties.

43. On September 22, 2015, having reviewed FC REIT's Form 8-K, one of the Hotel Principals emailed Singal to express concern that FC REIT listed the Hotels as being owned by FC REIT in a public filing, before the steps in the Side Letter Agreement had been completed, including that "it would be terribly bad for us" if one of the lenders for the Hotels learned of the filing. The Hotel Principals further noted that "we remain very concerned" in the absence of Singal performing the Side Letter Agreement conditions. Singal responded, indicating that he would soon send an indemnification agreement and affirming that he was working on funding the required deposits.

44. On the morning of September 24, 2015, one of the Hotel Principals wrote to Singal that they could not "wait until tomorrow to have a conference call with counsel[.] They have now reviewed the 8k and in their opinion, it needs to be rescinded. It refers to … debt being assumed. It states other things that simply aren't factual. This is a bad situation we now find ourselves in...."

45. Also on September 24, 2015, FC REIT filed an amended Form 8-K that repeated the same the material misrepresentations from the September 21, 2015 Form 8-K relating to FC REIT's ownership of the hotels and assumption of debt, as alleged above. Singal signed the amended Form 8-K as CEO and chairman of the board of FC REIT even though he knew or was reckless in not knowing, and should have known: (1) that several conditions precedent for FC Private to acquire the Hotels, which he had agreed to in the Side Letter Agreement, had not been satisfied; (2) that he had been engaged in continued negotiations with the Hotel Principals to acquire the Hotels; (3) that FC REIT did not control, directly or indirectly, any of the Hotels; and (4) that the Hotel Principals disputed FC REIT's assertion of ownership of the Hotels after reviewing the September 21, 2015 Form 8-K.

46. Singal's and FC REIT's misrepresentations were material because a reasonable investor would have wanted to know the true facts relating to ownership of the Hotels—*i.e.*, that Singal, through FC Private, had not contributed them to FC REIT, and that FC REIT neither owned, nor controlled the Hotels. Singal's misconduct caused FC REIT's net asset value to decline by $15.2 million. Singal's misconduct also caused the net asset value per share to decrease, which resulted in FC REIT selling shares to investors at inflated prices.

### D. Singal Continued His Efforts to Acquire the Hotels

47. Singal did not correct the misrepresentations and omissions in the September 21, 2015 Form 8-K and September 24, 2015 amended Form 8-K, and they remained outstanding for several months while he continued to negotiate with the Hotel Principals to acquire the Hotels. However, Singal still lacked the cash to pay the required deposits, which prevented FC REIT from

Case 1:22-cv-05960-PGG    Document 1-1    Filed 07/13/22    Page 56 of 222

SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v...., 2019 WL 6827346...

acquiring the Hotels. Because he had claimed in two SEC filings that he already owned the Hotels, and had contributed them to FC REIT, Singal was not permitted to use proceeds from FC REIT's offering to pay the deposits and acquire the Hotels.

48. On September 25, 2015, the Hotel Principals wrote to Singal to express their increasingly-urgent concerns about the outstanding Form 8-K filings that falsely represented that FC REIT owned and controlled the Hotels. Moreover, they wanted Singal to immediately send them a "more formal" memorandum of understanding ("MOU"); and they noted that they would "continue to work with [Singal] in [an] attempt to help [him] execute on these deals." They also reiterated that if one of the lenders on the Hotels "gets wind of the 8K filing before we have a chance to notify all parties *we are screwed*." (emphasis added). They added, "WE NEED THAT LETTER (MOU) today."

49. Singal responded that he would "do whatever [he] [could] on [his] end" that day and then later forwarded them a letter on REIT letterhead, which Singal signed on behalf of FC Private. The letter was back-dated to September 16, 2015, and contained the same terms as the Side Letter Agreement.

50. Singal corresponded with the Hotel Principals over the following weeks, expressing that he was trying—and failing—to gain access to cash to make the deposits to begin to satisfy the conditions in the Side Letter Agreement.

51. On October 7, 2015, one of the Hotel Principals wrote Singal, among others, expressing that they were still willing to structure a deal with him. One of the Hotel Principals asked Singal to let them know if he still wanted to buy the Hotels, but he added: "As we discussed and agreed today and last week the current assignments were predicated upon certain conditions precedent that we all know were not met...."

**E. Singal Abandoned His Efforts to Acquire the Hotels for FC REIT in December 2015**

52. By the end of September 2015, the former owner of FC REIT Advisor ("Former Owner"), who had stayed on as a consultant and FC REIT's Chief Investment Officer, had grown concerned about the Hotels, although he was unaware of the Side Letter Agreement and the ongoing negotiations with the Hotel Principals. Additionally, the Former Owner was holding $25 million worth of Singal's OP Units as collateral for the purchase of FC REIT Advisor, the value of which depended in part on the Hotels. He ultimately contacted the Hotels' bankruptcy counsel and demanded that the bankruptcy counsel recognize FC REIT as the owner of the Hotels.

53. After contacting counsel, the Former Owner learned that the Hotel Principals disputed that FC REIT owned the Hotels. The Former Owner concluded that Singal, through FC Private, had been issued $15.2 million in OP Units for the Hotels that FC Private did not own and therefore did not contribute to FC REIT. He demanded that Singal rectify the situation.

54. On October 9, 2015, the Former Owner wrote Singal's attorney, who had represented Singal during the September 15, 2015 transactions, including the contribution of the Hotels, stating:

> We have a problem. I just got off the phone with [bankruptcy counsel]. They are taking the position that 1, there was no consideration for the transfer by [the Hotel Principals] to [FC Private]. 2. [One of the bankruptcy lawyers] tells me that he spoke to Suneet after I sent the letter and Suneet told him that it was all a mistake and that there was no transfer [of] interests and that he should not concern himself with the letter I wrote. 3. That they intend on writing the SEC to state that there was a material misrepresentation made in the 8K with respect to these hotels and that they were not transferred. Not only is this a problem. But $15 million of the OP units are represented by the hotel assets.

FILED: NEW YORK COUNTY CLERK 05/11/2022 12:43 PM    INDEX NO. 652225/2022
NYSCEF DOC. NO. 1    Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 57 of 222    RECEIVED NYSCEF: 05/11/2022

SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v...., 2019 WL 6827346...

55. On October 16, 2015, Singal wrote to the Hotel Principals: "After going through everything with legal counsel back and forth this past couple of weeks, it appears we may need to restructure how the hotel portfolio is put together. We need to satisfy all legal parties and jurisdictions .... The legal complexities introduced this week may steer the ship...."

56. By late-December 2015, Singal abandoned efforts to acquire the Hotels for FC REIT.

57. By reason of Singal's sole ownership and control of FC Private at all relevant times, his knowledge is imputed to FC Private. Thus, FC Private, knowingly or recklessly provided substantial assistance to Singal throughout the fraudulent scheme, including, for example, by purporting to contribute the Hotels using false assignment agreements and accepting the $15.2 million in OP Units.

### F. Singal and FC REIT Made Material Misrepresentations and Omissions in FC REIT's January 7, 2016 and February 8, 2016 Forms 8-K

58. On January 7, 2016, FC REIT filed a Form 8-K, which Singal signed, stating that, on December 31, 2015, FC REIT had notified "[the Hotel Principals] … of its intention not to move forward with the acquisition of twelve limited service properties located in Texas and New Mexico … as a result of [the Hotel Principals'] inability to procure all necessary approvals from … lenders, investors, and the Bankruptcy court for the acquisition" of the properties.

59. The Form 8-K was materially misleading because, among other reasons, it failed to disclose that the actual reason that FC REIT had not acquired the Hotels was that *Singal* failed to make required deposits or to otherwise meet the conditions in the Side Letter Agreement. Singal also knew or was reckless in not knowing, and should have known, that it was materially misleading to describe the Hotels transaction as if it were a *potential* transaction that FC REIT merely decided "not to move forward with" given that Singal previously had represented publicly that FC REIT *already owned* the Hotels in two prior Form 8-K filings, which had not been withdrawn or corrected.

60. Further, FC REIT's description of the properties in the January 7, 2016 Form 8-K was materially different from FC REIT's description of the same properties in the September 2015 Forms 8-K. That made it difficult, if not impossible, for investors reading the January 7, 2016 Form 8-K to understand that the properties described therein were the exact properties that FC REIT represented it owned in the September 2015 Forms 8-K.

61. FC REIT also filed a materially misleading Form 8-K on February 8, 2016, which Singal signed. The February 8, 2016 Form 8-K announced that FC Private had contributed a new property to FC REIT, but failed to disclose that it had contributed that property at a more than 35% discount to try to make up for the fact that FC Private had been issued $15.2 million in OP Units for the Hotels that it neither owned nor contributed to FC REIT.

62. The materially misleading January 7, 2016 and February 8, 2016 Forms 8-K reflected Singal's continued efforts to conceal his fraudulent conduct from FC REIT's investors, and the public with respect to the Hotels. By engaging in his fraudulent scheme, and continuing to lie about it in public documents, Singal deprived current and potential investors of material information about the nature and value of any investment in FC REIT.

63. Given his personal participation in the conduct at issue, as alleged in this Complaint, Singal knew or was reckless in not knowing, and should have known, at the time he signed the January 7, 2016 and February 8, 2016 Forms 8-K that they were materially misleading.

64. Additionally, Singal obtained money or property by means of the material misstatements and omissions in the Forms 8-K described in this Complaint because FC REIT was offering and selling shares at the time and, as the beneficial owner of the REIT Advisor, Singal received asset management fees that were determined in part by reference to the value of FC REIT's total assets.

## G. FC REIT Made Material Misrepresentations and Omissions in Pricing Supplements
## Concerning its Net Asset Value and Sold Shares to Investors at Inflated Prices

65. The NAV, or net asset value, is the total assets of FC REIT minus the liabilities. And the NAV per share is calculated by dividing the NAV by the total number of outstanding shares.

66. FC REIT started calculating NAV in January 2015. Following the initial NAV calculation, FC REIT represented that it would calculate NAV daily and that the price of its shares would be equal to FC REIT's NAV per share plus certain commissions and fees. FC REIT was required to file supplements to its prospectus under the federal securities laws to reflect facts or events that constituted a substantive change or addition to the information set forth in the last prospectus filed with the SEC. FC REIT reported its daily NAV to shareholders through prospectus supplements, which were filed monthly with the SEC and included the NAV per share as of each business day.

67. Singal's failure to contribute the Hotels to FC REIT despite FC REIT having paid for them caused a $15.2 million equity shortfall, which naturally reduced the NAV of FC REIT. Yet, even after this failure, FC REIT filed several monthly pricing supplements to its May 8, 2015 prospectus that materially overstated the NAV per share.

68. FC REIT filed pricing supplements on October 5, 2015, November 2, 2015, December 3, 2015, January 7, 2016 and February 5, 2016. These pricing supplements collectively represented that the NAV per share remained at $12.49 on each day between September 1, 2015 and January 29, 2016. Although no further pricing supplements were filed after February 5, 2016, FC REIT did not report any change in the NAV until July 15, 2016, at which point it reported in a Form 8-K that the NAV per share increased to $16.03 as of July 12, 2016.

69. FC REIT's failure to change the NAV per share to reflect the $15.2 million equity shortfall resulted in FC REIT materially overstating NAV per share between at least September 16, 2015, and February 5, 2016.

70. FC REIT also sold shares at materially overstated prices during this period. On information and belief, FC REIT issued approximately $3.5 million in common stock between September 29, 2015 and February 3, 2016.

71. This conduct was material because a reasonable investor would have wanted to know of the equity shortfall and that the shares were worth less than FC REIT reported. FC REIT knew or was reckless in not knowing, and should have known that the pricing supplements contained materially inflated valuations.

72. FC REIT Advisor, which Singal beneficially owned and controlled at all relevant times, knowingly or recklessly provided substantial assistance to FC REIT in making the material misrepresentations, omissions, and misleading statements in the public filings at issue because it was responsible for assisting FC REIT in preparing, reviewing and filing documents with the Commission. Because he owned and controlled FC REIT Advisor at all relevant times, Singal's knowledge is imputed to it.

73. Further, because Singal was FC REIT's board chairman and CEO, his knowledge is imputed to FC REIT.

## H. FC REIT Failed to File Quarterly and Annual Reports with the SEC

74. Section 15(d) of the Exchange Act, and its Rules 15d-1 and 15d-13 require issuers that have filed a registration statement that has become effective to file periodic reports under conditions that applied to FC REIT. FC REIT was obligated, but failed, to file certain periodic reports, including quarterly reports on Form 10-Q and annual reports on SEC Form 10-K. FC REIT filed a registration statement on Form S-11 that first became effective on August 15, 2012, and it filed several post-effective amendments that subsequently became effective, the last one on May 8, 2015.

75. FC REIT has not filed a quarterly report on Form 10-Q since its quarterly report for the quarter ended June 30, 2015; nor has it filed an annual report on Form 10-K since its annual report for the fiscal year ended December 31, 2014. FC REIT Advisor knowingly or recklessly provided substantial assistance to FC REIT because it was responsible for assisting FC REIT in preparing, reviewing and filing quarterly and annual reports with the Commission.

## II. Fraudulent Conduct Related to the BDC

### A. Starting in 2016, Singal Acquired an Interest in the BDC Advisor, Joined the Investment Committee, and Sought to Have the BDC Invest in Businesses He Owned

76. By fall 2016, Singal's FC Private and its subsidiaries were under significant cash flow pressure.

77. In an effort to raise cash to benefit his other businesses and himself, Singal approached the BDC Advisor about the BDC possibly buying or investing in FC Private and/or some of its subsidiaries. Singal also considered acquiring an interest in the BDC Advisor. By this time, the BDC had not raised any capital from the public; nor had it made any investments.

78. On October 12, 2016, Singal, through FC Private, acquired a 24.9% ownership interest in the parent company that owned the BDC Advisor. In exchange, Singal agreed to provide capital to satisfy certain liabilities of the BDC and the BDC Advisor. The agreement provided that Singal had the option to acquire a controlling interest in the BDC Advisor at a later date, upon the occurrence of certain specified events. Under the deal, the BDC Advisor would "commence due diligence for one or more potential transactions with [FC Private] whereby [FC Private] or an affiliate would sell certain assets to the fund...."

79. In connection with the agreement, Singal also became a member of the BDC Advisor's three person investment committee, which was responsible for evaluating, approving, and managing, the investments of the BDC.

80. On March 28, 2017, Singal, through FC Private, signed an agreement to acquire 100% of the ownership interest in the parent company that owned the BDC Advisor. And on March 30, 2017, Singal became chairman of the BDC's board of directors. That same day, the remainder of the BDC's board of directors resigned and were replaced by board members Singal had chosen. The board also appointed Singal's chosen replacement to be the BDC's president and CEO.

### B. Both the BDC Advisor and Singal Were Investment Advisers and Both Owed a Fiduciary Duty to the BDC

81. Investment advisers are people or companies who, for compensation, are engaged in the business of providing advice to others or issuing reports or analyses regarding securities.

82. Both the BDC Advisor and Singal were investment advisers as defined in the Advisers Act.

83. The BDC Advisor was, for compensation, in the business of advising the BDC as to the value of securities and/or as to the advisability of investing in, purchasing, or selling securities. The written investment advisory agreement between the BDC and the BDC Advisor provided that the BDC Advisor's duties included: (1) determining the composition and allocation of the BDC's portfolio, the nature and timing of the changes therein and the manner of implementing such changes; (2) identifying, evaluating, and negotiating of the structure of the BDC's investments; (3) executing, monitoring, and servicing the BDC's investments; (4) determining the securities and other assets that BDC shall purchase, retain, or sell; (5) performing due diligence on prospective portfolio companies; and (6) providing the BDC with such other investment advisory, research, and related services as the BDC reasonably requested or required for the investment of its funds.

84. The BDC's registration statement provided that the BDC intended to invest in equity and debt securities in addition to originating loans to small- and middle-market U.S. companies.

Case 1:22-cv-05960-PGG Document 1-1 Filed 07/13/22 Page 60 of 222

SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v...., 2019 WL 6827346...

85. Pursuant to the BDC's investment advisory agreement, the BDC Adviser was entitled to compensation for the investment advisory services it provided. These fees included: (1) a base management fee at an annual rate of 2% of its assets under management, and, (2) an incentive fee that was calculated based on investment income.

86. The BDC paid the BDC Advisor more than $28,000 in base management fees for the fiscal year ended December 31, 2017 for its investment advisory work in identifying, evaluating, negotiating, executing, monitoring, and servicing the BDC's investments.

87. Singal also acted as an investment adviser under the definition in the Advisers Act. Through his membership on the BDC Advisor's investment committee, and as a beneficial owner, he had the power to direct the management and policies of the BDC Advisor.

88. Among other things, Singal personally advised the BDC as to which investments to make, and he had the power to direct the purchase and sale of securities. For example, he recommended that that BDC invest in Company A, and he approved the investments.

89. Singal received compensation for advising the BDC concerning its investments, through his beneficial ownership interest in the BDC Advisor, which received fees, including a base management fee for its advisory services.

90. As investment advisers, both the BDC Advisor and Singal were fiduciaries to the BDC. As such, both the BDC Advisor and Singal owed the BDC affirmative duties of utmost good faith and full and fair disclosure of all material facts. The BDC Advisor and Singal also had an affirmative duty to employ reasonable care to avoid misleading the BDC, and to act in the BDC's best interest.

91. The BDC Advisor and Singal had a duty to eliminate or at least expose through full and fair disclosure all conflicts of interest which might incline them—consciously or unconsciously—to render advice which was not disinterested. Further, Singal and the BDC Advisor had a duty under the investment advisory contract to monitor the BDC's investments and to determine the securities and other assets that the BDC should purchase, retain, or sell.

92. Singal also owed the BDC fiduciary obligations as a director. According to the BDC's offering documents, the BDC's directors had a duty to oversee and monitor the BDC's investment performance. The BDC's directors also had a duty to supervise the BDC Advisor.

**C. Singal Caused the BDC's First Investment to be a Loan to a Company He Owned Until the Day Before the Loan**

93. As the next step in his fraud, Singal convinced the BDC to focus on making a loan to Company A, which Singal owned at the time through FC Private. Company A owned and operated more than a dozen franchised fast food locations on the West Coast. Historically, Singal used the cash Company A generated to support FC Private and his other privately held businesses. At the time of the loan—in significant part because Singal used Company A's cash to benefit FC Private—Company A was behind in paying numerous bills, including rents, sales tax payments, and franchise fees.

94. Because Singal had acquired an interest in the BDC Advisor, the BDC concluded that any investment into entities owned by Singal, such as Company A, would be considered an "affiliated transaction" under Section 57 of the Company Act. BDC management did not want to engage in affiliated transactions, in part because they required approval by the board of directors, which BDC management did not want to seek.

95. Instead, to avoid the issue, BDC management required Singal to sell Company A, as a condition of the loan. BDC management repeatedly told Singal that before the BDC would make the loans to Company A, the BDC's outside legal counsel

had to conclude—among other things—that FC Private's sale of Company A constituted a "true sale," such that the loan would not be considered an affiliated transaction.

96. On February 23, 2017, the day before the BDC entered into its first loan agreement with Company A, Singal sold his interests in Company A to Company A's Manager for $11.5 million through a promissory note for the full amount. It was a seller-financed note, and Singal, acting through FC Private, was the seller.

97. The sale of Company A was documented in a membership interest purchase agreement that provided for an interest rate of six percent, with interest and principal deferred for twelve months after execution of the promissory note. This meant that the Company A Manager had no obligation to pay Singal any principal or interest for twelve months after the parties signed the note.

98. The $11.5 million promissory note from the Company A Manager to FC Private was not executed until several months after the sale. The promissory note was guaranteed by Company A, and it was secured by Company A's membership interests and all the assets of Company A.

99. BDC management required that the $11.5 million promissory note be subordinate to the BDC's loan to Company A. This would mean, for example, that in the event of a default by Company A, the BDC would be paid back for its loan before Singal would be paid under the promissory note.

**D. Despite the Sale, Singal Secretly Maintained Control Over the Management and Policies of Company A**

100. Although Singal, through FC Private, sold all the membership interests in Company A to the Company A Manager on February 23, 2017, Singal retained control over the management and policies of Company A by virtue of: (1) his relationship with the Company A Manager and (2) his beneficial ownership interest in and control over Company B, the entity that supplied employees, human resources and accounting services to Company A.

101. Before he bought the company from Singal, the Company A Manager had handled the day-to-day operations of all the fast food restaurants in Company A. He had frequent contact with Singal, as the then-owner, was part of Singal's executive management team, and considered Singal to be a friend. Because of this relationship, the Company A Manager was willing to believe Singal's assurances that that the sale would only be temporary and that Singal's business endeavors would provide opportunities to expand the business.

102. Before he sold Company A, Singal arranged for Company B to be the employer entity for the employees of several of his privately held businesses, including Company A, so that human resources and other services could be centrally managed. Singal owned a 50% interest in Company B and controlled it through FC Private, which was the managing member of Company B.

103. Company B employed, among others, the employees who performed services for his other businesses, including the accounting staff, the Controller and executive managers (including the Company A Manager), as well as the individuals who worked at Company A. Company B billed the various privately held businesses for their portion of payroll and benefits expenses, and it charged each a fee for its services. This arrangement continued at least until August of 2017—several months after Singal sold Company A.

104. Consequently, until August 2017, the same Controller who managed Company A's accounting, cash flow, and bookkeeping functions simultaneously managed the accounting, cash flow, and bookkeeping functions for FC Private. The Controller continued to report to Singal as an employee of Company B; continued to inform Singal of Company A's cash constraints—collectively with the other FC Private entities—and continued to take direction from Singal regarding Company A's cash flow. The Company A Manager also remained on the payroll of Company B post-sale, and Singal continued to treat the Company A Manager as a member of FC Private's executive management team.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v...., 2019 WL 6827346...

105. Additionally, after the sale, Singal maintained authority over Company A's bank accounts; and he could freely transfer cash from Company A's bank accounts to FC Private's bank accounts, which continued to be linked for purposes of cash transfers. In fact, only Singal and the Controller—*not* the Company A Manager—had the authority to make intra-bank cash transfers from Company A to FC Private. Company A also remained a guarantor on certain of FC Private's financial obligations.

106. Moreover, although it never came to fruition, Singal assured the Company A Manager in advance of the sale that the BDC would later buy Company A from the Company A Manager. Singal also indicated to the Company A Manager that FC Private might be willing to partner with Company A to acquire additional franchises and/or otherwise help Company A expand in the future.

107. Singal further assured the Company A Manager that Singal's continued use of Company A's resources to support FC Private would be accounted for—or "trued up"—in connection with some future transaction. Based on Singal's false assurances, the Company A Manager did not take steps to separate Company A's operations from FC Private's operations until approximately August 2017.

108. Singal never disclosed his conflicts of interest to the BDC's independent directors—namely, that he continued to control Company A after he sold it, and that he misappropriated and misdirected money, including BDC loan proceeds, from Company A to support his private businesses following the sale.

### E. Singal Caused the BDC to Make a $1.5 Million Loan to Company A on February 24, 2017, and then Misappropriated More than Half the Proceeds

109. On February 24, 2017, the BDC and Company A executed a loan agreement and promissory note for a $1.5 million loan from the BDC to Company A. Singal suggested that the BDC consider Company A as an investment option, recommended the loan terms, and ultimately approved the loan as a member of the BDC Advisor's investment committee.

110. The promissory note constituted a security, as defined under the federal securities laws, because, among other reasons, Company A wanted to fund its business, and the BDC expected that it would receive a rate of return based on the profits Company A generated through the investment.

111. The loan agreement contained affirmative covenants concerning Company A's use of BDC loan proceeds, stating, "Borrower shall use the proceeds of the Loan evidenced by the Note for (a) expenses relating to the construction of new franchise locations…, (b) expenses relating to the remodeling of existing franchise location and the addition of a new franchise and kiosk …, (c) deposit for remodeling of existing franchise locations … and (d) working capital purposes."

112. Company A received the $1.5 million in BDC loan proceeds on February 27, 2017. By the next day, Singal had directed the transfer of at least $800,000 of the $1.5 million from Company A to FC Private—despite that he had sold Company A, and despite the affirmative covenants prohibiting Singal from using the loan proceeds to support his private businesses.

113. Because he had sold Company A, and he was not otherwise authorized to take Company A's money for his own use, Singal's transfer constituted a misappropriation of the BDC's funds.

114. Singal did not disclose these transfers—which were also conflicts of interest—to the BDC's independent directors. Rather, as Singal directed, the Controller improperly recorded the transfers on Company A's books as principal reduction payments on the $11.5 million note.

115. Singal knew or was reckless in not knowing, and should have known, before Company A received the BDC loan proceeds that he would misappropriate money from Company A to FC Private. To that end, the Controller wrote Singal on February 21,

SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v..., 2019 WL 6827346...

2017, regarding the expected BDC loan proceeds urging "that a minimum of $700k will need to be kept in [Company A] to start construction projects, reimburse [the Company A Manager] for expenses paid out of pocket, rents, and sales tax."

116. Again on February 24, 2017, the day the loan documents were executed, the Controller wrote to Singal concerning the need to keep at least $700,000 of the BDC loan proceeds with Company A in light of "some serious shortfalls", including for, among other things, rents, sales tax and royalties. The Controller also noted that "there is not enough [money] to go around" and that there would be "negative cash balances in a few weeks." The Controller also admonished Singal that they could no longer "keep transferring $ to [FC Private] on a daily basis as we have done in the past" and that there was a need to keep Company A "in good standing for transfer into the BDC." Despite knowing the purpose of the loan, Singal nonetheless directed the Controller to transfer at least $800,000 to FC Private just four days after receiving this email.

### F. Singal Caused the BDC to Make a Second $1.5 Million Loan to Company A on March 31, 2017, and Again Misappropriated Loan Proceeds

117. In furtherance of his plan to transfer BDC funds to his private company, Singal took on a greater role in the BDC. And on March 28, 2017, Singal signed a deal that would give him 100% ownership of the BDC Advisor; the deal closed on April 3, 2017. On March 30, 2017, Singal became chairman of the BDC's board of directors.

118. The next day, on March 31, 2017, the BDC and Company A executed a loan agreement and promissory note for a second $1.5 million unsecured loan to Company A.

119. For the same reasons as the first loan, the promissory note was a security. Additionally, as with the first loan from the BDC to Company A, the second loan agreement contained affirmative covenants requiring that the BDC loan proceeds be used for specific purposes, including for expenses related to the construction of a new location, expenses relating to the remodeling of two existing locations, and working capital. Singal approved the second loan as a member of the BDC Advisor's three-person investment committee.

120. Company A received $1.5 million in loan proceeds from the second BDC loan on March 31, 2017. That same day, Singal—by then the BDC's chairman—directed the transfer of $500,000 from Company A to FC Private. That transfer was recorded on Company A's general ledger as a principal payment on the $11.5 million note payable from the Company A Manager to FC Private.

121. Because Singal no longer owned Company A, and he did not have authorization to take these funds from the Company A Manager, Singal's actions again constituted a misappropriation of the BDC's funds.

122. Singal knew or was reckless in not knowing, and should have known, before Company A received the BDC loan proceeds that he would misappropriate money from Company A to FC Private.

123. Singal did not disclose to the BDC's independent directors that he had caused the transfer of BDC loan proceeds from the second BDC loan from Company A to FC Private. Transferring BDC loan proceeds from Company A—which Singal secretly continued to control—to FC Private for Singal's personal use was a conflict of interest, and it violated the loan agreements. It also constituted a breach of fiduciary duty involving personal misconduct while Singal was serving as a BDC director.

124. As with the first BDC loan, Singal planned in advance to transfer BDC loan proceeds from Company A to FC Private. Singal carried out his plan over repeated requests of the Company A Manager (who now owned Company A) to keep more of the loan proceeds for Company A. For example, on March 3, 2017, the Company A Manager texted the Controller that Company A needed "to get 2 million from [the] BDC instead of 1" and that "1 million need[ed] to go straight to [Company A]."

Case 1:22-cv-05960-PGG Document 1-1 Filed 07/13/22 Page 64 of 222

SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v...., 2019 WL 6827346...

125. When Company A received the BDC loan proceeds on March 31, 2017, the Company A Manager wrote the Controller to indicate his concern about Singal's diversions of loan proceeds: "Wire is in!!!!… We should take a picture. It will last longer...." The Controller responded: "I'm taking $500k for [FC Private] and transferring [the] rest of payroll...." That same day the Company A Manager (owner) asked the Controller about the cash flow from a particular retail location, and she told him that, although some of the cash had been used for Company A, most of it was diverted to FC Private. The transfers to FC Private took place at Singal's direction.

126. Singal's misappropriation of March 31, 2017 BDC loan proceeds took place while he was a BDC director and was acting as principal for the BDC. Because he controlled Company A and knew that he was going to take some of the loan proceeds, he knowingly borrowed money from the BDC using Company A as a conduit. Additionally, he knowingly effected a transaction in which the BDC was a joint or joint and several participant.

127. In addition to the approximately $1.3 million in BDC loan proceeds, Singal directed the transfer of (or directly transferred) at least $700,000 more (which may have included BDC loan proceeds) in various amounts and on various days from Company A to FC Private, for his personal use and benefit, between the time after he sold Company A and approximately August 2017.

### G. Singal Exercised His Control Over Company A to Fraudulently Obtain Merchant Cash Advances for His Own Benefit

128. Because Singal had misappropriated as much as half of the $3 million in loan proceeds from the BDC—by diverting those funds to his private company—Company A had very little cash by April 2017, and remained delinquent in its financial obligations.

129. After Singal misappropriated $1.3 million of the BDC loan proceeds, Singal found yet another way to capitalize on his secret control of Company A, and to squeeze more cash out of the struggling company. To that end, after Company A exhausted the BDC loan proceeds that Singal did *not* misappropriate and divert to FC Private, Singal entered into at least eight MCAs, or merchant cash advance agreements, in April, May, and June 2017. In these MCAs Singal sold Company A's receivables, or he used Company A's assets as collateral, for cash advances to FC Private. The receivables he sold totaled more than $1.8 million.

130. These MCAs included sworn Affidavits of Confession of Judgment ("COJ") in which Singal falsely asserted that he owned Company A, which he had already sold. The COJs were either signed by Singal or stamped with his signature stamp and notarized, with his knowledge and approval. Singal hand signed his assistant's notary journal for the COJs at issue.

131. In at least some instances, Company A transferred cash to FC Private the same day that it received the cash advance and recorded the transfers as principal reduction payments on the $11.5 million promissory note.

132. In other instances, the advances went directly to FC Private, but Company A made daily payments and recorded them as principal reduction payments on the $11.5 million promissory note.

133. From April through June 2017, Singal was copied on numerous emails containing drafts of the merchant cash advance applications that falsely listed him as the beneficial owner of Company A post-sale. And Singal communicated with the Controller and others in setting up calls regarding the MCAs. Singal also personally communicated with the lenders' representatives concerning the advances involving Company A post-sale.

134. Singal did not disclose these merchant cash advances to the BDC's independent directors, thereby breaching his duty to act in the BDC's best interest, and to monitor and provide advice about the BDC's investments as required by the advisory contract.

**H. Singal Knew, But Did Not Disclose, That Company A Had Dire Cash Flow
Problems that Resulted in Company A Filing for Bankruptcy Protection**

135. The BDC Advisor, which Singal wholly beneficially owned and controlled as of April 3, 2017, had a fiduciary obligation under the terms of the investment advisory agreement to monitor the BDC's investments. For example, the BDC's registration statement placed on the BDC Advisor responsibility for "ongoing monitoring of each investment made, with particular emphasis on early detection of deteriorating credit conditions at portfolio companies which would result in adverse portfolio developments."

136. Singal knew or was reckless in not knowing, and should have known, that Company A had a serious cash flow problem, which he caused or exacerbated by diverting cash to FC Private and by fraudulently incurring the debt obligations under the merchant cash advance agreements. In fact, Singal also knew that the cash problem was so grave that it: (1) jeopardized Company A's ability to continue as a going concern and, (2) put the BDC's unsecured loans to Company A at risk.

137. Singal received numerous emails from the Controller and the Company A Manager concerning Company A's liquidity issues. For example:
a. On April 26, 2017, the Controller informed Singal that Company A was not "generating enough cash to cover all the loan payments." On May 1, 2017, the Controller informed Singal that the state taxing authority had rejected Company A's payment plan regarding more than $167,000 in past due taxes and had put a lien on Company A's bank accounts.

b. On May 17, 2017, the Controller emailed Signal to inform him of "urgent" cash needs including Company A's rent payments, royalty payments, renovation payments and sales tax obligations. The Controller informed Singal that Company A's daily deposits were going to "pay for food and merchant loans. Nothing remaining." The Controller added that there were "no definite sources of cash" and that "[b]ecause [their] cash balances [were] so low and there [were] so many daily payments, [MCA] lenders change or deny at the last minute when they do the bank review. This used to not happen, but it has been happening the last couple of weeks." Singal responded, in part, "There has to be a way to get this figured out" and that they were "too close to succeed vs. fail now."

c. On July 7, 2017, the Company A Manager texted Singal not to "swipe" any additional money from Company A's bank accounts and that he needed to have his credit card bill paid "so the stores can run." The Company A Manager also told Singal that he was "proposing no transfers from [Company A's bank] account[s] without plan[n]ing and [the Company A Manager's] approval." Singal's response made clear he would continue to divert money from Company A, stating, "swipes can't stop ...."

d. On July 10, 2017, Singal personally transferred cash from Company A to FC Private, which cancelled Company A's payroll transfer and left Company A without enough funds to make payroll. The Controller emailed Singal that he had taken "the payroll $ again" that morning and that she "had a wire scheduled to go out" but after his transfer there were not enough funds. The Controller added that they had "over $75k in floating payroll checks from [the prior] week" and that one of the merchant cash advance companies expected "$8k [that day] or they [were] going to collections...." Singal apologized and told her to "move the [Company A] piece back over" but the Controller responded that she could not move it back because there were not enough funds.

e. On July 11, 2017, the Company A Manager texted Singal that a landlord was filing for eviction at two of Company A's business locations. Singal responded that he was "[d]oing everything possible to move cash as fast as" he could. On July 12, 2017, the Company A Manager texted Singal to ask him for a "cash infusion" to buy food because "the well [was] dry" and Company A was "at negative in the accounts." Singal responded that he was not then in a position to help.

138. By July 21, 2017, Company A's financial condition had become so dire that Singal and the Company A Manager began discussing whether Company A should enter bankruptcy.

Case 1:22-cv-05960-PGG Document 1-1 Filed 07/13/22 Page 66 of 222

SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v...., 2019 WL 6827346...

139. On July 21, 2017, Singal forwarded a bankruptcy lawyer contact to the Company A Manager. On July 24, 2017, the Company A Manager texted the Controller that they were "getting deeper in crap" and that they "may have to file BK for [Company A]."

140. Then on August 1, 2017, a merchant cash advance company froze Company A's bank accounts. By August 2, 2017, Company A had been in default for 60 days on a secured bank loan.

141. On August 22, 2017, Singal texted the Company A Manager to confirm that he was just preparing, but not filing, bankruptcy paperwork. On September 11, 2017, the Controller texted Singal that the Company A Manager was "pretty adamant" about filing for bankruptcy that week. The Controller informed Singal that if he thought he could get funding by the following week then Company A could probably make it, but it if funding was two weeks away then they could not make it. Singal responded: "Yes we are going to make it. Hold strong."

142. On September 13, 2017, the Controller texted the Company A Manager to inform him that Singal had talked to two of the landlords and that they were "willing to wait another couple weeks because they [did not] want BK [bankruptcy]." On September 14, 2017, Singal texted the Company A Manager to ask if he made "an official decision" about bankruptcy and the Company A Manager responded that they "ha[d] to file" because they could not "use any account."

143. Ultimately, Company A filed for bankruptcy protection on September 14, 2017.

144. Despite knowing of Company A's worsening financial state, Singal never disclosed to the BDC that one of its main investments was teetering on the edge of bankruptcy.

145. In August 2019, after Singal was no longer an officer or otherwise affiliated with the BDC, the BDC—under new management—disclosed in its Form 10-K for the fiscal year ended December 31, 2017, that it wrote down the BDC's $3 million investment in Company A to $0 "due to lack of creditworthiness."

146. FC Private, which Singal owned and controlled at all relevant times, knowingly or recklessly provided substantial assistance to Singal throughout the fraudulent scheme, including, for example, by selling Company A, so that the BDC would make loans to Company A, but then accepting the transfer of BDC loan proceeds, which violated the affirmative covenants in Company A's loan agreements with the BDC. Because Singal owned and controlled FC Private, his knowledge is imputed to it.

### I. Singal Continued his Fraudulent Scheme Through the Fall of 2017 by Concealing his Knowledge of Company A's Bankruptcy and his Knowledge of Company A's Use of BDC Loan Proceeds

147. Singal continued his fraudulent scheme by concealing Company A's dire financial condition and bankruptcy plans from BDC management, its independent directors, and its shareholders.

148. For example, following Company A's bankruptcy, Singal signed a Form 8-K filing on September 21, 2017, as acting CEO of the BDC, falsely representing that the BDC had no advance notice of Company A's bankruptcy filing, and that the BDC believed that the bankruptcy filing would not impact the BDC's ability to sell its loan in Company A to a third party.

149. Contrary to the representations in the Forms 8-K, Singal knew or was reckless in not knowing, and should have known in advance, that Company A was in dire financial condition and was preparing to file for bankruptcy protection. He knew this because his fraudulent misconduct was at the very least a major contributing factor in driving Company A into bankruptcy. For the same reasons, he also knew that the BDC was highly unlikely to recover its $3 million investment given Company A's dire financial condition and debt load.

150. Singal also concealed his knowledge that BDC loan proceeds had been transferred to FC Private, ostensibly as principal reduction payments on the $11.5 million note. For example, Signal signed a Company A investment review memorandum dated May 15, 2017, as a member of the BDC Advisor's investment committee, that falsely stated that Company A used the BDC loan proceeds "primarily to upgrade two existing units and to bring on two new sites and to provide working capital" even though he knew that at least $1.3 million of the $3 million total had been transferred to FC Private to be used for the benefit of other entities.

151. Singal later misrepresented his knowledge of Company A's use of BDC loan proceeds in response to requests by the BDC's new auditors. In February of 2018, in response to a request from the BDC's auditors as to whether any of the $3 million in BDC loan proceeds was used to repay the $11.5 million note or otherwise went to any First Capital-related entities, BDC management responded (based on Singal's misrepresentations and omissions) that it did "not believe that any of the 3MM was used to pay the note but [they had] no way to verify that."

152. The BDC's auditor then suggested that BDC management ask Singal and FC Private to confirm that "nobody affiliated with FC received any of the $3MM." Singal falsely stated in response, among other things, that he was "not aware of how the use of proceeds were spent by [Company A] as the business was sold from [FC Private] and [FC Private] simply held a note for $11.5MM which it still [held]...."

153. In contrast to his representations, Singal knew that BDC loan proceeds in fact had been transferred from Company A to FC Private—because he directed the transfers.

### J. Singal Made Material Misrepresentations and Omissions in the BDC's Registration Statement

154. Unless an exemption applies under the federal securities laws, companies such as the BDC seeking to offer securities to the public must file a registration statement with the SEC and must make the disclosures required by the applicable form (in this case SEC Form N-2). Registration statements typically include a prospectus, which makes required disclosures to investors concerning, among other things, the company and the offering to assist them in deciding whether to invest. Under the federal securities laws, companies must update registration statements that have gone effective under certain circumstances through post-effective amendments.

155. Singal made material misrepresentations and omissions in two post-effective amendments to the BDC's registration statement on SEC Form N-2 concerning the relationship between the BDC and Company A, the BDC's only portfolio company at that time. Singal signed the post-effective amendments as chairman of the BDC's board of directors. Form N-2, Item 8, requires BDCs to "disclose … the relationship of the portfolio companies to the Registrant." The instructions to Form N-2 state that "[i]n describing the relationship of portfolio companies to the Registrant," the BDC must "[d]isclose any other material business, professional, or family relationship between the officers and directors of the Registrant and any portfolio company, its officers, directors, and affiliates ...."

156. Singal knowingly or recklessly, and negligently, failed to disclose in Post-Effective Amendments No. 4 and No. 5 to the BDC's registration statement on Form N-2, which were filed on April 11, 2017, and April 28, 2017, respectively, that he—the BDC's chairman of the board of directors—had a material relationship with Company A, the BDC's then only portfolio company, and that he used Company A's resources to support FC Private for his own benefit. Among other things, as of the time of the post-effective amendments at issue, Singal maintained a controlling influence over the management and policies of Company A, and he participated in key decision-making for Company A, even after he divested his interest.

157. Singal also had direct access to Company A's bank accounts, directed the transfer of at least $1.3 million of the $3 million in BDC loan proceeds from Company A to FC Private, and continued to use Company A's cash for his own company, FC Private. Further, Singal, through FC Private, owned a 50% interest in and he controlled the entity that supplied all of the employees for Company A for a fee, at least until August 2017.

158. Additionally, Singal had applied for merchant cash advances on Company A's receivables, falsely representing to own it in sworn affidavits.

159. Therefore, Singal knew or was reckless in not knowing, and should have known, when he signed the post-effective amendments that he—the BDC's chairman of the board—had a material relationship with Company A—the BDC's then only portfolio company. None of this information was disclosed as required by Form N-2.

160. The post-effective amendments also were materially misleading because they represented that the BDC had no relationship with Company A other than in connection with its investments, when in fact Singal, BDC's chairman of the board of directors, was diverting resources from Company A to support FC Private, the entity through which he owned the BDC Advisor.

161. These omissions and misleading statements were material because a reasonable investor would want to know that the BDC's chairman (who also owned and controlled the BDC's investment adviser) had a material relationship with the company in which the BDC made its largest investment and that he exploited that relationship to enrich himself to the detriment of the BDC.

162. Singal obtained money or property by means of these material untrue statements and omissions because the BDC was offering and selling securities to the public at the time, and Singal received asset management fees as the beneficial owner of the BDC Advisor, which were determined in part based on the BDC's gross assets.

### K. Singal Breached his Fiduciary Duty as an Investment Adviser to the BDC, or, in the Alternative, Aided and Abetted the BDC Advisor's Breach of Fiduciary Duty

163. Singal breached his fiduciary duty as an investment adviser to his client, the BDC, in numerous ways. For example, Singal failed to make full and fair disclosure of his conflicts of interest to the BDC's independent directors.

164. Independent directors play a central role policing conflicts of interest and protecting the interests of investment companies subject to the Company Act, such as BDCs, and their investors. The Company Act requires a majority of a BDC's directors to be independent directors, meaning that they are not interested persons of the BDC (*e.g.*, affiliated persons of the BDC or the BDC's investment adviser). In order for independent directors to fulfill the watchdog role envisaged for them by Congress, the investment adviser must make full and fair disclosure to the independent directors of all material facts, especially relating to any potential conflicts of interest, so the independent directors can decide whether to consent to such conflicts.

165. Singal failed to disclose to the BDC's independent directors that he directed the transfer of BDC loan proceeds from Company A to FC Private for his own benefit; that he continued to exercise a controlling influence over the management and policies of Company A; and that he continued to use Company A's resources to support his personal business interests.

166. Singal also failed to disclose to the BDC's independent directors that Company A's business operations continued to be intertwined with those of FC Private and that he had a 50% beneficial ownership interest in Company B, which supplied Company A's employees and provided, *inter alia*, payroll services for a fee.

167. Singal also breached his fiduciary duty to the BDC by failing to disclose to the BDC's independent directors Company A's deteriorating financial condition and his role in causing it.

168. As described above, Singal had a duty to monitor the BDC investments under the terms of the investment advisory contract. Singal knew that Company A was materially delinquent in numerous financial obligations, that it had serious cash flow constraints—which he largely caused—and that it was considering filing for bankruptcy.

169. Singal also knew that he personally contributed to Company A's financial problems by misappropriating to FC Private for his benefit the cash that Company A needed to pay its rent, payroll and other financial obligations, and by taking out several

merchant cash advances on the future receivables of Company A. These actions by Singal eventually led to Company A's bank accounts being frozen and Company A being unable to operate its business. Notwithstanding his knowledge of Company A's financial condition and his role in causing it, Singal failed to disclose that information to the BDC's independent directors pursuant to his duty to monitor the BDC's investments.

170. In the alternative, the BDC Advisor, which Singal beneficially owned, in whole or in part, and controlled at all relevant times, also breached its fiduciary duty to the BDC in violation of the Advisers Act as a result of Singal's conduct described herein. Singal knowingly or recklessly provided substantial assistance to the BDC Adviser through the conduct described in this Complaint. Singal's knowledge is imputed to the BDC Advisor by reason of his ownership interest in and control over it.

## COUNT I

### Violations of Section 17(a) of the Securities Act

#### (Singal)

171. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

172. By engaging in the conduct described above with respect to both FC REIT and the BDC, Defendant Singal, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) knowingly or recklessly employed any device, scheme or artifice to defraud; (b) knowingly, recklessly or negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) knowingly, recklessly or negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

173. By reason of the foregoing, Defendant Singal violated, and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT II

### Violations of Section 17(a)(2) of the Securities Act

#### (FC REIT)

174. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

175. By engaging in the conduct described above with respect to FC REIT, Defendant FC REIT, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce, or by use of the mails, directly or indirectly knowingly, recklessly or negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

176. By reason of the foregoing, Defendant FC REIT violated, and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

### COUNT III

#### *Violations of Section 10(b) and Rule 10b-5 of the Exchange Act*

#### *(Singal)*

177. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

178. By engaging in the conduct described above with respect to both FC REIT and the BDC, Defendant Singal directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, in connection with the purchase or sale of any security, knowingly or recklessly: (a) employed any device, scheme or artifice to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person.

179. By reason of the foregoing, Defendant Singal violated, and, unless enjoined, is reasonably likely to continue to violate, Section 10(b), Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a), Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b), and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

### COUNT IV

#### *Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act*

#### *(FC REIT)*

180. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

181. By engaging in the conduct described above with respect to FC REIT, Defendant FC REIT directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security.

182. By reason of the foregoing, Defendant FC REIT violated, and, unless enjoined, is reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

### COUNT V

#### *Violations of Section 206(1) and Section 206(2) of the Advisers Act*

#### *(Singal)*

183. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

184. By engaging in the conduct described above with respect to the BDC, Defendant Singal acted as an investment adviser to the BDC within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11). For compensation, he engaged in the business of advising the BDC as to the value of securities and as to the advisability of investing in, purchasing, or selling securities.

185. By engaging in the conduct described above with respect to the BDC, Singal by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, knowingly or recklessly employed any device, scheme, or artifice to defraud any client or prospective client.

186. By engaging in the conduct described above with respect to the BDC, Singal, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, knowingly, recklessly or negligently engaged in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

187. By reason of the foregoing, Singal violated, and, unless enjoined, is reasonably likely to continue to violate, Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1) and Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## COUNT VI

### *Violations of Section 36(a) of the Company Act*

### (Singal)

188. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

189. By engaging in the conduct described above with respect to the BDC, while serving or acting as a director, Defendant Singal engaged in acts or practices constituting a breach of fiduciary duty involving personal misconduct in respect of a registered investment company for which he, at the time of the misconduct, so served or acted.

190. By reason of the forgoing, Defendant Singal violated, and unless enjoined and restrained will continue to violate, Section 36(a) of the Investment Company Act, 15 U.S.C. § 80a-35(a).

## COUNT VII

### *Violations of Section 57(a)(3) and 57(a)(4) of the Company Act and Company Act Rule 17d-1*

### (Singal)

191. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

192. By engaging in the conduct described above with respect to the BDC, Defendant Singal, while serving as a director of a BDC, acting as principal for the BDC, knowingly borrowed money or other property from such BDC or from any company controlled by such BDC.

193. By engaging in the conduct described above as to the BDC, Defendant Singal, while serving as a director of a BDC, acting as principal for the BDC, knowingly effected a transaction in which such BDC or a company controlled by such BDC was a joint or a joint and several participant with him.

194. By engaging in the conduct described above as to the BDC, Defendant Singal, while an affiliated person of the BDC, acting as principal, participated in, or effected a transaction in connection with, any joint enterprise or other joint arrangement or profit-sharing plan in which the BDC was a participant. "Joint enterprise or other joint arrangement or profit sharing plan" is defined in Company Act Rule 17d-1, which applies to Section 57(a)(4) pursuant to Section 57(i), to include any written or oral plan, contract, authorization or arrangement, or any practice or understanding concerning an enterprise or undertaking whereby a registered investment company and any affiliated person have a joint or joint and several participation, or share in the profits of such enterprise or undertaking.

195. By reason of the forgoing, Defendant Singal violated, and unless enjoined and restrained will continue to violate, Section 57(a)(3) of the Investment Company Act , 15 U.S.C. § 80a-56(a)(3), Section 57(a)(4) of the Investment Company Act, 15 U.S.C. § 80a-56(a)(4), and Company Act Rule 17d-1, 17 C.F.R. § 270.17d-1.

## COUNT VIII

### Violations of Section 15(d) of the Exchange Act and Exchange Act Rules 15d-1 and 15d-13

### (FC REIT)

196. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

197. By engaging the conduct described above with respect to FC REIT, Defendant FC REIT, having filed a registration statement that had become effective pursuant to the Securities Act of 1933, failed to file quarterly and annual reports on Forms 10-Q and Forms10-K, respectively, within the time period prescribed in the forms.

198. By reason of the forgoing, Defendant FC REIT violated, and unless enjoined and restrained will continue to violate, Section 15(d) of the Exchange Act, 15 U.S.C. § 78(o)(d), and Exchange Rule 15d-1, 17 C.F.R. § 240.15d-1, and Rule 15d-13, 17 C.F.R. § 240.15d-13.

## COUNT IX

### Aiding and Abetting Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act

### (FC REIT Advisor)

199. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

200. By engaging in the conduct described above with respect to FC REIT, Defendant FC REIT Advisor, which was owned and controlled by Signal at all relevant times and was responsible for assisting in the preparing of FC REIT's public filings, knowingly or recklessly provided substantial assistance to FC REIT in its violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

201. By reason of the foregoing, Defendant FC REIT Advisor aided and abetted FC REIT's violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b), as alleged in Count IV, and unless enjoined, will continue to aid and abet violations thereof.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v...., 2019 WL 6827346...

## COUNT X

### *Aiding and Abetting Violations of Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act*

### (FC Private)

202. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

203. By engaging in the conduct described above with respect to both FC REIT and the BDC, Defendant FC Private, which was owned and controlled by Singal at all relevant times, knowingly or recklessly provided substantial assistance to Singal in his violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rules 10b-5(a) and 10b-5(c), 17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c).

204. By reason of the foregoing, Defendant FC Private aided and abetted Defendant Singal's violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rules 10b-5(a) and 10b-5(c), 17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c), as alleged in Count III, and unless enjoined, will continue to aid and abet violations thereof.

## COUNT XI

### *Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act*

### (FC REIT Advisor)

205. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

206. By engaging in the conduct described above with respect to FC REIT, Defendant FC REIT Advisor, which was owned and controlled by Singal at all relevant times and was responsible for assisting in the preparing of FC REIT's public filings, knowingly or recklessly provided substantial assistance to FC REIT in tis violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

207. By reason of the foregoing, Defendant FC REIT Advisor aided and abetted FC REIT's violation of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), as alleged in Count II, and unless enjoined, will continue to aid and abet violations thereof.

## COUNT XII

### *Aiding and Abetting Violations of Section 17(a)(1) and 17(a)(3) of the Securities Act*

### (FC Private)

208. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

209. By engaging in the conduct described above with respect to both the REIT and the BDC, Defendant FC Private, which was owned and controlled by Singal at all relevant times, knowingly or recklessly provided substantial assistance to Defendant Singal in his violations of Section 17(a)(1) and Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1) and (a)(3).

SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v...., 2019 WL 6827346...

210. By reason of the foregoing, Defendant FC Private aided and abetted Defendant Singal's violation of Section 17(a)(1) and Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1) and (a)(3), as alleged in Count I, and unless enjoined, will continue to aid and abet violations thereof.

## COUNT XIII

### Aiding and Abetting Violations of Sections 206(1) and (2) of the Advisers Act

### (Singal)

211. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

212. By engaging in the conduct described above with respect to the BDC, Defendant Singal knowingly or recklessly provided substantial assistance to the BDC Advisor, which was owned in whole or in part and controlled by Singal at all relevant times, in its violations of Sections 206(1) and (2) of the Advisers Act.

213. By reason of the foregoing, Defendant Singal aided and abetted the BDC Advisor's violation of Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. § 80b-6(1) and 80b-6(2), as alleged in this Complaint, and unless enjoined, will continue to aid and abet violations thereof.

## COUNT XIV

### Aiding and Abetting Violations of Section 15(d) of the Exchange Act and Exchange Act Rules 15d-1 and 15d-13

### (FC REIT Advisor)

214. The Commission re-alleges and incorporates by reference herein each and every allegation contained in the paragraphs above.

215. By engaging in the conduct described above with respect to FC REIT, Defendant FC REIT Advisor which was owned and controlled by Singal at all relevant times and was responsible for assisting in the preparing of FC REIT's public filings, knowingly or recklessly provided substantial assistance to FC REIT in its violations of Section 15(d) of the Exchange Act and Exchange Act Rules 15d-1 and 15d-1.

216. By reason of the foregoing, Defendant FC REIT Advisor aided and abetted FC REIT's violation of Section 15(d) of the Exchange Act, 15 U.S.C. § 78(o)(d), and Exchange Rule 15d-1, 17 C.F.R. § 240.15d-1, and Rule 15d-13, 17 C.F.R. § 240.15d-13, as alleged in Count VIII, and unless enjoined, will continue to aid and abet violations thereof.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find Defendants committed the violations charged, and enter Judgments:

### I.

### Permanent Injunctions

Permanently restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the federal securities laws alleged in this Complaint.

## II.

### *Disgorgement*

Ordering Defendants Singal and FC Private to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## III.

### *Penalties*

Ordering Defendants Singal, FC Private, and FC REIT Advisor to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and as to Singal, further pursuant to Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).

## IV.

### *Officer and Director Bar*

Ordering pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), Section 21(d)(2) of the Exchange Act, 15 U.S.C § 78u(d)(2), and Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5), and in the inherent equitable powers of this Court, permanently prohibiting Defendant Singal from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which is required to file reports with the Commission pursuant to section 15(d) of the Exchange Act.

## V.

### *Further Relief*

Granting such other and further relief as the Court determines to be necessary and appropriate.

## VI.

### *Retention of Jurisdiction*

Further, the Commission respectfully requests the Court retain jurisdiction over this action and over Defendants in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

### *DEMAND FOR A JURY TRIAL*

Under Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

DATED: December 13, 2019

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By: */s/*

Derek S. Bentsen (DB-8369)

Joshua E. Braunstein (*pro hac* to be filed)

Matthew F. Scarlato (*pro hac* to be filed)

Securities and Exchange Commission

100 F Street, NE

Washington, DC 20549

Telephone: (202) 551-6426 (Bentsen)

Email: BentsenD@sec.gov

*Attorneys for Plaintiff*

---

**End of Document** <span style="float:right">© 2021 Thomson Reuters. No claim to original U.S. Government Works.</span>

# EXHIBIT B

# FENNEMORE.

**David Lewandowski**
**Of Counsel**
dlewandowski@fennemorelaw.com

7800 Rancharrah Parkway,
Reno, Nevada 89511
PH (775) 788-2235 | FX (775) 788-2261
fennemorelaw.com

February 3, 2022

**Via Electronic Mail: Maria Fernandez (mfernandez@ftenet.com)**

Ms. Maria Fernandez
Corporate Secretary
FTE Networks, Inc.
237 W. 35th Street, Suite 806
New York, NY 10001

**Via FedEx**

FTE Networks, Inc.
c/o Incorp Services, Inc.
3773 Howard Hughes Pkwy., Suite 500S
Las Vegas, NV 89169

Re: Amendment to Bylaws

Ladies and Gentlemen:

This firm represents Innovativ Media Group, Inc., a shareholder in FTE Networks, Inc. ("FTE"). I have enclosed a written consent signed on behalf of a majority-in-interest of the shareholders of FTE. That written consent amends the bylaws of FTE in certain particulars and is effective upon your receipt. Please update your records accordingly and file this amendment with FTE's bylaws.

If you have any questions regarding this document, please feel free to contact me.

Best regards,

David Lewandowski

19326659.1/057702.0001

IMG 000014

DocuSign Envelope ID: 83B7F88F-947A-4A2C-9B8C-45156DF215E1

WRITTEN CONSENT OF THE SHAREHOLDERS OF

FTE NETWORKS, INC.,
a Nevada corporation,

The undersigned, holding a majority of the voting power of the issued and outstanding stock of FTE Networks, Inc., a Nevada corporation (the "Corporation"), individually and collectively consent by this writing to take the following actions, to adopt the following resolutions, and to transact the following business of the Corporation pursuant to Section 2.12(a) of the Corporation's bylaws (the "Bylaws") and to Section 78.320 of the Nevada Revised Statutes:

**Amendment of Bylaws.**

WHEREAS, the undersigned desire to amend the Bylaws in certain particulars as more fully set forth below:

NOW, THEREFORE, IT IS HEREBY RESOLVED, that the Bylaws are amended as follows:

*Section 3.1 of the Bylaws is amended and restated in its entirety as follows:*

**3.1 General Powers.** Subject to these bylaws, the Corporation's articles of incorporation and applicable law, all corporate powers shall be exercised by or under the authority of, and the business and affairs of the Corporation managed under the direction of, its Board; *provided, however,* that:

a. No shares of the capital stock of the Corporation may be issued to any officer, director or stockholder (each, an "Insider") of the Corporation or any affiliate of an Insider without the approval of stockholders holding a majority of the voting power of the issued and outstanding shares of the Corporation's capital stock (such stockholders, the "Controlling Stockholders"). As used in these Bylaws, "affiliate" means a person, trust or entity who controls, is controlled by or is under common control with a specified person, trust or entity, along with the immediate family members of any such specified person along with any person or entity acting in concert with such specified person. "Control" in the preceding sentence means the power to direct the policies and affairs of an entity or trust;

b. Without the consent of the Controlling Stockholders the Board may not:

i. adopt any shareholder rights, poison pill, staggered board or other plan that has an anti-takeover purpose or effect; and

1

DocuSign Envelope ID: 83B7F88F-947A-4A2C-9B8C-45156DF215E1

        ii.     issue any shares of stock with voting rights greater than the voting rights of shares of the Corporation's common stock.

*Section 3.2 of the Bylaws is amended and restated in its entirety as follows:*

    **3.2**    ***Number and Qualification of Directors***.  The Board shall consist of three members.  Directors do not need to be residents of Nevada or shareholders of the Corporation.

*Section 5 of the Bylaws is eliminated in its entirety.*

*The first paragraph and the next sentence thereafter of Section 6.5 of the Bylaws is amended and restated in its entirety as follows:*

    **6.5**    ***Restrictions on Transfer or Registration of Shares.***  Without the consent of the Controlling Stockholders, the Board may only impose restrictions on the transfer or registration of transfer of shares (including any security convertible into, or carrying a right to subscribe for or acquire shares) in the following circumstances:

*Section 6(c) of the Bylaws is eliminated in its entirety.*

*Section 9.1 of the Bylaws is amended and restated in its entirety as follows:*

    **9.1**    ***Amendments.***  Without the consent of the Controlling Stockholders, the Corporation's Board may not amend, repeal, modify or supplement the Corporation's Bylaws at any time.

**General**

FURTHER RESOLVED, that this instrument may be executed in multiple counterparts, which, when taken together, shall constitute one and the same instrument.  Any signature page of this instrument may be detached from any counterpart without impairing the legal effect of any signatures thereon, and may be attached to another counterpart identical in form thereto, but having attached to it one or more additional signature pages.  Any signature transmitted electronically (including DocuSign or similar electronic signature) shall have the same effect as an original, manual signature.

FURTHER RESOLVED, that it is the intent of the undersigned that the foregoing resolutions be effective immediately upon delivery of an executed copy hereof to the registered agent or the secretary of the Corporation.

[signatures appear on following pages]

IMG 000016

DocuSign Envelope ID: 83B7F88F-947A-4A2C-9B8C-45156DF215E1

[signature page to Written Consent of the Shareholders of FTE Networks, Inc., a Nevada corporation]

Majique Ladnier

Danish Mir

Khawaja Zargham bin Aamer

First Capital Master Advisor, LLC

By: _____

Printed: Suneet Singal

Title: Manager

Alex Szkaradek

Antoni Szkaradek

Stephen Goodwin

Peter Ghishan

Joseph Cunningham

Dennis Shorrock

TTP 8, LLC

By: _____

Printed: Majique Ladnier

Title: Authorized Signatory Party

Innovativ Media Group, Inc.

By: Tom Coleman

Printed: Tom Coleman

Title: CEO

Timothy Swanston

Robert Swanston

Patrick Shorrock

Eric Phelps

_____

Chris Ferguson

3

IMG 000017

# EXHIBIT C

FILED: NEW YORK COUNTY CLERK 05/11/2022 12:43 PM    INDEX NO. 652225/2022
NYSCEF DOC. NO. 4    Case 1:22-cv-05960-PGG    Document 1-1    Filed 07/13/22    Page 83 of 222    RECEIVED NYSCEF: 05/11/2022
Case 2:22-cr-00068-KJM    Document 1    Filed 04/07/22    Page 1 of 8

PHILLIP A. TALBERT
United States Attorney
MIRIAM R. HINMAN
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

**FILED**

**Apr 07, 2022**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

SUNEET SINGAL,

Defendant.

CASE NO. 2:22-cr-0068 KJM

18 U.S.C. § 1343 – Wire Fraud (6 counts); 18 U.S.C.
§ 1341 – Mail Fraud (4 counts); 18 U.S.C.
§ 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal
Forfeiture

I N D I C T M E N T

COUNTS ONE THROUGH SIX: [18 U.S.C. § 1343 – Wire Fraud]

The Grand Jury charges:

SUNEET SINGAL,

defendant herein, as follows:

## I.    **INTRODUCTION**

At all times relevant to the Indictment:

1.    SUNEET SINGAL resided in El Dorado Hills, California, and worked in both Gold River, California, and New York, New York.

2.    COMPANY 1 was registered in Nevada and operated a chain of fast-food franchises in California. COMPANY 1 had an office in Gold River, California.

3.    COMPANY 2 was registered in California and owned COMPANY 1 until on or about

INDICTMENT

1

FILED: NEW YORK COUNTY CLERK 05/11/2022 12:43 PM
INDEX NO. 652225/2022
NYSCEF DOC. NO. 4
Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 84 of 222
RECEIVED NYSCEF: 05/11/2022
Case 2:22-cr-00068-KJM   Document 1   Filed 04/07/22   Page 2 of 8

1  February 23, 2017, when it was sold to Individual 1. SUNEET SINGAL was the owner and Managing

2  Member of COMPANY 2. COMPANY 2 had an office in Gold River, California.

## II.   SCHEME TO DEFRAUD

4   4.    Beginning in or about March 2017, and continuing through in or about July 2017,

5  defendant SUNEET SINGAL and others known and unknown to the Grand Jury knowingly devised,

6  intended to devise, and participated in a material scheme and artifice to defraud and to obtain money by

7  means of materially false and fraudulent pretenses, representations, and promises.

8   5.    The purpose of the scheme was to induce financing companies to provide funds to

9  COMPANY 1 and COMPANY 2 in the form of merchant cash advances, which are advances of money

10  in exchange for promises to repay greater amounts of money from future receivables.

## III.   MANNER AND MEANS

12   In furtherance of the fraud, SUNEET SINGAL employed, among others, the following ways and

13  means:

14   6.    On or about February 23, 2017, SUNEET SINGAL signed a sale contract pursuant to

15  which COMPANY 2 sold COMPANY 1 to Individual 1.

16   7.    After February 23, 2017, despite no longer having an ownership interest in COMPANY

17  1, SUNEET SINGAL continued to purport to act as a representative of COMPANY 1, take action

18  allegedly on behalf of COMPANY 1, and direct others to take action with respect to COMPANY 1.

19   8.    After February 23, 2017, SUNEET SINGAL and others working with him and at his

20  direction and control applied to third-party financing companies for merchant cash advances to be

21  provided to COMPANY 1 and COMPANY 2.

22   9.    In documents and communications provided to the third-party financing companies,

23  SUNEET SINGAL and others working with him and at his direction and control provided false

24  statements, including stating that SUNEET SINGAL was the owner of COMPANY 1 and was

25  authorized to act on behalf of COMPANY 1.

26   10.    For example, SUNEET SINGAL signed and authorized that his signature stamp be

27  placed on documents for the third-party financing companies that contained false statements about the

28  ownership and control of COMPANY 1, including that SUNEET SINGAL was a principal, owner,

1   officer, and director of COMPANY 1 and that COMPANY 2 was the managing member of COMPANY

2   1.

3       11.    As a result of the false documents and false statements provided by SUNEET SINGAL

4   and others working with him and at his direction and control, the third-party financing companies

5   provided merchant cash advances to COMPANY 1 and COMPANY 2.  The merchant cash advances

6   required the recipient to repay the financing company at a high rate over a short time period.

7       12.    SUNEET SINGAL and others working with him and at his direction and control used the

8   merchant cash advances for various expenses, including operating expenses for COMPANY 1 and

9   COMPANY 2.

10      13.    COMPANY 1 was unable to make a substantial portion of the required repayments to the

11  third-party financing companies and filed for bankruptcy on or about September 14, 2017.

12                          **IV.  USE OF THE INTERSTATE WIRES**

13      14.    On or about the dates listed below, for the purpose of executing the aforementioned

14  scheme and artifice to defraud and attempting to do so, SUNEET SINGAL, as more specifically charged

15  below, knowingly transmitted and caused to be transmitted by means of wire communication in

16  interstate and foreign commerce certain writings, signs, signals, pictures and sounds:

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

INDICTMENT

| COUNT | ON OR ABOUT DATE | WIRE DESCRIPTION |
|-------|------------------|------------------|
| 1 | April 12, 2017 | Wire transfer of $197,370 from Financing Company 1 to JP Morgan Chase account ending in #0562 |
| 2 | April 20, 2017 | Wire transfer of $112,308 from Financing Company 2 to JP Morgan Chase account ending in #3187 |
| 3 | April 20, 2017 | Wire transfer of $48,500 from Financing Company 2 to JP Morgan Chase account ending in #3187 |
| 4 | April 21, 2017 | Wire transfer of $294,946 from Financing Company 3 to JP Morgan Chase account ending in #9924 |
| 5 | May 5, 2017 | Wire transfer of $96,970 from Financing Company 4 to JP Morgan Chase account ending in #9924 |
| 6 | May 22, 2017 | Wire transfer of $43,975 from Financing Company 4 to JP Morgan Chase account ending in #0562 |

All in violation of Title 18, United States Code, Sections 2 and 1343.

COUNTS SEVEN THROUGH TEN: [18 U.S.C. § 1341 - Mail Fraud]

The Grand Jury further charges:

SUNEET SINGAL,

defendant herein, as follows:

15.     The Grand Jury re-alleges and incorporates by reference all of the allegations set forth in Paragraphs 1 through 13 of Counts One through Six of this Indictment, as set forth above.

16.     On or about the dates listed below, for the purpose of executing the aforementioned scheme and artifice to defraud and attempting to do so, SUNEET SINGAL did knowingly cause to be deposited, and did knowingly cause to be delivered, matter and things to be sent and delivered by a private and commercial interstate carrier according to the directions thereon, as more specifically set forth below:

///

///

FILED: NEW YORK COUNTY CLERK 05/11/2022 12:43 PM    INDEX NO. 652225/2022
NYSCEF DOC. NO. 4    Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 87 of 222    RECEIVED NYSCEF: 05/11/2022

Case 2:22-cr-00068-KJM   Document 1   Filed 04/07/22   Page 5 of 8

| COUNT | ON OR ABOUT DATE | MAIL MATTER |
|-------|------------------|-------------|
| 7 | April 10, 2017 | Documents sent via FedEx to Financing Company 1 in Florida |
| 8 | May 4, 2017 | Documents sent via FedEx to Financing Company 4 in New York |
| 9 | May 17, 2017 | Documents sent via FedEx to Financing Company 5 in New Jersey |
| 10 | May 18, 2017 | Documents sent via FedEx to Financing Company 4 in New York |

All in violation of Title 18, United States Code, Sections 2 and 1341.

FORFEITURE ALLEGATION:  [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture]

1.    Upon conviction of one or more of the offenses alleged in Counts One through Ten of this Indictment, defendant SUNEET SINGAL shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real and personal, which constitutes or is derived from proceeds traceable to such violations, including but not limited to the following:

a.    A sum of money equal to the total amount of proceeds traceable to such offenses, for which defendant is convicted.

2.    If any property subject to forfeiture, as a result of the offenses alleged in Counts One through Ten of this Indictment, for which defendant is convicted:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to

INDICTMENT                                         5

1 | seek forfeiture of any other property of defendant, up to the value of the property subject to forfeiture.

2

3                                           A TRUE BILL.

4                              **/s/ Signature on file w/AUS/**

5                              _____

6                                           FOREPERSON

7    PHILLIP A. TALBERT
     United States Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDICTMENT                                    6

2:22-cr-0068 KJM

No. _ _ _ _ _ _ _ _ _ _ _

---

# UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

## THE UNITED STATES OF AMERICA

*vs.*    **No Bail Warrant Pending Hearing**

SUNEET SINGAL

---

### I N D I C T M E N T

**VIOLATION(S):**   18 U.S.C. § 1343 – Wire Fraud (6 counts);
18 U.S.C. § 1341 – Mail Fraud (4 counts);
18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c) -- Criminal Forfeiture

---

*A true bill,*

*/s/* **Signature on file w/AUSA**
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Foreman.*

*Filed in open court this* _ _ _ _ _ 7th _ _ _ _ _ _ *day*

*of* _ _ _ _ April _ _ _ _ _ _ _ *. A.D. 20* _ 22 _ _ _ _

_ _ _ _ _ _ _ _ _ _ /s/ Lisa M. Kennison _ _ _ _ _ _ _
*Clerk.*

**No Bail Warrant Pending Hearing**

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

---

GPO 863 525

FILED: NEW YORK COUNTY CLERK 05/11/2022 12:43 PM

NYSCEF DOC. NO. 4

INDEX NO. 652225/2022

RECEIVED NYSCEF: 05/11/2022

Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 90 of 222
Case 2:22-cr-00068-KJM   Document 1   Filed 04/07/22   Page 8 of 8

2:22-cr-0068 KJM

**United States v. Suneet Singal**
**Penalties for Indictment**

**Defendant**
**SUNEET SINGAL**

## COUNTS 1-6:

VIOLATION:           18 U.S.C. § 1343 – Wire Fraud

PENALTIES:           Up to 20 years in prison; or
                     Fine of up to $250,000, or twice the gross gain or gross loss, whichever is
                     greater; or both fine and imprisonment
                     Supervised release of up to 3 years
                     Restitution

SPECIAL ASSESSMENT:  $100 (mandatory on each count)

## COUNTS 7-10:

VIOLATION:           18 U.S.C. § 1341 – Mail Fraud

PENALTIES:           Up to 20 years in prison; or
                     Fine of up to $250,000, or twice the gross gain or gross loss, whichever is
                     greater; or both fine and imprisonment
                     Supervised release of up to 3 years
                     Restitution

SPECIAL ASSESSMENT: $100 (mandatory on each count)

## FORFEITURE ALLEGATION:

VIOLATION:           18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture

PENALTIES:           As stated in the charging document

# EXHIBIT D

**Execution Version**

**PURCHASE AGREEMENT**

**BY AND AMONG**

**FTE NETWORKS INC.,**
**as the Parent**

**US HOME RENTALS LLC,**
**as the Acquisition Sub**

**ALEXANDER SZKARADEK, ANTONI SZKARADEK, VPM HOLDINGS, LLC,**
**DOBRY HOLDINGS MASTER LLC, KAJA 3, LLC, KAJA 2, LLC, and KAJA, LLC**
**as the Equity Sellers**

**VISION PROPERTY MANAGEMENT, LLC**
**as the Asset Seller**

**AND**

**ALEXANDER SZKARADEK**
**as the Sellers' Representative**

**Dated as of December 20, 2019**

# TABLE OF CONTENTS

**Page**

ARTICLE 1 SALE AND PURCHASE OF THE MEMBERSHIP INTERESTS
     AND ASSETS; PURCHASE PRICE .........................................................2

1.1    Sale and Purchase of the Equity Interests ...................................................2
1.2    Sale and Purchase of the Transferred Assets and Liabilities .....................2
1.3    Assignment of Contracts and Rights............................................................4
1.4    Aggregate Consideration .............................................................................5

ARTICLE 2 CLOSING; PURCHASE PRICE ADJUSTMENTS.........................................5

2.1    Closing ........................................................................................................5
2.2    Certain Pre-Closing Deliveries ...................................................................5
2.3    Closing Actions and Deliveries ...................................................................6
2.4    Purchase Price Determination......................................................................8
2.5    Withholding ...............................................................................................10
2.6    Limitation on Parent Shares; Exemption from Registration.....................10

ARTICLE 3 REPRESENTATIONS AND WARRANTIES RELATING TO THE
     COMPANIES ..............................................................................................10

3.1    Organization and Good Standing................................................................10
3.2    Authorization of Agreement .....................................................................11
3.3    Conflicts; Consents of Third Parties..........................................................11
3.4    Capitalization; Indebtedness. .....................................................................12
3.5    Subsidiaries and Investments.....................................................................12
3.6    Financial Statements .................................................................................12
3.7    No Undisclosed Liabilities.........................................................................13
3.8    Taxes .........................................................................................................13
3.9    Real Property. ............................................................................................15
3.10    Title to Assets; Related Matters .................................................................16
3.11    Intellectual Property...................................................................................16
3.12    Company Contracts.....................................................................................17
3.13    Employees and Benefits.............................................................................18
3.14    Litigation....................................................................................................20
3.15    Compliance with Laws; Permits. ...............................................................20
3.16    Environmental Matters...............................................................................21
3.17    Financial Advisors .....................................................................................21
3.18    Affiliate Arrangements...............................................................................22
3.19    Insurance Policies ......................................................................................22
3.20    Absence of Certain Developments..............................................................22
3.21    Form Agreements.......................................................................................23
3.22    Bank Accounts ..........................................................................................23
3.23    Officers, Directors and Managers ..............................................................24

-i-

#55975433 v13

# TABLE OF CONTENTS

**Page**

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES RELATING TO THE SELLERS**................................................................24

4.1   Authorization of Agreement .....................................................24
4.2   Conflicts; Consents of Third Parties. ........................................24
4.3   Ownership and Transfer of the Equity Interests and Transferred Assets .....................................................................................25
4.4   Litigation..................................................................................25
4.5   Compliance with Laws; Permits. ..............................................25
4.6   Financial Advisors ...................................................................26
4.7   Acquisition for Own Account; Accredited Investor .................26

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES RELATING TO PARENT AND ACQUISITION SUB**...................................28

5.1   Organization and Good Standing..............................................28
5.2   Acquisition Sub........................................................................28
5.3   Capitalization...........................................................................28
5.4   Authorization of Agreement .....................................................29
5.5   Conflicts; Consents of Third Parties.........................................29
5.6   Litigation..................................................................................30
5.7   Financial Advisors ...................................................................30

**ARTICLE 6 COVENANTS** ................................................................30

6.1   Interim Operation of Business ..................................................30
6.2   Exclusivity ...............................................................................32
6.3   Cooperation and Further Assurances.........................................32
6.4   Pre-Closing Access to Information ............................................33
6.5   Confidentiality.........................................................................33
6.6   Preservation of Records ...........................................................34
6.7   Publicity ...................................................................................34
6.8   Tax Matters. .............................................................................34
6.9   Employee Matters ....................................................................36
6.10  Release. ....................................................................................39
6.11  Termination of Intercompany Arrangements ............................40
6.12  Post-Closing Cash Consideration .............................................40
6.13  Post-Closing Stock Consideration ............................................40
6.14  Deposit .....................................................................................40
6.15  Clawback...................................................................................40
6.16  Rehab Properties ......................................................................41

**ARTICLE 7 INDEMNIFICATION**.....................................................41

#55975433 v13

## TABLE OF CONTENTS

**Page**

7.1 Survival. ....41
7.2 Indemnification. ....41
7.3 Claims Procedure; Participation in Litigation....42
7.4 Purchase Price Adjustment ....44
7.5 Limitations ....44
7.6 Exclusive Remedies ....45

ARTICLE 8 CONDITIONS TO CLOSING....45

8.1 Conditions Precedent to Obligations of Parent and Acquisition Sub ....45
8.2 Conditions Precedent to Obligations of the Sellers ....46

ARTICLE 9 TERMINATION ....47

9.1 Termination of Agreement....47
9.2 Effect of Termination....48

ARTICLE 10 REPRESENTATIVE ....48

10.1 Appointment ....48
10.2 Authority ....48
10.3 Indemnification Claims; and Net Adjustment Amount ....48
10.4 No Liability ....49
10.5 Reliance....49

ARTICLE 11 MISCELLANEOUS ....49

11.1 Specific Performance ....49
11.2 Expenses ....49
11.3 Governing Law ....49
11.4 Jurisdiction ....49
11.5 Entire Agreement ....50
11.6 Amendments and Waivers ....50
11.7 Notices ....50
11.8 Binding Effect; Third-Party Beneficiaries; Assignment....51
11.9 Counterparts ....51
11.10 Further Assurances....52
11.11 WAIVER OF JURY TRIAL....52

ARTICLE 12 DEFINITIONS....52

12.1 Definitions....52
12.2 Cross-Reference of Other Definitions ....62
12.3 Other Definitional and Interpretive Matters ....63
12.4 Joint Drafting ....64

# TABLE OF CONTENTS

**<u>Page</u>**

<u>EXHIBITS & SCHEDULES</u>

Exhibit A        Certificate of Designation
Schedule I       Companies
Schedule II      Tax Allocation Statement Principles
Schedule 1.2(b)(v) - Excluded Assets
Schedule 1.2(c)(iii) - Excluded Liabilities
Schedule 6.10(a) – Transferred Employees
Schedule 12.1(b) - Assumed Liabilities

-i-

# PURCHASE AGREEMENT

This PURCHASE AGREEMENT (this "Agreement") is made and dated as of December 20, 2019 (the "Effective Date"), by and among (i) FTE Networks Inc., a Delaware corporation ("Parent"), (ii) US Home Rentals LLC, a Delaware limited liability company and direct wholly owned subsidiary of Parent (the "Acquisition Sub") (iii) Alexander Szkaradek, an individual ("Alex"), (iv) Antoni Szkaradek, an individual ("Antoni"), (v) VPM Holdings, LLC, a South Carolina limited liability company ("VPM Holdings"), (vi) Kaja 3, LLC, a South Carolina limited liability company ("Kaja3"), (vii) Kaja 2, LLC, a South Carolina limited liability company ("Kaja2"), (viii) Kaja, LLC, a South Carolina limited liability company ("Kaja"), (ix) Dobry Holdings Master LLC, a Delaware limited liability company ("Dobry" and together with Alex, Antoni, VPM Holdings, Kaja3, Kaja2, and Kaja, the "Equity Sellers"), (x) Vision Property Management, LLC, a South Carolina limited liability company (the "Asset Seller" and together with the Equity Sellers, the "Sellers"), and (xi) Alexander Szkaradek, in his capacity as the representative of the Sellers (the "Sellers' Representative"). Parent, Acquisition Sub, Sellers' Representative and Sellers are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties".

# BACKGROUND

WHEREAS, the Sellers own one hundred percent (100%) of the equity interests of each of the entities (collectively, the "Equity Interests") listed on Schedule I (the "Entities", each individually, an "Entity") and all of the Transferred Assets and Liabilities;

WHEREAS, the Sellers wish to sell to Acquisition Sub and Acquisition Sub wishes to purchase from the Sellers, the Equity Interests and Transferred Assets and Liabilities for the Purchase Price and upon the terms and subject to the conditions hereinafter set forth (the "Transaction"); and

WHEREAS, the Parties intend that the transfer of the Equity Interests and Transferred Assets in exchange for Common Stock and Preferred Stock pursuant to this Agreement, be part of the same plan, for purposes of Section 351 of the Code, as the transfer of assets by certain transferors to Parent in exchange for shares of Parent stock within the twelve (12) month period following the date hereof ("Other Transfers"). If Parent reasonably determines that the shares of Common Stock and Preferred Stock issued to Equity Sellers pursuant to this Agreement, together with shares of Parent stock that is owned or will be issued to transferors pursuant to the Other Transfers, in the aggregate represent 80% or more of the total combined voting power of all Parent's voting stock, and 80% or more of the total number of shares of each other class of stock of Parent, Parent will treat the transfers of the Common Stock and Preferred Stock pursuant to this Agreement as issued in a transaction qualifying under Section 351 of the Code.

## TERMS

**NOW, THEREFORE**, in consideration of the premises and the representations, warranties, covenants and agreements contained in this Agreement, the parties hereto, intending to be legally bound hereby, do hereby agree as follows:

## ARTICLE 1

## SALE AND PURCHASE OF THE MEMBERSHIP INTERESTS AND ASSETS; PURCHASE PRICE

1.1    <u>Sale and Purchase of the Equity Interests</u>.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Equity Seller shall sell to Acquisition Sub, and Acquisition Sub shall purchase from the Equity Seller, the Equity Interests free and clear of all Liens.

1.2    <u>Sale and Purchase of the Transferred Assets and Liabilities</u>.

(a)    <u>Transferred Assets and Liabilities</u>.  Subject to the terms and conditions of this Agreement, at the Closing, the Asset Seller will sell, convey, assign, transfer and deliver to the Acquisition Sub, and Acquisition Sub will purchase, acquire and accept from the Asset Seller all of the Transferred Assets free and clear of all Liens (other than Permitted Exceptions), and agree to pay, discharge and perform in accordance with their terms all of the Transferred Liabilities as the same shall exist immediately prior to the Closing; <u>provided</u>, that the actions to be taken by the Sellers, Parent and Acquisition Sub pursuant to this <u>Section 1.2(a)</u> are subject to the exclusions set forth in <u>1.2(b)</u> and <u>1.2(c)</u>.

(b)    <u>Excluded Assets</u>.  Parent and Acquisition Sub expressly understand and agree that the following Assets and properties of the Asset Seller and its Affiliates (the "<u>Excluded Assets</u>") shall be retained by the Asset Seller and its Affiliates, notwithstanding any other provision of this Agreement:

(i)    (A) all cash on hand or held by any bank or other third Person other than any cash reflected on the Final Closing Statement and (B) all rights to any bank accounts other than any Transferred Bank Accounts;

(ii)    any rights to any Tax refunds as a result of or with respect to Taxes with respect to any taxable period or portion thereof ending on or before the Closing Date;

(iii)    all Actions (including counterclaims) and defenses against third parties relating to any of the Excluded Assets or the Excluded Liabilities as well as any books, records and privileged information relating thereto;

(iv)    the following Assets and properties of the Asset Seller and its Affiliates, other than the Companies:

(A)     Tax Returns with respect to the Business or the Transferred Assets relating to any taxable period or portion thereof ending on or before the Closing Date;

(B)     any employee benefit plans, programs, arrangements and Contracts (including any retirement benefit and post-retirement health benefit plans, programs, arrangements and agreements) sponsored or maintained by such Persons and any trusts and other Assets related thereto, but excluding any Assumed Contracts;

(C)     the Policies, other than those owned or maintained exclusively by the Companies;

(D)     any interest under this Agreement or in any document, certificate or instrument delivered pursuant to or in connection with this Agreement;

(E)     any personnel and employment records for employees and former employees who are not Transferred Employees;

(F)     all corporate minute books (and other similar corporate records) and stock records (other than those of the Companies);

(G)     any books and records relating exclusively to the Excluded Assets;

(H)     any books, records or other materials that the Sellers or any of their Affiliates other than the Companies (1) are required by Law to retain, (2) reasonably believe are necessary to enable the Sellers or such Affiliate to prepare and/or file Tax Returns, or (3) is prohibited by Law from delivering to Parent and Acquisition Sub; provided that the Sellers will (if reasonably requested by Parent) provide Parent and Acquisition Sub with a true and complete copy of all books, records and other materials retained by Sellers pursuant to subsections (1) and (2) above that relate to the Companies, the Transferred Assets and Liabilities or the Business;

(I)     any shares of capital stock or other equity securities of any Person other than the Companies; and

(v)     the Assets of the Companies set forth on Schedule 1.2(b)(v).

(c)     Excluded Liabilities.  Notwithstanding anything in Section 1.2(b) or in any other provision of this Agreement or any document, certificate or instrument delivered pursuant to or in connection with this Agreement to the contrary, except for the Transferred Liabilities: (i), Acquisition Sub is not assuming or agreeing to pay or discharge any Liabilities of the Equity Seller or its Affiliates and (ii) Acquisition Sub is not assuming or agreeing to pay or discharge any Liabilities of the Asset Seller for any of the following (all such Liabilities not being assumed being herein referred to as the "Excluded Liabilities"):

(i)     any Indebtedness of the Asset Seller or any of its Affiliates (other than the Company Indebtedness specifically assumed pursuant to this Agreement);

-3-

(ii)      any Liability relating to or arising under any Excluded Asset;

(iii)      any Liability set forth on Schedule 1.2(c)(iii);

(iv)      any Liability relating to or arising from any current or pending Action against any of the Companies or the Sellers related to the operation of the Business;

(v)      any Liability relating to or arising from any of the matters listed on Schedule 3.14(a), Schedule 3.14(b), Schedule 3.15(a)(i), or Schedule 3.15(a)(ii) or any matter which, if it existed prior to the Effective Date, would constitute an exception to the representations and warranties contained in Sections 3.14, 3.15, 4.4 or 4.5.

(vi)      (A) any Liability for Taxes arising as a result of or with respect to the Business, any Company or the Transferred Assets with respect to any taxable period or portion thereof ending on or before the Closing Date (for this purpose, with respect to Taxes imposed on a periodic basis for a period that includes, but does not end on, the Closing Date, such Taxes shall be allocated ratably on a daily basis to the extent not based on income, receipts or expenses, and to the extent based on income, receipts or expenses, shall be allocated based on a closing of the books method as of the close of business on the Closing Date), (B) any Liability for Taxes that will arise as a result of the transactions contemplated hereby, and including with respect to the sale and purchase of the Equity Interests, and (C) any Liability for Taxes of the Equity Seller or the Asset Seller;

(vii)      any Liability for any intercompany accounts payable (including trade accounts payable), or other loan, Contract or advance by the Asset Seller or its Affiliates to any Company;

(viii)    any Transaction Expenses; and

(ix)      Retained Bonuses.

1.3      Assignment of Contracts and Rights.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any of the Transferred Assets and Liabilities or any claim or right or any benefit arising thereunder or resulting therefrom if (a) an attempted assignment or transfer thereof, without the consent of a third party thereto, would constitute a breach or other contravention thereof or a violation of Law or would in any way adversely affect the rights of Parent or Acquisition Sub thereunder and (b) such consent is not obtained prior to the Closing. The Asset Seller will use its commercially reasonable efforts to obtain the consent of the other parties to any such Transferred Assets and Liabilities or any claim or right or any benefit arising thereunder for the assignment thereof to Parent or Acquisition Sub as Parent or Acquisition Sub may request. If such consent is not obtained, or if an attempted transfer or assignment thereof would be ineffective or a violation of Law or would adversely affect the rights of Parent or Acquisition Sub (as assignee of the Asset Seller or any Affiliate thereof) thereto or thereunder so that Parent or Acquisition Sub would not in fact receive all such rights, each Party will enter into any arrangement reasonably requested by the other Party under which (i) Parent or Acquisition Sub would, in compliance with Law, receive the benefits and assume the obligations and bear the economic burdens associated with such

-4-

Transferred Assets and Liabilities, claim, right or benefit in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Parent or Acquisition Sub, and (ii) the Asset Seller would enforce for the benefit (and at the expense) of Parent or Acquisition Sub any and all of its rights against a third party associated with such Transferred Assets and Liabilities, claim, right or benefit, and the Asset Seller would promptly pay to Parent or Acquisition Sub when received all monies received by Asset Seller under any Transferred Assets and Liabilities, claim, right or benefit.

   1.4 <u>Aggregate Consideration</u>.  Subject to the adjustment provisions set forth in <u>Section 2.4</u>, the aggregate consideration for the Equity Interests and the Transferred Assets and Liabilities shall be Three Hundred Fifty Million Dollars ($350,000,000) (the "<u>Base Purchase Price</u>") which shall be consist of (i) $10,000,000 of cash, payable in accordance with <u>Section 6.12</u>, (ii) the Common Stock Consideration issuable in accordance with <u>Section 6.14</u>, (iii) the Entities' Indebtedness and (iv) Preferred Stock having an aggregate stated value equal to Three Hundred Eight Million Dollars ($308,000,000) minus the aggregate amount of the Entities' Indebtedness, <u>plus</u>, (a) the amount, if any, by which the Net Working Capital exceeds the Target Net Working Capital, <u>minus</u>, (b) the amount, if any, by which the Net Working Capital is less than the Target Net Working Capital, and <u>minus</u> (c) the amount of Transaction Expenses (the "<u>Closing Preferred Stock</u>"), issuable in accordance with <u>Section 6.13</u>, in each case as of the applicable Determination Time (collectively the amounts in clauses (i) through (iv), the "<u>Purchase Price</u>").  The Purchase Price shall be paid as provided in <u>Article 2</u>.

<div align="center">

**ARTICLE 2**

**CLOSING; PURCHASE PRICE ADJUSTMENTS**

</div>

   2.1 <u>Closing</u>.  Subject to the satisfaction of the conditions set forth in this Agreement (or the waiver thereof by the Party entitled to waive any such condition), the consummation of the Transaction (the "<u>Closing</u>") will take place on third (3rd) Business Day  after the satisfaction or waiver of each condition to the Closing set forth in <u>Article 8</u> (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, is agreed to in writing by Parent, Acquisition Sub and Sellers.  The Closing shall take place through the execution and exchange, via .pdf copies of originally signed documents, of the documents and agreements contemplated herein.  The date on which the Closing will occur is referred to in this Agreement as the "<u>Closing Date</u>." Subject to <u>Article 9</u>, failure to consummate the transactions contemplated by this Agreement on the date and time and at a place determined pursuant to this <u>Section 2.1</u> shall not result in the termination of this Agreement and shall not relieve any Party of any obligation or covenant contained in this Agreement.

   2.2 <u>Certain Pre-Closing Deliveries</u>.

   (a) The Sellers shall deliver to Parent prior to Closing (a) letters from each respective lender to the Companies, in form and substance satisfactory to the Parent, setting forth the total amount of Indebtedness outstanding as of the Closing (i) on any assets of any of the Companies or (ii) on the Equity Interests (the "<u>Outstanding Indebtedness Letters</u>"), in respect of

<div align="center">-5-</div>

all Indebtedness, (b) an invoice from each professional advisor (including lawyers, accountants and investment bankers) for all unpaid Transaction Expenses relating to all services performed by such advisor in connection with this Agreement, the Transaction and the other transactions contemplated by the Transaction Documents, and (c) each as defined below, the Closing Estimates and the Payment Allocation Schedule.

(b)     The Sellers shall deliver to Parent, no later than three (3) Business Days prior to the Closing, a schedule, in a form approved by Parent showing the aggregate number of shares of Common Stock and Preferred Stock to be issued to each Seller (the "Payment Allocation Schedule").  The Payment Allocation Schedule shall also include the following information for each Seller (as of the Closing Date): (a) the Seller's address and (b) the Seller's taxpayer identification number.

2.3     <u>Closing Actions and Deliveries</u>.  At the Closing:

(a)     Sellers shall have paid or shall cause to be paid, on behalf of each of the Companies, or make available to each respective Company for payment to the applicable recipients thereof in the case where such payment gives rise to a withholding Tax obligation on the part of such Company, by wire transfer of immediately available funds, the Estimated Transaction Expenses to the applicable recipients thereof as set forth on the Estimated Closing Statement and, where applicable, such recipient's invoice;

(b)     Each Seller shall deliver to Purchaser a certificate stating that such Seller has reviewed the Payment Allocation Schedule, there are no omissions or errors on the Payment Allocation Schedule with respect to such Seller and any information on such documents regarding such Seller is accurate and complete.

(c)     The Sellers shall deliver to Parent and Acquisition Sub written resignations duly executed by the managers and officers of each of the Companies, as required by Parent and Acquisition Sub, with such resignations effective as of the Closing;

(d)     The Sellers shall deliver to Parent and Acquisition Sub the approvals, consents, waivers and assignments set forth on <u>Schedule 2.3(d)</u>;

(e)     The Sellers shall deliver to Parent and Acquisition Sub a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of each of the Companies certifying as to such customary matters involving its organization and, to the extent applicable, its authorization of this Agreement, the Transaction Documents to which it is a party and its consummation of the Transaction or the other transactions contemplated hereby or thereby;

(f)     The Sellers shall deliver to Acquisition Sub a certificate from the Secretary of State (or such other appropriate Governmental Body) of the state of formation of each Company as to the good standing of such Company, in all cases as of a date not more than two (2) Business Days prior to the Closing Date;

(g)     Each Seller shall deliver to Acquisition Sub a completed and duly executed form W-9;

-6-

(h)     Each Seller shall deliver to Acquisition Sub an affidavit (in such form as is reasonably agreed to by Acquisition Sub), meeting the requirements of Section 1445(b)(2) of the Code and the Treasury Regulations promulgated thereunder, certifying that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(i)     The Sellers shall deliver the Local Transfer Agreements;

(j)     The Sellers shall have delivered evidence reasonably satisfactory to Parent of the termination of the Intercompany Agreements;

(k)     The Asset Seller and Acquisition Sub shall have duly executed and delivered the Assignment and Assumption Agreement, in the form agreed upon by the Parties (the "Assignment and Assumption Agreement");

(l)     The Asset Seller and Acquisition Sub shall have duly executed and delivered the Employee Sharing Agreement in the form agreed upon by the Parties (the "Employee Sharing Agreement")

(m)     The Asset Seller and Acquisition Sub shall have duly executed and delivered the Bill of Sale in the form agreed upon by the Parties (the "Bill of Sale"); and

(n)     The Parties shall have executed and delivered such other special warranty deeds, bills of sale, endorsements, consents, assignments and other good and sufficient instruments of conveyance and assignment as the parties shall deem reasonably necessary to vest in Acquisition Sub all right, title and interest in, to and under the Transferred Assets and to evidence Acquisition Sub's assumption of the Transferred Liabilities;

(o)     The Equity Seller shall have delivered evidence of the termination of that certain Master Real Property Conveyance Agreement, dated October 26, 2019, between the Equity Seller and TTP8, LLC and such termination shall continue to be effective through the Closing Date;

(p)     If the Parent is then listed on the New York Stock Exchange, Parent shall have received approval from the New York Stock Exchange for its Supplemental Listing Application for issuance of additional shares of Common Stock;

(q)     Conditioned upon the Closing, the Equity Sellers shall have been released from those three certain Guarantee Agreements, dated July 10, 2017, between the Equity Sellers and Inmost Partners, LLC guaranteeing the notes issued by DSV SPV1 LLC, DSV SPV2 LLC, and DSV SPV3 LLC; and

(r)     The Parent shall have completed and received the proceeds of the Financing.

2.4    <u>Purchase Price Determination.</u>

(a)    <u>Closing Date Purchase Price Determination</u>.  At least three (3) Business Days prior to the Closing, the Sellers shall deliver to Parent and Acquisition Sub a statement (the "<u>Estimated Closing Statement</u>") setting forth the Sellers' good faith, reasonably detailed calculations of Estimated Entities' Indebtedness, Estimated Net Working Capital and Estimated Transaction Expenses.  The Sellers represent and warrant to the Parent and Acquisition Sub that the Estimated Closing Statement has been prepared based upon the books and records of the Companies on a modified accrual basis consistent with prior periods.

(b)    <u>Post-Closing Date Purchase Price Adjustments</u>.  As promptly as practicable, but no later than one hundred twenty (120) days after the Closing, Parent shall cause to be prepared and delivered to the Sellers' Representative a statement (the "<u>Closing Statement</u>") setting forth Parent's calculation of the Purchase Price and reasonably detailed calculations demonstrating each component thereof, including the Base Purchase Price, Entities' Indebtedness, Net Working Capital and Transaction Expenses.

(c)    Dispute Resolution Procedures.

(i)    If the Sellers' Representative disagrees with Parent's calculation of Base Purchase Price, Transferred Liabilities and Entities' Indebtedness, Net Working Capital or Transaction Expenses as set forth in the Closing Statement delivered pursuant to <u>Section 2.4(b)</u>, the Sellers' Representative may, within thirty (30) days after delivery of the Closing Statement (the "<u>Review Period</u>"), deliver a written notice to Parent setting forth the Sellers' Representative's calculation of the items and amounts in dispute (the "<u>Objection Notice</u>").  Any such notice of disagreement shall specify all items or amounts as to which the Sellers' Representative disagrees, and the Sellers' Representative shall be deemed to have agreed with the calculation of all other items and amounts set forth in the Closing Statement.

(ii)    If an Objection Notice shall be properly delivered pursuant to <u>Section 2.4(c)(i)</u>, the Sellers' Representative and Parent shall, during the fifteen (15) days following such delivery, negotiate in good faith the disputed items or amounts.  The matters set forth in any written resolution executed by the Sellers' Representative and Parent shall be final and binding on the parties on the date of such written resolution.

(iii)    If the Sellers' Representative and Parent are unable to reach such agreement during such fifteen (15) day period, they shall promptly thereafter submit any matters in dispute to a regionally recognized firm of certified public accountants or other financial organization appointed by the mutual agreement of Parent and Sellers' Representative (the "<u>Independent Accountant</u>") for resolution.  The Independent Accountant shall only determine the specific items under dispute, with respect to each specific item or amount in dispute, and shall determine an amount which is no higher than the highest number submitted by either Parent or the Sellers' Representative or which is no lower than the lowest number submitted by either Parent or the Sellers' Representative, and shall base its determinations solely on written submissions by Parent and the Sellers' Representative (or by in-person or telephonic conferences if mutually agreed to by Parent, the Sellers' Representative and the Independent Accountant).  The

-8-

Independent Accountant shall deliver to the Sellers' Representative and Parent, as promptly as practicable, a written report as to the resolution of each disputed item and the resulting computation of the Purchase Price. Such report shall be final and binding on the parties hereto and shall not be subject to further review or appeal (absent manifest arithmetical error). The Independent Accountant shall consider only those items and amounts in the Sellers' Representative's and Parent's respective calculations of Indebtedness, Net Working Capital or Transaction Expenses, each as of the applicable Determination Time, including each of the components thereof, that are identified as being items and amounts to which the Sellers' Representative and Parent have been unable to agree; provided, however, that other items that may be impacted by the resolution of the disputed items may be adjusted as necessary by the Independent Accountants. The costs and expenses of the Independent Accountant shall be borne by the Sellers, on the one hand, and Parent, on the other hand, based on the inverse of the percentage of the amounts that the Independent Accountant determines in such party's favor bears to the aggregate amount of the total items in dispute as originally submitted to Independent Accountant. For example, should the aggregate items in dispute total $1,000 and the Independent Accountant awards $600 in favor of the Sellers' Representative's position, sixty percent (60%) of the costs of its review would be borne by Parent and forty percent (40%) of the costs would be borne by the Sellers.

(iv)     The Closing Statement shall become final (the "Final Closing Statement") (A) at the end of the Review Period if the Sellers' Representative has not delivered an Objection Notice to Parent by such time, (B) with such changes as are necessary to reflect matters resolved pursuant to any written resolution executed pursuant to Section 2.4(c)(ii), on the date such resolution is executed and delivered, if all outstanding matters are resolved through such resolution or (C) with such changes as are necessary to reflect the Independent Accountant's resolution of the matters in dispute (together with any changes necessary to reflect matters previously resolved pursuant to any written resolution executed pursuant to Section 2.4(c)(ii) and any matters not disputed pursuant to a notice of disagreement), on the date the Independent Accountant delivers its final, binding determination pursuant to Section 2.4(c)(iii).

(d)     Net Adjustment Amount. Upon final determination of the Purchase Price as provided in Section 2.4(c) (the "Final Purchase Price"):

(i)     if the Net Adjustment Amount is positive, Parent shall, as promptly as practicable, but in no event later than five (5) Business Days following the determination of the Final Purchase Price as provided in Section 2.4(c), release the entire Holdback Amount to the Sellers, and Parent shall issue additional Preferred Stock with an aggregate value equal to the Net Adjustment Amount to the Sellers;

(ii)     if the Net Adjustment Amount is negative, then Parent shall, as promptly as practicable, but in no event later than five (5) Business Days following the determination of the Final Purchase Price as provided in Section 2.4(c), release to Sellers the greater of (a) that portion of the Holdback Amount equal to (x) the Holdback Amount less (y) the absolute value of the Net Adjustment Amount, and (b) zero;

(iii)     if the Net Adjustment Amount is zero, then Parent shall, as promptly as practicable, but in no event later than five (5) Business Days following the determination of the

Final Purchase Price as provided in Section 2.4(c), release the entire Holdback Amount to the Sellers.

2.5     Withholding.  Parent and any other applicable withholding agent are entitled to deduct and withhold, or cause to be deducted and withheld, from any amounts payable under this Agreement or any Transaction Documents, any withholding Taxes or other amounts required to be deducted and withheld pursuant to the Code or any applicable Law.  Any amount deducted and withheld pursuant to this Section 2.5 shall be treated for all purposes of this Agreement and any Transaction Document, as applicable, as having been paid to the Person in respect of whom such deduction and withholding was made.

2.6     Limitation on Parent Shares; Exemption from Registration.

(a)     Any adjustments made to the Purchase Price pursuant to this Agreement that would result in an increase to the Purchase Price, shall result in additional Preferred Stock being issued to the Sellers.

(b)     The Parent Securities to be issued in connection with this Agreement shall be issued in a transaction exempt from registration under the Securities Act, by reason of Section 4(a)(2) thereof and/or Regulation D promulgated under the Securities Act and may not be re-offered or resold other than in conformity with the registration requirements of the Securities Act and such other laws or pursuant to an exemption therefrom.  The certificates issued by Parent with respect to the Parent Securities issued hereunder shall be legended to the effect described above and shall include such additional legends as necessary to comply with applicable U.S. federal securities laws, and Blue Sky laws and to reflect the transfer restrictions set forth in Section 4.7(b) hereof..

(c)     All Sellers agree to execute such documents as Parent may reasonably determine to be necessary to ensure that the Parent Securities to be issued in connection with this Agreement are issued in a transaction exempt from registration under the Securities Act, by reason of Section 4(a)(2) thereof and/or Regulation D promulgated under the Securities Act.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES RELATING TO THE COMPANIES

With respect to each Company, the Sellers represent and warrant to Parent and Acquisition Sub as follows:

3.1     Organization and Good Standing.  The Company is duly organized, validly existing and in good standing under the laws of the state of its formation and has all requisite power and authority to own, lease and operate its properties and to carry on its business as currently conducted and proposed to be conducted.  The Company is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would

-10-

not have a Material Adverse Effect, and each such jurisdiction where the Company is so qualified, authorized or in good standing is set forth in Schedule 3.1.

3.2    Authorization of Agreement.  The Company has all requisite power and authority to execute, deliver and fully and timely perform the Company's obligations under each agreement, document, instrument or certificate contemplated by this Agreement or otherwise to be executed by the Company in connection with the Transaction (collectively, the "Company Documents"), and to consummate the Transaction and all other transactions contemplated hereby and thereby.  The execution, delivery and full and timely performance of each Company Document and the consummation of the Transaction and all other transactions contemplated hereby and thereby have been duly authorized by all requisite corporate, limited liability company or limited partnership, as the case may be, action on the part of the Company.  Each of the Company Documents have been, duly and validly executed and delivered by the Company and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) the Company Documents constitute, the legal, valid and binding obligations of the Company, enforceable against it in accordance with its and their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity) (collectively, the "Enforceability Exceptions").

3.3    Conflicts; Consents of Third Parties.

(a)    Except as set forth on Schedule 3.3(a), none of the execution, delivery or performance by the Company of the Company Documents, the consummation of the Transaction or the other transactions contemplated hereby or thereby, or full and timely compliance by the Company with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, acceleration, modification, or cancellation under, any provision of (i) the articles of incorporation, by-laws, operating or limited liability company agreement, or comparable organizational documents of the Company; (ii) any Company Contract, Lease or Permit; or (iii) any Law or Order applicable to the Company or by which the Company's properties or assets are bound or subject.

(b)    None of the execution and delivery by the Company of the Company Documents, the consummation of the Transaction or the other transactions contemplated hereby or thereby, or full and timely compliance by the Company with any of the provisions hereof or thereof will result in the creation or imposition of any Lien (other than Permitted Exceptions) on any properties or assets of the Company.

(c)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person, including any Governmental Body, is required on the part of the Company in connection with the execution and delivery of, and the full and timely performance of the covenants and agreements set forth in this Agreement or the Company Documents, or the compliance by the Company with any of the provisions hereof or

thereof, or the consummation of the Transaction and the other transactions contemplated herein or therein.

3.4    Capitalization; Indebtedness.

(a)    The Equity Interests related to the Company represent one hundred percent (100%) of the authorized equity securities of the Company.  The Equity Interests are held of record and beneficially as set forth on Schedule 3.4(a).  All of the Equity Interests have been validly issued to the Equity Sellers in the amounts set forth on Schedule 3.4(a), are fully paid and were not issued in violation of any preemptive or other similar rights in effect at the time of issuance. The Equity Interests are free and clear of all Liens.  There is no (i) existing option, warrant, call, right or Contract of any character to which the Company is a party requiring, and there are no securities of the Company outstanding which upon conversion or exchange would require, the issuance of any equity interests of the Company or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, equity interests of the Company or (ii) outstanding obligation, contingent or otherwise, of the Company to repurchase, redeem or otherwise acquire any capital stock or other securities of the Company (including the Equity Interests).  There is no voting trust, proxy, or Contract with respect to the voting, redemption, sale, transfer or other disposition of any capital stock or other securities of the Company (including the Equity Interests).    The Company has no outstanding, and has not authorized any, equity appreciation, phantom equity, profit participation or similar rights.

(b)    Schedule 3.4(b) lists each item (including the amount) of Indebtedness of the Company, and each instrument, document or Contract evidencing, or entered into in connection with, such Indebtedness, including each instrument, document or Contract evidencing, or entered into in connection with, any obligation for the reimbursement of letters of credit, performance bonds or similar transactions of the Company.

3.5    Subsidiaries and Investments.  The Company does not have, and has never at any time had any, Subsidiaries or investments in the securities of another Person.

3.6    Financial Statements.  Attached as Schedule 3.6 are correct and complete copies of (i) the unaudited balance sheet of the Company as of December 31, 2018 and December 31, 2017, and the related unaudited statements of income, owners' equity and cash flows of the Company for the years then ended (the "Prior Years Financial Statements"), and (ii) the unaudited balance sheet of the Company as of the Effective Date (the "Interim Balance Sheet" and the date thereof is hereinafter referred to as the "Interim Balance Sheet Date") and the related statements of income and cash flow for the period from January 1, 2019 through the Effective Date (together with the Interim Balance Sheet, the "Interim Financial Statements" and, collectively with the Prior Years Financial Statements, including the related notes and schedules thereto, as the case may be, the "Financial Statements").  Each of the Financial Statements is derived from the books and records of the Company, is complete and correct, and has been prepared on a modified accrual basis on a consistent basis throughout the period involved, subject only in the case of the Interim Financial Statements to changes resulting from normal year-end adjustments (the effect of which will not be materially adverse to the Company).  The Financial Statements present fairly in all

-12-

material respects the financial position and results of operations of the Company as of the dates and for the periods indicated therein.

3.7    No Undisclosed Liabilities.    Except as set forth on Schedule 3.7, the Company does not have any material Liabilities of a nature that would be required to be disclosed on a corporate balance sheet prepared in accordance with GAAP that are not adequately reserved against or described on the Interim Balance Sheet, other than (a) Liabilities incurred in the Ordinary Course of Business after the Interim Balance Sheet Date, or (b) Liabilities listed on a Schedule to this Agreement.  The Company does not have any "off-balance sheet arrangements" (as such term is defined in section 1.8 of Form 51-102F1 Management's Discussion & Analysis of National Instrument 51-102 – Continuous Disclosure Obligations, as amended).

3.8    Taxes.  Except as set forth on Schedule 3.8 (with specific reference to the specific subsection to which such disclosure is applicable):

(a)    All Tax Returns required to be filed by or with respect to the Company or any of its income have been properly and timely filed (taking into account valid extensions of time to file) in the prescribed manner, and each such Tax Return is true, correct and complete in all material respects.  All Taxes with respect to the Company or any of its income (whether or not shown on any Tax Return), business, operations or transactions (including sales and transfer taxes on acquisitions and dispositions of property) which have become due or payable have been timely paid.  The Company has adequately provided for, in its respective books of account and related records, Liability for all unpaid Taxes, which consists solely of current Taxes not yet due or payable;

(b)    The Company has made available to Parent true and complete copies of all Tax Returns of the Company for all taxable periods that remain open for assessment or reassessment as of the Closing Date and all notices of assessment or reassessment received in relation to those taxation periods;

(c)    The Company has duly and timely withheld or deducted all Taxes and other amounts required by Law to be withheld or deducted by it in respect of any amount paid or credited, or deemed to be paid or credited, by it to or for the account or benefit of any Person, including any current or former employee, officer, director, non-resident Person, creditor, independent contractor or other third party, and has duly and timely remitted to the appropriate Governmental Body such Taxes and other amounts required by Law to be remitted by it, and complied with all information reporting and backup withholding requirements, including the maintenance of required records with respect thereto, in connection with amounts paid or owing in accordance with and at the times required by Law, for all periods ending on or prior to the Closing Date;

(d)    There is no action, audit, dispute or Claim now in progress, proposed, or pending, or to the Knowledge of the Sellers threatened against, or with respect to, the Company in respect of any Taxes.  With respect to the Company, no Claim has been made by an authority in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction or that it must file Tax Returns.  The Company has not requested,

-13-

offered to enter into, or entered into, any agreement or other arrangement, or executed any waiver, providing for any extension of time, and the Company is not the beneficiary of any such extension of time, under any Law, within which (i) to file any Tax Return covering any Taxes for which the Company is or may be liable; (ii) to file any elections, designations or similar filings relating to Taxes for which the Company is or may be liable; (iii) the Company is or may be required to pay, collect or remit Taxes or amounts on account of Taxes; or (iv) any Governmental Body may assess, reassess, or collect Taxes for which the Company is or may be liable;

(e)     There are no assessments or reassessments of the Company's Taxes that have been issued and are outstanding and there are no outstanding issues which have been raised and communicated in writing, or otherwise, by a Governmental Body for any taxation period.  To the Knowledge of the Sellers, there is no contingent liability of the Company for Taxes or any grounds that could prompt an assessment or reassessment for Taxes.  No Governmental Body has challenged, disputed or questioned in writing, or otherwise, the Company in respect of Taxes or of any Tax Returns, filings or other reports filed under any Law, the final resolution of which is still pending.  The Company is not negotiating any draft or proposed assessment or draft or proposed reassessment with any Governmental Body.  The Company has not received any indication in writing, or otherwise, from any Governmental Body that an assessment or reassessment of the Company is proposed in respect of any Taxes, regardless of its merits.

(f)     The Company is not a party to or bound by, or have any obligation under, any Tax allocation Contract, Tax indemnity Contract, Tax sharing Contract or similar Contract or arrangement or any other obligation to indemnify any other Person with respect to Taxes.  There are no Liens with respect to Taxes on any of the assets or equity of the Company except for Permitted Exceptions;

(g)     The Company is not subject to any rulings in respect of Taxes of any Governmental Body that will be binding on the Company with respect to any period from and after the Closing Date.  The Company is not subject to any favorable Tax ruling by any Governmental Body or any Tax exemption or grant from any Governmental Body with respect to Taxes that would be lost or adversely affected by consummation of the transactions contemplated by this Agreement.  The Company has not filed a notice of objection under Law which will be in effect on the Closing Date;

(h)     No notices of determination of loss from a Taxing Authority to the Company has been requested by or issued to the Company.  The Company has not requested, received or entered into any advance Tax rulings or advance pricing agreements from or with any Governmental Body;

(i)     The Company (i) has not ever been a member of an affiliated, unitary or combined group filing a Tax Return on a consolidated basis (other than a group the common parent of which is the Sellers), and (ii) have any liability for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local, or foreign Law), as a transferee or successor, by contract, or otherwise;

-14-

(j)     Neither the Company, nor any Subsidiary, has participated in a "reportable transaction" required to be disclosed pursuant to Treas. Reg. §1.6011-4(b) or any predecessor thereof;

(k)     Neither the Company, nor any Subsidiary, will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (A) change in method of accounting for a taxable period ending on or prior to the Closing Date; (B) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign income Tax law) executed on or prior to the Closing Date; (C) intercompany transaction or excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local or foreign income Tax law); (D) installment sale or open transaction disposition made on or prior to the Closing Date; or (E) prepaid amount received on or prior to the Closing Date;

(l)     For U.S. federal income tax purposes, the Company is classified as a partnership and has been classified as either a partnership or as a "disregarded entity" at all times since formation.  No Governmental Body has ever challenged or questioned the Company's classification as a partnership or disregarded entity.

(m)     The Company collected all sales and use Taxes required to be collected and has remitted or will remit on a timely basis such amounts to the appropriate Governmental Body, or has been furnished properly completed exemption certificates.

3.9     Real Property.

(a)     Schedule 3.9(a) sets forth a correct and complete list of all the real property which the Company owns (together with all improvements thereon and all easements, rights and appurtenances pertaining thereto, each a "Real Property" and collectively, the "Real Properties"), and the information set forth thereon as to each Real Property is complete and accurate in all material respects.  The Company does not lease any real property as lessee or tenant.  With respect to each Real Property:

(i)     the Company identified on Schedule 3.9(a) as the owner has good, valid and marketable title to such Real Property, free and clear of all Liens, except Permitted Exceptions;

(ii)     such Real Property is subject to the Real Property Lease or other contract or arrangement identified with respect to such Real Property on Schedule 3.9(b), and except pursuant to such Real Property Lease or other contract or arrangement, no Person has a right to use or occupy such Real Property or any portion thereof;

(iii)     except as set forth on Schedule 3.9(a)(iii), no Person has an option, purchase right, right of first offer, right of first refusal or other right to purchase or lease such Real Property or any portion thereof or interest therein;

-15-

(iv)     except as set forth on <u>Schedule 3.9(a)(iv)</u>, such Real Property is in material compliance with all Laws; and

(v)     except as identified in <u>Schedule 3.9(a)(v)</u>, the Company has not received any written notice that any material portion of such Real Property will be condemned, requisitioned or otherwise taken by any Governmental Body.

(b)     <u>Schedule 3.9(b)</u> sets forth a correct and complete list of all the real property leases and subleases to which each Real Property is subject (the "<u>Real Property Leases</u>"). Each of the Real Property Leases is valid, binding, and in full force and effect, without modification or amendment from the form furnished to Acquisition Sub and is enforceable in accordance with its terms, except to the extent that enforceability may be limited by applicable Enforceability Exceptions. The Company is not in material breach or material default under any of the Real Property Leases to which the Company is a party. Complete copies of all Real Property Leases, together with any modifications, extensions, amendments and assignments thereof, have heretofore been furnished or made available to Acquisition Sub and Parent.

(c)     <u>Schedule 3.9(c)</u> sets forth a correct and complete list of all of the Real Property owned by the Company which the Sellers intend to rehabilitate but on which such rehabilitation efforts have not commenced as of the date hereof (collectively, the "<u>Rehab Properties</u>").

3.10     <u>Title to Assets; Related Matters</u>.  <u>Schedule 3.10</u> sets forth a correct and complete list of all of the Assets currently used in connection with the operation or conduct of the Business. The Company has good, valid and marketable title to, or a valid and enforceable leasehold interest in, all of the Assets, free and clear of all Liens, except Permitted Exceptions. All material equipment and other items of tangible personal property and assets located on or in or otherwise serving the Real Property necessary for the operation or conduct of the business of the Company consistent with past practice are in operating condition and capable of being used as currently used for their intended purposes and during their respective useful lives, reasonable wear and tear excepted. None of such assets, including the Assets, is in need of maintenance or repair except for ordinary, routine maintenance and repairs that are not material in nature or costs.

3.11     <u>Intellectual Property</u>.

(a)     The Company owns or has the valid right to use all Intellectual Property Rights used by the Company in the conduct of the business of the Company as presently conducted ("<u>Company Intellectual Property Rights</u>"), in each case, free and clear of all Liens, except Permitted Exceptions.

(b)     (i) To the Knowledge of the Sellers, no Person is infringing or otherwise violating any the Company Intellectual Property Rights and (ii) the conduct of the business of the Company as presently conducted does not and has not infringed, diluted, misappropriated or otherwise violated the Intellectual Property Rights of any other Person. The Company does not have any pending, unresolved notice or Legal Proceeding alleging that the Company is infringing upon, diluting, misappropriating or otherwise violating the Intellectual Property Rights of any

#55975433 v13

Person.  To the Knowledge of the Sellers, there is no pending, unresolved notice or Legal Proceeding against any other Person alleging that, such Person is infringing upon, diluting, misappropriating or otherwise violating any Company Intellectual Property Rights owned by the Company, and (iii) none of the Companies is a party to any other Legal Proceeding with respect to Intellectual Property Rights.

(c)     There are no judgments, decrees, judicial consents or orders against the Company that: (a) restrict the rights of the Company to use or enforce, or challenge or contest the Company's ownership of, the Company Intellectual Property Rights; or (b) restrict the conduct of the business of the Company as presently conducted in order to accommodate a third party's Intellectual Property Rights.

(d)     The Company maintains and are in compliance with, in all material respects, written privacy, security and data protection policies with respect to any confidential and sensitive information and/or data, including any financial or personally identifiable information (collectively, "Protected Information") that they may receive.  To the Knowledge of the Sellers, no Protected Information has been subject to any breach, misappropriation, unauthorized disclosure, or unauthorized access or use by any Person.

3.12    Company Contracts.

(a)     Except as set forth on Schedule 3.12(a), the Company is not a party, and none of the Company's respective properties or assets are bound by, any:

(i)     Contracts or instruments related to the incurrence of any Indebtedness of the Company or granting a Lien on any Asset;

(ii)     Personal Property Leases including those personal property leases to be assumed by Acquisition Sub as identified on Schedule 3.9(a);

(iii)     Contracts (A) with a duration of one (1) year or longer and (B) involving required payments of $100,000 over the life the Contract;

(iv)     Contracts for the acquisition of capital equipment or fixed assets requiring the payment of an amount in excess of  $10,000;

(v)     Contracts granting to any Person an option or a first refusal, first-offer or similar preferential right to purchase or acquire any ownership interests or material assets of any of the Companies;

(vi)     Contracts entered into involving, or otherwise in connection with, the sale or purchase of assets or properties (including equity securities) of any Person constituting a product line, service offering, line of business or ongoing business, whether by way of a merger, consolidation, business combination or similar transaction;

(vii)    Contracts involving the disposition of any assets (including equity securities) material to the ongoing operation of the business of the Company, and any Contracts entered into in connection therewith;

(viii)    joint venture, limited partnership, or similar Contracts;

(ix)    Contracts providing for change in control, retention, incentive compensation, deferred compensation, or severance payments to any employees, directors, officers, consultants or independent contractors of the Company;

(x)    employment, restrictive covenant, consulting or other similar Contracts with any employees, directors, officers, consultants or independent contractors of any of the Companies;

(xi)    Government Contracts;

(xii)    collective bargaining Contracts or other Contracts with any labor union or association representing any current or former employees of any of the Companies;

(xiii)    outstanding powers-of-attorney or similar powers granted by any of the Companies for any purpose whatsoever;

(xiv)    Contracts containing covenants that restrict any of the Companies' ability to freely engage in any line of business, in any geography or otherwise compete with any Person, including Contracts containing non-solicitation and most-favored nations clauses; and

(xv)    Contracts establishing or relating to an Affiliate Arrangement.

(b)    Correct and complete copies of all Company Contracts, including all amendments, modifications and supplements thereof have been made available to Parent.  Each such Company Contract is valid, binding and enforceable in accordance with its terms (subject to the Enforceability Exceptions) with respect to the Company, respectively, and, to the Knowledge of the Sellers, each other party to such Company Contract.  Except as set forth on Schedule 3.12(b), there is no existing default or breach, and no default or breach has occurred, under any Company Contract either by the Company or, to the Knowledge of the Sellers, the counterparties thereto, and no event has occurred, or circumstance exists, which, with the giving of notice or the lapse of time or both, would constitute a default or breach of any Company Contract by the Company or, to the Knowledge of the Sellers, the counterparties thereto, or result in the termination thereof or would cause or permit any acceleration or other changes of any material right or obligation or the loss of any material benefit under any Company Contract.

3.13    Employees and Benefits.

(a)    Schedule 3.13(a) sets forth a true, complete and correct list of each Plan.

(b)    As applicable with respect to each Plan, Sellers have made available to Acquisition Sub: (i) all written documents comprising the terms of such Plan (including

-18-

amendments and individual, trust or insurance agreements relating thereto); (ii) the most recent summary annual report and Form 5500 series (including all schedules thereto) filed with respect to each Plan; (iii) the summary plan description currently in effect and all material modifications thereto; (iv) the most recent actuarial report, financial statement and trustee report; (v) in the case of any Plan that is intended to be qualified under Section 401(a) of the Code, the most recent determination or opinion letter from the Internal Revenue Services; and (vi) all non-routine correspondence with the Internal Revenue Service or United States Department of Labor concerning the Plan in the past six years.

(c)     Each Plan has been maintained, operated and administered in compliance in all material respects with its terms and any related documents or agreements, and in compliance with the provisions of ERISA, the Code and other applicable Law.

(d)     Each Plan intended to be qualified under Section 401(a) of the Code has received a favorable determination or approval letter from the Internal Revenue Service with respect to such qualification, or may rely on an opinion letter issued by the Internal Revenue Service with respect to a prototype plan adopted in accordance with the requirements for such reliance, and nothing has occurred that would reasonably be expected to adversely affect the qualification of such Plan.

(e)     Neither the Sellers nor any ERISA Affiliate have sponsored, maintained, contributed to or been required to maintain or contribute to, or has any actual or contingent liability under, (i) a "defined benefit plan" as defined in Section 3(35) of ERISA or any other plan subject to Title IV of ERISA or the funding requirements of Section 302 of ERISA or Section 412 of the Code, (ii) a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA, or (iii) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(f)     There are no pending audits or investigations by any Governmental Body involving any Plan, and no threatened or pending Actions (except for individual claims for benefits payable in the normal operation of the Plans) involving any Plan, any fiduciary thereof or service provider thereto, nor, to the Knowledge of the Sellers, is there any basis for any such Actions.

(g)     No Plan provides death or medical benefits, beyond termination of service or retirement other than coverage mandated by applicable Law.

(h)     Each of the Sellers and each ERISA Affiliate have, for purposes of each Plan and for all other purposes, correctly classified each Business Employee as a common law employee and each Business Contractor as an independent contractor.

(i)     Each Seller's execution of, and performance of the transactions contemplated hereby, either alone or in combination with any other event or occurrence, will not constitute an event under any Plan that will result in any payment acceleration, vesting or increase in benefits with respect to any Business Employee or Business Contractor.

(j)     No payment which is or may be made by, from or with respect to any Plan, to any Business Employee or Business Contractor, either alone or in conjunction with any other payment, event or occurrence, will or could property be characterized as an "excess parachute

-19-

payment" under Section 280G of the Code. No Business Employee or Business Contractor has any "gross up" agreements or other assurance of reimbursement for any Taxes resulting from any such "excess parachute payments".

(k)    Schedule 3.13(k) sets forth a true, complete and correct list of (i) all employees of the Company engaged in the Business (the "Business Employees") as of the date of this Agreement (including any Business Employees on a leave of absence) and their respective names, employer, job titles, base cash compensation rates, target bonuses, accrued bonuses, target commissions, hire dates and, for any Business Employees on a leave of absence, the expected date of return to active employment (if known) and (ii) all independent contractors or consultants engaged in the Business (the "Business Contractors") as of the date of this Agreement.

(l)    Except as set forth on Schedule 3.13(l), other than as required by applicable Law, there are no Contracts that are Assumed Employee Liabilities relating to the employment of the Business Employees employed by Sellers on the date of this Agreement, other than Contracts that allow termination of employment without notice or payment of severance or other termination pay.

3.14    Litigation.

(a)    Except as set forth on Schedule 3.14(a), since January 1, 2015 there have not been any Legal Proceedings pending or, to the Knowledge of the Sellers, threatened (i) against or by the Company, (ii) against or by the Sellers relating to the Company or regarding any of their assets or properties, or (iii) against or by the Sellers or the Company that challenges or seeks to enjoin, prevent or otherwise delay, the Transaction or the other transactions contemplated by this Agreement or any of the Transaction Documents. To the Knowledge of the Sellers, no event has occurred or circumstance exists that could reasonably be expected to give rise to, or serve as the basis for, any Legal Proceeding.

(b)    Except as set forth on Schedule 3.14(b), since January 1, 2015 the Company is not and has not (i) been in default under or in breach of any Order, (ii) received any written notification or communication from any Governmental Body asserting that the Company is not in compliance with any Order or (iii) been party or subject to any Order. There are no unsatisfied judgments, penalties or awards affecting the Company or any of its properties, rights, or assets.

3.15    Compliance with Laws; Permits.

(a)    Except as set forth in Schedule 3.15(a)(i), the Company and the Business are, and since January 1, 2015 has complied with, in each case in all material respects, all applicable Laws, including without limitation with respect to mortgage lending, consumer protection, seller financing, installment sale contract, purchase money mortgage, contract for deed, and lease with option to purchase Laws. Except as set forth in Schedule 3.15(a)(ii), since January 1, 2015, none of the Companies has received any written notification or communication from any Governmental Body asserting that the Company is not in compliance with any applicable Law, including without limitation with respect to mortgage lending, consumer protection, seller

-20-

financing, installment sale contract, purchase money mortgage, contract for deed, and lease with option to purchase Laws.

(b)      Neither the Company nor any of its directors, officers, or employees, nor, to the Knowledge of the Sellers, any of their respective agents or other third party representatives has, directly or indirectly: (i) used any corporate funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payments to any Governmental Bodies or employees; or (iii) made, paid, offered, promised or given any other unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any official of a Governmental Body or any other Person.  No Governmental Body is investigating or has conducted, initiated or threatened any investigation of the Company or any of their officers, directors, or employees, or, to the Knowledge of the Sellers, any of their agents or third-party representatives in connection with an alleged or possible violation of any anti-corruption Laws.  The Company has not submitted any voluntary or involuntary disclosure to any Governmental Body or conducted any internal investigation, in connection with an alleged or possible violation of any anti-corruption Laws.

(c)      Except as set forth in <u>Schedule 3.15(c)</u>, all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights (each, a "<u>Permit</u>") which are required to be obtained from any Governmental Body in order for the Company to conduct its business since January 1, 2015 in compliance with applicable Laws and Orders have been obtained by it and are (or were during the applicable period) valid and in full force and effect.  <u>Schedule 3.15(c)(i)</u> contains a true and complete list of all Permits owned or possessed by the Company and required to conduct the business of the Company (collectively, the "<u>Company Permits</u>").  Copies of all of the Company Permits have been made available to Acquisition Sub.  All fees and charges with respect to such Company Permits have been paid in full.  Except as set forth in <u>Schedule 3.15(c)(ii)</u>, the Company is and, since January 1, 2015, has complied with, in each case in all material respects, with all of its obligations with respect to each Company Permit, and no event has occurred which allows, or upon the giving of notice or the passage of time or both would allow, the revocation or termination of any Company Permit.

3.16      <u>Environmental Matters</u>.  Except as set forth in <u>Schedule 3.16</u>, the Company is, and has been since January 1, 2015, in material compliance with all applicable Environmental Laws.  The Company has not received any request for information, notice, report or other information regarding any actual or alleged violation of any Environmental Laws, or that the Company is or may be liable under any applicable Environmental Laws, including any investigatory, remedial or corrective obligations relating to the Company, the Real Property, or any other property or facility currently or previously owned, leased, operated or controlled by the Company.  The Company has not treated, stored, disposed of, transported, handled, generated, or released any Hazardous Substances in violation of Environmental Laws, or in a manner which could reasonably be expected to result in a Legal Proceeding against, or Liability of, the Company.

3.17      <u>Financial Advisors</u>.  Except as set forth on <u>Schedule 3.17</u>, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Company in connection with the Transaction, and no Person is entitled to any fee or commission or like payment in respect thereof.

3.18    Affiliate Arrangements.  Except as set forth in Schedule 3.18, no officer, director, or Affiliate of the Company, or any member of such individual's immediate family, is a party to any Contract or transaction with the Company or has any interest in any property (real, personal, tangible, intangible or mixed) used by any of the Companies (in any such case, an "Affiliate Arrangement").

3.19    Insurance Policies.  Schedule 3.19(a) sets forth a correct and complete list of all current policies or binders of insurance maintained by or for the benefit the Company or relating to the assets, business, operations, employees, officers and directors of the Company (collectively, the "Policies") and true and complete copies of such Policies have been made available to Acquisition Sub and Parent.  Such Policies are in full force and effect.  The Company has not, nor has any of its Affiliates, received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of such Policies.  All premiums, deductibles and other amounts due on such Policies have been paid.  The Policies do not provide for any retrospective premium adjustment or other experience-based liability on the part of the Company.  All such Policies (i) are valid and binding in accordance with their terms; and (ii) have not been subject to any lapse in coverage.  Except as set forth on Schedule 3.19(b), there are no claims related to the business of the Company pending under any such Policy and there are no reservation of rights letters or similar communications currently in effect with respect to any such claims.  Schedule 3.19(c) sets forth a true and complete list of all outstanding claims under such policies made by or on behalf of the Sellers or any Person other than the Company, including the amount of each such claim, the identity of the policy under which each such claim has been made, and the policy period as to which each such claim relates.  Coverage under any Policy has never been denied or disputed by the applicable insurance carrier (other than a customary reservation of rights notice issued pursuant to specific claims under a policy) and there has been no material erosion of policy limits resulting from payments of claims.

3.20    Absence of Certain Developments.  Except as contemplated by this Agreement or as set forth on Schedule 3.20, since January 1, 2019 (i) there has not been any Material Adverse Effect, and (ii) the Company has conducted its businesses only in, and has not engaged in any transaction other than in, the Ordinary Course of Business.  Without limiting the foregoing, except as set forth on Schedule 3.20, since January 1, 2019, the Company has not:

(a)    increased the amount of any bonus, salary, fringe benefit or other compensation payable to any, director, officer, employee, consultant, or independent contractor of the Company, or entered into, amended or terminated any employment or severance Contract with any such person;

(b)    entered into or deferred any commitment for capital expenditures of the Company, or failed to make any capital expenditures of the Company to be made prior to the Closing, other than in accordance with the maintenance budget of the Company for the applicable fiscal year;

(c)    changed its accounting methods or principles in any material respect;

-22-

(d)      (i) made or changed any Tax election, (ii) settled or compromised any Tax claim or Liability, (iii) changed any method of accounting or annual accounting period for Tax purposes, (iv) surrendered any claim for a refund of Taxes or (v) waived or extended the statute of limitations in respect of any Tax or entered into any Contract with a Taxing Authority;

(e)      entered into or agreed to enter into any merger or consolidation with any corporation or other entity, or acquired the securities of any other Person;

(f)      paid, cancelled, incurred, waived, settled or discharged or satisfied any Indebtedness, Claim, or Liability (whether absolute, accrued, contingent or otherwise), except in the Ordinary Course of Business;

(g)      encumbered any of its properties or assets, tangible or intangible, except for Liens incurred in the Ordinary Course of Business, or sold, transferred or otherwise disposed of any assets, properties or rights of the business of the Company, except in the Ordinary Course of Business;

(h)      disposed of or has failed to keep in effect any rights in, to or for the use of any Company Intellectual Property Rights, franchise, license, Permit or certificate material to the business of the Company;

(i)      changed or modified in any manner its existing credit, collection and payment policies, procedures and practices with respect to accounts receivable and accounts payable, respectively;

(j)      incurred any material damage, destruction, theft, loss or business interruption;

(k)      waived or released any material right or claim of the Company or incurred any modifications, amendments or terminations of any Contracts which are in the aggregate material to the Company or its business;

(l)      materially modified the terms of, extended, renewed or terminated any Lease; or

(m)      agreed to do, or entered into any Contract requiring, any of the foregoing.

3.21      Form Agreements.  A copy of each standard form of Contract used by the Company with its customers is attached to Schedule 3.21.  Except as set forth on Schedule 3.21, there is no Contract with a present or former customer of the Company (a) that is currently in force and effect and (b) with terms and conditions that materially deviate from the terms and conditions set forth in the Contracts attached to Schedule 3.21.

3.22      Bank Accounts.  Schedule 3.22 sets forth a correct and complete list of each of the bank accounts of the Company, together with a true and complete list of the authorized signatories for such accounts.

-23-

#55975433 v13

    3.23  <u>Officers, Directors and Managers</u>. <u>Schedule 3.23</u> contains a correct and complete list of all of the current executive officers, directors and managers of each of the Company.

<div align="center">

**ARTICLE 4**

**REPRESENTATIONS AND WARRANTIES RELATING TO THE SELLERS**

</div>

Each Seller hereby represents and warrants to Parent and the Acquisition Sub as follows:

    4.1  <u>Authorization of Agreement</u>. Such Seller has all requisite capacity, power and authority to execute, deliver and fully and timely perform this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement as well as those to be executed by the Seller in connection with the consummation of the Transaction (collectively, the "<u>Seller Documents</u>"), and to consummate the Transaction and all other transactions contemplated hereby and thereby. This Agreement and each of the Seller Documents have been duly and validly executed and delivered by such Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement and the Seller Documents constitute the legal, valid and binding obligations of such Seller, enforceable against the Seller in accordance with its and their terms, subject to the Enforceability Exceptions.

    4.2  <u>Conflicts; Consents of Third Parties.</u>

    (a)  None of the execution and delivery by the Sellers of this Agreement or the Seller Documents, the consummation of the Transaction, or compliance by the Sellers with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, acceleration, modification, or cancellation under, any provision of any Law or Order applicable to the Sellers or by which any of its properties or assets (including the Equity Interests) are bound or subject.

    (b)  None of the execution and delivery by the Sellers of this Agreement or the Seller Documents, the consummation of the Transaction or the other transactions contemplated hereby or thereby, or full and timely compliance by the Sellers with any of the provisions hereof or thereof result in the creation or imposition of any Lien on the Equity Interests.

    (c)  No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person (including any Governmental Body) is required on the part of the Sellers in connection with the execution and delivery of, and the full and timely performance of the covenants and agreements set forth in, this Agreement or the Seller Documents or the compliance by the Sellers with any of the provisions hereof or thereof, or the consummation of the Transaction and the other transactions contemplated herein or therein, except for such consents, waivers, approvals, Orders, Permits or authorizations, the failure of which to obtain would not impair or delay in any respect the consummation of the Transaction and the other transactions contemplated by this Agreement or the Seller Documents, or give rise to a right on the part of any Person (including the Sellers or any Governmental Body) to unwind or obtain

<div align="center">-24-</div>

rescission of the Transaction or any of the other transactions contemplated by this Agreement or the Seller Documents.

4.3    <u>Ownership and Transfer of the Equity Interests and Transferred Assets</u>.  The Equity Sellers are the record and beneficial owner of the Equity Interests, free and clear of any and all Liens, and the Equity Interests have been validly issued to the Equity Sellers, are fully paid, and were not issued in violation of any preemptive or other similar rights in effect at the time of issuance.  There is no existing option, warrant, call, right or Contract of any character to which the Equity Sellers are a party requiring the transfer or otherwise evidencing the right to purchase any of such Equity Interests.  There is no voting trust, proxy, or Contract with respect to the voting, redemption, sale, transfer or other disposition of any such Equity Interests.  Upon the sale, transfer, assignment and delivery of the Equity Interests as provided in this Agreement, the Equity Sellers will convey to Acquisition Sub good, marketable and exclusive title to the Equity Interests, free and clear of any and all Liens.  Each Seller is not a "foreign person" within the meaning of Section 1445 of the Code.

4.4    <u>Litigation.</u>

(a)    Except as set forth on <u>Schedule 4.4(a)</u>, since January 1, 2015 there have not been any Legal Proceedings pending or, to the Knowledge of the Sellers, threatened (i) against or by any of the Sellers, (ii) against or by the Sellers relating to any of the Companies or regarding any of their assets or properties, or (iii) against or by the Sellers or any of the Companies that challenges or seeks to enjoin, prevent or otherwise delay, the Transaction or the other transactions contemplated by this Agreement or any of the Transaction Documents.  To the Knowledge of the Sellers, no event has occurred or circumstance exists that could reasonably be expected to give rise to, or serve as the basis for, any Legal Proceeding.

(b)    Except as set forth on <u>Schedule 4.4(b)3.14(b)</u>, since January 1, 2015 none of the Sellers have (i) been in default under or in breach of any Order, (ii) received any written notification or communication from any Governmental Body asserting that such Seller is not in compliance with any Order or (iii) been party or subject to any Order.  There are no unsatisfied judgments, penalties or awards affecting any of the Sellers or any of their properties, rights, or assets.

4.5    <u>Compliance with Laws; Permits.</u>

(a)    Except as set forth in <u>Schedule 4.5(a)(i)</u>, the Sellers and the Business are, and since January 1, 2015 have complied with, in each case in all material respects, all applicable Laws, including without limitation with respect to mortgage lending, consumer protection, seller financing, installment sale contract, purchase money mortgage, contract for deed, and lease with option to purchase Laws.  Except as set forth in <u>Schedule 4.5(a)(ji)</u>, since January 1, 2015, none of the Sellers has received any written notification or communication from any Governmental Body asserting that any of the Companies are not in compliance with any applicable Law, including without limitation with respect to mortgage lending, consumer protection, seller financing, installment sale contract, purchase money mortgage, contract for deed, and lease with option to purchase Laws.

(b)     None of the Sellers, or any of their directors, officers, or employees, nor, to the Knowledge of the Sellers, any of their respective agents or other third party representatives has, directly or indirectly: (i) used any corporate funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payments to any Governmental Bodies or employees; or (iii) made, paid, offered, promised or given any other unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any official of a Governmental Body or any other Person.  No Governmental Body is investigating or has conducted, initiated or threatened any investigation of the any of the Sellers or any of their officers, directors, or employees, or, to the Knowledge of the Sellers, any of their agents or third-party representatives in connection with an alleged or possible violation of any anti-corruption Laws.  None of the Sellers have submitted any voluntary or involuntary disclosure to any Governmental Body or conducted any internal investigation, in connection with an alleged or possible violation of any anti-corruption Laws.

(c)     All permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights (each, a "Permit") which are required to be obtained from any Governmental Body in order for any of the Sellers to conduct its business since January 1, 2015 in compliance with applicable Laws and Orders have been obtained by it and are (or were during the applicable period) valid and in full force and effect.  Schedule 4.5(c)(i) contains a true and complete list of all Permits owned or possessed by each of the Sellers and required to conduct the Business (collectively, the "Seller Permits").  Copies of all of the Seller Permits have been made available to Acquisition Sub.  All fees and charges with respect to such Seller Permits have been paid in full.  Except as set forth in Schedule 4.5(c)(ii), each of the Sellers is and, since January 1, 2015, has complied with, in each case in all material respects, with all of its obligations with respect to each Seller Permit, and no event has occurred which allows, or upon the giving of notice or the passage of time or both would allow, the revocation or termination of any Seller Permit.

4.6     Financial Advisors.  Except as set forth on Schedule 4.6, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Sellers in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

4.7     Acquisition for Own Account; Accredited Investor.

(a)     Acquisition for Own Account.  Except as set forth in clause (iii) below and in Section 4.7(b):

(i)     Sellers hereby acknowledge and confirm that the Equity Consideration to be acquired by Sellers will be acquired for investment for Sellers' own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that Sellers have no present intention of selling, granting any participation in, or otherwise distributing the same;

(ii)     By executing this Agreement, Sellers further represent that Sellers do not presently have any contract, undertaking, agreement or arrangement with any person or

-26-

entity to sell, transfer or grant participations to such person or entity or to any third party, with respect to any of the Equity Consideration; and

          (iii)    Sellers intend to and shall be permitted to transfer $10 million in aggregate stated value of the Closing Preferred Stock to Sellers' financial advisors; provided that (1) no portion of such stock will be transferred, directly or indirectly, to a Singal Party (as defined below), and (2) any such transfer shall be made in compliance with applicable securities laws (which may include Section 4(a)(7) of the Securities Act or so-called Rule 4(a)(1½) thereunder, both of which require that the transferees be accredited investors).

          (b)    <u>Restriction on Transfer</u>.  Sellers agree not to transfer any of the Equity Consideration to Suneet Singal ("<u>Singal</u>") nor any family member or affiliate or associate (with "affiliate" and "associate" having the meanings given under Rule 12b-2 under the Securities Exchange Act of 1934) of Singal (Singal and any of his current or future family members, affiliates or associates being herein referred to as a "<u>Singal Party</u>"), and any transfer of any of the Equity Securities (or any successive transfers) other than a Qualified Disposition (as defined below) shall be subject to the same restriction.  Notwithstanding the foregoing, Sellers may transfer any or all of the Common Stock Consideration plus up to $83 million in aggregate stated value of the Closing Preferred Stock to one or more trusts (each, a "<u>Vision Trust</u>") of which Alex and/or Antoni are the sole trustee(s), and under which the sole beneficiaries are: (i) with respect to up to $15 million in aggregate stated value of the Preferred Stock, Singal or an entity designated by him, and (ii) with respect to any or all of the Common Stock Consideration plus up to $68 million in aggregate stated value of the Closing Preferred Stock, the common shareholders of First Capital Real Estate Trust, Inc.; provided, however, that Singal shall not be permitted to have or share any voting or dispositive power over any assets held by any Vision Trust and no Singal Party shall be permitted to serve as a trustee of a Vision Trust or receive any shares of capital stock of the Parent (or any voting or other beneficial interest in any such shares) from a Vision Trust, except that the common shareholders of First Capital Real Estate Trust, Inc. may receive shares of capital stock of the Parent in a pro rata distribution from a Vision Trust so long as such distribution is either registered pursuant to the Securities Act or is exempt from such registration (a "<u>Permitted Spin-off</u>").  The Parent does not undertake any obligation to register any shares for such purpose.  Any distribution, sale or other transfer of any shares of capital stock of the Parent (or any voting or other beneficial interest in any such shares) by a Vision Trust, other than pursuant to (a) a Permitted Spin-off, (b) a public offering pursuant to a registration statement filed and declared effective under the Securities Act, (c) a sale pursuant to and in compliance with Rule 144(i) under the Securities Act (any disposition of shares described in any of the foregoing clauses (a), (b) or (c) being herein referred to as a "<u>Qualified Disposition</u>") shall be conditioned upon the distributee, purchaser or other transferee executing such documentation in form and substance satisfactory to the Company in its sole discretion evidencing such distributee's, purchaser's or other transferee's agreement to a substantially identical restriction on transfer, namely providing that no Singal Party shall be permitted to acquire any such shares (or any voting or other beneficial interest in any such shares) other than pursuant to a Qualified Disposition.  The same transfer restrictions and documentation requirement shall be imposed upon successive distributees, purchasers or other transferees of such shares.  Any shares transferred pursuant to a Qualified Disposition shall no longer be subject to the transfer restrictions set forth in this <u>Section 4.7(b)</u>.

(c)    <u>Accredited Investor</u>.  Seller is an accredited investor within the meaning of Rule 501(a) Regulation D promulgated under the Securities Act.

<div align="center">

**ARTICLE 5**

**REPRESENTATIONS AND WARRANTIES RELATING TO PARENT AND ACQUISITION SUB**

</div>

Parent hereby represents and warrants to the Sellers as follows:

5.1    <u>Organization and Good Standing</u>.  Parent is a corporation duly organized, validly existing and in good standing under the laws of Nevada and has all requisite corporate power and authority to own, lease and operate its properties and carry on its business as now conducted.  Acquisition Sub is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and carry on its business as now conducted.

5.2    <u>Acquisition Sub</u>.  Acquisition Sub is a direct, wholly-owned subsidiary of Parent and a disregarded entity for tax purposes.  Since its date of incorporation, Acquisition Sub has not carried on any business nor conducted any operations other than the execution of this Agreement, the performance of its obligations hereunder and matters ancillary thereto.

5.3    <u>Capitalization</u>.

(a)    As of the date hereof, the authorized capital of the Parent consists of:

(i)    100,000,000 shares of common stock, $0.001 par value per share (the "<u>Common Stock</u>"), 21,073,791 shares of which are issued and outstanding as of the Effective Date.  All of the shares of Common Stock have been duly authorized, are fully paid and nonassessable and were issued in compliance with applicable federal and state securities laws.

(ii)    5,000,000 shares of Preferred Stock (the "<u>Preferred Stock</u>"), of which (i) 4,500 shares have been designated Series A Preferred Stock (the "<u>Series A Preferred Stock</u>"), 416.595 of which are issued and outstanding as of the Effective Date, (ii) 1000 shares have been designated Series A-1 Preferred Stock (the "<u>Series A-1 Preferred Stock</u>"), 295.2340 of which are issued and outstanding as of the Effective Date, (iii) 100 shares have been designated Series H Preferred Stock (the "<u>Series H Preferred Stock</u>"), and 100 of which are issued and outstanding as of the Effective Date.  The rights, privileges and preferences of the Preferred Stock are as stated in the Articles of Incorporation and as provided by the Chapter 78 of the Nevada Revised Statutes.

(b)    The Parent has reserved 3,000,000 shares of Common Stock for issuance to officers, directors, employees and consultants of the Acquisition Sub pursuant to its 2017 Omnibus Incentive Plan duly adopted by the Board of Directors and approved by the Parent stockholders (the "<u>Stock Plan</u>").  Of such reserved shares of Common Stock, 387,632 shares have been issued pursuant to restricted stock purchase agreements, options to purchase 340,388 shares have been granted and are currently outstanding, and 2,271,980 shares of Common Stock remain available

<div align="center">-28-</div>

for issuance to officers, directors, employees and consultants pursuant to the Stock Plan. The Parent has furnished to the Sellers complete and accurate copies of the Stock Plan and forms of agreements used thereunder.

      5.4    <u>Authorization of Agreement</u>. Each of the Parent and Acquisition Sub has all requisite power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Parent or Acquisition Sub, as the case may be, in connection with the consummation of the Transaction (collectively, the "<u>Acquisition Sub Documents</u>"), and to consummate the Transaction. The execution, delivery and performance by the Parent and Acquisition Sub of this Agreement and each of the Acquisition Sub Documents and the consummation of the Transaction, have been duly and validly authorized by all necessary corporate action on behalf of each of the Parent and Acquisition Sub, respectively. This Agreement has been, and each of the Acquisition Sub Documents will be at or prior to the Closing, duly executed and delivered by Parent and/or Acquisition Sub, as the case may be, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each the Acquisition Sub Documents when so executed and delivered will constitute, the legal, valid and binding obligation of Parent and/or Acquisition Sub, respectively, enforceable against the Parent or Acquisition Sub, as the case may be, in accordance with its and their terms, subject to the Enforceability Exceptions.

      5.5    <u>Conflicts; Consents of Third Parties.</u>

      (a)    None of the execution and delivery by the Parent or Acquisition Sub of this Agreement or the Acquisition Sub Documents, the consummation of the Transaction, or compliance by the Parent or Acquisition Sub with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, any provision of (i) the certificate of incorporation and bylaws of Parent; (ii) the certificate of incorporation and bylaws of the Acquisition Sub; (iii) any Contract or Permit to which the Parent or Acquisition Sub is a party or by which any of the properties or assets of the Parent or Acquisition Sub are bound; (iv) any Law or Order applicable to the Parent or Acquisition Sub or by which any of its properties or assets are bound or subject.

      (b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of the Parent or Acquisition Sub in connection with the execution and delivery of this Agreement or the Acquisition Sub Documents, the compliance by the Parent or Acquisition Sub with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Parent or Acquisition Sub of any other action contemplated hereby or thereby.

      (c)    None of the execution and delivery by Parent or Acquisition Sub of this Agreement or the Acquisition Sub Documents, the consummation of the Transaction, or compliance by the Parent or Acquisition Sub with any of the provisions hereof or thereof requires, or will require, the vote or approval of the holders of any class or series of capital stock of the Parent or any direct or indirect equity holder of the Parent.

5.6    <u>Litigation</u>.  Except as set forth on <u>Schedule 5.5</u>, There are no Legal Proceedings pending or, to the knowledge of Parent or Acquisition Sub, threatened against the Parent or Acquisition Sub that, if adversely determined, are reasonably likely to prohibit or restrain the ability of the Parent or Acquisition Sub to enter into this Agreement or consummate the Transaction and the other transactions contemplated by this Agreement or the Acquisition Sub Documents.

5.7    <u>Financial Advisors</u>.  Other than Lateral Investment Management LLC, No Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Parent or Acquisition Sub in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

## ARTICLE 6

## COVENANTS

6.1    <u>Interim Operation of Business</u>.  From the date hereof through the earlier of the date this Agreement is terminated in accordance with its terms and the Closing Date, except as expressly required by this Agreement, each Seller will conduct their business, and will cause the business of the Companies to be conducted, only in the Ordinary Course of Business, except for any actions outside the Ordinary Course of Business for which Parent has given its prior written consent.  Without limiting the foregoing, from the date hereof through the earlier of the date this Agreement is terminated in accordance with its terms and the Closing Date, unless the Parent gives prior written consent to a contrary action, each Seller shall, and the Sellers shall cause each of the Companies to:

(a)    use commercially reasonable efforts to preserve the present business operations, assets, organization and goodwill of VPM Holdings, the Asset Seller or such Company, as the case may be, and maintain current relationships with clients, customers, suppliers, sponsors, brokers, agents, officers, employees and other persons with which VPM Holdings, the Asset Seller or such Company, as the case may be, has a significant business relationship;

(b)    not amend or authorize the amendment of the organizational documents of VPM Holdings, the Asset Seller or such Company, as the case may be

(c)    not authorize for issuance, issue, sell, deliver or agree or commit to issue, sell or deliver (whether through the issuance or granting of options, warrants, commitments, subscriptions, rights to purchase or otherwise) any equity securities or equity equivalents (including any options or appreciation rights) of VPM Holdings, the Asset Seller or such Company, as the case may be;

(d)    not declare, set aside, make or pay any non-cash distribution on or with respect to any of its equity or ownership interest;

(e)    not adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization (other than this Agreement);

<div align="center">-30-</div>

(f)     not reclassify, combine, split, subdivide or redeem, or purchase or otherwise acquire, directly or indirectly, any of its equity or ownership interests, or make any other change with respect to its capital structure;

(g)     not (i) incur or assume any Indebtedness or issue any debt securities, (ii) assume, guarantee, endorse or otherwise become liable or responsible, whether directly, contingently or otherwise, for the obligations of any other Person, except in the Ordinary Course of Business, (iii) make any loans, advances or capital contributions to or investments in any other Person, or (iv) create any encumbrance upon its assets, except for Permitted Exceptions;

(h)     not sell, lease or dispose of its assets in any single transaction or series of related transactions having a fair market value in excess of $100,000 in the aggregate, except in the Ordinary Course of Business;

(i)     not enter into any new Contract that would have been required to be set forth on Schedule 3.12(a) had such Contract been entered into prior to the date hereof;

(j)     not extend, modify, renew or terminate any Real Property Lease, except for extensions or renewals in the Ordinary Course of Business

(k)     not (i) acquire, by merger, consolidation or acquisition of stock or assets, any corporation, partnership or other business organization, (ii) enter into any joint venture, strategic alliance, exclusive dealing, noncompetition or similar Contract or (iii) make any new capital expenditure that exceed, in aggregate, $100,000;

(l)     not commence, settle or compromise any pending or threatened Legal Proceeding unless such Legal Proceeding is settled for monetary damages only for payments not to exceed $50,000 (net of expected insurance proceeds);

(m)     other than as required by Law, not (1) materially increase the severance or termination pay, change in control, retention, stay or other similar bonus, or other compensation or benefits provided to any former or current director, officer, or key employee of VPM Holdings, the Asset Seller or such Company, as the case may be; (2) make any change in the key management structure of VPM Holdings, the Asset Seller or such Company, as the case may be, including the hiring of additional officers or the termination or employment of existing officers (other than terminations for cause), except for any actions for which Parent has given its prior written consent; or (3) negotiate, enter into, amend, modify or terminate any collective bargaining agreement or other Contract with any labor union, labor organization or works council;

(n)     not make any material changes to the manner in which VPM Holdings, the Asset Seller or such Company, as the case may be, has collected its accounts receivable or paid its accounts payable in the Ordinary Course of Business by including discounting or accelerating or delaying payment or collection of such accounts outside of the Ordinary Course of Business;

(o)     not make any change in any method of accounting or accounting practice or policy, except as required by GAAP;

-31-

(p)     not make, revoke or modify any Tax election, settle or compromise any Tax liability or file any Tax return other than on a basis consistent with past practice; and

(q)     not take any action that if taken during the period from January 1, 2019 to the date of this Agreement would have been required to be set forth on <u>Schedule 3.20</u>; and

(r)     deliver to the Parent, within one (1) day of receipt, each draft and the final copy of that certain audit of the Companies being conducted by Turner, Stone & Company, LLP.

6.2     <u>Exclusivity</u>.  From the date hereof through the earlier of the date this Agreement is terminated in accordance with its terms and the Closing Date, each of the Sellers and the Companies shall not, and shall ensure that VPM Holdings's, the Asset Seller's, and the Companies' officers, directors, employees, investment bankers, financial advisors, lawyers, accountants or other advisors, agents or representatives shall not, take, directly or indirectly, any of the following actions with any party other than Acquisition Sub and Parent:

(a)     solicit, encourage, initiate or participate in any negotiations, inquiries or discussions with respect to any offer or proposal to acquire all or any significant part of any of VPM Holdings, the Asset Seller, or the Companies, whether by merger, consolidation, other business combination, purchase of capital stock, purchase of assets, or otherwise (each of the foregoing, a "<u>Restricted Transaction</u>");

(b)     disclose, in connection with a Restricted Transaction, any nonpublic information to any Person concerning the business or properties of any of VPM Holdings, the Asset Seller or the Companies or afford to any Person access to the properties, books or records of any of VPM Holdings, the Asset Seller or the Companies; or

(c)     enter into or execute any agreement relating to a Restricted Transaction.

From and after the date hereof and prior to the Closing, the Sellers shall promptly notify Parent in writing in the event that the Sellers, the Companies or VPM Holdings's, the Asset Seller's, or the Companies' officers, directors, employees, investment bankers, financial or other advisors, agents or representatives is contacted by any third party expressing an interest in discussing a Restricted Transaction.  The Sellers shall promptly notify Parent of (i) the identity of such third party and (ii) any information conveyed by such third party to the Sellers, the Companies or the VPM Holdings's, the Asset Seller's, or Companies' officers, directors, employees, investment bankers, advisors, agents or representatives in connection with such contact or relating to such Restricted Transaction.

6.3     <u>Cooperation and Further Assurances</u>.

(a)     Each of the parties shall use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Transaction, including (i) the giving of all notices to, the making of all filings with, and the obtaining of all authorizations, consents and approvals from, Governmental Bodies and (ii) the execution and delivery of any additional documents that may be

-32-

necessary or desirable to consummate the Transaction, and to fully carry out the purposes of, this Agreement.

(b)     During the period from the date hereof to the Closing, the Sellers shall give prompt notice to Parent, and Parent shall give prompt notice to the Sellers, of (i) the occurrence or nonoccurrence of any event which would cause any representation or warranty of the Sellers or Parent, as applicable, in this Agreement to be untrue or inaccurate in any material respect at or prior to the Closing Date and (ii) any material failure by the Sellers or Parent, as applicable, to comply with or satisfy, in any material respect, any covenant, condition or agreement to be complied with or satisfied by them hereunder; provided that the delivery of any notice pursuant to this Section 6.3(b) shall not limit or otherwise affect the remedies available hereunder to the party to which such notice is given.

6.4     Pre-Closing Access to Information. From the date hereof through the earlier of the date this Agreement is terminated in accordance with its terms and the Closing Date, VPM Holdings, the Asset Seller and the Companies shall permit Parent and its representatives to have reasonable access (at reasonable times and upon reasonable notice during regular business hours) to the books, records (including Tax records), contracts, financial and operating data and information and documents pertaining to each of the VPM Holdings, the Asset Seller and Companies, as Parent or its representatives may reasonably request; provided, that in exercising access rights under this Section 6.4, Parent shall not be permitted to interfere unreasonably with the conduct of the business of VPM Holdings, the Asset Seller or the Companies and; provided, further, that the foregoing shall not require VPM Holdings, the Asset Seller or the Companies to permit any inspection, or to disclose any information, that would reasonably be expected to result in the waiver of any applicable attorney-client or attorney work product privilege or the violation of any applicable Law.  The parties will, to the extent legally permissible, reasonably necessary and practicable, make appropriate substitute arrangements under circumstances in which the restrictions of the preceding sentence apply.

6.5     Confidentiality. The Sellers recognizes that by reason of their ownership of the Equity Interests and its operation of the Business of VPM Holdings and the Companies, the Sellers has acquired confidential information and trade secrets concerning VPM Holdings and the Companies, the use or disclosure of which could cause Parent and Acquisition Sub and, following the Closing, the Companies, substantial loss and damages.  Accordingly, the Sellers covenants to the Parent and Acquisition Sub that the Sellers and their Affiliates (other than the Companies) shall not, except with the prior written consent of Parent, directly or indirectly, disclose confidential information relating to VPM Holdings or the Companies, unless (a) it is or becomes generally available to the public other than as a result of disclosure by the Sellers or their Affiliates, (b) it is generally made available to third parties without limitations on its disclosure, or (c) disclosure is required by applicable Law.  In the event that the Sellers are required by applicable Law to disclose any confidential information or trade secrets regarding VPM Holdings or the Companies, the Sellers will not make any disclosure until, to the extent practicable and legally permissible, the Sellers' Representative or applicable Seller first notifies Parent promptly so that Parent may seek a protective order or other appropriate remedy or, in Parent's sole discretion, waive compliance with the terms of this Agreement (and if Parent seeks such an order, the Sellers will not oppose such efforts and the Sellers will provide such cooperation (at Parent's sole expense) as Parent

-33-

reasonably requests); thereafter, disclosures may occur only as allowed herein. In the event that no such protective order or other remedy is obtained, or that Parent waives compliance with the terms of this Agreement, and that the Sellers are nonetheless legally compelled to make such disclosures, the Sellers will (i) use commercially reasonable efforts to furnish only that portion of the confidential information or trade secrets regarding VPM Holdings or the Company that the Sellers are advised by counsel is legally required, (ii) to the extent practicable and legally permissible, give Parent written notice of the disclosures to be made, and (iii) exercise all commercially reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the information so disclosed.

6.6     Preservation of Records.  Parent shall, and shall cause the Companies to, on the one hand, and the Sellers shall, on the other hand, preserve and keep the records held by them relating to the business of the Companies for a period of seven (7) years from the Closing Date (or longer if required by applicable Law) and shall make such records available (upon reasonable advance prior written request and during normal business hours) to the other parties or any of their respective equity holders as may be reasonably required by the Sellers, on the one hand, or Parent and the Companies, on the other hand, in connection with, among other things, any Tax filings, any insurance claims and any Legal Proceedings, in order to enable a party to comply with its obligations under this Agreement and each of Transaction Documents to which it is a party. No party shall be required to provide any such access to the extent such access would violate applicable Law or would be reasonably likely to result in the waiver of any attorney-client or other evidentiary privilege; *provided*, that subject to advice of outside counsel that to do so would violate applicable Law, the parties shall enter into a joint defense or common interest agreement, in which event the other party shall provide such access notwithstanding the availability of any attorney-client or other evidentiary privilege. Notwithstanding the foregoing, nothing in this Agreement shall prohibit or limit the ability of Parent, Acquisition Sub or the Companies to liquidate, dissolve, merge, amalgamate, sell, contribute or otherwise dispose of (whether equity, assets or otherwise) or undertake a fundamental transaction with respect to the Companies following the Closing.

6.7     Publicity.  From and after the date hereof, neither Parent, Acquisition Sub nor the Sellers shall, directly or indirectly, issue any press release, public announcement or filing of any kind concerning the Transaction without the prior written consent of the other parties hereto, except where such press release, public announcement or filing is required by applicable Law and only to the extent required by such Law; *provided*, that Parent, Acquisition Sub and the Sellers will be entitled to communicate with their attorneys, accountants and other professional advisors for purposes of enforcing their respective rights under this Agreement and preparing and filing Tax Returns. Notwithstanding the foregoing, each party shall use its reasonable efforts to consult with the other parties prior to any such announcement to the extent practicable, and shall in any event promptly provide the other parties hereto with copies of any such announcement.

6.8     Tax Matters.

(a)     Purchase Price Allocation.  The parties hereto shall allocate the Aggregate Consideration for the Equity Interests and Transferred Assets and Liabilities (including all assumed liabilities and any other amounts required to be treated as consideration for federal income Tax purposes) and the restrictive covenants described in this Agreement, as adjusted pursuant to

-34-

Section 2.4, in accordance with the provisions of Section 1060 of the Code and the Treasury Regulations thereunder (the "Tax Allocation Statement"). The Tax Allocation Statement shall be prepared in accordance with the principles set forth Schedule II. The parties hereto shall report, act and file Tax Returns, including, but not limited to, Internal Revenue Service Form 8594, in all respects and for all purposes consistent with the Tax treatment described in this Section 6.8(a), and shall not take any position inconsistent with such tax treatment or the Tax Allocation Statement in any Tax Return or in any administrative or judicial proceeding relating to Taxes, unless otherwise required pursuant to a final determination (as defined in Section 1313 of the Code). The parties hereto agree that the Tax Allocation Statement determined in accordance with this Section 6.8(a) shall be binding upon Sellers and Parent for all Tax reporting purposes. If there is an increase or decrease in the Aggregate Consideration based upon an adjustment thereto in accordance with this Agreement within the meaning of Treasury Regulations Section 1.1060-1(e)(ii)(B) after the parties hereto have filed the initial IRS Form 8594, the parties hereto shall revise the Tax Allocation Statement accordingly.

(b)    Tax Returns. The Sellers shall timely prepare or cause to be prepared and timely file or cause to be filed all income Tax Returns of each of the Companies for all periods ending on or prior to the Closing Date. Such Tax Returns shall be prepared in a manner consistent with the past practice and custom of the Companies in preparing Tax Returns. The Sellers' Representative shall provide for the Parent, for its review and comment, a copy of any such Tax Return at least thirty (30) Business Days prior to the date such Tax Return is due. The Sellers shall pay all Taxes with respect to such Tax Returns and the income with respect thereto. The income of each of the Companies and their Subsidiaries shall be apportioned to the period up to and including the Closing Date and the period after the Closing Date by closing the books of each of the Companies and their Subsidiaries as of the end of the Closing Date.

(c)    Other Tax Returns. Parent shall prepare or cause to be prepared and file or cause to be filed (i) all non-income Tax Returns of the Companies for periods ending on or before the Closing Date ("Pre-Closing Tax Returns") and (ii) all Tax Returns for periods beginning on or before, and ending after, the Closing Date (a "Straddle Period Tax Return," and such periods, "Straddle Periods"). Such Tax Returns shall be prepared in accordance with the past practice and custom of the Companies in preparing Tax Returns, except as otherwise required by applicable Law. Parent shall provide to the Sellers' Representative, for their review, a copy of any such Tax Return at least thirty (30) Business Days prior to the date such Tax Return is due. The Sellers' Representative shall provide comments at least fifteen (15) Business Days prior to the date such Tax Return is due. Parent shall give due regard to proposed revisions to any such Tax Return as reasonably requested by the Sellers' Representative. In the event there is a disagreement as to whether revisions requested by the Sellers' Representative should be included in any such Tax Return, the disagreement shall be submitted to the Independent Accountant for resolution (the expenses of which shall be shared in a manner similar to that set forth in Section 2.4(c)(iii)). Parent shall file such Tax Returns as so finally prepared (including the resolution of the Independent Accountant, if applicable). The Sellers shall pay all Taxes with respect to Pre-Closing Tax Returns, and with respect to the portion of the Straddle Period ending on the Closing Date (as determined pursuant to Section 6.4(e)) with respect to Straddle Period Tax Returns, within five (5) days of demand therefor by Parent.

-35-

(d)     Straddle Period Taxes.  If the Companies are permitted but not required under applicable Law to treat the Closing Date as the last day of a taxable period, then the parties shall treat that day as the last day of a taxable period.  In the case of any Taxes with respect to a Straddle Period, the portion of such Tax which relates to the portion of the Straddle Period ending on the Closing Date shall (i) in the case of Taxes other than those based on income, receipts or expenses (e.g., payroll Taxes), be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period, and (ii) in the case of any Tax based on income, receipts or expenses, be deemed equal to the amount which would be payable if the Straddle Period ended as of the end of the Closing Date (and for such purposes, the taxable period of any partnership or pass-through shall be deemed to terminate at such time); *provided*, *however*, that items determined on an annual or periodic basis (such as deductions for depreciation) shall be apportioned on a daily basis.

(e)     Cooperation.  Parent, Acquisition Sub and the Sellers shall, and shall each cause their Subsidiaries and Affiliates to, provide to the other such cooperation and information, as and to the extent reasonably requested, in connection with the filing of any Tax Return, determining liability for Taxes or in conducting any audit, litigation or other Legal Proceeding with respect to Taxes.  Such cooperation and information shall include providing copies of all relevant portions of relevant Tax Returns and related documents, and making its employees available, to the extent reasonably requested.

(f)     Termination of Tax Sharing Agreements.  All Tax allocation or sharing agreements, if any, binding any of the Companies shall be terminated as of the Closing Date and none of the Companies shall be obligated to make any payment to any Person thereunder for any period.

(g)     Transfer Taxes.  To the extent any transfer are required to be paid in connection with this Transaction pursuant to applicable such Transfer Taxes shall be paid by the Sellers.  Parent shall timely file, to the extent required by applicable Law, all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and provide to the Sellers' Representative copies of such Tax Returns and other documentation.

6.9     Employee Matters.

(a)     Post-Closing Employment Arrangements - Transferred Employees.  At least three (3) Business Days prior to the Closing Date, Acquisition Sub shall extend, or shall cause its Affiliates to extend, employment offers to each Business Employee who is actively employed immediately prior to the Closing Date and who Acquisition Sub, in its sole discretion, lists on Schedule 6.10(a), with such employment to be effective as of 12:01 a.m. on the Closing Date. Such employment offers shall satisfy the following requirements for a period of at least 12 months following the Closing Date: (i) substantially the same duties and responsibilities (unless such Business Employee consents to enhanced duties and responsibilities), (ii) at least the same level of base pay, (iii) the same crediting of years of service (including any portions thereof credited by Sellers), and (iv) bonus potential and other compensation and benefits that are no less favorable in the aggregate to those provided to similarly situated employees of Acquisition Sub, but in no event

-36-

less favorable than such employee's existing bonus potential and other compensation and benefits, all as in effect with respect to the applicable Business Employee immediately prior to the Closing Date and in all cases in compliance with applicable Law. The Business Employees who accept Acquisition Sub's offer of employment shall be referred to herein as "<u>Transferred Employees</u>".

(b)     Effective as of 12:01 a.m. on the Closing Date, the Transferred Employees shall cease all active participation in and accrual of benefits under the Plans (the "<u>Retained Plans</u>"). Sellers shall retain sponsorship of, and shall retain and indemnify and hold harmless Acquisition Sub and its Affiliates against, all Liabilities under the Retained Plans, whether arising before, on or after the Closing, and Acquisition Sub and its Affiliates shall not assume sponsorship of, contribute to or maintain, or have any Liability with respect to, the Retained Plans.

(c)     Except as would result in a duplication of benefits for the same period of service, for purposes of eligibility to participate, vesting and, solely for the purposes of vacation, paid-time-off and/or severance plans, level of benefits under the employee benefit plans of Acquisition Sub and its Affiliates providing benefits to any Transferred Employees after the Closing (the "<u>New Plans</u>"), Acquisition Sub shall cause each Transferred Employee to receive credit for all service with Sellers before the Closing (including predecessor or acquired entities or any other entities with respect to which Sellers has given credit for prior service) to the extent recognized in any similar Plan in which such Transferred Employee participated immediately prior to the Closing; <u>provided</u>, <u>however</u>, that such crediting shall not apply to defined benefit, equity or equity derivative or non-qualified deferred compensation plans.

(d)     Sellers shall pay to each Transferred Employee all amounts in respect of vacation days and other paid time off accrued but not taken by such Transferred Employee on or prior to the Closing. Acquisition Sub shall have no obligation to honor such accrued vacation days or paid time off after the Closing. Following the Closing, the Transferred Employees' eligibility for vacation and other paid time off shall be determined under Acquisition Sub's vacation policy.

(e)     Acquisition Sub agrees to cause a defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (and a related trust exempt from tax under Section 501(a) of the Code) (as applicable, the "<u>Acquisition Sub 401(k) Plan</u>") to allow each Transferred Employee to make a "direct rollover" to the Acquisition Sub 401(k) Plan of the account balances of such Transferred Employee (but not including promissory notes evidencing any outstanding loans) under the Plan that is a defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (a "<u>Seller 401(k) Plan</u>") in which such Transferred Employee participated prior to the Closing if such Seller 401(k) Plan permits such a direct rollover and if such direct rollover is elected in accordance with applicable Law by such Transferred Employee. The rollovers described herein shall comply with applicable Law, and each party shall make all filings and take any actions required of such party under applicable Law in connection therewith. Acquisition Sub shall have no responsibility for any failure of Sellers to properly administer the Seller 401(k) Plan in accordance with its terms and applicable Law, including without limitation any failure to properly administer the accounts of Transferred Employees and their beneficiaries who effect a direct rollover pursuant to this <u>Section 6.10(e)</u>.

(f)    If not already paid by the Sellers prior to the Closing, the Sellers shall make a bonus payment to the Transferred Employee for the period ended on the Closing Date. Sellers may determine such bonus amount using any good faith methodology (which need not be the same for each Transferred Employee), including, without limitation, by basing such amount upon target bonus or upon actual performance.

(g)    Each Transferred Employee will be eligible to participate immediately, without any waiting time, in any New Plan to the extent coverage under such New Plan replaces coverage under a similar or comparable Plan in which such Transferred Employee participated immediately before the Closing, and for purposes of each New Plan providing medical, dental, pharmaceutical, vision and/or disability benefits to any Transferred Employee, Acquisition Sub shall cause all preexisting condition exclusions and actively at work requirements of such New Plan to be waived for such Transferred Employee and his or her covered dependents, to the extent any such exclusions or requirements were waived or were inapplicable under a similar or comparable Plan in which such Transferred Employee participated immediately before the Closing, and shall cause any co-payments, deductibles and out-of-pocket expenses paid by such Transferred Employee and his or her covered dependents during the portion of the plan year of the similar or comparable Plan in which such Transferred Employee participated immediately before the Closing ending on the date such Transferred Employee's participation in the corresponding New Plan begins to be taken into account under such New Plan as if such amounts had been paid in accordance with such New Plan, in each case to the extent all information reasonably necessary to implement such actions has been received from Sellers.

(h)    Sellers shall pay, perform or otherwise discharge, as the same shall become due and payable, in accordance with their respective terms, each of the following, without duplication (the "Excluded Employee Liabilities"):

(i)    any Liabilities relating to current or former employees of Sellers who are not Business Employees or who are not Transferred Employees (or their respective covered family members); and

(ii)   any Liabilities relating to Business Employees and Business Contractors (or their covered family members) that arise as a result of an event or events that occurred prior to 12:01 am on the Closing Date (including, without limitation, any and all Liabilities (including statutory or contractual severance benefits) arising as a result of the actual or constructive termination of a Business Employee's employment with Sellers as a result of the transactions contemplated by this Agreement).

(i)    Acquisition Sub shall pay, perform or otherwise discharge, as the same shall become due and payable, in accordance with their respective terms, any Liabilities relating to Transferred Employees (or their covered family members), that arise as a result of an event or events that occurred on or after 12:01 am on the Closing Date (the "Assumed Employee Liabilities").

(j)    Sellers shall be solely responsible for compliance with the requirements of Section 4980B of the Code and Part 6 of Subtitle I of ERISA, including provision of continuation

coverage (within the meaning of COBRA), with respect to all Business Employees, and their respective eligible spouses and dependents, for whom a qualifying event (within the meaning of COBRA) occurs at any time on or prior to the Closing Date (including qualifying events that occur in connection with the transactions contemplated hereby).

(k)     Nothing contained in this <u>Section 6.10</u>, whether express or implied, may be construed to (i) create any third party beneficiary or other rights in any person other than the parties to this Agreement, (ii) constitute an establishment, amendment, modification or termination of, or an undertaking to establish, amend, modify or terminate, any Plan, New Plan or other benefit or compensation plan, (iii) prohibit or limit the ability of Sellers, Acquisition Sub or any of their respective Affiliates to establish, amend, modify or terminate any Plan, New Plan or other benefit or compensation plan, or (iv) create any obligation on the part of Acquisition Sub or any of its Affiliates, as applicable, to continue to employ or engage for the performance of services any person (including any Transferred Employee), or to limit the ability of Acquisition Sub or any of its Affiliates to terminate the employment or service of any person at any time for any or no reason.

6.10     <u>Release.</u>

(a)     Effective as of the Closing, each of the Sellers hereby, for himself or itself and all of his or its beneficiaries, successors, assigns, Affiliates, heirs and personal representatives, as applicable (collectively, the "<u>Releasors</u>") fully and unconditionally releases, acquits and forever discharges each of the Companies and each of their respective past, present and future officers, directors, equity holders and employees, and their respective successors and assigns, in their capacities as such, (collectively, the "<u>Releasees</u>"), from any and all manner of actions, causes of action, Claims, debts, obligations, demands, liabilities, damages, costs, losses, expenses (including attorneys' and other professional fees and expenses), sums of money, accounts, bonds, bills, covenants, compensation, contracts, controversies, omissions, promises, variances, trespasses, losses, judgments, executions or other relief, whether known or unknown, matured or unmatured, suspected or unsuspected, fixed, contingent or otherwise, arising out of, relating to, accruing from or in connection with, (i) the fact that the Sellers is or was an equity holder of the Companies, (ii) the fact the Sellers held Indebtedness of the Companies, (iii)  any claims, causes of action or remedies relating to the Transaction or the other transactions contemplated hereby which are not established pursuant to this Agreement or the Transaction Documents, or (iv) any claims alleging a breach of duty on the part of the Companies or any officer, director, manager or employee of the Companies.  The foregoing notwithstanding, none of the Releasors is releasing or discharging the Releasees from the obligations and agreements of the Releasees, if any, established pursuant to this Agreement or the Transaction Documents.

(b)     The Sellers hereby irrevocably covenant to refrain from, directly or indirectly, asserting any claim or demand or commencing, instituting or causing to be commenced, any Legal Proceeding of any kind against any Releasee, based on or arising from any matter released pursuant to <u>Section 6.10(a)</u>.

(c)     The Sellers represent and agree that they (i) fully understand their rights to discuss all aspects of this Agreement with their attorneys, (ii) have availed themselves of this right, (iii) have carefully read and fully understand all of the terms of this Agreement, (iv) have not

transferred or assigned any rights or claims that they are hereby purporting to release herein, and (v) are voluntarily, and with proper and full authority, entering into this Agreement. The Sellers represent that they have had a reasonable period of time to consider the provisions of this Agreement, and that they have considered them carefully before executing this Agreement. The Sellers hereby acknowledge that the release in this <u>Section 6.9</u> was separately bargained for and that Parent and Acquisition Sub would not enter into this Agreement unless it included a broad release of unknown claims.

6.11    <u>Termination of Intercompany Arrangements</u>. Effective at the Closing, all Contracts or arrangements (other than the Assumed Contracts) between any Company (with respect to the Business), on the one hand, and the Sellers or any Affiliate of the Sellers, on the other hand (the "<u>Intercompany Agreements</u>"), shall be terminated without any party having any continuing obligation to the other. For the avoidance of doubt, understandings or Contracts entered into by either of the Sellers or any of their Affiliates, other than any Company, with a third party, shall not be terminated pursuant to this Agreement; <u>provided</u>, <u>however</u>, except to the extent expressly provided in the Employee Sharing Agreement or otherwise agreed to by the Sellers and Parent, the Business shall no longer receive any benefits under such understandings or Contracts.

6.12    <u>Post-Closing Cash Consideration</u>. Provided that the Closing has occurred or is occurring contemporaneously, the Acquisition Sub shall pay to the Sellers, in accordance with the Payment Allocation Schedule, (i) Four Million Seven Hundred Fifty Thousand Dollars ($4,750,000) no later than December 24, 2019, (ii) Two Million Dollars ($2,000,000) no later than December 31, 2019 and (iii) Three Million Dollars ($3,000,000) no later than February 29, 2019.

6.13    <u>Post-Closing Stock Consideration</u>. Within twenty (20) Business Days of the Closing Date, but in no event prior to January 1, 2020, Parent shall issue to Sellers, in accordance with the Payment Allocation Schedule, (i) Four Million Two Hundred Twenty Two Thousand Four Hundred Seventy Four (4,222,474) shares of Common Stock (the "<u>Common Stock Consideration</u>") and (ii) the Closing Preferred Stock minus the Holdback Amount.

6.14    <u>Deposit</u>. Upon the execution of this Agreement, the Acquisition Sub shall pay Two Hundred Fifty Thousand Dollars ($250,000) (the "<u>Deposit</u>") into an account designated by Sellers as a deposit to be credited against the Base Purchase Price at the Closing. In the event of the termination of this Agreement, the Sellers will repay the Deposit to the Acquisition Sub within three (3) days of the date of termination, unless this Agreement was properly terminated pursuant to <u>Section 9.1(c)</u> by virtue of a breach of this Agreement by Parent or Acquisition Sub, in which event the Deposit will be retained by the Sellers as its sole and exclusive remedy for such breach.

6.15    <u>Clawback</u>. If (a)(i) the Guaranteed Indebtedness is not repaid or refinanced, (ii) the Guarantee Agreements are not terminated or (iii) the Guarantors are not otherwise released from their obligations to guarantee the Guaranteed Indebtedness on or before the date that is 120 days after the Closing Date and (b), following such date, Inmost enforces the obligations of the Guarantors under the Guarantee Agreements by requiring the Guarantors to make a payment to Inmost to satisfy all or a portion of the Guaranteed Indebtedness (a

-40-

"Guarantee Payment") then, within 10 Business Days after being provided with satisfactory evidence that the Guarantors made a Guarantee Payment to Inmost, Parent and Acquisition Sub shall transfer to the Guarantors such amount of Equity Interests that Parent determines to have a value as nearly equal to the Guarantee Payment.

     6.16   Rehab Properties.  The Acquisition Sub shall transfer each of the Rehab Properties to Fix Pads, LLC, or its designee, within ten (10) Business Days after the satisfaction of all obligations and release of any Liens that may restrict the transfer of such Rehab Properties.

## ARTICLE 7

## INDEMNIFICATION

     7.1   Survival.

     (a)    Except as set forth in Section 7.1(b), the representations and warranties in this Agreement, together with the associated rights of indemnification, shall survive the Closing hereunder and continue in full force and effect until the date that is twenty-four months (24) after the Closing, and shall thereupon expire, together with the associated rights of indemnification, except to the extent that a claim for breach thereof has been asserted in writing prior to such expiration (in which event the representation or warranty, together with the associated rights of indemnification shall survive with respect to such claim until such claim has been resolved).

     (b)    The Fundamental Representations shall survive the Closing hereunder and continue in full force and effect, together with the associated rights of indemnification, until sixty (60) days following the expiration of the longest available statute of limitations (giving effect to any extension or waiver thereof) under applicable Law and shall thereupon expire, together with the associated rights of indemnification, except to the extent that a claim for a breach thereof has been asserted in writing prior to such expiration (in which event the representation or warranty, together with the associated rights of indemnification, shall survive with respect to such claim until such claim has been resolved).

     (c)    The indemnification obligations set forth in Section 7.2(a)(iii) shall survive with respect to each Tax obligation for which indemnification may be sought thereunder until sixty (60) days after the statute of limitations applicable to such Tax obligation.  Each of the other covenants and agreements contained herein (together with the associated rights of indemnification) shall survive the Closing and continue in full force and effect until performed in accordance with their terms.

     7.2   Indemnification.

     (a)    From and after the Closing, the Sellers hereby agree to indemnify and hold Parent, Acquisition Sub, the Companies and their respective direct and indirect equity holders, directors, managers and officers (collectively, the "Acquisition Sub Indemnified Parties") harmless from, against and in respect of, any and all Losses which may be sustained, suffered or incurred by, or imposed on, any of them to the extent resulting from, related to or arising out of: (i) any misrepresentation or any breach of warranty made by the Sellers in this Agreement or in

-41-

any Transaction Document; (ii) any breach of, or failure to fully and timely comply with, any covenant, agreement or obligation of the Sellers set forth in this Agreement or in any Transaction Document; (iii) Pre-Closing Liabilities, (iv) Pre-Closing Taxes, (v) any Excluded Liabilities, (vi) any Indebtedness for which no Outstanding Indebtedness Letter has been delivered by Sellers, (vii) any Transaction Expenses not included on the Payment Allocation Schedule (viii) any of the matters set forth on <u>Schedule 3.3(a)</u>, <u>Schedule 3.15(a)</u>, <u>Schedule 3.15(b)</u> or <u>Schedule 4.4</u>, and (ix) the Rehab Properties. Notwithstanding anything in this Agreement to the contrary, the representations, warranties and covenants of the Sellers, and the Parent's and Acquisition Sub's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of the Parent or Acquisition Sub or by reason of the fact that the Parent or Acquisition Sub knew or should have known that any such representation or warranty is, was or might be inaccurate or by reason of the Parent's or Acquisition Sub's waiver of any condition set forth in <u>Section 2.3</u> or <u>Section 8.1</u>, as the case may be.

(b)     From and after the Closing, Acquisition Sub hereby agrees to indemnify and hold the Sellers, their Affiliates, and their respective officers, directors and equity holders (collectively, the "<u>Seller Indemnified Parties</u>") harmless from, against and in respect of any and all Losses which may be sustained, suffered or incurred by, or imposed on, any of them to the extent resulting from, related to or arising out of (i) any misrepresentation in any representation or any breach of warranty made by Acquisition Sub in this Agreement or in any Transaction Document or (ii) any breach of, or failure to fully and timely comply with, any covenant, agreement or obligation of Parent and Acquisition Sub set forth in this Agreement or in any Transaction Document.

(c)     Notwithstanding anything contained in this Agreement, all "material", "Material Adverse Effect" and similar materiality type qualifications in the representations and warranties shall be ignored and not given any effect for purposes of determining (i) whether there is any misrepresentation or breach of warranty and (ii) the amount of any Loss which may be claimed pursuant to this <u>Article 7</u> in connection with any such misrepresentation or breach.

7.3     <u>Claims Procedure; Participation in Litigation.</u>

(a)     <u>Certain Definitions</u>.  For purposes hereof, a party claiming a right to indemnification shall be referred to as the "<u>Indemnified Party</u>", the party against whom such indemnification claim is made shall be referred to as the "<u>Indemnifying Party</u>" and written notices from an Indemnified Party to an Indemnifying Party which sets forth one or more Claims for indemnification under <u>Article 7</u> for Losses shall each be referred to as a "<u>Claim Notice</u>".

(b)     <u>Procedure for Direct Claims</u>.  Any Claim (other than a Third-Party Claim covered by <u>Section 7.3(c)</u>) by an Indemnified Party on account of a Loss that has been or may be sustained, suffered or incurred by, or imposed on, the Indemnified Party (a "<u>Direct Claim</u>") shall be asserted by the Indemnified Party giving the Indemnifying Party a Claim Notice; *provided*, *however*, any delay or failure to give such a Claim Notice shall not relieve the Indemnifying Party of its indemnification obligations except and only to the extent, if at all, that the Indemnifying Party has been materially prejudiced by reason of such delay or failure.  Each Claim Notice shall describe the Direct Claim in reasonable detail and shall indicate the estimated amount, if

reasonably practicable to do so, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have twenty (20) days after its receipt of a Claim Notice to respond in writing to such Direct Claim and, failing a written response, or if the Indemnifying Party and the Indemnified Party agree that an Indemnified Party is entitled to recover any amounts pursuant to this Agreement then the Indemnifying Party shall deliver such amounts by wire transfer of immediately available U.S. Dollars to an account designated by the Indemnified Party.

(c)    Procedure for Third-Party Claims.

(i)    In the event an Indemnified Party becomes aware of a claim from a third-party which such Indemnified Party reasonably believes may result in any Losses (without giving effect to the limitations in Section 7.5) (a "Third-Party Claim"), such Indemnified Party shall promptly notify the Indemnifying Party of such claim by delivery of a Claim Notice to such Indemnifying Party. Any delay or failure in so notifying the Indemnifying Party shall not relieve the Indemnifying Party of obligations under Section 7.2 except and only to the extent, if at all, that such Indemnifying Party is materially prejudiced by reason of such delay or failure.

(ii)    The Indemnifying Party shall have the right, exercisable by delivery of written notice to the Indemnified Party irrevocably acknowledging the Indemnifying Party's obligation to indemnify the Indemnified Party for the full amount of Losses arising from such Third-Party Claim, within twenty (20) days following the receipt of the applicable Claim Notice, to control the defense, negotiation or settlement of a Third-Party Claim, and be represented by counsel of its choice (subject to the reasonable approval of the Indemnified Party), in each case at its sole cost and expense; *provided*, that the Indemnifying Party shall not be entitled to assume or control the defense of a Third-Party Claim unless (A) it acknowledges its obligation to indemnify the Indemnified Parties for any Losses incurred by them, (B) the Third-Party Claim seeks only monetary damages, (C) the Third-Party Claim does not involve any allegation or fraud or violation of Law and (D) Notwithstanding anything to the contrary in this Section 7.3, the Indemnifying Party shall not, without the written consent of the Indemnified Party, settle or compromise any Third-Party Claim or permit a default or consent to entry of any judgment with respect thereto unless such settlement, compromise or judgment includes only the payment of monetary damages in an amount to be covered in its entirety by the Indemnifying Party, contains an unqualified release of such Indemnified Party from all liability in respect of the Third-Party Claim, does not impose any material obligations or restrictions on any of the Indemnified Party and, in the case of a claim by the Acquisition Sub Indemnified Parties, cannot reasonably be expected to result in a material Tax Liability for taxable periods (or portions thereof) beginning after the Closing Date. If the Indemnifying Party does not elect to control, or is otherwise not controlling the defense, negotiation or settlement of a particular Third-Party Claim, the Indemnified Party may defend against, negotiate, settle (subject to the approval of the Indemnifying Party, not to be unreasonably withheld, conditioned or delayed) or otherwise deal with such Third-Party Claim and be represented by counsel of its choice at the sole cost and expense, including reasonable attorneys' fees, of the Indemnifying Party.

(iii)    The party controlling the defense of any Third-Party Claim (the "Controlling Party") shall (A) permit the other party (the "Non-Controlling Party") to participate, at his or its own expense, in the defense of such Third-Party Claim, (B) keep the Non-Controlling

-43-

Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 140 of 222

Party reasonably informed of material developments in such Third-Party Claim at all stages thereof, and (C) permit the Non-Controlling Party and its counsel to confer on the conduct of the defense thereof.

(iv)     The Indemnified Party shall cooperate in all reasonable respects with the Indemnifying Party, any insurance company and their respective counsel in the investigation, trial and defense of any Third-Party Claim and any appeal arising therefrom and shall furnish such records, information and testimony and attend such conferences, discovery Legal Proceedings, hearings, trials and appeals as may be reasonably requested in connection therewith.

7.4     Purchase Price Adjustment.  With respect to any indemnity payment under this Agreement, the parties agree to treat, to the extent permitted by Law, all such payments as an adjustment to the Purchase Price paid hereunder (including for Tax purposes).

7.5     Limitations.  The rights of the Acquisition Sub Indemnified Parties to indemnification pursuant to the provisions of this Section 7.5 are subject to the following limitations:

(a)     The Sellers shall have no obligation to indemnify any Acquisition Sub Indemnified Parties pursuant to Section 7.2(a)(i), unless and until the aggregate amount of all Losses suffered or incurred by all Acquisition Sub Indemnified Parties which would otherwise be subject to indemnification hereunder exceeds $500,000.  (the "Deductible"), at which time such Acquisition Sub Indemnified Parties shall be entitled, subject to the terms and conditions of this Article 7 (including the limitations on indemnification set forth herein), to be indemnified against all Losses that exceed the Deductible; provided, however, that the Deductible shall not apply to indemnification for Losses arising from any breach of any of the Fundamental Representations or claims based on fraud or intentional misrepresentation.

(b)     Notwithstanding anything to the contrary in this Article 7, the maximum amount of Losses for which the Acquisition Sub Indemnified Parties shall be entitled to indemnification from the Sellers pursuant to Section 7.2(a)(i) shall not exceed, in the aggregate, the Purchase Price (the "Cap"); provided, however, that the Cap shall not apply to indemnification for Losses arising from any breach of any of the Fundamental Representations or claims based on fraud or intentional misrepresentation.  In the event of indemnification for Losses arising from any breach of any of the Fundamental Representations, the maximum amount of indemnification for losses in the aggregate, shall not exceed an amount equal to 100% of the Purchase Price.

(c)     All Losses suffered by the Acquisition Sub Indemnified Parties pursuant to Section 7.2(a) shall be recovered from each Seller, such number of shares of Common Stock and Preferred Stock (rounded up or down to the nearest whole share) equal to such Seller's pro rata percentage of the Common Stock and Preferred Stock as set forth on the Payment Allocation Schedule multiplied by an amount equal to the amount set forth in the Claim Notice or the resolved amount (as applicable) divided by the appropriate per share value of Common Stock and Preferred Stock (the "*Indemnity Cancelled Parent Shares*") shall be returned to Parent, deemed to be cancelled and all rights such Seller may have to such Common Stock and Preferred Stock shall be

-44-

extinguished.  For the purposes of this <u>Section 7.5(c)</u>, calculations intended to determine the number of shares of Common Stock applicable to a claim for indemnification under this <u>Section 7.5(c)</u> shall be made using the average of the closing price of the Common Stock reported by the New York Stock Exchange for the ten trading days immediately prior to the Closing Date and all calculations shall be rounded up or down to the nearest whole share. Notwithstanding anything to the contrary herein, the Acquisition Sub Indemnified Parties shall not be entitled to indemnification under this Agreement with respect to any Losses to the extent that such Losses were actually taken into consideration in determining the Net Adjustment Amount.

(d)     If any Acquisition Sub Indemnified Party or Seller Indemnified Party receives insurance proceeds as a result of any Losses with respect to which it has also received an indemnification payment or payments from the Sellers or Acquisition Sub, as the case may be, hereunder, the Acquisition Sub Indemnified Party or the Seller Indemnified Party shall pay the amount of such insurance proceeds (net of any out-of-pocket expenses incurred to obtain such insurance proceeds or any increase in premiums resulting from the receipt of such insurance proceeds, and in no event in excess of the indemnification payment or payments actually received from the Acquisition Sub or the Sellers, as the case may be, with respect to such Losses hereunder) to such party as such insurance proceeds are actually received by the Acquisition Sub Indemnified Party or the Seller Indemnified Party, as the case may be.

7.6     <u>Exclusive Remedies</u>.  After the Closing, the rights set forth in this <u>Article 7</u>, <u>Section 2.4(c)</u>, and <u>Section 2.4(d)</u> shall be the sole and exclusive remedies available to Parent, Acquisition Sub, the Sellers and their respective Affiliates with respect to any claims under this Agreement.  Notwithstanding the foregoing, the provisions of this <u>Article 7</u> shall not limit the rights of either party or otherwise apply with respect to claims based on fraud or intentional misrepresentation.

## ARTICLE 8

## CONDITIONS TO CLOSING

8.1     <u>Conditions Precedent to Obligations of Parent and Acquisition Sub</u>.  The obligations of Parent and Acquisition Sub to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in whole or in part by Parent and Acquisition Sub in writing to the extent permitted by applicable Law):

(a)     (i) Each of the Fundamental Representations shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date (or, if given as of a specific date, at and as of such date) and (ii) each of the other representations and warranties made by the Sellers in <u>Article 3</u> and <u>Article 4</u> of this Agreement (disregarding all qualifications and exceptions contained therein relating to materiality or Material Adverse Effect) shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date (or, if given as of a specific date, at and as of such date).

(b)     The Sellers shall have performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date.

(c)     There shall not be in effect any Order by a Governmental Body of competent jurisdiction prohibiting the consummation of the transactions contemplated by this Agreement.

(d)     There shall not have occurred any Material Adverse Effect.

(e)     Parent and Acquisition Sub shall have completed due diligence to their sole satisfaction.

(f)     A Certificate of Designation, in the form attached hereto as Exhibit A, indicating the rights, privileges, terms and obligations of the Preferred Stock shall have been agreed to by the Parent and Sellers' Representative and filed with the Office of the Secretary of State of the State of Nevada.

(g)     The Sellers and the Companies shall deliver all other items required to be delivered by the Sellers or the Companies at the Closing as specified in Section 2.3.

8.2     Conditions Precedent to Obligations of the Sellers.  The obligation of the Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived in whole or in part by the Sellers in writing to the extent permitted by applicable Law):

(a)     (i) Each of the representations and warranties of Parent and Acquisition Sub set forth in Section 5.1 and Section 5.2 shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date (or, if given as of a specific date, at and as of such date) and (ii) each of the other representations and warranties made by Parent and Acquisition Sub in Article 5 of this Agreement (disregarding all qualifications and exceptions contained therein relating to materiality) shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date (or, if given as of a specific date, at and as of such date).

(b)     Parent and Acquisition Sub shall have performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by Parent and Acquisition Sub on or prior to the Closing Date.

(c)     There shall not be in effect any Order by a Governmental Body of competent jurisdiction prohibiting the consummation of the transactions contemplated by this Agreement.

(d)     Parent and Acquisition Sub shall deliver all other items required to be delivered by Parent and Acquisition Sub at the Closing as specified in Section 2.3.

-46-

## ARTICLE 9

## TERMINATION

9.1     <u>Termination of Agreement</u>.  This Agreement may be terminated by the parties only as provided below:

(a)     By Parent, Acquisition Sub and the Sellers if each such parties agree to terminate this Agreement by mutual written consent at any time prior to the Closing;

(b)     By either Parent and Acquisition Sub or the Sellers:

(i)     if any Order of a Governmental Body causing the failure of the conditions set forth in <u>Section 8.1(c)</u> or <u>Section 8.2(c)</u> shall be in effect and shall have become non-appealable, final and permanent at any time prior to the Closing and the terminating Party delivered written notice of such event to the other party; *provided*, that no party may terminate this Agreement pursuant to this <u>Section 9.1(b)(i)</u> if the Order described in this <u>Section 9.1(b)(i)</u> resulted primarily from such party's breach of any representation or warranty made by it herein or the failure of such party to fulfill any of its covenants in this Agreement; and

(ii)     at any time on or after December 31, 2019 (the "<u>Outside Date</u>") upon written notice to the other party; *provided* that no party may terminate this Agreement pursuant to this <u>Section 9.1(b)(ii)</u> if such party shall have breached this Agreement in any manner that shall have primarily caused the failure to of the Closing to occur before the Outside Date;

(c)     by the Sellers, if Parent and Acquisition Sub has breached or failed to perform any of their representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform (i) would primarily give rise to the failure of a condition set forth in <u>Section 8.2(a)</u> or <u>Section 8.2(b)</u> and (ii) cannot be or has not been cured prior to the earlier of (A) the Business Day prior to the Outside Date and (B) the date that is twenty (20) Business Days from the date that Acquisition Sub is notified by the Sellers in writing of such breach or failure to perform; *provided*, that the right to terminate this Agreement under this <u>Section 9.1(c)</u> shall not be available to the Sellers if there has been a breach or failure to perform by any of the Companies or the Sellers that would primarily give rise to the failure of a condition in <u>Section 8.1(a)</u> or <u>Section 8.1(b)</u>; or

(d)     by Parent and Acquisition Sub, (i) if any of the Companies or Sellers has breached or failed to perform any of their representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform (A) would primarily give rise to the failure of a condition set forth in <u>Section 8.1(a)</u> or <u>Section 8.1(b)</u> and (B) cannot be or has not been cured prior to the earlier of (1) the Business Day prior to the Outside Date and (2) the date that is twenty (20) Business Days from the date that the Sellers is notified by Acquisition Sub in writing of such breach or failure to perform; *provided*, that the right to terminate this Agreement under this <u>Section 9.1(d)</u> shall not be available to Parent and Acquisition Sub if there has been a breach or failure to perform by Parent and Acquisition Sub that would primarily give rise to the failure of a condition in <u>Section 8.2(a)</u> or <u>Section 8.2(b)</u>, or (ii) if the diligence process

-47-

has not been completed to the Parent and Acquisition Sub's satisfaction by within four weeks from the date hereof.

    9.2 <u>Effect of Termination</u>.  In the event of the termination of this Agreement pursuant to <u>Section 9.1</u>, written notice thereof will be given by the terminating party to the other party specifying the provision hereof pursuant to which such termination is made, and all obligations of the parties hereunder (other than obligations under <u>Section 6.5</u>, <u>Section 6.7</u>, this <u>Section 9.2</u> and <u>Article 11</u>, which shall survive termination) shall terminate without any liability of any Party to any other Party; *provided*, that no termination shall relieve a Party from any liability arising from or relating to fraud or intentional misrepresentation or a willful breach of covenant by such party prior to termination.

# ARTICLE 10

# REPRESENTATIVE

    10.1 <u>Appointment</u>.  Sellers hereby consent to and acknowledge the appointment of the Sellers' Representative as the true and lawful attorney-in-fact of Sellers for all matters in connection with this Agreement, with the power and authority to act on each Seller's behalf as set forth in this <u>Article 10</u>.  The Sellers' Representative will act on behalf of Sellers with respect to all matters requiring action by Sellers under this Agreement and the Transaction Documents.  The Sellers' Representative hereby accepts such appointment.

    10.2 <u>Authority</u>.  The Sellers' Representative may take all actions required to be taken by Sellers under this Agreement and may take any other action contemplated by this Agreement. Any decision, act, consent or instruction of the Sellers' Representative shall constitute a decision of all of the Sellers and shall be final, binding and conclusive upon each such Seller. By giving notice to the Sellers' Representative in the manner provided by <u>Section 11.7</u>, any party shall be deemed to have given notice to Sellers.  Any action taken by the Sellers' Representative may be considered by the parties to be the action of Sellers for whom such action was taken for all purposes of this Agreement.

    10.3 <u>Indemnification Claims; and Net Adjustment Amount</u>.  The Sellers' Representative shall have the authority to determine, in his sole judgment, whether to make or prosecute claims for indemnification under <u>Article 7</u> on behalf of Sellers, retain counsel (and to select that counsel) to protect Sellers' interests, whether to assume the defense of or otherwise to control the handling of any claim and whether to consent to indemnification and to make all other decisions required to be made by Sellers pursuant to this Agreement, including whether to consent or withhold its consent to any settlement or compromise of a claim.  The Sellers' Representative shall have the authority to determine, in his sole judgment, the Net Adjustment Amount (and each component thereof) on behalf of Sellers, retain counsel and financial advisors (and to select such counsel or financial advisors) to assist in determining the Net Adjustment Amount (and each component thereof) on behalf of Sellers, and to make all other decisions required to be made by Sellers pursuant to this Agreement in connection with the determination of the Net Adjustment Amount (and any component thereof).

<div align="center">-48-</div>

10.4    <u>No Liability</u>.  The Sellers' Representative shall not be liable to any Seller for any act or omission taken pursuant to or in conjunction with this Agreement, except for his own bad faith or willful misconduct.  Sellers shall indemnify and hold the Sellers' Representative, and each successor thereof, harmless from any and all liability and expenses (including attorney's fees) which may arise out of any action taken or omitted by it as the Sellers' Representative in accordance with this Agreement, as the same may be amended, modified or supplemented, except such liability and expense as may result from the bad faith or willful misconduct of the Sellers' Representative.

10.5    <u>Reliance</u>.  Parent shall be entitled to rely conclusively on any and all instructions or decisions of, or actions taken by, the Sellers' Representative under this Agreement without any liability to, or obligation to inquire of, any of the Sellers, regardless of whether Parent has knowledge of any such dispute or disagreement.

# ARTICLE 11

## MISCELLANEOUS

11.1    <u>Specific Performance</u>.  Except as provided in <u>Section 6.14</u>, the parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to seek specific performance of the terms hereof, in addition to any other remedy to which they are entitled at Law or in equity. In no event shall the exercise of the Parent's or Acquisition Sub's right to seek specific performance pursuant to this <u>Section 11.1</u> reduce, restrict or otherwise limit the Sellers', the Companies', Parent's or Acquisition Sub's right to pursue all other applicable remedies at law, including seeking monetary damages.

11.2    <u>Expenses</u>.  Except as otherwise provided in this Agreement, the Sellers shall bear their own expenses and the expenses of the Companies, and the Parent and Acquisition Sub shall bear their own expenses, in each case incurred in connection with the negotiation and execution of this Agreement and each Transaction Document and the consummation of the transactions contemplated hereby and thereby.

11.3    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware, without giving effect to its conflicts or choice of law provisions of any other jurisdiction.

11.4    <u>Jurisdiction</u>.  Any claims, actions and Legal Proceedings arising out of this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby shall be brought in any state or federal court of competent jurisdiction located in New Castle County, State of Delaware and each of the parties hereto hereby submits to the exclusive jurisdiction of such courts for the purpose of any such claim, action or Legal Proceeding.  A final judgment in any such claims, action or Legal Proceedings shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Each party hereto irrevocably agrees not to assert (a) any objection which it may ever have to the laying of venue of any such claim, action or Legal Proceeding in any state or federal court located in the

New Castle County, State of Delaware and (b) any claim that any such claim, action or Legal Proceeding brought in any such court has been brought in an inconvenient forum.

        11.5  <u>Entire Agreement</u>.  This Agreement (including the schedules and exhibits hereto) and the Transaction Documents represent the entire understanding and agreement among the parties hereto with respect to the subject matter hereof.  This Agreement supersedes all prior and contemporaneous agreements, arrangements, undertakings and understandings between the parties with respect to such subject matter.

        11.6  <u>Amendments and Waivers</u>.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

        11.7  <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand, (ii) upon receipt of an automatic, electronic confirmation of transmission when sent by facsimile, or (iii) one Business Day following the day sent by overnight courier, in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

        If to the Sellers or Sellers' Representative, to:

        Alexander Szkaradek
        PO Box 488
        Columbia, SC 29202
        Phone: (803) 413-8808
        Email: alex@vpm3.com

        With copies (neither of which shall not constitute notice) to:

        Burr & Forman LLP
        1221 Main Street, Suite 1800
        Columbia, SC 29201
        Attention:  Erik Doerring, Esq.
        Phone: (803) 799-9800
        Email: edoerring@burr.com

        c/o Vision Property Management, LLC

PO Box 488
Columbia, SC 29202
Phone: (803) 726-2200
Email: jpincelli@vpm3.com

If to Parent, Acquisition Sub or the Companies (after Closing), to:

c/o FTE Networks, Inc.
237 West 35th Street, Suite 806
New York, NY 10001
Attention: Stephen Goodwin
Email: sgoodwin@ftenet.com

With a copy (which shall not constitute notice) to:

Pepper Hamilton LLP
3000 Two Logan Square
Philadelphia, Pennsylvania 19103
Attention: Robert Friedel, Esq. and Scott R. Jones, Esq.
Telecopy: 215-689-4652
Email: friedelr@pepperlaw.com and jonessr@pepperlaw.com

11.8    Binding Effect; Third-Party Beneficiaries; Assignment.    Except as otherwise provided herein, this Agreement may not, without the prior written consent of the other parties hereto, be assigned by operation of Law or otherwise, and any attempted assignment shall be null and void; subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors, permitted assigns and legal representatives; provided, however, that Parent or Acquisition Sub may pledge, assign or grant their (or their Affiliate's) lenders, for the benefit of such lenders, a continuing security interest in and to this Agreement, as security for payment of performance of the obligations of Parent or Acquisition Sub and/or their Affiliates to such lender by reason of borrowings, the guarantee of borrowings or otherwise.  Except as otherwise expressly stated in this Agreement, this Agreement shall be for the sole benefit of the parties to this Agreement and their respective successors and permitted assigns, and is not intended, nor shall be construed, to give any Person, other than the parties hereto (and their respective successors and permitted assigns) any legal or equitable right, remedy or claim hereunder.

11.9    Counterparts.    This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by facsimile, by electronic mail in "portable document format" (".pdf") form, or any other electronic transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

-51-

At the request of any party hereto or to any such contract, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.

11.10 <u>Further Assurances</u>. If, at any time after the Closing, the Sellers' Representative or Parent reasonably determines that further action is necessary to effectuate or memorialize the transaction contemplated by this Agreement or any other Transaction Document, each party hereto shall take or cause to be taken, at its own cost and expense, all such action as may be reasonably requested and execute, deliver and file, or cause to be executed, delivered and filed, all such documentation as may be reasonably requested.

11.11 WAIVER OF JURY TRIAL. **EACH PARTY HERETO HEREBY KNOWINGLY AND VOLUNTARILY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF OR THEREOF**.

## ARTICLE 12

## DEFINITIONS

12.1 <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 12.1</u>:

"<u>Action</u>" means any action, mediation, suit, litigation, arbitration, claim, proceeding, investigation, audit or review.

"<u>Affiliate</u>" means, (i) with respect to any natural Person, such Person's spouse, parents, lineal descendants and other immediate family members and (ii) with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Assets</u>" means, with respect to any specified Person, any and all of such Person's right, title and interest in and to all of the properties, assets, claims, Contracts and businesses of every kind, character and description, whether real, personal or mixed, whether tangible or intangible, whether accrued, contingent or otherwise, and wherever located, including any and all of such Person's right, title and interest in and to the following:

(a) any interest or leasehold interest of such Person in any real property;

-52-

(b)  all raw materials, work-in-process, finished goods or products, supplies and other inventories, including any such goods or products in transit or being held by customers pursuant to consignment arrangements;

(c)  all rights under Contracts;

(d)  all rights under Policies;

(e)  all accounts, notes and other receivables;

(f)  all rights under licenses for Intellectual Property;

(g)  all expenses of such Person that have been prepaid, including ad valorem Taxes and lease and rental payments;

(h)  all Actions against third parties, including unliquidated rights under manufacturers' and vendors' warranties and any rights with respect to any refund;

(i)  all Intellectual Property;

(j)  all Licenses, including Environmental Permits;

(k)  all books, records, files and papers, whether in hard copy or computer format, including sales and promotional literature, manuals and data, sales and purchase correspondence, lists of suppliers, customers, personnel and employment records and copies of any information relating to Taxes imposed on such Person;

(l)  all personal property and interests therein, including machinery, equipment, furniture, furnishings, office equipment, communications equipment, vehicles, spare and replacement parts, fuel and other tangible personal property, wherever located; and

(m)  all goodwill related to such Person's business or any other Asset of such Person.

"Assumed Contracts" means, except for any Excluded Asset, the Contracts to which the Asset Seller or any Affiliate (other than a Company) is a party and that are Related to the Business, including, to the extent not held by the Companies, (i) the employment agreements with the employees, (ii) the independent contractor agreements Related to the Business, and (iii) all confidentiality, restrictive covenant and similar agreements with the Employees and all independent contractors Related to the Business.

"Business" means the businesses, as currently conducted, of (a) the Companies and (b)  the Asset Seller.

"Business Day" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized to close.

-53-

#55975433 v13

"Cash and Cash Equivalents" means, with respect to any person, all cash and cash equivalents (including marketable securities and short term investments) determined in accordance with GAAP; and for the avoidance of doubt, Cash and Cash Equivalents shall be calculated net of (i) uncleared checks and drafts issued by such person, and (ii) restricted cash.

"Claim" means any written or oral demand, claim, complaint, suit, action, cause of action, investigation, proceeding or notice by any Person alleging actual or potential Liability for any Loss, or for any default under any Law, Contract, Permit or other instrument or agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Stock" means the common stock, par value $0.001, of Parent.

"Companies" means the Entities and Asset Seller, each individually a "Company".

"Company Contracts" means any Contract required to be listed on Schedule 3.12.

"Company Indebtedness" means all Indebtedness of the Companies or secured by any of the Transferred Assets.

"Contract" means any written or oral contract, indenture, license, Permit, undertaking, note, bond, Lease, commitment or other agreement or arrangement.

"Determination Time" means, for purposes of Article 1 and Article 2 of this Agreement, the close of business on the day immediately prior to the Closing Date; *provided*, that, in the case of a determination of the amount of Indebtedness, it shall mean the moment in time immediately prior to the Closing on the Closing Date, and in the case of a determination of any Tax components of Net Working Capital, it shall mean 11:59 p.m. on the Closing Date.

"Environmental Laws" means all federal, state, provincial and local statutes, regulations, and ordinances having the force or effect of law, all judicial and administrative orders and determinations, concerning pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, or cleanup of any hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, or polychlorinated biphenyls, that were enacted prior to the Closing Date and as they are in effect on the Closing Date.

"Entity Indebtedness" means the aggregate Indebtedness of the Entities.

"Equity Consideration" Common Stock Consideration and the Closing Preferred

Stock.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any corporation or trade or business (whether or not incorporated) which is treated with Sellers as a single employer within the meaning of Section 414 of the Code.

"Estimated Net Working Capital" means, in accordance with Section 2.4(a), the Sellers' good faith estimate of the amount of Net Working Capital as of the Determination Time.

"Estimated Transaction Expenses" means, in accordance with Section 2.4(a), the Sellers' good faith estimate of the Transaction Expenses as of the Determination Time.

"Estimated Entities' Indebtedness" means, in accordance with Section 2.4(a), the Sellers' good faith estimate of the Entities' Indebtedness as of the Determination Time.

"Final Indebtedness" has the meaning set forth in the definition of "Net Adjustment Amount".

"Final Net Working Capital" means the amount of Net Working Capital as of the Determination Time, as finally determined in accordance with Section 2.4(c)(iii).

"Final Transaction Expenses" has the meaning set forth in the definition of "Net Adjustment Amount".

"Financing" means debt or equity financing resulting in gross proceeds of at least $12,000,000 received by Parent.

"Fundamental Representations" means representations and warranties as to the quality of title or the absence of Liens on real property, and those representations and warranties made in any of the following Sections of this Agreement: 3.1, 3.2, 3.4, 3.8, 3.17, 3.18, 4.1, 4.3 and 4.4.

"GAAP" means United States generally accepted accounting principles.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether federal, provincial, state, local or foreign, or any agency, instrumentality or authority thereof, or any court or arbitrator, including any Taxing Authority or exchange on which a Person's stock is listed.

"Government Contract" means any Contract of any Company that is with any Governmental Body, prime contractor or upper-tier subcontractor relating to a program where the Company is a party for the purpose of providing goods or services to a Governmental Body, which (i) is currently in effect; or (ii) remains open to audit no matter when it was last in effect.

"Guarantee Agreements" means those certain Guarantee Agreements dated July 10, 2017 between each of the Guarantors and Inmost.

"Guaranteed Indebtedness" means the Indebtedness of DSV SPV1, LLC, DSV SPV2, LLC and DSV SPV3, LLC in favor of Inmost and guaranteed by the Guarantors pursuant to the Guarantee Agreements.

"Guarantors" means Alex, Antoni and VPM Holdings.

"Hazardous Substances" means any material, substance or waste that is regulated, classified, or otherwise characterized under or pursuant to any Environmental Laws as "hazardous," "toxic," "pollutant," "contaminant," "radioactive," "dangerous" or words of similar meaning and effect, including petroleum and its by-products, asbestos and polychlorinated biphenyls and includes any substance, the release of which may cause an adverse effect.

"Holdback Amount" means shares of Preferred Stock having an aggregate value of One Hundred Three Million Dollars ($103,000,000).

"Indebtedness" means, with respect to each Company, without duplication and as of an applicable date, the sum of all amounts (including the current portion thereof) owing by the Company (including principal, interest, prepayment penalties or fees, premiums, breakage amounts, expense reimbursements or other amounts payable in connection with any repayment) in respect of (i) indebtedness for money borrowed, (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments, for the payment of which such Person is responsible or liable, (iii) any obligations for or on account of Personal Property Leases (or other arrangement conveying the right to use) required to be capitalized in accordance with GAAP, (iv) any obligations of a Person, other than the Company, secured by a Lien against any of the Company's Assets, (v) all obligations for the reimbursement of letters of credit, performance bonds or similar transactions, but only to the extent actually drawn as of such date, (vi) the net amount (which may be a positive or negative number) of any obligations under any currency or interest rate swap or hedging Contract, and (vii) any obligation for the payment of the deferred purchase price for any properties, services or assets, other than ordinary trade payables incurred in the Ordinary Course of Business, (viii) any loans or other obligations, whether or not in writing, to the Sellers or its Affiliates (other than salary, bonus or similar Ordinary Course of Business compensation), (ix) all unpaid deferred compensation, severance, bonuses accrued or earned through, including as a consequence of, the Closing, and the employer's share of unpaid payroll Taxes attributed thereto, (x) all revenue of the Company attributable to products or services not yet provided or performed fully by the Company prior to the Closing Date and (xi) all obligations of the types described in clauses (i) through (x) above of any Person other than the Company, the payment of which is guaranteed, directly or indirectly, by the Company.

"Inmost" means Inmost Partners LLC.

"Intellectual Property Rights" means, collectively, all rights arising under United States, foreign and multinational: (a) patents and patent applications, including divisions, continuations, continuations-in-part, reissues, reexaminations and any renewals and extensions

thereof and all inventions claimed therein; (b) trade secrets, proprietary know-how and confidential information, inventions (whether or not patentable or reduced to practice), methodologies, processes, formulae and other proprietary and confidential information; (c) trademarks, service marks, trade names, designs, logos, slogans, tag lines, domain names and other indicators of source, all registrations and applications for registration of the foregoing, and all business goodwill appurtenant thereto; and (d) rights arising in works of authorship, whether or not published, copyrights (including copyrights arising in computer software), and all registrations and applications to register any of the foregoing, and including all moral rights and similar rights of attribution associated therewith.

"Knowledge of the Sellers" or any other similar knowledge qualification, means (i) the actual knowledge of the Sellers, and (ii) the knowledge that the Sellers would have had if each of them had made due inquiry of their respective direct reports in connection with making the representations and warranties in this Agreement.

"Law" means any federal, provincial, state, local or foreign law, statute, code, ordinance, rule, regulation, constitution, treaty, common law, interstate compact, judgment, decree, decision, order, ruling, other requirement or rule of law of any Governmental Body, administrative pronouncement having the effect of law, or legally binding or enforceable judicial or administrative guidance, pronouncement, or policy.

"Lease" means any lease, sublease, license, concession or other Contract, including any amendment, renewal or extension with respect thereto, to which a Company is a party, and pursuant to which a Person holds or has, or gives others, the right to use, possess, occupy, or access any real property or interest in real property.

"Legal Proceeding" means any claim, action, charge, cause of action, demand, lawsuit, arbitration, mediation, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity, whether or not before a Governmental Body.

"Liability" or "Liabilities" means any debts, liabilities, demands or obligations of any nature (whether known or unknown, accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, or as a guarantor or otherwise) and including all costs and expenses relating thereto.

"Lien" means any lien (statutory or other), encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, community property interest, condition, equitable interest, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"Local Transfer Agreements" means the instruments of assignment and transfer, in form and substance reasonably mutually agreed by the Parties, duly executed by the applicable Seller(s), evidencing the transfer of the Equity Interests and the Transferred Assets and Liabilities to the Acquisition Sub.

"Losses" means, with respect to any Person, any losses, Liabilities, damages, fines, and out-of-pocket costs and expenses (including reasonable attorneys' fees) against or affecting such Person; *provided*, that "Losses" shall not include punitive damages, or speculative damages except, in each case, to the extent such damages are required to be paid to a third party pursuant to a Third-Party Claim.

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, cash flows, assets, properties, financial condition or results of operations of the Companies, or (b) the ability of the Sellers or the Companies to consummate the Transaction and the other transactions contemplated hereby or by the other Transaction Documents on a timely basis; *provided*, *however*, that none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or may be, a Material Adverse Effect: (i) the effect of any change that generally affects the United States or foreign economies or securities, financial, banking or credit markets (including changes in interest or exchange rates) or geopolitical conditions; (ii) the effect of any change that generally affects any industry in which the Companies operates; (iii) the effect of any seasonal changes in the results of operations of the Companies consistent with past practices; (iv) the effect of any changes in applicable Laws; (v) the effect of any change caused by natural disasters or acts of nature, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions; or (vi) the failure of any of the Companies to meet any of its internal projections (it being understood that the underlying facts, events, circumstances or changes (other than those listed in clauses (i) through (v) above) giving rise to any such failure shall be considered in determining whether a Material Adverse Effect has occurred, or could reasonably be expected to occur); *provided*, *however*, that any event, occurrence, fact, condition or change referred to in clauses (i), (ii), (iv) and (v) above shall be taken into account in determining whether a Material Adverse Effect has occurred, or could reasonably be expected to occur, only to the extent that such event, occurrence, fact, condition or change has a disproportionate effect on the Companies as compared to other participants in the industries in which the Companies conduct their business.

"Net Adjustment Amount" means an amount, which may be a positive or a negative number, equal to (i) (A) if the Final Net Working Capital is greater than the Estimated Net Working Capital, the amount, if any, by which the Final Net Working Capital exceeds the Estimated Net Working Capital, which amount shall be expressed as a positive number, (B) if the Final Net Working Capital is less than the Estimated Net Working Capital, the amount, if any, by which the Estimated Net Working Capital exceeds the Final Net Working Capital, which amount shall be expressed as a negative number, or (C) if the Final Net Working Capital is equal to the Estimated Net Working Capital, zero, plus (ii) the amount, if any, by which the aggregate amount of Indebtedness of the Companies as set forth on the Final Closing Statement ("Final Indebtedness") is greater than Estimated Entities' Indebtedness, which amount shall be expressed as a negative number, plus (iii) the amount, if any, by which Final Indebtedness is less than Estimated Entities' Indebtedness, which amount shall be expressed as a positive number, plus (iv) the amount, if any, by which the aggregate amount of Transaction Expenses as set forth on the Final Closing Statement ("Final Transaction Expenses") are greater than Estimated Transaction Expenses, which amount shall be expressed as a negative number, plus (v) the amount, if any, by which Final Transaction

#55975433 v13

Expenses are less than Estimated Transaction Expenses, which amount shall be expressed as a positive number.

"Net Working Capital" means, with respect to each Company, an amount equal to its current assets minus its current liabilities, in each case as determined in accordance with GAAP. For the avoidance of doubt, "Net Working Capital" shall not include any amounts reflected in Cash and Cash Equivalents, deferred income taxes, Indebtedness or Transaction Expenses.

"Order" means any order, writ, injunction, judgment, decree, stipulation, ruling, writ, stipulation, determination, award, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of business of the Companies consistent with past practice.

"Permitted Exceptions" means (i) statutory Liens for Taxes, assessments or other governmental charges not yet payable; and (ii) zoning and other land use regulations by any Governmental Body, with which the Real Properties are in material compliance.

"Person" means any natural person, partnership, limited partnership, limited liability company, corporation, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Property Lease" means any lease, sublease, license, concession or other Contract, including any amendment, renewal or extension with respect thereto, to which a Company is a party, and pursuant to which a Person holds or has, or gives others, the right to use, possess or access any personal property or interest in personal property.

"Plans" means each "employee benefit plan," as defined in Section 3(3) of ERISA, and all other pension, retirement, supplemental retirement, deferred compensation, excess benefit, profit sharing, bonus, incentive, stock purchase, stock ownership, stock option, stock appreciation right, profits interest, equity derivative or other equity, phantom equity, employment, severance, salary continuation, termination, change-of-control, health, life, disability, group insurance, vacation, holiday and fringe benefit plan, program, policy, practice, Contract, or arrangement, in each case maintained, contributed to, or required to be contributed to, by the Sellers or any ERISA Affiliate for the benefit of any Business Employee or Business Contractor.

"Pre-Closing Liabilities" means any and all Liabilities relating to or arising out of the operation of the Companies prior to the Closing Date, in any case whether or not incurred prior to the Closing Date and whether or not reflected as a Liability on Schedule 3.7.

"Pre-Closing Taxes" means all (i) Taxes imposed on or relating to the Companies with respect to any taxable period or portion thereof ending on or before the Closing Date, (ii) Taxes of another Person for which the Companies are or may be liable as a result of being a successor or transferee of such Person on or prior to the Closing Date, as a result of any express or implied obligation existing on or prior to the Closing Date to indemnify any such Person, by Contract or otherwise and (iii) all Liability resulting by reason of the several Liability of the Companies pursuant to Treasury Regulations Section 1.1502-6 or any analogous state, local or

-59-

foreign law or regulation or by reason of the Companies or any of their Subsidiaries having been, or ceasing to be, a member of any consolidated, combined or unitary group on or prior to the Closing Date, (iv) all Liability for Taxes attributable to the failure by the Sellers to comply with any of the covenants or agreements of the Sellers under this Agreement, including without limitation a failure to comply with its obligations under Section 6.4(a).

"Preferred Stock" means the Preferred Stock of Parent with such rights, privileges, terms and obligations as are set forth in the Certificate of Designation filed pursuant to Section 8.1(f).

"Related to the Business" means used in the Business, except for (as used with respect to Assets) any Asset, the failure to transfer would not have more than a *de minimis* impact on the Business.

"Retained Bonuses" means (a) bonuses payable with respect to the employees set forth on Schedule 12.1(a) for all periods prior to the Closing Date and (b) any amounts payable in connection with the termination of the Asset Sellers' employees that are required to be paid.

"Securities Act" means the Securities Act of 1933, as amended (including the rules and regulations promulgated thereunder).

"Schedule" means a disclosure schedule delivered pursuant to this Agreement.

"Subsidiary" means, with respect to a Person (including the Companies), any other Person of which (i) at least a majority of the outstanding voting securities are owned, directly or indirectly, by such Person, or (ii) such Person is entitled, directly or indirectly, to appoint at least a majority of the board of directors, board of managers or comparable governing body of such other Person.

"Target Net Working Capital" means the Net Working Capital target agreed to by the Parties prior to Closing.

"Tax Return" means all returns, declarations, designations, forms, schedules, notices, filings, reports, elections, estimates, information returns or statements (including withholding tax returns and reports) filed or required to be filed in respect of any Taxes, including any schedule or attachment thereto and any amendment or supplement thereof.

"Tax" or "Taxes" means any income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, property or windfall profits taxes, environmental taxes, franchise, employees' income withholding, foreign or domestic withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, value added, goods and services, alternative or add-on minimum or other tax, fee or charge of a similar nature imposed by any Governmental Body, including any interest or penalties respect of the foregoing, in each case whether disputed or not.

-60-

"Taxing Authority" means the Internal Revenue Service and any other Governmental Body responsible for the administration, determination, assessment, or collection of, or otherwise having jurisdiction with respect to, any Tax.

"Transaction Documents" means the Company Documents, the Seller Documents and the Acquisition Sub Documents.

"Transaction Expenses" means, the amounts incurred by the Sellers or the Companies in connection with the preparation, execution and consummation of this Agreement and the other Transaction Documents, and the process undertaken by or on behalf of the Sellers and/or any of the Companies which resulted in this Agreement, including in respect of any fees, costs, expenses and/or reimbursements to attorneys, accountants, investment bankers, financial advisors and other service providers, and excluding, for the avoidance of doubt, any amounts reflected in Indebtedness or Net Working Capital.  For the avoidance of doubt, Transaction Expenses do not include outstanding real property transfer, sales, use, value added, goods and services, stamp, documentary, recording, registration, conveyance, stock transfer, intangible property transfer, personal property transfer, registration, or similar fees or Taxes or governmental charges (together with any interest or penalty, addition to Tax or additional amount imposed) which are Transfer Taxes.

"Transfer Taxes" means any real property transfer, sales, use, value added, goods and services, stamp, documentary, recording, registration, conveyance, stock transfer, intangible property transfer, personal property transfer, registration, or similar fees or Taxes or governmental charges (together with any interest or penalty, addition to Tax or additional amount imposed) in connection with the transactions contemplated by this Agreement.

"Transferred Assets" means, except for any Excluded Asset and except for the Equity Interests, all Assets of the Asset Seller or any of its Affiliates (other than the Companies) that are Related to the Business, including (a) the Assumed Contracts, and (b)  the Assumed IP (other than as held by any Company).

"Transferred Assets and Liabilities" means, collectively, the Transferred Assets and the Transferred Liabilities.

"Transferred Bank Accounts" means the bank accounts of the Companies.

"Transferred Liabilities" means all of the following Liabilities of the Asset Seller or any of its Affiliates (other than the Companies) to the extent related to the Business: (a) Current Liabilities included in the calculation of Net Working Capital, as reflected in the Purchase Price, (b) Liabilities related to the Transferred Assets, (c) those specific Liabilities set forth on Schedule 12.1(b), and (d) any amounts payable pursuant to Law or an employment Contract, collective bargaining agreement, or similar Contract entered into by Asset Seller or any of its Affiliates prior to the Closing in connection with the termination of employment of any Asset Seller Employee by the Asset Seller and/or its Affiliates in connection with this Agreement or the transactions contemplated hereby to the extent triggered by Acquisition Sub or its Affiliates not offering employment to each such Asset Seller Employee in accordance with Section 6.10.

-61-

    12.2   Cross-Reference of Other Definitions.  Each capitalized term listed below is defined in the corresponding Section of this Agreement:

| | |
|---|---|
| "Affiliate Arrangement" | Section 3.18 |
| "Agreement" | Introductory Paragraph |
| "Assets" | Section 3.10 |
| "Base Purchase Price" | Section 1.4 |
| "Cap" | Section 7.5(b) |
| "Change in Control Plan" | Section 6.1(m) |
| "Claim Notice" | Section 7.3(a) |
| "Closing" | Section 2.1 |
| "Closing Date" | Section 2.1 |
| "Closing Estimates" | Section **Error! Reference source not found.** |
| "Closing Statement" | Section 2.4(b) |
| "Company" | Introductory Paragraph |
| "Company Documents" | Section 3.2. |
| "Company Intellectual Property Rights" | Section 3.11(a) |
| "Company Permits" | Section 3.15(b) |
| "Controlling Party" | Section 7.3(c)(iii) |
| "Deductible" | Section 7.5(a) |
| "Direct Claim" | Section 7.3(b) |
| "Enforceability Exceptions" | Section 3.2 |
| "Estimated Closing Statement" | Section 2.4(a) |
| "Estimated Indebtedness" | Section **Error! Reference source not found.** |
| "Estimated Purchase Price" | Section **Error! Reference source not found.** |
| "Estimated Transaction Expenses" | Section **Error! Reference source not found.** |
| "Final Closing Statement" | Section 2.4(c)(iv) |
| "Final Purchase Price" | Section 2.4(d) |
| "Financial Statements" | Section 3.6 |
| "Improvements" | Section 3.10 |
| "Indemnified Party" | Section 7.3(a) |
| "Indemnifying Party" | Section 7.3(a) |
| "Independent Accountant" | Section 2.4(c)(iii) |
| "Interim Balance Sheet" | Section 3.6 |
| "Interim Balance Sheet Date" | Section 3.6 |
| "Interim Financial Statements" | Section 3.6 |
| "Non-Controlling Party" | Section 7.3(c)(iii) |
| "Objection Notice" | Section 2.4(c)(i) |
| "Outside Date" | Section 9.1(b)(ii) |

| "Payment Schedule" | Section **Error! Reference source not found.** |
|---|---|
| "Outstanding Indebtedness Letters" | Section 2.2 |
| "Permit" | Section 3.15(b) |
| "Policies" | Section 3.19 |
| "Pre-Closing Tax Returns" | Section 6.8(c) |
| "Prior Years Financial Statements" | Section 3.6 |
| "Protected Information" | Section 3.11(d) |
| "Acquisition Sub" | Introductory Paragraph |
| "Acquisition Sub Documents" | Section 5.4 |
| "Acquisition Sub Indemnified Parties" | Section 7.2(a) |
| "Purchase Price" | Section 1.4 |
| "Real Property Leases" | Section 3.9(b) |
| "Releasees" | Section 6.10(a) |
| "Releasors" | Section 6.10(a) |
| "Restricted Transaction" | Section 6.2 |
| "Review Period" | Section 2.4(c)(i) |
| "Equity Interests" | Recitals |
| "Seller" | Introductory Paragraph |
| "Seller Documents" | Section 4.1 |
| "Seller Indemnified Parties" | Section 7.2(b) |
| "Straddle Period Tax Return" | Section 6.8(c) |
| "Straddle Periods" | Section 6.8(c) |
| "Third-Party Claim" | Section 7.3(c) |
| "Transaction" | Recitals |

12.3   <u>Other Definitional and Interpretive Matters</u>.  Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)   <u>Calculation of Time Period</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(b)   <u>Exhibits/Schedules</u>.  The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)   <u>Headings</u>.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this

Agreement.   All references in this Agreement to any "<u>Article</u>" or "<u>Section</u>" are to the corresponding Article or Section of this Agreement unless otherwise specified.

(d)     <u>Including</u>.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

12.4   <u>Joint Drafting</u>.   The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

*[Remainder of page intentionally left blank; signature pages follow]*

-64-

#55975433 v13

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**PARENT**:

FTE NETWORKS INC.

By: _____
      Name: Michael P. Beys
      Title: Interim Chief Executive Officer

**ACQUISITION SUB**:

US HOME RENTALS LLC.
By: FTE Networks Inc., its sole member

By: _____
      Name: Michael P. Beys
      Title: Interim Chief Executive Officer

*[Signature Page to Purchase Agreement]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

<u>**SELLERS:**</u>

By: _____
Name: Alexander Szkaradek

By: _____
Name: Antoni Szkaradek

VPM HOLDINGS, LLC

By: _____
Name: Alexander Szkaradek
Title: Manager

VISION PROPERTY MANAGEMENT, LLC

By: _____
Name:  Alex Szkaradek
Title:  Managing Member

*[Signature Page to Purchase Agreement]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLERS:**

DOBRY HOLDINGS MASTER LLC,

By: VPM Holdings, LLC, its Manager

By: _____

    Name: Alexander Szkaradek
    Title: Manager

*[Signature Page to Purchase Agreement]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLERS:**

KAJA, LLC

By: _____

     Name:  Alex Szkaradek
     Title:   Managing Member

*[Signature Page to Purchase Agreement]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

## **SELLERS:**

KAJA 2, LLC

By: _____

    Name: Alex Szkaradek
    Title: Managing Member

*[Signature Page to Purchase Agreement]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLERS:**

KAJA 3, LLC

By: _____
    Name:
    Title:

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLERS' REPRESENTATIVE:**

By: _____

Name: Alexander Szkaradek

## Schedule I

## Companies

| Company Name | Entity Type | Organizational Jurisdiction |
|---|---|---|
| Alan Investments III, LLC | Limited liability company | Delaware |
| ALCA, LLC | Limited liability company | South Carolina |
| ALGA, LLC | Limited liability company | Georgia |
| ARINIA, LLC | Limited liability company | Arkansas |
| BMD Fund Series 2 LLC | Limited liability company | Delaware |
| Boom SC, LLC | Limited liability company | South Carolina |
| Dobry Holdings LLC | Limited liability company | Delaware |
| DSV SPV 1, LLC | Limited liability company | Delaware |
| DSV SPV 2, LLC | Limited liability company | Delaware |
| DSV SPV 3, LLC | Limited liability company | Delaware |
| IN SEVEN, LLC | Limited liability company | South Carolina |
| Kaja Holdings 2, LLC | Limited liability company | Delaware |
| Kaja Holdings, LLC | Limited liability company | Delaware |
| KYTEN, LLC | Limited liability company | South Carolina |
| Main Street Partners & Associates, INC | Corporation | California |
| Marty, LLC | Limited liability company | Maryland |
| MI SEVEN, LLC | Limited liability company | South Carolina |
| MIKA 2, LLC | Limited liability company | South Carolina |
| MINNOWA, LLC | Limited liability company | South Carolina |
| MO SEVEN, LLC | Limited liability company | Missouri |
| National Housing Partners, LLC | Limited liability company | Delaware |
| OH SEVEN, LLC | Limited liability company | South Carolina |
| PA SEVEN, LLC | Limited liability company | Pennsylvania |
| PENNA, LLC | Limited liability company | Pennsylvania |
| RV Holdings Two, LLC | Limited liability company | South Carolina |
| RVFM 11 Series, LLC | Limited liability company | Delaware |
| RVFM 13 Series, LLC | Limited liability company | Delaware |
| RVFM 4 Series, LLC | Limited liability company | Delaware |
| RVFM 9, LLC | Limited liability company | South Carolina |
| VARS, LLC | Limited liability company | South Carolina |
| YORKA, LLC | Limited liability company | New York |

## Schedule II

### Tax Allocation Statement Principles

      The Parties agree that the Aggregate Consideration and any other amount treated as consideration for U.S. federal income tax purposes (including without limitation the assumption of liabilities) will be allocated among the Companies' assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder applying the following allocation principles:

| **Class of Asset** | **Amount** |
|---|---|
| **Class I – Cash and Cash equivalents** | Actual amount |
| **Class II – Actively Traded Personal Property** | Net book value as reflected on the Final Closing Statement. |
| **Class III - Accounts Receivable/Unbilled Revenue** | Net book value as reflected on the Final Closing Statement. |
| **Class IV – Inventory** | Net book value as reflected on the Final Closing Statement. |
| **Class V - Property, Plant and Equipment** | Net book value as reflected on the Final Closing Statement. |
| **Class VI – Code Section 197 Intangibles, Except Goodwill And Going Concern** | Net book value as reflected on the Final Closing Statement. |
| **Class VII - Goodwill and Going Concern Value** | Residual amount. |

**Exhibit A**

**Certificate of Designation**

*See attached.*

Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 171 of 222

# CERTIFICATE OF DESIGNATION
## OF
## SERIES I PREFERRED STOCK
## OF
## FTE NETWORKS, INC.

I, the undersigned, hereby certify that I am the Interim Chief Executive Officer of FTE Networks, Inc. (the "**Corporation**"), a corporation organized and existing under the Nevada Revised Statutes (the "**NRS**"), and further do hereby certify:

FIRST: The original articles of incorporation of the Corporation were filed with the Secretary of State of Nevada on May 22, 2000, amended and restated on February 15, 2008, and amended and restated on April 24, 2008.  The articles of incorporation of the Corporation as such may be amended or restated from time to time, are referred to herein as the "**Articles of Incorporation**."

SECOND: The Certificate of Designation of Series B Preferred Stock was filed with the Secretary of State of Nevada on June 19, 2008, and amended and restated on July 14, 2008.

THIRD: The Certificate of Designation of Series C Preferred Stock was filed with the Secretary of State of Nevada on March 25, 2011, amended on May 11, 2011, and further amended on October 14, 2011.

FOURTH: The Certificate of Designation of Series D Preferred Stock was filed with the Secretary of State of Nevada on June 17, 2013.

FIFTH: The Certificate of Designation of Series E Preferred Stock was filed with the Secretary of State of Nevada on June 17, 2013.

SIXTH: The Certificate of Designation of Series F Preferred Stock was filed with the Secretary of State of Nevada on November 2, 2015.

SEVENTH: The Certificate of Designation of Series G Preferred Stock was filed with the Secretary of State of Nevada on December 4, 2017.

EIGHTH: The Certificate of Designation of Series H Preferred Stock was filed with the Secretary of State of Nevada on June 28, 2019.

NINTH: This Certificate of Designation of Series I Preferred Stock was duly adopted in accordance with the Articles of Incorporation and NRS Section 78.1955 by the written consent of the Board of Directors of the Corporation on December 19, 2019.  No shares of Series I Preferred Stock have been issued as of the date hereof.

TENTH: This Certificate of Designation of Series I Preferred Stock is as follows:

1.      Designation and Amount.

(a)      Number of Shares.  There is hereby created from the Five Million (5,000,000) shares of Preferred Stock, par value $0.01 per share (the "**Preferred Stock**"), authorized under the Articles of Incorporation, a series of preferred stock designated as Series I Preferred Stock, par value $0.01 per share (the "**Series I Preferred Stock**").  The authorized number of shares of the Series I Preferred Stock is Two Thousand (2,000) shares.

(b)      Reacquired Shares.  Any shares of Series I Preferred Stock purchased or otherwise acquired by the Corporation in any manner whatsoever shall become authorized but unissued shares of Series I Preferred Stock and may be reissued, subject to any conditions and restrictions on issuance that may be set forth in the Articles of Incorporation or otherwise required by law.

(c)      Rank.  The Series I Preferred Stock shall, with respect to voting rights, dividend rights, rights upon liquidation, winding up or dissolution, redemption rights and conversion rights, rank (i) junior to the Series A Preferred Stock and the Series A-1 Preferred Stock and all equity securities issued by the Corporation the terms of which specifically provide that such equity securities rank senior to the Series I Preferred Stock (the "**Senior Securities**"), (ii) on a parity with all equity securities issued by the Corporation the terms of which specifically provide that such equity securities rank on parity with the Series I Preferred Stock; and (iii) senior to all classes or series of the Corporation's common stock, par value $0.001 per share (the "**Common Stock**") and all equity securities issued by the Corporation the terms of which specifically provide that such equity securities rank junior to such Series I Preferred Stock.  For purposes of this Section 1(c), the term "equity securities" shall not include convertible debt securities.

2.      Voting.  The shares of Series I Preferred Stock shall have no voting rights.

3.      Dividends.  The holders of Series I Preferred Stock shall not be entitled to receive dividends paid on the Common Stock.

4.      Liquidation, Dissolution or Winding Up.

(a)      In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the holders of shares of Series I Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation available for distribution to its shareholders, after payment shall be made to the holders of the Senior Securities, but before any payment shall be made to the holders of Common Stock or any other class or series of stock ranking on liquidation junior to the Series I Preferred Stock, by reason of their ownership thereof, an amount equal to One Hundred Thousand Dollars ($100,000) per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization affecting such shares.

(b)      If upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation available for distribution to its shareholders shall be insufficient to pay the holders of shares of Series I Preferred Stock the full preferential amounts to which they shall be entitled, the holders of Series I Preferred Stock and any class or series of

-2-

stock ranking on liquidation on a parity with the Series I Preferred Stock shall share ratably in any distribution of the available assets and funds of the corporation in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

(c)      After the payment of all preferential amounts required to be paid to the holders of Series I Preferred Stock and any other class or series of stock ranking on liquidation on a parity with the Series I Preferred Stock, the holders of the Series I Preferred Stock shall not be entitled to share in the distribution of the remaining assets and funds of the corporation available for distribution to its shareholders.

5.      <u>Conversion Rights</u>.  The shares of Series I Preferred Stock shall have no conversion rights.

6.      <u>Redemption Rights</u>.  The shares of Series I Preferred Stock shall have no redemption rights.

7.      <u>Votes to Issue, or Change the Terms of Shares of Series I Preferred Stock</u>. Any amendment to this Certificate of Designation shall be effective upon (i) the approval of the Board of Directors of the Corporation and (ii) the affirmative vote of the holders of not less than a majority of the aggregate number of then-issued and outstanding shares of Series I Preferred Stock at a meeting duly called for such purpose, or by the written consent without a meeting of such holders of not less than a majority of the then outstanding shares of Series I Preferred Stock (the "***Required Series I Holders***").  No vote of any other class or series of capital stock of the Corporation shall be required to amend this Certificate of Designation.  The affirmative vote of the Required Series I Holders shall be required for any amendment to the Corporation's Articles of Incorporation which would adversely affect any of the powers, designations, preferences and rights of the shares of Series I Preferred Stock.

8.      <u>Lost or Stolen Certificates</u>. Upon receipt by the Corporation of evidence reasonably satisfactory to the Corporation of the loss, theft, destruction or mutilation of any certificates representing shares of Series I Preferred Stock, and, in the case of loss, theft or destruction, of any indemnification undertaking by the holder of Series I Preferred Stock to the Corporation in customary form and in the case of mutilation, upon surrender and cancellation of the certificate(s) representing shares of Series I Preferred Stock, the Corporation shall execute and deliver new preferred share certificate(s) of like tenor and date.

9.      <u>Notices</u>. Whenever notice is required to be given hereunder, unless otherwise provided herein, such notice shall be given in writing and will be mailed by certified mail, return receipt requested, or delivered against receipt to the party to whom it is to be given (a) if to the Corporation, at the Corporation's executive offices or (b) if to a holder of the Series I Preferred Stock, at the address set forth on Corporation's books and records.

* * * * *

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Designation of Series I Preferred Stock of FTE Holdings, Inc. to be signed by its Chief Executive Officer on this 19th day of December, 2019.

-3-

#56323907 v4
4830-2845-1503.2

By: _____
Name:  Michael P. Beys
Title:   Interim Chief Executive Offic

#56323907 v4
4830-2845-1503.2

EX-10.1 2 ex10-1.htm

**Exhibit 10.1**

## FIRST AMENDMENT TO PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO PURCHASE AGREEMENT (this "Amendment") is made and entered into as of December 30, 2019, by and among (i) FTE Networks Inc., a Delaware corporation ("Parent"), (ii) US Home Rentals LLC, a Delaware limited liability company and direct wholly owned subsidiary of Parent (the "Acquisition Sub") (iii) Alexander Szkaradek, an individual ("Alex"), (iv) Antoni Szkaradek, an individual ("Antoni"), (v) VPM Holdings, LLC, a South Carolina limited liability company ("VPM Holdings"), (vi) Kaja 3, LLC, a South Carolina limited liability company ("Kaja3"), (vii) Kaja 2, LLC, a South Carolina limited liability company ("Kaja2"), (viii) Kaja, LLC, a South Carolina limited liability company ("Kaja"), (ix) Dobry Holdings Master LLC, a Delaware limited liability company ("Dobry") and together with Alex, Antoni, VPM Holdings, Kaja3, Kaja2, and Kaja, the "Equity Sellers"), (x) Vision Property Management, LLC, a South Carolina limited liability company (the "Asset Seller" and together with the Equity Sellers, the "Sellers"), and (xi) Alexander Szkaradek, in his capacity as the representative of the Sellers (the "Sellers' Representative"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such terms in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, the Parties have entered into that certain Purchase Agreement dated as of December 20, 2019 (the "Purchase Agreement"); and

WHEREAS, pursuant to Section 11.6 of the Purchase Agreement, the Parties desire to amend the Purchase Agreement as per the terms of this Amendment.

## AGREEMENT

NOW, THEREFORE, the Parties, in consideration of their mutual covenants and agreements herein set forth, and intending to be legally bound hereby, do hereby covenant and agree as follows:

1. *Amendments*.

1.1 Section 2.2(b) of the Purchase Agreement is hereby amended by deleting the section in its entirety and replacing it with the following:

"At least two (2) Business Days prior to any issuance of Common Stock or Closing Preferred Stock pursuant to this Agreement, the Sellers shall deliver to Parent a schedule, in a form approved by Parent showing the aggregate number of shares of Common Stock and Preferred Stock to be issued to each Seller (the "Payment Allocation Schedule"). The Payment Allocation Schedule shall also include the following information for each Seller (as of the Closing Date): (a) the Seller's address and (b) the Seller's taxpayer identification number."

1.2 Section 2.6(b) of the Purchase Agreement is hereby amended by by inserting "and Section 6.17" after "4.7(b)".

Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 176 of 222

1.3 Section 6.12 of the Purchase Agreement is hereby amended by deleting the section in its entirety and replacing it with the following:

"Provided that the Closing has occurred or is occurring contemporaneously, the Acquisition Sub shall pay to the Sellers, in accordance with the Payment Allocation Schedule, Nine Million Seven Hundred Fifty Thousand Dollars ($9,750,000) no later than January 31, 2020; provided that Acquisition Sub may satisfy its obligation under this Section 6.12 by delivery of one or more promissory notes to Sellers for such amounts."

1.4 Section 6.13 of the Purchase Agreement is hereby amended by deleting the section in its entirety and replacing it with the following:

"Within twenty (20) Business Days of the Closing Date, but in no event prior to January 1, 2020 and provided that Sellers have delivered the final Payment Allocation Statement and Closing Statement in accordance with Section 2.2(b) and Section 2.4(a), respectively (each satisfactory to Parent in Parent's sole discretion), Parent shall issue to Sellers, in accordance with the Payment Allocation Schedule, (i) Four Million Two Hundred Twenty Two Thousand Four Hundred Seventy Four (4,222,474) shares of Common Stock (the "Common Stock Consideration") and (ii) the Closing Preferred Stock minus the Holdback Amount."

1.5 A new section 6.17 shall be added to the Purchase Agreement after Section 6.16 of the Purchase Agreement, which shall read as follows:

"Section 6.17. Common Stock Transfer. If Parent believes a proposed transfer of any of the Common Stock Consideration (a "Proposed Common Transfer") without shareholder approval could jeopardize the restoration or retention of Parent's NYSE American listing of Parent's Common Stock, Parent may suspend such Proposed Common Transfer pending the approval of such Proposed Common Transfer by Parent's shareholders at the next annual meeting of shareholders."

1.6 Section 7.5(a) of the Purchase Agreement is hereby amended by replacing "$500,000" therein with "$100,000".

2. *Post-Closing Cash Consideration*. The Sellers hereby direct Acquisition Sub to make the payments (or deliver promissory notes in lieu of such payments (any promissory notes so delivered shall be collectively referred to herein as the "Notes")) set forth in Sections 6.12 of the Purchase Agreement, as amended, to the parties and in the respective amounts set forth on Exhibit A to this Amendment. Each Seller hereby agrees that payments made (or the delivery of Notes) in accordance with Exhibit A to this Amendment shall satisfy Parent's and Acquisition Sub's obligations with respect to Section 6.12 of the Purchase Agreement. To the extent Notes are delivered to the Sellers, Parent and Acquisition Sub shall use commercially reasonable efforts to obtain financing sufficient to pay such Notes in accordance with the terms thereof.

2

3. *Transaction Expenses*. For purposes of Sections 1.4 and 2.4 of the Purchase Agreement, "Transaction Expenses" shall not include any advisory or other fees, commissions or other payments owed or paid by the Sellers to any Singal Party.

4. *Adequate Protection*. The Common Stock Consideration and the Closing Preferred Stock shall remain subject to the Sellers' indemnification obligations under the Purchase Agreement until such shares are transferred in a Qualified Disposition.

5. *Miscellaneous*.

    5.1 *No Further Amendment*. Except as expressly modified by this Amendment, all of the terms, covenants and provisions of the Purchase Agreement shall continue in full force and effect. In the event of any conflict or ambiguity between the terms, covenants and provisions of this Amendment and those of the Purchase Agreement as existing prior to this Amendment, the terms, covenants and provisions of this Amendment shall control.

    5.2 *Governing Law*. This Amendment shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws rules of such state.

    5.3 *Successors and Assigns*. The provisions of this Amendment shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

    5.4 *Binding Agreement*. This Amendment shall be binding upon the heirs, executors, administrators, successors and assigns of the Parties.

    5.5 *Counterparts; Delivery*. This Amendment may be signed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Any signed counterpart may be delivered by facsimile or other form of electronic transmission (*e.g.*, .pdf) with the same legal force and effect for all purposes as delivery of an originally signed agreement.

*[Signature Page Follows]*

\* \* \* \* \*

3

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLERS:**

By:    */s/ Alexander Szkaradek*
Name: Alexander Szkaradek

By:    */s/ Antoni Szkaradek*
Name: Antoni Szkaradek

VPM HOLDINGS, LLC

By:    */s/ Alexander Szkaradek*
Name: Alexander Szkaradek
Title:  Manager

VISION PROPERTY MANAGEMENT, LLC

By:    */s/ Alexander Szkaradek*
Name: Alexander Szkaradek
Title:  Managing Member

[Signature Page to First Amendment to Stock Purchase Agreement]

IMG 000557

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLERS:**

KAJA, LLC

By:     _/s/ Alexander Szkaradek_
Name: Alexander Szkaradek
Title:  Managing Member

KAJA 2, LLC

By:     _/s/ Alexander Szkaradek_
Name: Alexander Szkaradek
Title:  Managing Member

KAJA 3, LLC

By:     _/s/ Alexander Szkaradek_
Name: Alexander Szkaradek
Title:  Managing Member

DOBRY HOLDINGS MASTER LLC,

By:     VPM Holdings, LLC, its Manager

By:     _/s/ Alexander Szkaradek_
Name: Alexander Szkaradek
Title:  Manager

[Signature Page to First Amendment to Stock Purchase Agreement]

IMG 000558

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLERS' REPRESENTATIVE:**

By:    */s/ Alexander Szkaradek*

Name: Alexander Szkaradek

[Signature Page to First Amendment to Stock Purchase Agreement]

Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 181 of 222

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**PARENT:**

FTE NETWORKS INC.

By:      */s/ Michael P. Beys*
Name: Michael P. Beys
Title:  Interim Chief Executive Officer

**ACQUISITION SUB:**

US HOME RENTALS LLC

By:      */s/ Michael P. Beys*
Name: Michael P. Beys
Title:  President

[Signature Page to First Amendment to Stock Purchase Agreement]

IMG 000560

**Exhibit A**

**Post-Closing Cash Consideration Payments**

The Sellers hereby direct that the payment to be made by Acquisition Sub to Sellers pursuant to Section 6.12(i) of the Purchase Agreement (as amended by this Amendment) shall be made in cash or by the delivery of Notes to the following persons in the amounts set forth opposite each such person's name:

| Payment Recipient | Amount |
|---|---|
| Alexander Szkaradek | $ 4,875,000 |
| Antoni Szkaradek | $ 4,875,000 |

IMG 000561

# EXHIBIT E

## Blacker, Andrew

| | |
|---|---|
| **From:** | Heskin, Shane |
| **Sent:** | Sunday, February 13, 2022 4:26 PM |
| **To:** | Blacker, Andrew |
| **Subject:** | FW: ATTORNEY CLIENT COMMUNICATION - FW: TD Bank Accounts |
| **Attachments:** | K2D10-278_missing_check_05142021.png; K2D10-278_missing_check_2_05142021.png; Office Depot Scan.pdf; TD Bank Wire.pdf |
| **Importance:** | High |

**From:** Maria Fernandez <mfernandez@ftenet.com>
**Date:** Thursday, Feb 10, 2022, 9:50 PM
**To:** Heskin, Shane <heskins@whiteandwilliams.com>
**Cc:** mbeys@blmllp.com <mbeys@blmllp.com>
**Subject:** ATTORNEY CLIENT COMMUNICATION - FW: TD Bank Accounts

CAUTION: This message originated outside of the firm. Use caution when opening attachments, clicking links or responding to requests for information.

Regards,

Maria G. Fernandez
Corporate Counsel
**FTE Networks, Inc.**
**US Home Rentals LLC**
237 West 35th Street, Suite 806
New York, NY 10001
mfernandez@ftenet.com
(214) 354-6692

**FTE** Networks

*CONFIDENTIALITY NOTICE: The information in this email may be confidential and/or privileged. This email is intended to be reviewed only by the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system. Nothing contained in this message or in any attachment shall constitute a contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions. Thank-you.*

**From:** Maria Fernandez
**Sent:** Tuesday, May 18, 2021 3:24 PM
**To:** Alex Szkaradek <alex@schealthspv.com>
**Cc:** Michael Beys <mbeys@blmllp.com>; Stephen Goodwin <sgoodwin@ftenet.com>; Peter Ghishan <peter@cpnv.com>; Joseph Cunningham <jfc@libertymac.com>; Ernest Scheidemann <escheidemann@ftenet.com>

1

**Subject:** RE: TD Bank Accounts
**Importance:** High

Alex,

Per our call earlier, attached is a copy of the consumer check that was deposited into the TD Bank Account (which corresponds with the account held at TD Bank in the name of Kaja Holdings on pg. 2 of the first PDF).

To be clear, we are not requesting access to Fix Pad bank accounts—we are only asking for access to the accounts that bear the name of the various entities USHR acquired. We need to control these accounts as a matter of good corporate governance and, in particular, to (1) tie out all the various FixPads transactions that have occurred to date; (2) reconcile what we show as DLP/DSV payments in respect of FixPad properties; and (3) account for any and all consumer monies that have been deposited into these accounts.

Based on my discussions with Finance, I can't stress how important it is that USHR/FTE is granted unfettered access to these accounts. I would appreciate it if you could help us close this gap as soon as possible.

Regards,

Maria G. Fernandez
Corporate Counsel
**FTE Networks, Inc. (FTNW)**
237 West 35th Street, Suite 806
New York, NY 10001
mfernandez@ftenet.com
(214) 354-6692

**FTE** Networks

*CONFIDENTIALITY NOTICE: The information in this email may be confidential and/or privileged. This email is intended to be reviewed only by the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system. Nothing contained in this message or in any attachment shall constitute a contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions.  Thank-you.*

**From:** Maria Fernandez
**Sent:** Thursday, May 6, 2021 10:20 AM
**To:** Alex Szkaradek <alex@schealthspv.com>
**Cc:** Michael Beys <mbeys@blmllp.com>; Stephen Goodwin <sgoodwin@ftenet.com>; Peter Ghishan <peter@cpnv.com>; Joseph Cunningham <jfc@libertymac.com>; Ernest Scheidemann <escheidemann@ftenet.com>
**Subject:** RE: TD Bank Accounts

Thanks, Alex.

My point is that now that we are aware of these bank accounts, we (FTE/USHR) need visibility into them, particularly if we are ever going to finish reconciling debt paydowns and the like. Can you facilitate that?

Regards,

Maria G. Fernandez
Corporate Counsel
**FTE Networks, Inc. (FTNW)**
237 West 35th Street, Suite 806
New York, NY 10001
mfernandez@ftenet.com
(214) 354-6692

FTE Networks

*CONFIDENTIALITY NOTICE: The information in this email may be confidential and/or privileged. This email is intended to be reviewed only by the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system. Nothing contained in this message or in any attachment shall constitute a contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions. Thank-you.*

**From:** Alex Szkaradek <alex@schealthspv.com>
**Sent:** Thursday, May 6, 2021 9:55 AM
**To:** Maria Fernandez <mfernandez@ftenet.com>
**Cc:** Michael Beys <mbeys@blmllp.com>; Stephen Goodwin <sgoodwin@ftenet.com>; Peter Ghishan <peter@cpnv.com>; Joseph Cunningham <jfc@libertymac.com>
**Subject:** Re: TD Bank Accounts

Maria

This all in reference to the DLP mortgaged homes that are all owned by fixpads NOT USHR.

The issue is DLP has a first mortgage lien on assets that Fixpads owns but is not on the deed. The deed cannot be transferred from DSV/Kaja/USHR related entities because USHR has not paid off its obligations thus forcing me to pay them off. We have been doing this now for 16 months and everyone is aware of this.

This is again why I have been harping on the deed issue for months to get resolved. The DLP mortageged deeds cannot be transferred without debt payoff. All of these homes are acconted for and been disclosed in emails to the board and were part of the updated agreement we signed 4 weeks ago.

Happy to get on a call to discuss.

On Thu, May 6, 2021, 9:24 AM Maria Fernandez <mfernandez@ftenet.com> wrote:

Alex,

I received a call from a representative at TD Bank following my inquiry into certain bank statements (attached) that Jayne came across when she visited the South Carolina office. There is statement as recent as March 2021 (attached).

FTE/USHR was not aware that it had a TD Bank account, much less that several accounts had been opened in the name of its LLC's, hence my call eliciting more information and requesting access to these accounts. I was told by Barbara (investigator) that she had received an email from you clearing up the matter and that these accounts should remain open. Unfortunately, she wasn't authorized to share any additional information with me because I am not an authorized person on these accounts (to my knowledge, no one at FTE/USHR is). What exactly happened here?

I think it goes without saying that this is a breach of our internal controls. FTE/USHR's finance team needs visibility into these accounts and control of same immediately. Please add Ernie or Jayne to the accounts that pertain to the LLC's USHR acquired so that Finance can begin reconciling these statements and transition signing authority to USHR.

Regards,

Maria G. Fernandez
Corporate Counsel
**FTE Networks, Inc. (FTNW)**
237 West 35th Street, Suite 806
New York, NY 10001
mfernandez@ftenet.com
(214) 354-6692

3

*CONFIDENTIALITY NOTICE: The information in this email may be confidential and/or privileged. This email is intended to be reviewed only by the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system. Nothing contained in this message or in any attachment shall constitute a contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions.  Thank-you.*



**TD Bank**
**America's Most Convenient Bank®**
1701 Route 70 East
Cherry Hill, NJ 08034-5400
T 888 751 9000

**tdbank.com**

DSV SPV 1 LLC
PO BOX 488
COLUMBIA, SC. 29202

Saturday, November 14, 2020

Notice of Hold / Delayed Availability

ACCOUNT NUMBER:      ████8009
DATE OF DEPOSIT:     11/13/2020
AMOUNT OF ITEM:      $65,287.46
CHECK NUMBER:        0

At TD Bank we are committed to protecting your accounts. We are writing to let you know we have delayed availability of funds from your deposit as account information indicates that the check may not be paid.

Although we try our best to make sure your funds are available as soon as possible, sometimes we need to place a hold on a deposit(s). Rest assured, your funds will be available no later than six business days after the deposit is made, unless we are notified of a returned check.

If you did not receive a delayed availability notice at the time of the deposit and your check was paid, we will refund any overdraft or returned check fees as a result of the additional delay in the availability of your funds. To obtain a refund of any fees incurred if the deposited check has been paid, please contact your local TD Bank.

We are here for you

We are sorry for the inconvenience, and appreciate your patience. If you have any questions, please call us anytime at 1-888-751-9000.

Sincerely,

TD Bank Fraud Operations



**TD Bank**
**America's Most Convenient Bank®**
1701 Route 70 East
Cherry Hill, NJ 08034-5400
T 888 751 9000

tdbank.com

KAJA HOLDINGS 2 LLC
PO BOX 488
COLUMBIA, SC.  29202

Tuesday, November 17, 2020

## Notice of Hold / Delayed Availability

ACCOUNT NUMBER:  ▓▓▓▓8025
DATE OF DEPOSIT:  11/16/2020
AMOUNT OF ITEM:  $59,928.02
CHECK NUMBER:  0

At TD Bank we are committed to protecting your accounts. We are writing to let you know we have delayed availability of funds from your deposit as account information indicates that the check may not be paid.

Although we try our best to make sure your funds are available as soon as possible, sometimes we need to place a hold on a deposit(s). Rest assured, your funds will be available no later than six business days after the deposit is made, unless we are notified of a returned check.

If you did not receive a delayed availability notice at the time of the deposit and your check was paid, we will refund any overdraft or returned check fees as a result of the additional delay in the availability of your funds. To obtain a refund of any fees incurred if the deposited check has been paid, please contact your local TD Bank.

We are here for you

We are sorry for the inconvenience, and appreciate your patience. If you have any questions, please call us anytime at 1-888-751-9000.

Sincerely,

TD  Bank Fraud Operations



**TD Bank**
**America's Most Convenient Bank®**
1701 Route 70 East
Cherry Hill, NJ 08034-5400
T 888 751 9000

tdbank.com

KAJA HOLDINGS 2 LLC
PO BOX 488
COLUMBIA, SC. 29202

Saturday, February 6, 2021

## Notice of Hold / Delayed Availability

ACCOUNT NUMBER:    ████8025
DATE OF DEPOSIT:    2/5/2021
AMOUNT OF ITEM:    $3,194.87
CHECK NUMBER:    0

At TD Bank we are committed to protecting your accounts. We are writing to let you know we have delayed availability of funds from your deposit as account information indicates that the check may not be paid.

Although we try our best to make sure your funds are available as soon as possible, sometimes we need to place a hold on a deposit(s). Rest assured, your funds will be available no later than six business days after the deposit is made, unless we are notified of a returned check.

If you did not receive a delayed availability notice at the time of the deposit and your check was paid, we will refund any overdraft or returned check fees as a result of the additional delay in the availability of your funds. To obtain a refund of any fees incurred if the deposited check has been paid, please contact your local TD Bank.

We are here for you

We are sorry for the inconvenience, and appreciate your patience. If you have any questions, please call us anytime at 1-888-751-9000.

Sincerely,

TD  Bank Fraud Operations


**TD Bank**
America's Most Convenient Bank®

*Purchased Entity*
*18/80/8019*

2
9

MB 01 004044 06573 B 11 A

||||||ı||ı||ı||ı|ıı||ıııı|ı|ı|ı|ı|ı|ıı||ıı|ıı||ııı||ı||ı|ı|ı|

ALAN INVESTMENTS III LLC
PO BOX 488
COLUMBIA, SC 29202-0000

To: ALAN INVESTMENTS III LLC

This letter serves as notification of the following Incoming Wire Transfer
credited to account number **********8059 on 02/12/2021.
If you have any questions, please contact your nearest TD Bank Branch
or call 1-800-YES-2000.

| | |
|---|---|
| Amount: | $36,039.96 |
| Beneficiary: | ALAN INVESTMENTS III LLC |
| Account Number: | **********8059 |
| Address: | 4668 AUGUSTA HIGHWAY |
| | LEXINGTON, SC 29073 |
| Sender: | |
| Bank Name: | SYNOVUS BANK |
| ABA Number: | |
| Reference Number: | 210212163231H600 |
| Originator Bank: | |
| Address: | |
| By Order Of: | VAUGHT LAW OFFICE LLC |
| Address: | IOLTA/IOTA ACCOUNT |
| | 6416 BRADLEY PARK DR SUITE B |
| | COLUMBUS, GA 31904-0000 |
| Receiver Bank Name: | TD BANK NA |
| ABA Number: | |
| FRB Incoming Confirmation Number: | 20210212C1B76E1C00860902121632FT01 |
| Reference for Beneficiary: | |
| Originator to Beneficiary: | SALE OF 2420 BRUCE AVENUE        COLUMBUS |
| | , GA |
| Bank to Bank Information: | |
| Miscellaneous Information: | |

THANK YOU FOR CHOOSING TD BANK.

Page 01

**TD Bank**

America's Most Convenient Bank®

2
9

MB 01 004507 43031 E 12 A

ALAN INVESTMENTS III LLC
PO BOX 488
COLUMBIA, SC 29202-0000

To: ALAN INVESTMENTS III LLC

This letter serves as notification of the following Outgoing Wire Transfer
debited to your account number **********8059 on 12/07/2020.
If you have any questions, please contact your nearest TD Bank Branch
or call 1-800-YES-2000.

| | |
|---|---|
| Amount: | $15,000.00 |
| Beneficiary: | Fix Pads LLC |
| Account Number: | **********1027 |
| Address: | 16 Berryhill Road |
| | Columbia SC 29210 |
| Sender Bank Name: | TD BANK |
| ABA Number: | |
| FRB Outgoing Confirmation Number: | 20201207C1B76E1C006401 |
| Reference Number: | 201207140014H100 |
| By Order Of: | ALAN INVESTMENTS III LLC |
| Account Number: | **********8059 |
| Address: | PO BOX 488 |
| | LEXINGTON |
| | SC USA 29073 |
| Receiver Bank Name: | BANK OF AMERICA, N |
| ABA Number: | |
| Originator Bank: | |
| Account Number: | |
| Address: | |
| Reference for Beneficiary: | |
| Originator to Beneficiary: | |
| Bank to Bank Information: | |
| Miscellaneous Information: | |

THANK YOU FOR CHOOSING TD BANK.

Page 01



**Bank**

America's Most Convenient Bank®

MB 01 005137 67770 B 12 C

ALAN INVESTMENTS III LLC
PO BOX 488
COLUMBIA, SC 29202-0000

To: ALAN INVESTMENTS III LLC

This letter serves as notification of the following Outgoing Wire Transfer
debited to your account number **********8059 on 01/04/2021.
If you have any questions, please contact your nearest TD Bank Branch
or call 1-800-YES-2000.

```
Amount:                             $34,225.20
Beneficiary:                        Fix Pads LLC
Account Number:                     **********1027
Address:                            16 Berryhill Road
                                    Columbia SC 29210
Sender Bank Name:                   TD BANK
ABA Number:
FRB Outgoing Confirmation Number:   20210104C1B76E1C001649
Reference Number:                   210104090129H100
By Order Of:                        ALAN INVESTMENTS III LLC
Account Number:                     **********8059
Address:                            PO BOX 488
                                    LEXINGTON
                                    SC USA 29073
Receiver Bank Name:                 BANK OF AMERICA, N
ABA Number:
Originator Bank:
Account Number:
Address:
Reference for Beneficiary:
Originator to Beneficiary:
Bank to Bank Information:
Miscellaneous Information:
```

THANK YOU FOR CHOOSING TD BANK.

Page 01



**America's Most Convenient Bank®**

2
9

MB 01 004208 47779 E 12 A

ALAN INVESTMENTS III LLC
PO BOX 488
COLUMBIA, SC 29202-0000

To: ALAN INVESTMENTS III LLC

This letter serves as notification of the following Outgoing Wire Transfer
debited to your account number **********8059 on 12/11/2020.
If you have any questions, please contact your nearest TD Bank Branch
or call 1-800-YES-2000.

| | |
|---|---|
| Amount: | $96,992.47 |
| Beneficiary: | Fix Pads Llc |
| Account Number: | **********1027 |
| Address: | 16 BERRYHILL RD |
| | SUITE 200 |
| | COLUMBIASC |
| Sender Bank Name: | TD BANK |
| ABA Number: | |
| FRB Outgoing Confirmation Number: | 20201211C1B76E1C003612 |
| Reference Number: | 201211123538XI01 |
| By Order Of: | ALAN INVESTMENTS III LLC |
| Account Number: | **********8059 |
| Address: | PO BOX 488 |
| | COLUMBIA, SC 29202-0000 |
| Receiver Bank Name: | BANK OF AMERICA, N |
| ABA Number: | |
| Originator Bank: | |
| Account Number: | |
| Address: | |
| Reference for Beneficiary: | PJBH-BW7MX9 |
| Originator to Beneficiary: | |
| Bank to Bank Information: | |
| Miscellaneous Information: | |

THANK YOU FOR CHOOSING TD BANK.

Page 01



**America's Most Convenient Bank®**

2
9

MB 01 003853 46665 E 12 A

ılı|lılı|ılımıl|ıllın|lım|ıln|ılı|ılı||llıylını|||lın

ALAN INVESTMENTS III LLC
PO BOX 488
COLUMBIA, SC 29202-0000

To: ALAN INVESTMENTS III LLC

This letter serves as notification of the following Outgoing Wire Transfer
debited to your account number **********8059 on 12/10/2020.
If you have any questions, please contact your nearest TD Bank Branch
or call 1-800-YES-2000.

| | |
|---|---|
| Amount: | $1,500.00 |
| Beneficiary: | Fix Pads LLC |
| Account Number: | **********1027 |
| Address: | 16 Berryhill Road |
| | Columbia SC 29210 |
| Sender Bank Name: | TD BANK |
| ABA Number: | ▮▮▮▮▮▮ |
| FRB Outgoing Confirmation Number: | 20201210C1B76E1C004647 |
| Reference Number: | 201210150039H101 |
| By Order Of: | ALAN INVESTMENTS III LLC |
| Account Number: | **********8059 |
| Address: | PO BOX 488 |
| | LEXINGTON |
| | SC USA 29073 |
| Receiver Bank Name: | BANK OF AMERICA, N |
| ABA Number: | ▮▮▮▮▮▮▮ |
| Originator Bank: | |
| Account Number: | |
| Address: | |
| Reference for Beneficiary: | |
| Originator to Beneficiary: | |
| Bank to Bank Information: | |
| Miscellaneous Information: | |

THANK YOU FOR CHOOSING TD BANK.

Page 01

Member FDIC   TD Bank, N.A.



**America's Most Convenient Bank®**

2
9

MB 01 003852 46665 E 12 A

||ı|ı|ı|ıı|||ı||ıııııı|ı|ı||ıı||ıı|ı|ı||ı||ıı|ı||lı|l|||ı|ı

ALAN INVESTMENTS III LLC
PO BOX 488
COLUMBIA, SC 29202-0000

To: ALAN INVESTMENTS III LLC

This letter serves as notification of the following Incoming Wire Transfer
credited to account number **********8059 on 12/10/2020.
If you have any questions, please contact your nearest TD Bank Branch
or call 1-800-YES-2000.

Amount:                                        $101,473.87
Beneficiary:                                   ALAN INVESTMENTS III LLC
Account Number:                                **********8059
Address:
Sender:
Bank Name:                                     FIRST CITIZENS BK
ABA Number:
Reference Number:                              201210090759H601
Originator Bank:
Address:
By Order Of:                                   DARRYL HOLLAND ATTY
Address:                                       722 E MCBEE AVE
                                               GREENVILLE, SC 29601-3027
Receiver Bank Name:                            TD BANK, NA
ABA Number:
FRB Incoming Confirmation Number:              20201210C1B76E1C00217512100909FT01
Reference for Beneficiary:
Originator to Beneficiary: 109 BREANNA DR.                      PROCEEDS
     FROM SALE
Bank to Bank Information:
Miscellaneous Information:

THANK YOU FOR CHOOSING TD BANK.

Page 01



**Bank**

America's Most Convenient Bank®

2
9

MB 01 005504 09457 E 13 A

ılılılılılıılıılılıılılılı

DSV SPV2 LLC
PO BOX 488
COLUMBIA, SC 29202-0000

To: DSV SPV2 LLC

This letter serves as notification of the following Outgoing Wire Transfer
debited to your account number **********8372 on 02/16/2021.
If you have any questions, please contact your nearest TD Bank Branch
or call 1-800-YES-2000.

Amount:                               $100,000.00
Beneficiary:                          Fix Pads LLC
Account Number:                       **********1027
Address:                              16 Berryhill Road
                                      Columbia SC 29210
Sender Bank Name:                     TD BANK
ABA Number:
FRB Outgoing Confirmation Number:     20210216C1B76E1C002427
Reference Number:                     210216090303H100
By Order Of:                          DSV SPV2 LLC
Account Number:                       **********8372
Address:                              PO BOX 488
                                      LEXINGTON
                                      SC USA 29073
Receiver Bank Name:                   BANK OF AMERICA, N
ABA Number:
Originator Bank:
Account Number:
Address:
Reference for Beneficiary:
Originator to Beneficiary:
Bank to Bank Information:
Miscellaneous Information:

THANK YOU FOR CHOOSING TD BANK.

Page 01

Member FDIC  TD Bank, N.A.



**TD Bank**
America's Most Convenient Bank®

2
9

MB 01 004043 06573 B 11 A

ıllıllılıllıılllıllılıllıllılıllılılıllılılıllılıllılı

DSV SPV2 LLC
PO BOX 488
COLUMBIA, SC 29202-0000


To: DSV SPV2 LLC

This letter serves as notification of the following Incoming Wire Transfer
credited to account number **********8372 on 02/12/2021.
If you have any questions, please contact your nearest TD Bank Branch
or call 1-800-YES-2000.

```
Amount:                              $80,360.70
Beneficiary:                         DSV SPV2 LLC
Account Number:                      **********8372
Address:                             4668 AUGUSTA HIGHWAY
                                     LEXINGTON, SC  29073

Sender:
Bank Name:                           CENTENNIAL BANK
ABA Number:                          ███████
Reference Number:                    20210212CM000027
Originator Bank:
Address:
By Order Of:                         NORTH FLORIDA TITLE COMPANY
Address:                             1624 VILLAGE SQUARE BLVD STE 202
                                     TALLAHASSEE FL 32309
Receiver Bank Name:
ABA Number:                          TD BANK, NA
                                     ███████
FRB Incoming Confirmation Number:    20210212C1B76E1C00259302120936FT01
Reference for Beneficiary:
Originator to Beneficiary: APPLY FUNDS TO ACCT. #████8372
Bank to Bank Information:
Miscellaneous Information:
```

THANK YOU FOR CHOOSING TD BANK.



Page 01



2
9

MB 01 003752 95796 E 11 A

|||ı|ı|ı|ı||ı||ııı|ı|ı||ı|ı|ıı|ı||ı||ııı|ı|ıı||ı|||||ı||ıı||ıı||ıı|ıı||

DSV SPV2 LLC
16 BERRYHILL RD
COLUMBIA, SC 29210-0000

To: DSV SPV2 LLC

This letter serves as notification of the following Outgoing Wire Transfer
debited to your account number **********8372 on 02/02/2021.
If you have any questions, please contact your nearest TD Bank Branch
or call 1-800-YES-2000.

| | |
|---|---|
| Amount: | $23,392.01 |
| Beneficiary: | Fix Pads LLC |
| Account Number: | **********1027 |
| Address: | 16 Berryhill Road |
| | Columbia SC 29210 |
| Sender Bank Name: | TD BANK |
| ABA Number: | ███████ |
| FRB Outgoing Confirmation Number: | 20210202C1B76E1C000775 |
| Reference Number: | 210202090052H100 |
| By Order Of: | DSV SPV2 LLC |
| Account Number: | **********8372 |
| Address: | 16 BERRYHILL RD |
| | LEXINGTON |
| | SC USA 29073 |
| Receiver Bank Name: | BANK OF AMERICA, N |
| ABA Number: | ███████ |
| Originator Bank: | |
| Account Number: | |
| Address: | |
| Reference for Beneficiary: | |
| Originator to Beneficiary: | |
| Bank to Bank Information: | |
| Miscellaneous Information: | |

THANK YOU FOR CHOOSING TD BANK.

Page 01


**Bank**

America's Most Convenient Bank®

2
9

MB 01 003591 10884 E 11 A

DSV SPV3 LLC
PO BOX 488
COLUMBIA, SC 29202-0000

To: DSV SPV3 LLC

This letter serves as notification of the following Outgoing Wire Transfer
debited to your account number **********8124 on 02/17/2021.
If you have any questions, please contact your nearest TD Bank Branch
or call 1-800-YES-2000.

```
Amount:                                  $88,493.91
Beneficiary:                             Fix Pads LLC
Account Number:                          **********1027
Address:                                 16 Berryhill Road
                                         Columbia SC 29210
Sender Bank Name:                        TD BANK
ABA Number:
FRB Outgoing Confirmation Number:        20210217C1B76E1C001099
Reference Number:                        210217090041H100
By Order Of:                             DSV SPV3 LLC
Account Number:                          **********8124
Address:                                 PO BOX 488
                                         LEXINGTON
                                         SC USA 29073
Receiver Bank Name:                      BANK OF AMERICA, N
ABA Number:
Originator Bank:
Account Number:
Address:
Reference for Beneficiary:
Originator to Beneficiary:
Bank to Bank Information:
Miscellaneous Information:
```

THANK YOU FOR CHOOSING TD BANK.

Page 01



**TD** **Bank**

America's Most Convenient Bank®

2
9

MB 01 005503 09457 E 13 A

Ⅰ‖‖‖‖‖Ⅰ‖ⅡⅠⅠ‖ⅠⅠⅡⅠ‖ⅡⅠⅡⅠⅠ‖ⅠⅡⅠⅠ‖ⅠⅡ‖Ⅰ‖ⅠⅠ‖ⅠⅠⅠⅠ

DSV SPV3 LLC
PO BOX 488
COLUMBIA, SC 29202-0000

To: DSV SPV3 LLC

This letter serves as notification of the following Incoming Wire Transfer
credited to account number **********8124 on 02/16/2021.
If you have any questions, please contact your nearest TD Bank Branch
or call 1-800-YES-2000.

Amount:                                    $72,198.25
Beneficiary:                               DSV SPV3 LLC
Account Number:                            **********8124
Address:

Sender:
Bank Name:                                 TOWNEBANK
ABA Number:                                ███████████
Reference Number:                          1651650830
Originator Bank:
Address:
By Order Of:                               PRIORITY TITLE & ESCROW LLC
Address:                                   641 LYNNHAVEN PARKWAY
                                           SUITE 200
                                           VIRGINIA BEACH VA 23452
Receiver Bank Name:                        TD BANK, NA
ABA Number:                                ███████████
FRB Incoming Confirmation Number:          20210216C1B76E1C00793902161234FT01
Reference for Beneficiary:
Originator to Beneficiary: PROCEEDS FOR 2125 CARRSVILLE HIGHWAY FRANKL
    IN VA 23851 (THE HUNT FAMILY TRUST, DSV SPV3, LLC ) FILE ██████5969
Bank to Bank Information:
Miscellaneous Information:

THANK YOU FOR CHOOSING TD BANK.

Page 01

# TD Bank

**America's Most Convenient Bank®**

2
9

MB 01 004506 43031 E 12 A

DSV SPV3 LLC
PO BOX 488
COLUMBIA, SC 29202-0000

To: DSV SPV3 LLC

This letter serves as notification of the following Outgoing Wire Transfer
debited to your account number **********8124 on 12/07/2020.
If you have any questions, please contact your nearest TD Bank Branch
or call 1-800-YES-2000.

| | |
|---|---|
| Amount: | $46,237.41 |
| Beneficiary: | Fix Pads Llc |
| Account Number: | **********1027 |
| Address: | 16 Berryhill Road #200 |
| | ColumbiaSC |
| Sender Bank Name: | TD BANK |
| ABA Number: | |
| FRB Outgoing Confirmation Number: | 20201207C1B76E1C000299 |
| Reference Number: | 201207080457XI02 |
| By Order Of: | DSV SPV3 LLC |
| Account Number: | **********8124 |
| Address: | PO BOX 488 |
| | COLUMBIA, SC 29202-0000 |
| Receiver Bank Name: | BANK OF AMERICA, N |
| ABA Number: | |
| Originator Bank: | |
| Account Number: | |
| Address: | |
| Reference for Beneficiary: | CANN-BVYUYW |
| Originator to Beneficiary: | |
| Bank to Bank Information: | |
| Miscellaneous Information: | |

THANK YOU FOR CHOOSING TD BANK.

Page 01

# EXHIBIT F

## SECOND AMENDMENT TO PURCHASE AGREEMENT

THIS SECOND AMENDMENT TO PURCHASE AGREEMENT (this "Amendment") is made and entered into as of April 2, 2021, by and among (i) FTE Networks Inc., a Delaware corporation ("Parent"), (ii) US Home Rentals LLC, a Delaware limited liability company and direct wholly owned subsidiary of Parent (the "Acquisition Sub") (iii) Alexander Szkaradek, an individual ("Alex"), (iv) Antoni Szkaradek, an individual ("Antoni"), (v) VPM Holdings, LLC, a South Carolina limited liability company ("VPM Holdings"), (vi) Kaja 3, LLC, a South Carolina limited liability company ("Kaja3"), (vii) Kaja 2, LLC, a South Carolina limited liability company ("Kaja2"), (viii) Kaja, LLC, a South Carolina limited liability company ("Kaja"), (ix) Dobry Holdings Master LLC, a Delaware limited liability company ("Dobry" and together with Alex, Antoni, VPM Holdings, Kaja3, Kaja2, and Kaja, the "Equity Sellers"), (x) Vision Property Management, LLC, a South Carolina limited liability company (the "Asset Seller" and together with the Equity Sellers, the "Sellers"), and (xi) Alexander Szkaradek, in his capacity as the representative of the Sellers (the "Sellers' Representative"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such terms in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, the Parties have entered into that certain Purchase Agreement dated as of December 20, 2019; and

WHEREAS, the Parties have entered into Amendment No. 1 to the Purchase Agreement as of December 30, 2019 (the original Purchase Agreement, as amended by Amendment No. 1 and this Amendment, being herein referred to as the "Purchase Agreement"); and

WHEREAS, pursuant to Section 11.6 of the Purchase Agreement, the Parties desire to amend the Purchase Agreement as per the terms of this Amendment.

## AGREEMENT

NOW, THEREFORE, the Parties, in consideration of their mutual covenants and agreements herein set forth, and intending to be legally bound hereby, do hereby covenant and agree as follows:

1.   *Amendments*.

1.1   Section 1.4 of the Purchase Agreement is hereby amended to read in full as follows:

1.4   Aggregate Consideration. The aggregate consideration for the Equity Interests and the Transferred Assets and Liabilities shall be Three Hundred Fifty Million Dollars ($350,000,000) (the "Base Purchase Price") which shall be consist of (i) a $250,000 deposit previously paid pursuant to Section 2.14, (ii) promissory notes in the principal amount of $9,750,000 previously issued to the Sellers, (ii) the Common Stock Consideration issuable in accordance with Section

<u>6.13</u>, (iii) the Entities' Indebtedness, and (iv) shares of Series I Preferred Stock (the "<u>Preferred Stock</u>") having an aggregate stated value equal to Twenty Million Dollars ($20,000,000) issuable in accordance with <u>Section 6.13</u> (collectively the amounts in clauses (i) through (iv), the "<u>Purchase Price</u>").

1.2      Sections 2.4 and 2.6(a) of the Purchase Agreement are hereby deleted.

1.3      All references in Section 2.6 of the Purchase Agreement to "Parent Securities" are hereby replaced with "Equity Consideration," and all references in the Purchase Agreement and in Amendment No. 1 to the Purchase Agreement to "Closing Preferred Stock" are hereby replaced with "Preferred Stock."   The term "Equity Consideration" in Section 12.1 of the Purchase Agreement is hereby amended to read as follows: "Equity Consideration" means Common Stock Consideration and the Preferred Stock, together with any Common Stock issued upon conversion of the Preferred Stock, and any securities issued or distributed by way of stock dividend, stock split or other distribution, merger, consolidation, exchange offer, recapitalization or reclassification or similar transaction.

1.4      Section 4.7(b) is hereby deleted and replaced with the following:

(b)      <u>Restriction on Transfer</u>.

(i)  Sellers may freely transfer any of the Equity Consideration without FTE consent, except as provided in this Section 4.7(b), and subject to compliance with applicable law.

(ii)   Sellers agree not to distribute, sell or otherwise transfer any of the Equity Consideration to Suneet Singal ("Singal") or any immediate family member or affiliate of Singal (Singal and any of his current or future immediate family members or affiliates being herein referred to as a "<u>Singal Party</u>"), and any distribution, sale or other transfer of any of the Equity Consideration (or any successive transfers) shall be subject to the same restriction, except as otherwise provided by clause (iii) or (iv) below.  Except as otherwise provided by clause (iii) or (iv) below, any purported distribution, sale or other transfer of any Equity Consideration to any Singal Party shall be null and void ab initio, and in the event of any purported transfer in violation of this clause (ii), then:

(1) all voting rights associated with such Equity Consideration (or any securities issued by Parent upon conversion or exchange thereof) shall be suspended; and

(2) upon demand by Parent, the participants to such purported transfer shall (and the Sellers shall cause them to) promptly take all steps necessary to rescind the purported transfer and to restore record and beneficial ownership of all of the purportedly transferred Equity Consideration to the Sellers.  If record and beneficial ownership of such Equity Consideration is not restored as contemplated by the preceding sentence within 10 days of Parent's demand therefor, Parent shall instruct

45307829 v1

its transfer agent to mark such Equity Consideration as canceled and no longer issued or outstanding, and the Sellers hereby consent to such action by Parent and its transfer agent.

For purposes of this paragraph (ii), the term "immediate family member" shall have the meaning given in Rule 303A.02 of the NYSE Listed Company Manual and the term "affiliate" shall have the meaning given under Rule 12b-2 under the Securities Exchange Act of 1934, as the same may be amended from time to time hereafter, provided that Singal or any immediate family member of Singal shall not be deemed to be an affiliate of an entity if  if any them, individually or collectively, own less than 40% of the total equity interests in such entity (a "Non-Singal Affiliate").

(iii)  Notwithstanding the prohibition set forth in clause (ii) above, Sellers may distribute, sell or otherwise transfer any of the Equity Consideration to a Singal Party, provided that:

(1)  So long as such Equity Consideration is owned by  any Singal Party, all voting rights associated with such Equity Consideration (or any securities issued by Parent upon conversion or exchange thereof) shall be exercised by the Seller that transferred such Equity Consideration to such Singal Party; and

(2)  Within 150 days after acquisition of record of any Equity Consideration by any Singal Party, either (a) if such Singal Party is an affiliate of Singal or an immediate family member of Singal and such affiliate becomes a Non-Singal Affiliate, or (b) all right, title and interest in and to all such Equity Consideration shall be transferred to one or more Persons who are not Singal Parties.  If the foregoing sentence is not complied with, then upon demand by Parent, the beneficial owners of the applicable Equity Consideration shall (and the Sellers shall cause them to) promptly take all steps necessary to rescind the purported transfer and to restore record and beneficial ownership of all of such Equity Consideration to the Sellers.  If record and beneficial ownership of such Equity Consideration is not restored as contemplated by the preceding sentence within 20 days of Parent's demand therefor, Parent shall instruct its transfer agent to mark such Equity Consideration as canceled and no longer issued or outstanding, and the Sellers hereby consent to such action by Parent and its transfer agent.

(iv)  Any distribution, sale or other transfer of any Equity Consideration pursuant to a Qualified Disposition (as defined below) shall not be subject to the transfer  restrictions set forth in this Section 4.7(b), and any Equity Consideration previously distributed, sold or otherwise transferred pursuant to a Qualified Disposition shall no longer be subject to the transfer  restrictions set forth in this Section 4.7(b).  For purposes of this Section 4.7(b), a "Qualified Disposition" shall mean any distribution, sale or other transfer of any shares of Equity Consideration pursuant to (a) a public offering pursuant to a registration statement filed and

45307829 v1

declared effective under the Securities Act, or (b) a sale pursuant to and in compliance with Rule 144(i) under the Securities Act.

(v)   Except as otherwise provided by clause (iv) above, any distribution, sale or other transfer of any Equity Consideration not otherwise prohibited by clause (ii) above shall be conditioned upon the distributee, purchaser or other transferee executing such documentation in form and substance satisfactory to Parent in its sole discretion evidencing such distributee's, purchaser's or other transferee's agreement to the restrictions on transfer as that set forth in this Section 4.7.   The same transfer restrictions and documentation requirement shall be imposed upon successive distributees, purchasers or other transferees of such shares.

(vi) Nothing in this Section 4.7(b) shall limit the right of any Singal Party to serve as a broker with respect to a sale of any Equity Consideration by the Sellers, provided that such Singal Party is duly licensed as a broker-dealer in all applicable jurisdictions to the extent required by law, and provided further that no Singal Party acquires record or beneficial ownership to any of the Equity Consideration.

(vii)  The stock certificates or other evidence of ownership for the Equity Consideration shall be legended to reflect the transfer restrictions set forth in this Section 4.7(b).

1.5     Section 6.13 of the Purchase Agreement is hereby deleted, and all references in the Purchase Agreement to Section 6.13 of the Purchase Agreement shall be deemed to refer to this Section 1.5 of this Amendment.   Promptly following the date of this Amendment, Parent shall issue to Sellers, in accordance with the Payment Allocation Schedule attached as Schedule A hereto, (i) Twenty Two Million Sixty Three Thousand Three Hundred Seventy Six (22,063,376) shares of Common Stock, and (ii) Two Hundred (200) shares of Preferred Stock; provided that, with respect to one-half of the common shares referred to in clause (i) above (i.e. Eleven Million Thirty One Thousand Six Hundred Eighty Eight (11,031,688) shares of Common Stock, the "FC REIT Shares"), the Sellers agree to sell, transfer and convey the FC REIT Shares to First Capital Real Estate Trust, Inc. effective immediately following the issuance of such shares to the Sellers, and the obligation of Parent to issue the FC REIT Shares to the Sellers shall be suspended until, and shall be subject to the condition precedent that, Sellers shall have provided such documentation as shall be reasonably requested by Parent to demonstrate that Sellers have agreed to sell, transfer and convey the FC REIT Shares to First Capital Real Estate Trust, Inc. and to enable and instruct Parent's transfer agent to transfer the FC REIT Shares from the Sellers to First Capital Real Estate Trust, Inc. immediately following the issuance of such shares to the Sellers.

1.6     Section 6.16 of the Purchase Agreement is hereby deleted.   The Parties hereby agree as follows relative to the Fix Pads properties.   Consistent with the established pattern, Fix Pads properties will continue to be rehabbed with construction loans by Acquisition Sub and then sold to third parties, with the profits being distributed to the Sellers.   The Sellers will continue to cooperate with and use commercially reasonable efforts to support Acquisition Sub's rehab activities, consistent with past practices.   Any Fix Pad properties that have not yet been sold by

4

September 30, 2021 ("Unrehabbed Properties") will either be transferred by the current fee title owner to the Sellers free and clear of any liens for borrowed money, or Acquisition Sub will pay the then-current fair market value of such Unrehabbed Properties to the Sellers.

2.      Except as otherwise provided by law, by the Purchase Agreement or by any other contractual provisions binding on the Sellers, the Common Stock, the Preferred Stock shall be freely transferable by the Sellers.  Any Seller who is a member of the Board of Directors or an officer or employee of Parent or any subsidiary will also be subject to any insider trading policy or other policy or similar document binding on all members of the Board of Directors or officers or employees, respectively.

3.      The Parties acknowledge that prior to the date hereof,  no Equity Consideration has been issued to or delivered to Sellers.  The Sellers acknowledge and agree that the issuance of Equity Consideration as provided in Section 1.5 hereof satisfy and discharge in full Parent's obligations with respect to the issuance of Equity Consideration in respect of the Purchase Price.  For the avoidance of doubt, Equity Consideration does not include the issuance by Parent of the Promissory Notes and Promissory Grid Notes as defined below.

4       Promptly following the date hereof, and prior to the issuance of the shares of Preferred Stock to the Sellers pursuant to Section 1.5 of this the Amendment, the Certificate of Designation for the Preferred Stock shall be amended so as to read in full as set forth in Schedule B attached hereto.  The Parties hereby consent to such amendment.

5.      The Sellers agree that the Promissory Notes issued by Parent to each of Alex and Antoni Szkaradek, dated December 30, 2019, each in the original principal amount of $4,875,000, each as amended from time to time thereafter, are hereby amended and restated in the forms attached hereto as Exhibits A and B, respectively, each in the modified principal amount of $5,372,250 (the "Amended and Restated Promissory Notes").  Promptly following the date hereof, Parent shall also issue to each of Alex and Antoni Szkaradek a Promissory Grid Note, in the forms attached hereto as Exhibits C and D, respectively (the "Grid Notes").   The Parties agree that the Heloc-related debt which is already reflected in FTE's financial information (in the principal amount of approximately $800,000, the "Heloc Debt") is senior in right of repayment to the Amended and Restated Promissory Notes and the Grid Notes, the Grid Notes are senior in right of repayment to the Amended and Restated Promissory Notes, and the Heloc Debt, the Amended and Restated Promissory Notes and the Grid Note are all senior to right of repayment to all other FTE debt except for debt which may already have contractually-provided priority.

6.      So long as the Sellers or a Transferee (as defined below) own shares of Common Stock and shares of Preferred Stock convertible into shares of Common Stock equal to an aggregate of not less than Eleven Million Thirty-One Thousand Six Hundred Eighty Eight (11,031,688) shares of Common Stock (as equitably adjusted for any stock splits, stock dividends, reclassifications, recapitalizations or similar events occurring after the date hereof) (the "Threshold Shares"), Parent shall facilitate the nomination and election of any one individual designated by the holders of a majority of the shares of Common Stock or the Preferred Stock held by the Sellers or such Transferee from time to time for election to the Board of Directors of Parent by, among other things, including such individual on any proxy statement soliciting votes for the election of

45307829 v1

directors of Parent. Any such nominees must (a) be reasonably acceptable to the Board (such acceptance not to be unreasonably withheld) in accordance with the Board's internal procedures and bylaws, (b) qualify as "independent," in accordance with the applicable rules of the SEC and the New York Stock Exchange ("NYSE") listing standards, and (c) not be an immediate family member or an affiliate (with "immediate family member" having the meaning given in Rule 303A.02 of the NYSE Listed Company Manual and with "affiliate" having the meaning given under Rule 12b-2 under the Securities Exchange Act of 1934, as the same may be amended from time to time hereafter) of any then-incumbent board members ("Independent Board Members"). For purposes of this Section 6, the term "Transferee" shall mean a Parent stockholder who can trace his, her or its ownership of all of the Threshold Shares, through one or more intermediate acquisitions, back to one or more of the Sellers as the original holders of such Threshold Shares.

7.     *Miscellaneous*.

7.1     *No Further Amendment*. Except as expressly modified by this Amendment, all of the terms, covenants and provisions of the Purchase Agreement (as previously modified) shall continue in full force and effect.  In the event of any conflict or ambiguity between the terms, covenants and provisions of this Amendment and those of the Purchase Agreement as existing prior to this Amendment, the terms, covenants and provisions of this Amendment shall control.

7.2     *Governing Law*. This Amendment shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws rules of such state.

7.3     *Successors and Assigns*.  The provisions of this Amendment shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

7.4     *Binding Agreement*.  This Amendment shall be binding upon the heirs, executors, administrators, successors and assigns of the Parties.

7.5     *Counterparts; Delivery*. This Amendment may be signed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Any signed counterpart may be delivered by facsimile or other form of electronic transmission (*e.g.*, .pdf) with the same legal force and effect for all purposes as delivery of an originally signed agreement.

*[Signature Page Follows]*

* * * * *

45307829 v1

IN WITNESS WHEREOF, the Parties have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLERS:**

By: _____
Name: Alexander Szkaradek

By: _____
Name: Antoni Szkaradek

VPM HOLDINGS, LLC

By: _____
    Name: Alexander Szkaradek
    Title: Manager

VISION PROPERTY MANAGEMENT, LLC

By: _____
    Name: Alexander Szkaradek
    Title: Managing Member

IN WITNESS WHEREOF, the Parties have caused this Second Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLERS:**

KAJA, LLC

By: _____
      Name: Alexander Szkaradek
      Title: Managing Member

KAJA 2, LLC

By: _____
      Name: Alexander Szkaradek
      Title: Managing Member

KAJA 3, LLC

By: _____
      Name: Alexander Szkaradek
      Title: Managing Member

DOBRY HOLDINGS MASTER LLC,

By: VPM Holdings, LLC, its Manager

By: _____
      Name: Alexander Szkaradek
      Title: Manager

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

SELLERS' REPRESENTATIVE:

By: _____

Name: Alexander Szkaradek

Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 213 of 222

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**PARENT:**

FTE NETWORKS INC.

By: _____

Name: Michael P. Beys
Title: Interim Chief Executive Officer

**ACQUISITION SUB:**

US HOME RENTALS LLC

By: _____

Name: Michael P. Beys
Title: Interim Chief Executive Officer

Schedule A

Payment Allocation Schedule

| | Shares of Common Stock | Shares of Series I Preferred Stock |
|---|---|---|
| Alex Szkaradek | 11,031,688* | 100 |
| Antoni Szkaradek | 11,031,688* | 100 |

_____

\* One-half of these shares are being immediately transferred to First Capital Realty Trust, Inc.

45307829 v1

Schedule B

Designations of Series I Preferred Stock

[See Attached]

Exhibit A

Amended and Restated Promissory Note – Alex Szkaradek

[See Attached]

Exhibit B

Amended and Restated Promissory Note – Antoni Szkaradek

[See Attached]

Exhibit C

<u>Promissory Grid Note – Alex Szkaradek</u>

[See Attached]

45307829 v1

<u>Exhibit D</u>

<u>Promissory Grid Note – Antoni Szkaradek</u>

[See Attached]

Case 1:22-cv-05960-PGG   Document 1-1   Filed 07/13/22   Page 220 of 222

# EXHIBIT G

<div style="text-align:center">**DECLARATION OF THOMAS COLEMAN**</div>

1

COUNTY OF ~~Santa Fe~~ )

2

STATE OF ~~New Mexico~~ )ss.

3

I, THOMAS COLEMAN, under penalty of perjury, declare as follows:

4

1. I am the President of Innovativ Media Group ("IMG"). I am over the age of 18

5

years old, and possess personal knowledge of the facts set forth in this declaration.

6

2. Innovativ has been a stockholder of record of 500,000 shares of defendant FTE

7

Networks, Inc. ("FTE") for over six months.

8

3. FTE does not have a principal office, or any office, in Nevada.

9

4. Exhibit 1 to Plaintiffs' Ex Parte Temporary Restraining Order and Motion for

10

Preliminary Injunction ("Motion") is a true and accurate copy of a printout from the Nevada

11

Secretary of State confirming that FTE is a Nevada corporation whose registered agent's office is

12

located in Clark County, Nevada.

13

5. Exhibit 3 to the Motion is a true and correct copy of the letter that my counsel

14

sent to FTE in January 2022, requesting a shareholder meeting.

15

6. FTE did not notice any shareholder meeting in response to that letter.

16

7. Exhibit 4 to the Motion is a true and correct copy of a letter that my counsel sent

17

to FTE on February 3, 2022, containing an amendment to FTE's bylaws that was signed by

18

myself on behalf of IMG, and by what I believe is a majority of FTE's current shareholders.

19

8. Exhibit 5 to the Motion is a true and correct copy of a letter that my counsel

20

received from FTE in response to the amendment.

21

9. Exhibit 6 is a true and correct copy of a letter that my counsel sent to FTE on

22

February 8, 2022.

23

10. FTE has not allowed IMG to inspect the stockholder list.

24

11. FTE has not noticed any shareholder meeting.

25

12. At the end of December 2021 I contacted FTE via our New York attorney, Barry

26

Kazan of Mintz & Gold, and requested information about FTE and its operations since none had

27

been published in over a year. After weeks of excuses and delays, FTE's general counsel

28

19490821

1    responded and refused to provide any information.

2          13.    In mid-January, I spoke with FTE's sole independent member of the Board of

3    Directors, Joseph Cunningham ("Cunningham"). I learned of the deteriorating condition of FTE

4    and that FTE's two other Directors, Michael Beys ("Beys") and Richard DaSilva ("DaSilva")

5    had proposed that, in exchange for a modest amount of capital, FTE should grant DaSilva and/or

6    his affiliated company, full and perpetual control of the Company through the issuance of a new

7    class of super voting convertible stock. Cunningham told me he refused to assent to this plan

8    because it was definitely not in the best interest of shareholders, who have been in the dark about

9    FTE's operations for almost two (2) years. Cunningham further expressed that he believed that

10   Beys and DaSilva were going to attempt to execute their plan and issue stock without his consent

11   or shareholder approval as required. If Beys and DaSilva attempted to issue this stock, it would

12   result in a significant dilution of the shareholder's voting rights and allow the current embattled

13   management to remain in power.

14         14.    My conversation with Cunningham led me to organize a group representing what

15   I believe is a majority of the other stockholders, and we amended the bylaws to prohibit the

16   current Board from attempting to execute their plan, or a poison pill or any other sort of improper

17   stock issuances without shareholder consent.

18         Dated this 17th day of March, 2022.

19

20

21   THOMAS COLEMAN

22

23

24

25

26

27

28