# EXHIBIT 3

~~SUPREME~~**UNITED STATES DISTRICT** COURT ~~OF~~
**FOR** THE ~~STATE~~**SOUTHERN DISTRICT** OF NEW YORK~~.~~

~~COUNTY OF NEW YORK~~

---

FTE NETWORKS, INC.,

                       Plaintiffs,

      v.

SUNEET SINGAL; TTP8, LLC; FIRST CAPITAL
MASTER ADVISOR, LLC; MAJIQUE LADNIER;
~~DANISH MIR; KHAWAJA ZARGHAM BIN
AAMER;~~ THOMAS COLEMAN; INNOVATIV
MEDIA GROUP, INC.; JOSEPH F.
CUNNINGHAM~~; PETER K. GHISHAN~~;
STEPHEN M. GOODWIN; AND BRUCE M.
FAHEY,

                       Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

~~Index~~Case No. 1:22-cv-05960-JHR

## AMENDED COMPLAINT

Plaintiff FTE Networks, Inc. ("FTE"), by and through its undersigned counsel, files this Amended Complaint against Suneet Singal ("Singal"), TTP8, LLC ("TTP8"), First Capital Master Advisor, LLC ("FCMA"), Majique Ladnier ("Ladnier"), ~~Danish Mir ("Mir"), Khawaja Zargham bin Aamer ("Aamer"),~~ Thomas Coleman ("Coleman"), Innovativ Media Group, Inc. ("Innovativ"), Joseph F. Cunningham ("Cunningham"), ~~Peter K. Ghishan ("Ghishan"),~~ Stephen M. Goodwin ("Goodwin"), and Bruce M. Fahey ("Fahey"), and~~,~~ alleges as follows:

### NATURE OF THE ACTION

1.     This is an action seeking to stop habitual fraudster Suneet Singal and his co-conspirators (the "Enterprise") from continuing to defraud innocent investors across the country through their pattern of fraud and racketeering~~.~~ and to take over FTE using illicitly held and acquired shares.

2.      Nothing has stopped the Enterprise and its mastermind, Singal, from terrorizing their innocent victims to date.  Not Singal's $7 million fine by the U.S. Securities and Exchange Commission ("SEC") in 2021.  Not his ten-year expulsion from the securities industry.  And not even Singal's ~~recent~~2022 federal indictment by the U.S. Attorney for the Eastern District of California, charging him with multiple counts of felony wire and mail fraud.  As detailed herein, his fraud and racketeering schemes continue unabated.

3.      Undeterred by facing up to 20 years in prison for his most recent predicate acts of wire and mail fraud, Singal's fraud and racketeering schemes are long running, wide ranging and continue through today.

4.      Although the number of victims and the depths of Singal's fraud and racketeering are yet to be unearthed, what has already been exposed is disturbing and telling of an unrepentant criminal who will continue to terrorize victims unless permanently enjoined by this Court.

5.      Singal's fraud and racketeering know no bounds.  The web of companies used to further his scheme is a tangled one.  His co-conspirators and enablers are numerous.  The damage he continues to cause is endless.  And his victims are countless.

6.      On December ~~13~~16, 2019, the SEC was the first to expose Singal's fraud and racketeering schemes when it charged Singal with a series of securities frauds against two public companies—a common target of the Enterprise:

> This case is about two separate frauds Suneet Singal perpetrated that involved two public companies—a real estate investment trust ("FC REIT") and a business development company ("BDC")—between September 2015 and at least March 2018. In the fraud involving FC REIT, Singal purported to contribute 12 hotels that he did not own to close a business deal related to FC REIT that personally benefitted him. He then made numerous material misrepresentations in public SEC filings concerning FC REIT's ownership of the hotels. As part of the deal, Singal received consideration valued at more than $15 million for the hotels. Singal's sham contribution diluted the value of FC REIT's shares and resulted in FC REIT selling shares at inflated prices to unsuspecting investors.  With respect to the BDC, Singal

engaged in a course of fraudulent conduct while he was a director and investment adviser to the BDC, and he owed a fiduciary duty to the BDC. As a fiduciary, Singal had a duty to act in the best interests of the BDC, to employ reasonable care to avoid misleading the BDC, and to not engage in self-dealing. Instead, and in breach of that duty, Singal lied about his conflicts of interest and misappropriated money that the BDC lent—as its largest investment—to a company he secretly controlled ("Company A~~").¹~~").[2]

7.      Just two months before being charged by the SEC, Singal had already spun his next web of fraud and lies to terrorize an even broader range of victims—the shareholders of FTE, at the time a publicly traded company on the New York Stock Exchange ("NYSE").

8.      Singal's first act was to dupe FTE into giving him approximately 20% of the common shares of FTE in exchange for retiring a portion of FTE's debt ~~In inducing FTE to give up these shares, Singal never had any intention of paying for the debt.~~, worth approximately $3,900,000, held by two entities, TBK 327 Partners, LLC ("TBK") and Suwyn Investments LLC ("Suwyn").  However, neither Singal nor his company, Defendant TTP8, ever acquired that debt—they simply lied that they acquired it.

9.      In fact, Singal and TTP8 never paid a penny to acquire FTE's debt, never had any intention to pay to acquire FTE's debt, and never closed on any transaction to acquire any such debt, as has recently been confirmed by the accompanying and annexed declarations of TBK's and Suwyn's managers.  As a result, Singal and TTP8 defrauded FTE of 4,193,684 shares of its stock for no consideration.  Singal and TTP8 would later disperse these fraudulently acquired shares among their co-conspirators, including his wife, Defendant Majique Ladnier, his close TTP8 associates and former Defendants Danish Mir and Khawaja Zargham Bin Aamer,[3] and Defendant

---

¹ ~~See Ex. A, Securities and Exchange Commission Complaint against Suneet Singal, dated December 13, 2019.~~
[2] _See_ Ex. A, Securities and Exchange Commission Complaint against Suneet Singal, dated December 13, 2019.

[3] Despite numerous efforts, FTE has been unable to locate and serve Danish Mir and Khawaja Zargham Bin Aamer with the original Complaint, and has therefore removed them as Defendants.

Innovativ Media Group, Inc. ("Innovativ") (controlled by Defendant Thomas Coleman ("Coleman")).

10.     This fraudulent scheme was made possible by the acts of Singal's co-conspirators he helped appoint to positions of power in FTE, including Defendant Stephen M. Goodwin—FTE's former interim CEO—who unilaterally approved the issuance of these FTE shares to TTP8 without advising or obtaining approval from the FTE board.

9.11.   His second, and far broader fraudulent act, was to pitch FTE on a portfolio of real estate properties, which Singal fraudulently represented to FTE and its shareholders were worth more than $350 million.

10.12.  In pitching this opportunity to FTE, Singal knew that the portfolio of properties was poisoned with unlimited underlying liability to state attorneys general and consumer protection groups nationwide but knowingly and intentionally misrepresented the severity of these liabilities.

11.13.  In duping FTE to continue with this transaction even in the face of his recent SEC charges, Singal conspired with the owners of the real estate portfolio, Alex and Antoni Szkaradek (the "Szkaradeks"), to fraudulently conceal Singal's true participation and interest in the transaction by falsely representing that Singal was a mere broker and would have nothing to do with the transaction upon completion.  This representation was knowingly and intentionally false, for Singal was always lurking in the shadows and calling the shots in the background, all while his co-conspirators actively hid his active involvement.

12.14.  To further this fraudulent concealment, the Szkaradeks and others conspired with Singal to violate a provision and prohibition in the transaction closing documents that no shares of FTE would be transferred to Singal, and that 11,031,688 FTE shares purportedly earned by Singal for his "broker fee" would never touch his hands, and instead would be transferred to the victims

of ~~his~~Singal's earlier fraud—the shareholders of the First Capital Real Estate Investment Trust (the "FC REIT").  That representation, like so many others, was knowingly and intentionally false, as Singal, the Szkaradeks, and the other co-conspirators have known and hidden all along.

~~13.~~15.  ~~To be clear, *to this day*~~For over a year, Singal, the Szkaradeks and their other co-conspirators ~~have~~ refused to transfer the 11,031,688 FTE shares to his FC REIT victims.  It was not until on or about November 7, 2022, that FTE, through its own initiative, was able to transfer the shares to FC REIT after months of the Szkaradeks' refusal.

~~14.~~16.  Instead, Singal, the Szkaradeks and their co-conspirators, including past and present FTE directors and officers, ~~have~~ used those very 11,031,68 shares rightfully belonging to FC REIT to further their ongoing fraud and racketeering conspiracy to take over control of FTE. In addition to refusing to transfer the 11,031,688 FTE shares as required by the closing documents, Singal has also acquired additional shares of FTE through various other ruses and fraudulent transfers to companies he controls.

~~15.~~17.  On February 3, 2022, Singal, the Szkaradeks and their co-conspirators, including past and present FTE directors and officers, acted on their fraud and racketeering scheme by attempting a coup to take over control of FTE through a purported amendment to its bylaws.  *See* Ex. B.

~~16.~~18.  Singal's fraud and racketeering do not get more brazen.  Among other co-conspirators, the purported bylaws amendment was signed by Singal himself~~.~~ (as Manager for FCMA), his wife Majique Ladnier, ~~Defendant~~ TTP8 (owned and controlled by Singal and his wife), and ~~Defendant~~ Innovativ (a company owned and controlled by ~~Defendant Thomas~~ Coleman).

19.     Incredibly, Singal even conspired with FTE's former officer, Stephen M. Goodwin, ("Goodwin"), and two other directors of FTE, Peter K. Ghishan ("Ghishan") and Joseph F. Cunningham ("Cunningham"), who Singal helped install, and who also signed onto the February 3, 2022 *ultra vires* amendments to FTE's bylaws to further the conspiracy.

20.     Approximately a year later, on March 11, 2023, Goodwin, Cunningham, FCMA (with Singal signing on its behalf), Innovativ (with Coleman signing on its behalf) and TTP8 (with Ladnier singing on its behalf), along with co-conspirator Alex Szkaradek, again attempted to pass *ultra vires* amendments to FTE's bylaws for a second time.

~~17.~~21.  Incredibly, Cunningham, an FTE board member, joined this March 11, 2023 coup attempt despite the fact that, as alleged in the public record,[4] the co-signors had acquired their FTE shares through fraud.

~~18.~~22.  That is not all.  Apparently, the depth of Singal's fraud and racketeering shares a common thread of mail and wire fraud going back many years.  Besides the 2015 to 2018 fraud scheme charged by the SEC, on April 7, 2022 a federal grand jury indicted Singal for a series of wire and mail fraud committed by Singal in 2017 through his use of two other companies he claimed to own or control.  As alleged in the indictment, Singal stole over $800,000 from other purported investors in the receivables of those companies.[5]  *See* Ex. C.

~~19.~~23.  Undeterred by the charges brought by the SEC and the U.S. Attorney, Singal continues his unlawful scheme against FTE by now conspiring with other shareholders, directors and officers of FTE to overtake control of the company.

---

[4] FTE first publicly made the ~~the~~ allegations concerning Singal's and TTP8's fraudulent acquisition of these 4.1 million FTE common stock shares in a Nevada state court action on February 27, 2023.

[5] The Federal criminal trial of the matter is scheduled to be April 1, 2024, in the U.S. District Court for the Eastern District of California.

20.24.  FTE now brings this action seeking a judgment and order: (i) permanently enjoining Singal and the other Defendants from any involvement in the affairs of FTE; (ii) enjoingenjoining Singal and of the Defendants from receiving any of the 11,031,688 FTE shares designated for the FC REIT; (iii) directing the return of all of Signal's and TTP8's FTE shares to FTE; (iv) directing the return of all FTE shares possessed by Singal's affiliates and co-conspirators; and (v) awarding compensatory damages, treble damages and attorney's fees.

## THE PARTIES

21.25.  Plaintiff FTE Networks, Inc. is a corporation duly organized under the laws of Nevada with its principal place of business located in New York, New York.

22.26.  Defendant Suneet Singal is an individual residing at 512 Alta Vista Court, El Dorado Hills, California 95762.

23.27.  Defendant Majique Ladnier is Singal's wife and also resides at 512 Alta Vista Court, El Dorado Hills, California 95762.

24.28.  Defendant TTP8 is a limited liability company duly organized under the laws of Delaware with its principal place of business located at 2355 Good Meadow Way, Suite 160, Gold River, California 95670.

25.29.  Defendant First Capital Master Advisor is a limited liability company duly organized under the laws of Delaware with its principal place of business located at 2355 Good Meadow Way, Suite 160, Gold River, California 95670.

26.30.  Defendant, Innovativ Media Group, Inc. is a corporation duly organized under the laws of Wyoming with its principal place of business located at 12021 Wilshire Blvd., Suite 450, Los Angeles, California 90025.

27.31.  Defendant Thomas Coleman is an individual residing at 9601 Wilshire Boulevard, Suite 1109, Beverly Hills, California 90210.

28.32.  Defendant Bruce M. Fahey is an individual residing at 85 11th Street, Garden City, New York 11530.

29.33.  Defendant Joseph F. Cunningham is an individual residing at 1350 Promontory Drive, El Dorado Hills, California 95762.

30.    Defendant Peter K. Ghishan is an individual residing at 275 Hill Street, Third Floor, Reno, Nevada 89501.

31.    Defendant Danish Mir is an individual residing at 1350 Broadstone Parkway, Folsom, California 95630.

32.    Defendant Khawaja Zargham bin Aamer is an individual residing at 3230 Fieldcrest Drive, Sacramento, California 95821.

33.34.  Defendant Stephen M. Goodwin is an individual at 1350 Broadstone Parkway, Folsom, California 95630.

**JURISDICTION**

34.35.  This Court has subject matter jurisdiction because this dispute arises from tortious and unlawful conduct occurring within the State of New York.

35.36.  Each Defendant is subject to the personal jurisdiction of this State because each Defendant purposely availed itself of the jurisdiction of this State by committing tortious and unlawful conduct within this State, and/or by directing their tortious and unlawful conduct against Plaintiff within this State.

36.37.  Venue is proper within this County because Plaintiff resides within this County, and the facts giving rise to the claims at issue occurred primarily within this County.

-8-

**FACTS**

~~37.~~38.  In or around February 2019, FTE was hit with the bombshell that its former Chief Executive Officer ("CEO"), Michael Palleschi, and its former Chief Financial Officer ("CFO"), David Lethem had orchestrated a fraudulent scheme to hide the deteriorating financial condition of the company, and to embezzle millions of dollars to pay for private jet use, luxury automobiles, personal credit cards, unauthorized wire transfer, stock issuances and unauthorized salary increases.~~[6]~~[7]

~~38.~~39.  FTE's troubles caught the attention of fraudster and racketeer Suneet Singal, who would soon find himself in SEC hot water and ultimately under federal criminal indictment.~~[8]~~[9]

~~39.~~40.  Striking when FTE was at its most vulnerable, Singal, working in concert with the Szkaradeks and others, hatched their own fraudulent scheme to ~~(i~~: (i) dupe FTE into transferring over 4 million shares of its common stock to TTP8, Singal's company, over the false representation that Singal's company, TTP8, had cancelled approximately $3,900,000 in FTE's debt, when, in fact, not a penny was cancelled; (ii) shed a portfolio of underwater properties that were plagued with state regulatory and consumer liabilities, (~~ii~~iii) secure tens of millions of dollars from FTE for a portfolio of properties that was overleveraged; and (~~iii~~iv) shirk the Szkaradeks' many millions of dollars of personal debt obligations onto the back of FTE.

---

[6] ~~Both former officers were ultimately charged by state and federal prosecutors with numerous felonies on July 15, 2021.~~ ~~See~~ ~~https://www.cnbc.com/2021/07/15/fte-networks-executives-charged-with-securities-fraud-conspiracy.html;~~ ~~https://www.sec.gov/litigation/complaints/2021/comp_pr2021-127.pdf~~

[7] Both former officers were ultimately charged by state and federal prosecutors with numerous felonies on July 15, 2021.  *See*  https://www.cnbc.com/2021/07/15/fte-networks-executives-charged-with-securities-fraud-conspiracy.html; https://www.sec.gov/litigation/complaints/2021/comp_pr2021-127.pdf

[8] ~~See~~ ~~https://www.sec.gov/litigation/litreleases/2021/lr25145.htm~~ ~~("SEC Obtains Final Judgment for More Than $7 Million and Bars Former CEO and Board Chairman from the Securities Industry");~~ ~~https://www.justice.gov/usao-edca/pr/el-dorado-hills-man-indicted-fraud-against-merchant-cash-advance-companies~~ ~~("El Dorado Hills Man Indicted for Fraud Against Merchant Cash Advance Companies").~~

[9] *See* https://www.sec.gov/litigation/litreleases/2021/lr25145.htm ("SEC Obtains Final Judgment for More Than $7 Million and Bars Former CEO and Board Chairman from the Securities Industry"); https://www.justice.gov/usao-edca/pr/el-dorado-hills-man-indicted-fraud-against-merchant-cash-advance-companies ("El Dorado Hills Man Indicted for Fraud Against Merchant Cash Advance Companies").

40.41.  On October 10, 2019, the Commonwealth of Pennsylvania filed a Complaint against the Szkaradeks, their company Vision Property Management, LLC ("Vision") and a series of other Szkaradek related companies, accusing them of luring consumers into "rent to own" agreements on poorly maintained, foreclosed houses. Among other fraudulent practices, the Pennsylvania Attorney General ("AG") alleged that the Szkaradeks and their companies failed to disclose that these agreements provided no ownership rights to consumers unless they exercised an overpriced option, and that consumers faced immediate eviction if they fell behind on payments. The Pennsylvania AG further alleged that certain provisions in Vision's agreements making consumers responsible for expensive repairs required to make the homes safe to live in were unlawful.  It was further alleged that Vision utilized an "Agreement for Deed" and other contract formats that were unfair, deceptive and/or unlawful.

41.42.  In response to the Pennsylvania AG's lawsuit and a swelling of similar consumer complaints across its portfolio of over 3,000 properties among 46 states, the Szkaradeks contemplated bankruptcy and met with their own bankruptcy counsel in mid-October 2019.

42.43.  Rather than file for bankruptcy (which could not shield them from the looming onslaught of state AG and consumer lawsuits due to their underlying fraud), the Szkaradeks instead hatched a scheme with Singal to unload their liabilities, while simultaneously reaping millions of dollars for their own personal benefit.

43.44.  Their target was FTE, a publicly traded company that (i) was reeling from its own public fraud scandal, (ii) suffered from ballooning short-term and long-term debt obligations, and (iii) was about to install a new board of directors and management team to right a sinking ship stricken by fraud.

44.45.  The scheme was (i) to pitch the portfolio of liability laden properties onto FTE's new board and management under the false premise that the properties were worth hundreds of millions of dollars and would allow FTE to recover from the damage caused by its former CEO and CFO—; and (ii) obtain millions of shares of FTE common stock through falsely representing to FTE that Singal and his company, TTP8, had discharged millions of FTE's pre-existing debt, while relying on Singal's appointed then-interim CEO, Goodwin, to approve the transaction without advising or obtaining approval for FTE's board.

46.    Less than two weeks after Vision had been sued by the Pennsylvania AG, Singal had already begun to spin his scheme with the Szkaradeks by attending the first meeting of FTE's newly appointed board on October 22, 2019.  It was during this meeting that FTE appointed, at Singal's recommendation, Goodwin to serve as its interim CEO.

45.47.  At this board meeting, Singal – along with his closest associates, Defendants Mir and Aamer, and also his hand-picked cronies on FTE's board – introduced FTE to the Szkaradek portfolio and pitched a potential acquisition of the problematic Vision properties.  In making his pitch to FTE's new board, Singal represented that Vision's portfolio of properties had a then existing book value in excess of $350 million, and that with minimal rehabilitation, the properties would be worth in excess of $500 million.  As a further inducement to acquire the Vision portfolio and further garner support from FTE's new board members, Singal offered to retire millions of dollars of debt and promised to help facilitate a new fundraising channel through the exchange of FTE stock.

48.    During the October 22, 2019 FTE board meeting, Singal also proposed that FTE should issue TTP8 shares of FTE's common stock in exchange for TTP8 agreeing to cancel approximately $3,900,000 million in FTE debt held by TBK and Suwyn.   FTE's board

conditionally approved this proposal, subject to proof of good and legal marketable title to the subject debt.

49.     On November 15, 2019, in furtherance of Singal and TTP8's plan to fraudulently obtain these shares, Goodwin, Singal's plant, unilaterally approved the issuance of 5,468,379 shares of FTE stock to TTP8 without advising or obtaining approval form FTE's board, on the purported representation that Singal, through TTP8, had retired FTE's debt held by TBK and Suwyn.

50.     Goodwin's unilateral transfer of these 5,468,379 shares of FTE stock represented more than 20% of FTE's stock and thereby triggered NYSE registration and reporting rules, which Goodwin failed to adhere to.

51.     FTE learned of Goodwin's decision to transfer these shares to TTP8 on December 9, 2019, and the next day, December 10, 2019, FTE board member Michael P. Beys ("Beys") directed FTE to self-report this violation of NYSE's rules to the NYSE.

52.     On December 11, 2019, the NYSE suspended trading of FTE stock because of the improprieties.

53.     Goodwin protested that this issuance of shares above the 20% threshold was a good faith mistake, and Singal and TTP8, for their part, continued to misrepresent that they had good and legal marketable title to the approximately $3,900,000 debt held by TBK and Suwyn that Singal and TTP8 represented was extinguished.

54.     Consequently, FTE immediately demoted Goodwin, replacing him with Beys, a former Assistant U.S. Attorney for the Eastern District of New York, and contacted the NYSE to disclose the share issuance improprieties.

55.     Relying on these representations from Singal and TTP8, on December 13, 2019, FTE entered into a superseding note exchange agreement with TTP8 whereby TTP8 represented it had cancelled FTE's debt held by TBK and Suwyn, in exchange for consideration of receiving 4,193,684 shares of FTE stock (a reduction from the 5,468,379 shares Goodwin had authorized that exceeded NYSE's rules) (the "Note Exchange Agreement").

56.     As discussed in further detail below, Singal's and TTP8's representation concerning the cancellation of FTE's debt was knowingly false and not a penny of this debt was actually cancelled, as confirmed by declarations from both TBK's and Suwyn's managers.

46.57.   On December 16, 2019, just days before the Vision portfolio was scheduled to close, and just days after the Note Exchange Agreement was executed, FTE learned that the SEC had filed securities fraud charges against Singal for, among other things, selling properties that he did not own.[10][11]

47.58.   As a result of the SEC's fraud charges against Singal – who through his affiliates was a roughly 20% shareholder – FTE immediately instituted a "firewall" between itself and Singal, directing all members of FTE's board and management not to have any communications with Singal, either directly or through affiliates, regarding the company's business affairs.

48.59.   Despite these troubling charges by the SEC, the Szkaradeks remained resolute in closing on the Vision portfolio.  However, and in light of the "firewall," the Szkaradeks represented to FTE and its board members that Singal was merely a broker, and would not be involved in the transaction after its close.  This was a lie and a fraud, as is now abundantly clear.

---

[10]   *See* ~~https://secinvestigations.org/2019/12/16/sec-charges-suneet-singal-first-capital-real-estate-investments-llc-first-capital-real-estate-advisors-lp-and-first-capital-real-estate-trust-inc/~~

[11]   *See* https://secinvestigations.org/2019/12/16/sec-charges-suneet-singal-first-capital-real-estate-investments-llc-first-capital-real-estate-advisors-lp-and-first-capital-real-estate-trust-inc/

49.60.  Indeed, the Szkaradeks insisted that Singal be compensated for his so-called finder's fee through the transfer of $100 million of *their* to-be-received FTE stock (later changed to 11,031,688 FTE shares).  In pushing for this purported fee, the Szkaradeks promised that the stock would not be distributed either to them or to Singal, but rather, directly to the victims of Singal's SEC fraud, the shareholders of the FC REIT.

50.61.  To be sure, on December 20, 2019, Singal issued his own press release announcing the acquisition of the Vision portfolio by FTE, and the concomitant pledge of $100 million in FTE shares (later changed to 11,031,688 FTE shares) to the victims of his SEC fraud – the FC REIT.[12].[13]

### A.   General Background of Plaintiffs' Business and Financial Trouble

51.62.  FTE Networks is a corporation duly organized under the laws of Nevada.  Prior to its relationship with the Szkaradeks, FTE primarily provided innovative, technology-oriented solutions for smart platforms, network infrastructures and buildings. The company provided end-to-end design, construction management, build and support solutions for state-of the art networks, data centers, residential, and commercial properties and services for Fortune 100/500 companies. After meeting Singal and the Szkaradeks, FTE sought to reposition itself as a real-estate company, owning and operating properties in the single-family residential market.

### B.   The Purchase Agreement with the Szkaradeks

52.63.  In the wake of the embezzlement scandal involving its former CEO and CFO, FTE formed a new board of directors consisting of Michael P. Beys, ("Beys"), Richard de Silva, ("de Silva"), Defendant Joseph F. Cunningham, ("Cunningham"), and Defendant Peter K. Ghishan. ("Ghishan").

---

[12]        https://apnews.com/press-release/pr-newswire/business-lifestyle-residential-real-estate-fte-networks-inc-af0f7f4e57a009a9faf934eff686282e

[13]        https://apnews.com/press-release/pr-newswire/business-lifestyle-residential-real-estate-fte-networks-inc-af0f7f4e57a009a9faf934eff686282e

53.64.  Two of the directors, ~~Defendants~~Defendant Cunningham and Ghishan, had close business ties with Singal, who was purporting to act as a financial advisor to the newly appointed FTE Board.  The other two directors, Beys and de Silva, were not aware of the full extent of those close business ties.

54.65.  During the first board meeting on October 22, 2019, Singal, acting in concert with the Szkaradeks, recommended to the board that it appoint Defendant Stephen M. Goodwin ("Goodwin") as the interim CEO of FTE.  Goodwin likewise had a close business relationship with Singal.  In all, Goodwin, Cunningham and Ghishan all had close business ties to Singal, the full extent of which were unknown to Beys and de Silva.

55.66.  The Board accepted and acted upon Singal's recommendation.

56.67.  As a result, ~~Defendants~~ Cunningham, Ghishan, and Goodwin effectively were Singal's secret operatives on the FTE board.

~~57.     During the same board meeting, Singal made numerous financial proposals to rehabilitate and reinvent FTE.  Specifically, Singal promised to help raise tens, if not hundreds, of millions of dollars for the company.~~

~~58.     As part of Singal's fundraising promises, one of the proposals was for Singal to purchase and retire several million dollars' worth of existing FTE debt in exchange for conversion of that debt into 5,468,379 shares of FTE stock (later reduced to 4,193,684 shares of FTE stock in order to fall below the applicable 20% NYSE and SEC threshold), which the board approved.~~

~~59.     During the same meeting, Singal presented the FTE Board with the portfolio of properties owned and managed by the Szkaradeks, through Vision Property Management, LLC and VPM Holdings, LLC (collectively "Vision").  At the time of the meeting, the Vision portfolio~~

-15-

~~consisted of approximately 3,500 properties across 46 states and, according to Singal and his co-conspirators, was valued at over $350 million, including $82 million of debt.~~

~~60.     On December 9, 2019, the FTE board learned that the share issuance to Singal was never registered or disclosed, as required by NYSE listing rules, and that the shares issued by then-CEO Stephen M. Goodwin exceeded the 20% threshold of then-outstanding shares of FTE, another violation of NYSE listing rules.~~

~~61.     Consequently, FTE immediately terminated Goodwin, replacing him with Beys, a former Assistant U.S. Attorney for the Eastern District of New York, and contacted the NYSE to disclose the share issuance improprieties.~~

~~62.     On December 11, 2019, the NYSE suspended trading of FTE stock because of the improprieties.~~

~~63.~~68.  On December 16, 2019, the SEC issued a press release announcing a series of securities fraud charges against Singal for defrauding investors of First Capital Real Estate Investments LLC, First Capital Real Estate Advisors LP, and First Capital Real Estate Trust Inc. (collectively, the "FC REIT~~"). 14~~").[15]

69.     On the back of the SEC charges against Singal and the share issuance improprieties (also to Singal), the NYSE commenced the de-listing procedure of FTE stock on the following day, December 17, 2019.

~~64.~~70.  The two directors of FTE *without* ties to Singal, Beys and de Silva, had absolutely no knowledge of the SEC's newly announced charges against Singal, or that he had been under investigation.  And while ~~Defendants~~ Cunningham, Ghishan and Goodwin – the directors and

---

[14] ~~*See* https://secinvestigations.org/2019/12/16/sec-charges-suneet-singal-first-capital-real-estate-investments-llc-first-capital-real-estate-advisors-lp-and-first-capital-real-estate-trust-inc/~~

[15] *See*  https://secinvestigations.org/2019/12/16/sec-charges-suneet-singal-first-capital-real-estate-investments-llc-first-capital-real-estate-advisors-lp-and-first-capital-real-estate-trust-inc/

officers of FTE *with* preexisting ties to Singal – *claimed* they were not aware of the charges or investigation, hindsight now suggests otherwise.  They were his co-conspirators all along.

71.    Nevertheless, in light of the serious SEC fraud charges against Singal – who through his affiliates was a roughly 20% shareholder through the aforementioned then-undiscovered fraud involving Singal and TTP8's falsely representing they had cancelled millions in FTE's debt – FTE immediately instituted a "firewall" between itself and Singal, with all FTE directors and managers agreeing not to have any communications with Singal, either directly or through affiliates, regarding the company's business affairs.

65.72.  While the "firewall" has remained in place ever since then, it is now abundantly clear that Singal's secret operatives on FTE's board and in senior management, namely Defendants Cunningham, Ghishan and Goodwin – directly and throughwith the Szkaradeks and other co-conspirators – fraudulently concealed their ongoing relationship and communications with the racketeer, passing highly confidential information to him to help him perpetrate his fraud and racketeering scheme.

66.    On the back of the SEC charges against Singal and the share issuance improprieties (also to Singal), the NYSE commenced the de-listing procedure of FTE stock on the following day, December 17, 2019.

73.    This highly confidential information included, but was not limited to, FTE's intention in late 2021 to sue Singal, the Szkaradeks and, possibly, Innovativ, as well as FTE's intention to prepare defenses to prevent the very takeover Defendants were planning.

67.74.  Despite the pending SEC charges against Singal, the "firewall" and the de-listing of FTE stock, the Szkaradeks nevertheless insisted that they wanted to complete the Vision portfolio transaction, which was to be largely paid for by FTE's soon-to-be de-listed stock.

68.75.  The Szkaradeks represented to FTE that Singal was merely a broker, and that Singal would not be further involved in the Visions Vision transaction.  The Szkaradeks insisted, however, that Singal be paid a whopping $100 million finder's fee for the Vision transaction (later changed to 11,031,688 FTE shares) from the stock of FTE that they would receive.

69.76.  Over the next two weeks until closing on December 30, 2019, the Vision deal was restructured to ensure that no consideration would go from FTE to Singal, his family members or his affiliates.  Rather, any amounts payable to Singal would instead be paid directly to the victims of Signal's SEC fraud, the FC REIT and its shareholders.

70.77.  As part of the due diligence, FTE relied on a report from Collateral Analytics, which had been introduced to FTE by the Szkaradeks, and which was based on comparisons from the geographic areas of the properties.  The report, however, did not take into account material information known to and concealed by Singal, and the Szkaradeks, namely, the extent of the state AG and local-level liabilities attached to the properties due to, among other wrongdoings, the fraudulent rent-to-own scheme perpetrated by the Szkaradeks.

71.78.  Among other things, the Szkaradeks and Singal did not disclose the number and volume of consumer complaints that had been lodged against Vision throughout various states, including open state AG and consumer fraud investigations into Vision's lease-to-own agreements and business practices.

72.79.  The existence of these liabilities effectively rendered the properties radioactive from a market perspective.

73.80.  Without knowing the full extent of Vision's then existing and future liabilities (which were known to the Szkaradeks and Singal but willfully misrepresented and purposefully concealed from FTE), FTE closed on the Vision portfolio on December 30, 2019.16.17

74.    Section 3.4, Capitalization; Indebtedness, stated in pertinent part:

    (a)    The Equity Interests are free and clear of all Liens.

75.81.  Notably, Section 3.14 of the Purchase Agreement, Litigation, provided:

    (a)    [S]ince January 1, 2015 there have not been any Legal Proceedings pending or, to the Knowledge of the Sellers, threatened (i) against or by the Company, (ii) against or by the Sellers relating to the Company or regarding any of their assets or properties, or (iii) against or by the Sellers or the Company that challenges or seeks to enjoin, prevent or otherwise delay, the Transaction or the other transactions contemplated by this Agreement or any of the Transaction Documents.  To the Knowledge of the Sellers, no event has occurred or circumstance exists that could reasonably be expected to give rise to, or serve as the basis for, any Legal Proceeding.

    (b)    [S]ince January 1, 2015 the Company is not and has not (i) been in default under or in breach of any Order, (ii) received any written notification or communication from any Governmental Body asserting that the Company is not in compliance with any Order or (iii) been party or subject to any Order.  There are no unsatisfied judgments, penalties or awards affecting the Company or any of its properties, rights, or assets.

76.82.  Moreover, Section 3.15, Compliance with Laws; Permits, stated in pertinent part:

    (a)    [T]he Company and the Business are, and since January 1, 2015 has complied with, in each case in all material respects, all applicable Laws, including without limitation with respect to mortgage lending, consumer protection, seller financing, installment sale contract, purchase money mortgage, contract for deed, and lease with option to purchase Laws…[S]ince January 1, 2015, none of the Companies has received any written notification or communication from any Governmental Body asserting that the Company is not in compliance with any applicable Law, including without limitation with respect to mortgage lending, consumer protection, seller financing, installment sale contract, purchase money mortgage, contract for deed, and lease with option to purchase Laws.

83.    Finally, Section 3.4, Capitalization; Indebtedness, stated in pertinent part:

---

16 A true a correct copy of the Purchase Agreement is attached hereto as Ex. D.
17 A true a correct copy of the Purchase Agreement is attached hereto as Ex. D.

(a)      The Equity Interests are free and clear of all Liens.

77.84.  With those provisions of the Purchase Agreement in mind, the Szkaradeks consummated the transaction and professed that their business and portfolio was not subject to any liens, pending or threatened litigation, and that they had complied with all applicable Laws.

78.85.  In connection with the closing, the Szkaradeks conspired with Singal to knowingly misrepresent and/or intentionally conceal the following:

a.  Although the brick-and-mortar value of the portfolio was arguably $350 million – based on a valuation report arranged by Vision – it was not disclosed that the majority of properties in the portfolio, which were subject to a national lease-to-own scheme orchestrated by the Szkaradeks, were unsellable and virtually impossible to collect rent from.  These properties actually provided a negative value to the portfolio;

b.  The Szkaradeks falsely represented that they were nearing a settlement with the Pennsylvania AG for pending claims when in reality no such agreement was remotely close;

c.  No disclosure was made of pending homeowner complaints in Michigan, Ohio, and numerous other states to their respective AGs, which were known precursors to private class actions and state regulatory actions filed by the AGs;

d.  No disclosure of the massive tax obligations and utility deficiencies owed by Vision;

e.  Fraudulently misrepresented that Singal was merely a one-time broker in the transaction, while concealing the very basis of the relationship between the Szkaradeks and Singal as partners and co-conspirators.

79.86.  Moreover, in or around October of 2019, the Szkaradeks consulted with a bankruptcy attorney, Michael Beal, demonstrating that the Szkaradeks knew that the Vision portfolio properties had little to no value, and were effectively underwater.

80.87.  Among the persons aware of Vision's liabilities prior to the closing are Eric Taylor (then existing property manager), John Pincelli, Esq. (attorney for Vision), and Todd Merson.

81.88.  As part of the transaction, the Szkaradeks were paid $250,000 in cash (which was paid directly to settle a Vision legal matter) and were provided a promissory note of $9.75 million to be paid by January 2020.

82.89.  The Szkaradeks also received $228 million of preferred FTE shares, on the basis that the trading of FTE stock, once re-listed, would properly price the value of the transaction.

**C.      The Conspiracy to Return Unencumbered Properties to the Szkaradeks**

83.90.  In order to facilitate the closing of the initial transaction, FTE formed US Home Rentals, LLC ("USHR") to run the portfolio of properties purchased from the Szkaradeks.

84.91.  As part of the original transaction, FTE had agreed to return a subset of approximately 280 properties to another Szkaradek entity named FixPads.

85.92.  On September 25, 2020, upon the insistence of the Szkaradeks, FTE hired Munish Bansal as the CEO of USHR.  As several co-conspirators, including Ghishan and Cunningham, knew but fraudulently concealed, Singal had identified Bansal and pushed him through the Szkaradeks and their cronies in FTE's board and management to have Bansal take over USHR and eventually FTE.  Thus, Bansal's hiring was a key part of the second act of Singal and the Szkaradeks' fraudulent scheme: to (i) take control of FTE's Board and management; (ii) expedite the transfer of the most favorable FixPads properties to the Szkaradeks; and (iii) push FTE into bankruptcy so that the Szkaradeks could take back its properties free and clear of their liabilities.

86.93.  Around the time that Bansal took over as CEO of USHR, Vision's former property manager, Eric Taylor, attempted to inform FTE that Vision's portfolio was grossly underwater, and was not worth what had been previously represented by the Szkaradeks and Singal.

87.94.  Bansal and other Singal-planted board members, including Ghishan and Cunningham, disputed Taylor's allegations, and Bansal retaliated by firing Taylor on November 23, 2020.

88.95.  In addition to firing Taylor, Bansal continuously pressed to transfer desirable, lien-free FixPads properties to the Szkaradeks.  Defendants Cunningham, Ghishan and Goodwin pressed as well.

89.96.  Ultimately, when FTE refused, the Szkaradeks systematically began transferring FixPads properties owned by USHR/FTE without the authorization of FTE, fraudulently claiming that they had authorization.  Defendants Cunningham, Ghishan and Goodwin likely knew about the fraudulent FixPads transfers, as discovery will likely show.

90.97.  In fraudulently transferring these properties, the Szkaradeks were not only pocketing the equity in the properties, but in some cases, they failed to obtain the consent of FTE's largest creditors, who had security interests in the majority of the Vision properties.  In doing so, the Szkaradeks, with the knowledge and participation of their co-conspirators in FTE's board and management, —Goodwin, Cunningham, and Ghishan—irreparably damaged FTE's relationship with such creditors.18.19

---

[18] However, in some cases, creditors allowed these unauthorized, fraudulent transactions by providing payoff letters and applying the proceeds of these sales to pay down debt owed to them, thereby benefitting themselves and the Szkaradeks at FTE's expense.

[19] However, in some cases, creditors allowed these unauthorized, fraudulent transactions by providing payoff letters and applying the proceeds of these sales to pay down debt owed to them, thereby benefitting themselves and the Szkaradeks at FTE's expense.

91.98.  At one point, to accomplish their fraudulent transfers of these properties, the Szkaradeks opened bank accounts at TD Bank, fraudulently signing for FTE and its subsidiary USHR, and failing to provide FTE with access to these accounts.[20].[21]

92.99.  In addition to firing Taylor, Bansal actively sabotaged rehab efforts of USHR's properties to the point that employees questioned Bansal's decision-making and motives.

93.100.       On December 30, 2020, as a direct result of the actions taken by the Szkaradeks, FTE's largest creditor exercised its managerial security interests in the majority of the portfolio purchased from the Szkaradeks.

94.101.       In early 2021, FTE began selling a small portion of the properties purchased from the Szkaradeks to help cover the expenses needed to run the portfolio.  At that time, FTE soon realized that the properties it had purchased from the Szkaradeks were effectively radioactive to the market due to the fraudulent rent-to-own scheme, and the growing number of state AG and consumer fraud complaints.

95.102.       Specifically, FTE learned that it could not sell a vast majority of the properties due to injunctions, stop orders, and other actions taken by state AGs and consumer protection groups in several states, including Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania and Wisconsin.

D.       **The April 2021 Amendment and Conspiracy to Take Over FTE Management**

96.103.       As originally intended, the Vision transaction was to be paid through an exchange of FTE common stock, with FTE always maintaining the controlling voting rights of the company.  FTE, however, was ultimately de-listed.

---

[20] *See* Ex. E (Attachments from email by M. Fernandez to A. Szkaradek, dated May 18, 2021)
[21] *See* Ex. E (Attachments from email by M. Fernandez to A. Szkaradek, dated May 18, 2021)

97.104.        On April 2, 2021, FTE and the Szkaradeks therefore amended the consideration paid to the Szkaradeks as follows:

    a.   The promissory note of $9.75 million was increased to approximately $10.7 million to account for accrued interest and certain debt paydowns made to FTE's creditors (by way of FixPads sales made without FTE's consent);

    b.   40% of the common equity in FTE, which equated to 22,063,376 shares (half of which, or 11,031,688, were designated for the vicitims victims of Singal's SEC fraud, the FC REIT and its shareholders); and

    c.   $20 million of preferred shares, which could be converted into another 9% of common shares, which would provide up to 49% total equity in FTE.

98.105.        The amendment also required FTE to deed back all of the FixPads properties to the Szkaradeks free and clear, which were approximately 220 at the time, down from nearly 280.

99.106.        Importantly, as a material part of the amendment – and as part of the overriding Singal "firewall" in effect since December 2019 – the Szkaradeks were prohibited from transferring any of their shares to Singal, family members or affiliates.²² ²³

100.107.        Yet, true to form, in furtherance of the conspiracy with Singal, the Szkaradeks have attempted to transfer *all* of their consideration from the transaction – debt, preferred equity and common equity of FTE – to Singal's affiliates and family members, including

---

²² A true a correct copy of the April 2021 Amendment is attached hereto as Ex. F.
²³ A true a correct copy of the April 2021 Amendment is attached hereto as Ex. F.

Singal's wife Majique Ladnier and Defendant Innovativ (owned and controlled by Defendant Thomas Coleman), in direct violation of the April 2021 Amendment and the "firewall".[24]".[25]

~~101.~~108.	Also, true to form, these fraudulent transfers would not have been possible without the knowledge and participation of Singal's cronies in FTE's board and management – ~~Defendants~~ Cunningham, Ghishan and Goodwin – and other co-conspirators, all of whom were in direct communication with Singal and each other, passing on highly confidential information about FTE to a known racketeer and fraudster.

~~102.~~109.	Indeed, the scheme to take control of FTE began ~~as~~in early ~~as April~~ 2020 when Singal, through TTP8, sought to transfer 500,000 of his shares in a private secondary transaction to Defendant Innovativ (owned and controlled by Defendant Thomas Coleman), which at the time, did not sound off any alarm bells and was approved by FTE.

~~103.~~110.	But later events would reveal that this was just one step in a long-orchestrated fraud and racketeering scheme by Singal, the Szkaradeks, Coleman, Innovativ and the other co-conspirators to take over control of FTE.

111.	~~In October 2019, Singal first acquired approximately 20% of FTE's then outstanding common shares due, in part, to his knowingly false representations that he would secure further future financing for FTE.  Specifically, on~~ As referenced above, during the October 22, 2019, ~~the FTE Board~~ board meeting, Singal proposed that his company, TTP8, discharge certain FTE debt held by TBK and Suwyn—valued at approximately $3,900,000—which the board conditionally approved ~~the issuance of~~.

---

[24] ~~To hide their fraudulent transfers to Singal and his affiliates, the Szkaradeks and their co-conspirators made the transfers in ways designed to avoid detection, including the use of a Wyoming shell company.~~

[25] To hide their fraudulent transfers to Singal and his affiliates, the Szkaradeks and their co-conspirators made the transfers in ways designed to avoid detection, including the use of a Wyoming shell company.

112.   On or about November 15, 2019, Goodwin, acting unilaterally and without advising or getting approval for the board, issued 5,468,379 shares of FTE common stock (later reduced to 4,193,684 shares of FTE ~~common~~ stock) to TTP8~~, an entity owned and controlled by~~ on Singal~~,~~ ~~in connection with the conversion of~~ and TTP8's representation that they had extinguished this debt, by emailing issuance instructions to its then-transfer agent, Nevada Agency & Transfer Company ("NATCO").

113.   On or about December 9, 2019, FTE's board first learned of Goodwin's unilateral decision, demoted him immediately, and restructured the agreement between FTE and TTP8 in a Note Exchange Agreement, dated December 13, 2019 and signed by Singal as TTP8's CEO, in which TTP8 contractually represented it had cancelled the approximately $~~2 million~~3,900,000 in ~~unsecured~~ debt ~~(a large portion~~held by TBK and Suwyn.

114.   As part of ~~this unsecured~~the Note Exchange Agreement, the consideration TTP8 received was adjusted from the 5,468,379 shares of FTE common stock Goodwin had unilaterally authorized to 4,193,684 shares in order to comply with NYSE rules.

~~104.~~115.     The debt ~~belonged to Chris Ferguson,~~that Singal purportedly paid off was held by (i) TBK 327 Partners, LLC ("TBK"), an entity managed by a former member of FTE's board of directors~~).[26]~~ Chris Ferguson ("Ferguson"), and (ii) an entity called Suwyn Investments LLC ("Suwyn").

116.   Singal and TTP8, however, did not satisfy FTE's debt as promised and as represented to FTE's board, and as represented in the Note Exchange Agreement, in exchange for 4,193,684 shares of FTE common stock issued to TTP8.

---

~~[26] On information and belief, Singal and TTP8 have not paid any of the unsecured debt holders any money for the debt Singal and TTP8 acquired from them.~~

117.    As set forth in Ferguson's declaration, dated March 7, 2023, Ex. H, Mr. Ferguson's company, TBK has held certain promissory notes issued by FTE to TBK since 2014.  Ex. H ¶ 7.

118.    In 2019, TTP8, through Singal's direction, purportedly attempted to acquire the FTE debt held by TBK.  To that end, on or about October 16, 2019, TBK and TTP8 executed a "Pledge and Purchase Agreement", but this transaction was never closed and no consideration was exchanged in performance thereof.  Ex. H ¶¶ 6-8.

119.    Nevertheless, Singal represented to the FTE board, that he had satisfied FTE's debt held by TBK—which TBK presently denies, *see* Ex. H ¶ 4.

120.    Like TBK, Suwyn held legal right, title and interest in certain promissory notes issued by FTE to Suwyn.  *See* Declaration of Mark Suwyn, dated March 17, 2023, attached hereto as Exhibit I.

121.    Contrary to Singal's representations to FTE's board, like with TBK, Singal and TTP8 purportedly attempted to acquire FTE's debt held by Suwyn, but the "transaction never closed and no consideration at all was ever exchanged in performance thereof." Ex. I ¶ 6.

122.    At bottom, TTP8 and Singal lied to FTE that TTP8 had extinguished FTE's debt held by TBK and Suwyn in order to dupe FTE into transferring shares to TTP8 as consideration for this fictitious performance, and in doing so, breached the Note Exchange Agreement.

123.    Cunningham, Ghishan and Goodwin, Singal's inside men on the FTE board, knew or should have known that Singal's and TTP8's representations concerning their extinguishing the debt held by TBK and Suwyn were false, yet they readily approved issuing 4,193,684 shares (originally more) of FTE common stock to TTP8 in order to advance Defendants' conspiracy to take over FTE.

124.    Beys and de Silva, the two remaining FTE board members who were not involved in Defendants' conspiracy, relied on Singal's and TTP8's representation in approving the issuance of 4,193,684 shares of FTE common stock to TTP8.

125.    At this time, neither Beys nor de Silva had any reason to suspect that Singal was a habitual fraudster, or that their fellow board members where in cahoots with Singal in a conspiracy to fraudulently acquire FTE shares for the ultimate purpose of taking over the company.

126.    As described herein, Singal and TTP8 subsequently transferred these fraudulently acquired 4,193,684 shares of FTE common stock among the other Defendants and co-conspirators, including his wife, Defendant Majique Ladnier, his close TTP8 associates Danish Mir and Khawaja Zargham Bin Aamer, and Innovativ (controlled by Defendant Coleman), which gave Innovativ its first and only foothold ownership in FTE, which it would later use alongside the other Defendants to fraudulently pass *ultra vires* amendments to FTE's bylaws.

105.127.    In early 2020, pursuant to a Court Order issued by the Common Pleas Court of Allegheny County, Pennsylvania (the venue of a pending suit in which the Szkaradeks and certain affiliated entities were sued for, among other things, having allegedly engaged in a series of fraudulent practices involving Pennsylvania consumers), the Szkaradeks were enjoined from transferring any consideration received in connection with the Vision Purchase Agreement and agreed to assign any proceeds or consideration received in connection with the Vision Purchase Agreement into an escrow account controlled by the Pennsylvania AG.

106.128.    Shortly after the injunction was issued, Singal and, through TTP8, proceeded to transfer nearly all of their preexisting FTE common shares to affiliates.that were secured by the above-described fraud to Defendants and other co-conspirators.

107.129.    In or around May 2020, TTP8 transferred 702,000 of its 4,193,684 shares of FTE common stock to Defendant Khawaja Zargham bin Aamer, a TTP8 employee, purportedly as payment for certain deferred compensation.  The parties to the transfer provided FTE with an opinion of counsel, as required by NATCO, as to why this transfer qualified for an exemption under Securities laws. This opinion was rendered by Ronald J. Logan with Logan Law Firm PLC.

108.130.    In or around May 2020, TTP8 transferred 891,566 of its 4,193,684 shares of FTE common stock to Defendant Danish Mir, another TTP 8TTP8 employee, also purportedly as payment for certain deferred compensation.  Again, the parties to the transfer provided an opinion of counsel to FTE as to why this transfer qualified for an exemption under Securities laws. This opinion was also rendered by Ronald Logan.

109.131.    In or around May 2020, TTP8 "distributed" 1,790,118 of its 4,193,684 shares of FTE common stock to Singal's wife, Defendant Majique Ladnier, pursuant to a stock distribution agreement. Ronald Logan noted that this distribution did not amount to a change in beneficial ownership, as Singal and Ladnier were spouses and, as such, held an undivided interest in TTP8.

110.132.    Finally, in or around May 2020, TTP8 transferred 500,000 of its 4,193,684 shares of FTE common stock to Defendant Innovativ (owned and controlled by Defendant Coleman), purportedly in satisfaction of debt owed to Innovativ. An opinion as to why this transfer qualified for an exemption under Securities laws was also rendered by Ronald Logan.

133.    Ronald Logan's opinion letter on these transactions, submitted on Innovativ's behalf, also repeated the false representation that he had confirmed that TTP8 had discharged the FTE debt held by TBK and Suwyn.

111.134.        Singal, by and through TTP8, retained only 310,000 shares of the original 4,193,684 shares of FTE common stock.

112.135.        While these transfers were taking place, FTE and the Szkaradeks discussed amending the Vision Purchase Agreement to reflect FTE's current circumstances.  For many months, however, Alex Szkaradek refused to amend the agreement until one of his key demands was met – the appointment of Munish Bansal as the CEO of USHR, the real-estate subsidiary of FTE and its main asset.

113.136.        On September 25, 2020, after six months of deliberations and discussions (spearheaded by Ghishan on an almost daily basis, and supported by Goodwin and Cunningham), FTE appointed Munish Bansal as USHR's CEO.[27] [28]

114.137.        On numerous occasions and as part of FTE's overriding "firewall" of Singal, Bansal was expressly directed not to have any contact with Singal, as were other members of the Board and management of FTE, and Bansal repeatedly claimed to understand and comply with this directive.  Nevertheless, FTE recently learned that Singal, Bansal and the Szkaradeks were separately convening calls and exchanging emails through at least December 2020.[29] [30]

---

[27] As part of the fraud and racketeering scheme, Bansal, the Szkaradeks and other co-conspirators – particularly Defendants Cunningham, Ghishan and Goodwin, then members of FTE's board and management – all lied that Bansal had never communicated with Singal, when they all then and there well knew that Singal had identified Bansal and was communicating with him regularly.  Fraud and racketeering – particularly by the "independent" directors of a public company – simply do not get more brazen.

[28] As part of the fraud and racketeering scheme, Bansal, the Szkaradeks and other co-conspirators – particularly Cunningham, Ghishan and Goodwin, then members of FTE's board and management – all lied that Bansal had never communicated with Singal, when they all then and there well knew that Singal had identified Bansal and was communicating with him regularly.  Fraud and racketeering – particularly by the "independent" directors of a public company – simply do not get more brazen.

[29] It is becoming increasingly clear that Defendants Cunningham and Ghishan were also speaking to Singal during all relevant time periods, without disclosing their communications to FTE.

[30] It is becoming increasingly clear that Cunningham and Ghishan were also speaking to Singal during all relevant time periods, without disclosing their communications to FTE.

115.138.     With Bansal's appointment in hand, the Szkaradeks were prepared to resume their discussions with FTE regarding an amendment to the Vision Purchase Agreement.

116.139.     On April 2, 2021, after more than 18 months of negotiations in which Cunningham, Ghishan, Goodwin and Bansal were advocating strenuously for the Szkaradeks, FTE finally executed an amendment to the Vision Asset Purchase Agreement.[31]

117.140.     As with FTE's overriding "firewall" of Singal, the April amendment to the Vision Purchase Agreement also contained an express prohibition on any transfers of FTE stock to Singal, his family members or affiliates.[32]

118.141.     Despite this prohibition, a few months later the Szkaradeks began to do just that – to transfer their FTE stock to Singal and his affiliates, namely his wife, Defendant Ladnier, and Defendant Innovativ (owned and controlled by Defendant Coleman) – though in a way designed to avoid detection.

119.142.     Specifically, on October 7, 2021, Erik Doerring, the Szkaradeks' attorney, informed FTE that the Szkaradeks were transferring the common stock, preferred stock and

---

[31] Several weeks later, Ghishan began negotiations to resign from the FTE board, and a resignation agreement was executed in August 2021.  Similarly, Defendant Goodwin ceased to participate in FTE's board meetings, or in management, shortly after the signing of the April amendment to the Vision Purchase Agreement.  Lastly, Bansal separated from US Home Rentals LLC on April 15, 2021, shortly after this amendment.

[32] Several weeks later, Defendant Ghishan began negotiations to resign from the FTE board, and a resignation agreement was executed in August 2021.  Similarly, Defendant Goodwin ceased to participate in FTE's board meetings, or in management, shortly after the signing of the April amendment to the Vision Purchase Agreement.

promissory notes received in connection with the Vision transaction to Redemption SPV, LLC, a newly formed Wyoming LLC, owned and controlled by the Szkaradeks.[33][34]

~~120.~~143.      On November 12, 2021, FTE received another email from Doerring attaching copies of (i) a common stock purchase and sale agreement, dated November 10, 2021, between the Szkaradeks and Innovativ (owned and controlled by Defendant Coleman) (the "Innovativ Agreement"), to which Singal and TTP8 transferred 500,000 FTE shares in May 2020, and (ii) a membership interest purchase agreement, dated November 10, 2021, between the Szkaradeks and EEME LLC, an entity controlled by Defendant Majique Ladnier, Singal's wife (the "Ladnier Agreement").[35]").[36]

---

[33] On October 22, 2021, FTE received an email from Doerring attaching the memorialized agreement between the Szkaradek's and the FC REIT in connection with the transfer of 11,031,688 shares to the FC REIT, as required in the April amendment to the Vision Purchase Agreement.  However, as of today, the transfer of these shares from the Szkaradeks to the FC REIT has not occurred – to the contrary, Singal, the Szkaradeks and other co-conspirators named herein are refusing to turn over the shares designated for the earliest known victims of Singal's fraud and racketeering, the shareholders of the FC REIT.  In fact, as set forth throughout this complaint, Singal, the Szkaradeks and other co-conspirators continue to exercise control over these shares as if they were their own.

[34] On October 22, 2021, FTE received an email from Doerring attaching the memorialized agreement between the Szkaradek's and the FC REIT in connection with the transfer of 11,031,688 shares to the FC REIT, as required in the April amendment to the Vision Purchase Agreement.  However, as of the filing of the original Complaint, the transfer of these shares from the Szkaradeks to the FC REIT had not occurred – to the contrary, Singal, the Szkaradeks and other co-conspirators named herein refused to turn over the shares designated for the earliest known victims of Singal's fraud and racketeering, the shareholders of the FC REIT.  In fact, as set forth throughout this complaint, Singal, the Szkaradeks and other co-conspirators continued to exercise control over these shares as if they were their own.

[35] Doerring had represented the Szkaradeks in connection with the April amendment to the Vision Purchase Agreement just several months earlier and actively participated in the drafting of the documents and negotiation of all relevant terms and provisions.  Without any doubt, Doerring was keenly aware of the express prohibition on transfers to Singal and his affiliates.  He was keenly aware of the Singal "firewall" policy underlying that prohibition.  And above all, Doerring knew there was a court-ordered prohibition on any transfers of the Szkaradeks' Vision transaction consideration as a result of applicable litigation with the Pennsylvania AG.

[36] Doerring had represented the Szkaradeks in connection with the April amendment to the Vision Purchase Agreement just several months earlier and actively participated in the drafting of the documents and negotiation of all relevant terms and provisions.  Without any doubt, Doerring was keenly aware of the express prohibition on transfers to Singal and his affiliates.  He was keenly aware of the Singal "firewall" policy underlying that prohibition.  And above all, Doerring knew there was a court-ordered prohibition on any transfers of the Szkaradeks' Vision transaction consideration as a result of applicable litigation with the Pennsylvania AG.

121.144.      The Innovativ Agreement purported to transfer 11,031,688 shares of FTE common stock to Innovativ in exchange for 7,545,600 units of membership interest of CF RE-CPC SPV II LLC, a Wyoming entity owned by Innovativ.

122.145.      The Ladnier Agreement purported to transfer the promissory notes and preferred stock in exchange for 1,454,400 units of membership interest of CF RE-CPC SPV II LLC, the same Wyoming entity owned by Ladnier, EEME LLCInnovativ.

123.146.      As Singal, the Szkaradeks and their co-conspirators (and even their attorneys) there and then well knew, these transfers and agreements violated several provisions of law including, among other things: (i) the Singal prohibition under the amended Vision Asset Purchase Agreement; and (ii) a Pennsylvania court order which enjoined the Szkaradeks from transferring or otherwise disposing of the consideration received in connection with the Vision Asset Purchase Agreement.  What is more, as hindsight now shows, these transfers were part of SingalSingal's, the Szkaradeks' and the other co-conspirators' fraud and racketeering conspiracy to illegally take control of FTE.

124.147.      Just a few weeks after the purported, fraudulent transfers of FTE stock and debt, on December 21, 2021 FTE received a letter from Barry Kazan, an attorney representing Defendant Thomas Coleman, the CEO of Defendant Innovativ, one of Singal's original transferees, demanding to inspect FTE's books and financial records.  FTE informed Mr. Kazan that, upon advice from FTE's Nevada counsel, Defendant Coleman was not entitled to inspect FTE's financial records given his holdings fell below 1% of FTE's issued and outstanding stock.

148.   In an effort to circumvent this decision, Coleman, through his attorney, misrepresented to FTE on January 18, 2022 that it had acquired the 11,031,688 shares of FTE common stock, originally intended to be given to the FC REIT, from the Szkaradeks.

~~125.~~149.        Just over a month later, on February 3, 2022, it became abundantly clear that Innovativ, Singal, his other affiliates, the Szkaradeks, and their co-conspirators, including their appointees to the Board and management of FTE, had been working together – in secret – all along.

~~126.~~150.        Specifically, FTE received a letter from Defendant Innovativ's Nevada counsel (who has ~~since confirmed that he~~ also ~~represents~~represented Singal and the Szkaradeks), containing a written consent purporting to amend FTE's bylaws.  The 17 signatories to this purported written consent included Singal, the Szkaradeks and all their aforementioned (attempted or purported) transferees and co-conspirators, as follows:

a.  Majique Ladnier (signing in her individual capacity);
b.  Danish Mir (signing in his individual capacity);
c.  Khawaja Zargham bin Aamer (signing in his individual capacity);
d.  First Capital Master Advisor, LLC (signed by Singal in his capacity as Manager);
e.  Alex Szkaradek (signing in his individual capacity);
f.  Antoni Szkaradek (signing in his individual capacity);
g.  Stephen Goodwin (signing in his individual capacity);
h.  Peter Ghishan (signing in his individual capacity);
i.  Joseph Cunningham (signing in his individual capacity);
j.  TTP8, LLC (signed by Majique Ladnier in her capacity as an authorized signatory);
k.  Innovativ Media Group, Inc. (signed by Thomas Coleman in his capacity as CEO); and
l.  Chris Ferguson, from whom Singal and TTP8 first acquired FTE common stock through the aforementioned conversion of unsecured debt (an unsigned signature block~~).~~).[37]

~~127.~~151.        Notably, the shareholders signing the written consent claimed to speak for, and thereby exercise control over, the 11,031,688 shares designated for the initial victims of Singal's fraud and racketeering, the shareholders of the FC REIT.  But in fact, the FC REIT

---

[37] Ferguson has testified that he never gave any indication to the Defendants that he supported their proposed changes to FTE's bylaws.  Ex. H ¶ 9.  Ferguson's participation in the scheme was solicited by Defendant Coleman, who circulated a copy of the proposed bylaw amendments to Ferguson, but Ferguson declined to sign the document. *Id*. ¶¶ 10-13.

categorically and vehemently denies any participation in the written consent and claims that its FTE shares ~~are being~~were used without its authorization and unlawfully – yet another act of fraud by these unrepentant fraudsters.~~38~~ 39

152.   Indeed, the Szkaradeks would continue to wrongly withhold transferring the 11,031,688 FTE shares they were obligated to "immediately" transfer to FC REIT upon the closing of the Vision Purchase Agreement for over a year.

153.   Ultimately, the Szkaradeks' malfeasance forced FTE's hand and on or about November 7, 2022, FTE rectified the Szkaradeks' breach by agreeing to transfer ownership of 11,031,688 FTE shares to FC REIT in accordance with the clear intent of the Vision Purchase Agreement.

~~128.~~154.      Immediately upon receiving the written consent, the general counsel for FTE sent an email to Defendant Cunningham, a current director, asking him how his signature appeared on the written consent, and other FTE personnel also confronted him.

~~129.~~155.      Cunningham admitted that he had been speaking with Defendant Coleman of Innovativ, and it became unmistakably clear that he had been passing highly confidential information to Singal, Coleman, the Szkaradeks and other co-conspirators~~.~~, including FTE's intention in late 2021 to sue Singal, the Szkaradeks and, possibly, Innovativ, as well as FTE's intention to prepare defenses to prevent the very takeover Defendants were planning. Ex. G ¶ 13.

156.   Cunningham's divulgence of this highly confidential information to Coleman spurred Coleman and the other Defendants to immediately put the coup into action by passing the

---

38 ~~The FC REIT is attempting to intervene in ongoing litiations in Pennsylvania and Nevada in order to stop Singal, the Szkaradeks and their co-conspirators from using the 11,031,688 shares designated for the FC REIT, as their own. The FC REIT will likely seek to join in this action as well.~~

39 The FC REIT has at times attempted to intervene in ongoing litigations in Pennsylvania and Nevada in order to stop Singal, the Szkaradeks and their co-conspirators from using the 11,031,688 shares designated for the FC REIT, as their own. The FC REIT will likely seek to join in this action as well.

*ultra vires* amendments to FTE's bylaws under the color of representing a majority of FTE's shares, notwithstanding the fact that this supposed "majority" included the 11,031,688 shares that belonged to FC REIT under the Vision Purchase Agreement.

157.    Absent inclusion of these 11,031,688 FC REIT Shares that Defendants fraudulently attempted to vote to advance their conspiracy to take over FTE, not to mention other shares held by the signatories that were acquired in violation of the Vision Purchase Agreement and/or by Singal's fraudulent representation that he had retired FTE's debt held by Suwyn and TBK, the Defendants in no way constituted a majority of FTE's shareholders.

~~130.~~158.        Similarly, in a March 17, 2022 affidavit submitted in a related litigation in Nevada, Defendant Coleman himself lays the fraud and racketeering conspiracy bare, admitting in his sworn statement that Cunningham – a sitting director of FTE – had been passing through highly confidential information to other members of the conspiracy~~.~~, such as FTE's intention on defending itself from Defendants' conspiracy through adopting what Cunningham referred to as a "poison pill." *See* Ex. G.

~~131.~~159.        It is now unmistakably clear that Singal, the Szkaradeks, Cunningham, Ghishan, Goodwin and Coleman, among other co-conspirators, were acting in concert and ~~on behalf~~in furtherance of their brazen fraud and racketeering scheme, much to the detriment of FTE's other shareholders ~~and the countless of their other criminal and tortious acts~~.

160.    What is more, even after all the fraud that was uncovered since the closing of the Vision Purchase Agreement and revelation in March 2023 that Singal and TTP8 fraudulently acquired over 4 million shares of FTE common stock, Defendants, including FTE's own board member Cunningham, are still conspiring to take over the Company.

161.    Specifically, on or about March 11, 2023, Defendants FCMA (with Singal signing on its behalf as CEO), Ladnier, TTP8 (with Ladnier signing as manager), Innovativ (with Coleman signing as President), Goodwin, and Cunningham, along with co-conspirator Alex Szkaradek, attempted to pass a second *ultra vires* amendment to FTE's bylaws such that Defendants and Alex Szkaradek, with their assumed false title as FTE's "controlling shareholders," would have veto authority over any potential insolvency proceeding for FTE and any change in control over FTE. A copy of this March 11, 2023 second *ultra vires* amendments to FTE's bylaws is attached hereto as Ex. J.

162.    Outrageously, Cunningham, despite knowing that this purported "controlling shareholder" group had obtained virtually all of their shares of FTE common stock through fraud in connection with the Vision Purchase Agreement and the false representation that TTP8 had discharged the debt held by TBK and Suwyn, continues to align with these conspirators in a gross violation of his fiduciary duty owed to FTE.

163.    On or about March 12, 2023, after FTE had learned that Singal and TTP8 had defrauded FTE by falsely representing that TTP8 had discharged the millions of FTE debt held by TBK and Suwyn, FTE's board—consisting of Beys, de Silva and Cunningham—met to vote on cancelling the 4,193,684 shares of FTE common stock given to TTP8 as part of the fraud.

164.    In furtherance of Defendants' conspiracy to unlawfully take control over FTE, Cunningham—despite having definitive proof that Singal and TTP8 had lied about cancelling FTE's debt—abstained from voting in favor of cancelling the issuance of the 4,193,684 shares of FTE common stock given to TTP8.

165.    Singal's federal criminal trial in the unrelated fraud matter is scheduled for April 1, 2024, in the U.S. District Court for the Eastern District of California.

## FIRST CAUSE OF ACTION
### (RICO:  18 U.S.C. § 1962)

~~132.~~166.        Plaintiff repeats and re-alleges the allegations of each of the foregoing

paragraphs.

### A.     The Unlawful Activity

~~133.~~167.        The Enterprise consists of a series of associated-in-fact entities whose

common purpose is to defraud innocent private and public investors out of money using the means

of wire and mail fraud.  The Enterprise is controlled and manipulated by Singal.  As demonstrated

by Singal's recent indictment for mail and wire fraud, the existence of the Enterprise began by at

least 2017 and continues through today.

### B.     Culpable Person

~~134.~~168.        Singal is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18

U.S.C. § 1962(c) in that he is an individual capable of holding a legal interest in property.

~~135.~~169.        At all relevant times Singal was, and is, a person that exists separate and

distinct from the Enterprise.

~~136.~~170.        Singal is the mastermind of the Enterprise.

### C.     The Enterprise

~~137.~~171.        Singal and ~~TTP 8, First Capital Advisor~~TTP8, FCMA, and Innovative ("the

Companies") constitute an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

~~138.~~172.        Singal and the Companies are associated in fact and through relations of

ownerships for the common purpose of carrying on an ongoing unlawful enterprise through a

common scheme designed to defraud both private and public investors.

~~139.~~173.        The Enterprise's conduct constitutes "fraud by wire" and "fraud by mail"

within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C.

1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

~~140.~~174.    Singal and the Companies have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of defrauding investors as follows:

     **i.    Suneet Singal**

~~141.~~175.    Singal is the mastermind of the Enterprise.  He is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which fraudulent schemes the Enterprise will devise, how the schemes will be performed, which of the Companies will participate and how the proceeds of the unlawfully obtained funds will be disbursed among the Enterprise members, including to Singal himself.

~~142.~~176.    In his capacity as the mastermind of the Enterprise, Singal is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes.

~~143.~~177.    Singal has taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise, including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to take unlawful actions, and executing legal documents in support of the Enterprise.

~~144.~~178.    Singal has ultimately benefited from the Enterprise's funneling of the unlawfully obtained proceeds to the Companies and Singal further benefits from the receipt of distributions and commissions by the Companies.

    ii.    **TTP8**

145.179.      TTP8 maintains officers, books, records, and bank accounts independent of Singal and the other Enterprise members.  TTP8 is owned on paper by Singal and his wife, Majique Ladnier.

146.180.      Directly and through Singal and its other agent employees, TTP8 has been an active participant and central person in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's scheme to defraud investors.  TTP8 has been and continues to be responsible for acting as a conduit to funnel and disguise unlawfully obtained funds and proceeds of the Enterprise.

181.    In this case TTP8 was the entity used by Singal to fraudulently represent to FTE that TTP8 had discharged approximately $3,900,000 of FTE's debt held by TBK and Suwyn in October 2019.

147.182.      After fraudulently acquiring FTE stock, TTP8 was used to funnel: (i) 4,193,684 shares of FTE (which amounted to approximately 20% of the outstanding shares of FTE) to itself in late 2019 by way of conversion of unsecured promissory notes; (ii) 702,000 shares of FTE to Defendant Khawaja Zargham bin Aamer in May 2020 (a TTP8 employee); (iii) 891,566 shares of FTE to Defendant Danish Mir in May 2020; (iv) 1,790,118 shares of FTE to Singal's wife, Defendant Majique Ladnier, in May 2020; and (v) 500,000 shares of FTE stock to Defendant Innovativ in May 2020.

183.    TTP8 has also used its ill-gotten shares of FTE to attempt to pass *ultra vires* amendments to FTE's bylaws, along with the other Defendants and co-conspirators, on both February 3, 2022, and March 11, 2023, such that the Defendants and their co-conspirators would unlawfully take control over FTE.

148.184.        TTP8 ultimately benefits from the Enterprise's unlawful activity by receiving proceeds from the Enterprise's unlawful schemes.

### iii.    Innovativ

149.185.        Innovativ maintains officers, books, records, and bank accounts independent of Singal and the other Enterprise members.  It is owned on paper by Defendant Thomas Coleman.

150.186.        Directly and through Singal and its other agent employees, Innovativ has been an active participant and central person in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's scheme to defraud investors.  Innovativ has been and continues to be responsible for acting as a conduit to funnel and disguise unlawfully obtained funds and proceeds of the Enterprise.

151.187.        In this case, Innovativ was used to: (i) acquire 500,000 shares of FTE stock for the Enterprise in May 2020; (ii) purportedly acquire 11,031,688 shares of FTE common stock for the Enterprise on November 10, 2021; (iii) send a records demand letter to FTE via U.S. Mail on December 21, 2021; and (iv) execute a purported amendment to FTE's bylaws on February 3, 2022; and (v) execute a second purported amendment to FTE's bylaws on March 11, 2023.

152.188.        Innovativ ultimately benefits from the Enterprise's unlawful activity by receiving proceeds from the Enterprise's unlawful schemes.

### iv.    First Capital Master Advisor ("FCMA")

153.189.        FCMA maintains officers, books, records, and bank accounts independent of Singal and the other Enterprise members.  On information and belief, it is controlled by Singal.

154.190.        Directly and through Singal and its other agent employees, FCMA has been an active participant and central person in the operation and management of the Enterprise and

its affairs, and in the orchestration, perpetration, and execution of the Enterprise's scheme to defraud investors. FCMA has been and continues to be responsible for acting as a conduit to funnel and disguise unlawfully obtained funds and proceeds of the Enterprise.

155.191.     In this case, FCMA was used to: (i) acquire 308,305 shares of FTE stock for the Enterprise; and (ii) execute a purported amendment to FTE's bylaws on February 3, 2022; and (iii) execute a second purported amendment to FTE's bylaws on March 11, 2023.

156.192.     FCMA ultimately benefits from the Enterprise's unlawful activity by receiving proceeds from the Enterprise's unlawful scheme.

**D.     Engagement in Interstate Commerce.**

157.193.     The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

158.194.     Specifically, the members of the Enterprise maintain offices in California, Utah and Nevada, and use personnel in those offices to further the affairs of the Enterprise involving investor victims throughout the United States via the extensive use of interstate emails, telephone calls, wire transfers and bank withdrawals processed electronically. The members of the Enterprise also use interstate mail to further the common goals of the Enterprise.

159.195.     In the present case, all communications between the Enterprise and Plaintiff were by interstate email, telephone calls, wire transfers or other interstate wire communications. Specifically, the Enterprise used interstate emails and telephone calls to originate, transfer, and collect upon the unlawful proceeds, consisting of, among other things, securities, stock, and cash.

**E.     Causation and RICO Injury**

160.196.     FTE has and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

161.197.     The injuries to FTE directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(c) include, but are not limited to, the loss of its stock, monetary damages on monies paid to the Enterprise, diminution in value of its business, loss of goodwill, and opportunity costs due to the lost value of its money and stock.

162.198.     Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants'Singal's criminal activities.

163.199.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages, plus costs and attorneys' fees from DefendantsSingal.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

164.200.     Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

165.201.     Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

166.202.     By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the affairs of the Enterprise, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to engage in a pattern of mail and wire fraud in violation of 18 U.S.C. § 1962(c).

167.203.         Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire and mail fraud in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to defraud private and public investors across the nation.

168.204.         Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire and mail fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

169.205.         The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

170.206.         By way of specific facts establishing the conspiracy among Defendants:

**Suneet Singal/Majique Ladnier/TTP8/FCMA:**

   i.   10/22-/19-10/23/19 – Singal is present at the first (and only in person) meetings of the new FTE board, along with his associates, in New York, NY;

   ii.  10/22/19 – At Singal's direction, the FTE Board appoints Cunningham and Ghishan as "independent" directors and also Goodwin as interim CEO of FTE, with Singal effectively controlling three fifths of FTE's board;

   iii. 10/22/19 – Singal induces the FTE board (which he controlled) to allow him to acquire approximately 20% of the company's common stock through a transaction approved on the same day, by falsely representing to the board that he had extinguished certain debt held by TBK and Suwyn in the form of promissory notes;

   iv.  10/22/19 – Singal introduces the Vision transaction to the board (which he controlscontrols) of FTE of which he is a 20% shareholder;

   v.   12/11-12/19 – Singal's appointee as Interim CEO, Stephen M. Goodwin, steps down because of the improper share issuance to Singal, and is replaced by Michael Beys.  Singal and TTP8 again represent that they had extinguished the debt held by TBK and Suwyn in order to fraudulently acquire millions of shares of F;

vi.     12/16/19 – Singal is charged by the SEC in an unrelated securities fraud scheme for selling real estate assets he did not own;

vii.    12/17/19 – the improper share transfer to Singal is the impetus for the NYSE commencing delisting proceedings against FTE;

viii.   12/17/19 – FTE institutes a Singal "firewall," prohibiting FTE's board and management from having any business dealings with Singal, including as to the Vision transaction;

ix.     12/30/19 – Singal-originated Vision real estate portfolio is sold to FTE and involves numerous fraudulent misrepresentations about the status of the portfolio;

x.      4/17-5/19/20 – Singal's entity TTP8 purports to transfer 500,000 shares of FTE stock to Innovativ Media Group (owned and controlled by Defendant Coleman), for which attorney Ronald J. Logan provides the legal opinion (4/17/20);

xi.     7/13/21 – Singal enters into a consent judgment with the SEC, agreeing to a 10-year bar from the securities industry and approximately $7M in restitution payments;

xii.    2/3/22 – Singal orchestrates a purported amendment of FTE's bylaws through Innovativ's Nevada counsel by signing on behalf of FCMA as its CEO, and is joined by his wife Ladnier singing on behalf of TTP8;

xiii.   4/7/22 – Singal is indicted by for a separate wire and mail fraud scheme, and the indictment is unsealed on 4/18/22;
        –

xiv.    3/11/23 – TTP8, with Ladnier singing on its behalf as manager, and FCMA (with Singal singing on its behalf as CEO) orchestrate and attempt a second purported amendment of FTE's bylaws.

**Steven M. Goodwin, ex Interim CEO of FTE**

i.      2/9/16 – Goodwin has long-standing ties to Singal, having been his partner in the controversial Township Nine project in Sacramento, CA (https://www.prnewswire.com/news-releases/first-capital-real-estate-trust-incorporated-acquires-92-interest-in-a-78-million-development-site-300217220.html);

ii.     1/31/19 – Goodwin is named as trustee of an unrelated Singal Trust, with a recent litigant noting that he is a "friend and business partner of Singal" (https://casetext.com/case/red-lion-hotels-franchising-inc-v-first-capital-real-estate-invs-2);

iii.   10/22-23/19 – Goodwin is present at the first (and only in person) meeting of the new FTE board, in New York, NY;

iv.   10/22/19 – Goodwin is named interim CEO of FTE, and controls 3/5ths of the FTE board along with his close friends Cunningham and Ghishan; (his bio was forwarded to FTE on 10/18/19 by Defendant Aamer, the Director of Strategy of Defendant FCMA);

v.   10/22/19 – Goodwin causes FTE, as the new board's first order of business, to approve a transaction whereby Singal and TTP8 are set to acquire 20% of the company's common stock;

vi.   10/22/19 – Goodwin starts to promote the Vision transaction to FTE and to advocate on behalf of the Szkaradeks – continuously – until April 2021 when the transaction is formally amended;

vii.   11/15/2019 – Goodwin unilaterally approves the transfer of 5,468,379 shares of FTE common stock to TTP8 based on Singal's and TTP8's false representation that TTP8 had discharged the approximately $3,900,000 debt held by TBK and Suwyn, and did so without notice or approval of FTE's board;

~~vii.~~viii.   12/11/19 –Goodwin steps down as interim CEO after it is discovered that the Singal share acquisition transaction violated NYSE rules;

~~viii.~~ix.   12/11/19 – Goodwin remains as Executive Vice President of Operations of FTE and is invited to all FTE board meetings as an observer until approximately April or May 2021;

~~ix.~~x.   12/17/19 – Goodwin is subject to the Singal "firewall" policy, prohibiting FTE's board and management from having any business dealings with Singal, including as to the Vision transaction, though he fraudulently conceals repeated violations of it;

~~x.~~xi.   12/30/19 – Singal-originated Vision real estate portfolio, which Goodwin supports and advocates for, is sold to FTE and involves numerous fraudulent misrepresentations about the status of the portfolio;

~~xi.~~xii.   1/20 – Goodwin's main role starting in 2020 and through the first quarter of 2021 is to negotiate *on behalf of FTE* with the Szkaradeks, though in fact, with the benefit of hindsight, the opposite occurs and Goodwin's sole motivation is to advance the goals and interests of Singal, the Szkaradeks and the fraud and racketeering conspiracy (fraudulently concealing that he was speaking with Singal);

~~xii.~~xiii.   2/12/21 – Goodwin is issued 250,000 shares of FTE common stock pursuant to his employment agreement;

xiii.xiv.   04/ 21 – Goodwin continuously attends FTE board meetings as an observer up until this point, with the signing of the Second Amendment to the Vision Purchase Agreement;

xiv.xv.   2/3/22 – Goodwin is a signatory to the purported bylaws amendment, sent through Innovativ's Nevada counsel;

xv.xvi.   3/16/22 – Goodwin's employment is formally terminated;

**Joseph F. Cunningham, current director of FTE, and Peter Ghishan, ex director of FTE**

i.   9/20/14 – Ghishan, an attorney, is the registered agent in Nevada for First Capital Partners LLC (part of the family of Singal's First Capital companies), which he co-manages with Singal, using the same address (https://www.bizapedia.com/nv/first-capital-partners-llc.html);

ii.   10/18/19 – Cunningham and Ghishan, both of whom had long-standing ties to Singal, are appointed to the FTE board on Singal's recommendation (https://d1io3yog0oux5.cloudfront.net/_ec27a35eced2f2e95bb2e8193e18aed2/ftenet/news/2019-10-18_FTE_Networks_Receives_Notice_of_Noncompliance_159.pdf);

iii.   10/22-23/19 – Cunningham and Ghishan are present at the first (and only in person) meetings of FTE's new board in New York, NY, and vote in favor of all Singal-related matters on that date, including the appointment of Goodwin as interim CEO, the Singal acquisition of FTE common shares transaction and the decision to pursue the Vision purchase transaction;

iv.   12/17/19 – Cunningham and Ghishan are subject to the Singal "firewall" policy, prohibiting FTE's board and management from having any business dealings with Singal, including as to the Vision transaction, though they fraudulently conceal repeated violations of it;

v.   12/30/19 – Singal-originated Vision real estate portfolio, which Cunningham and Ghishan support and advocate for, is sold to FTE and involves numerous fraudulent misrepresentations about the status of the portfolio;

vi.   1/20 – Almost immediately from the start of 2020, Cunningham and Ghishan, along with Goodwin as a shadow director, control the board of FTE and, with the benefit of hindsight, clearly seek to advance the interests of the RICO enterprise and the goals of the conspiracy over the interests of any other constituency; among other things, they seek to infiltrate the management of FTE by hiring Munish Bansal, fraudulently concealing the fact that Singal had identified and recommended him; they seek to gain more FTE shares on behalf

of Singal and other members of the conspiracy; they advocate exclusively for the interests of the Szkaradeks whose Vision transaction was at the heart of the fraud and racketeering conspiracy; they unlawfully seek to recuse another director from all FTE board decisions, at the behest of Singal and the Szkaradeks; and finally, they continuously seek to put FTE and all its subsidiaries into bankruptcy even when there is no legitimate interest in, or legal basis to, do so;

vii.   1/30/20 – Email correspondence shows that Munish Bansal has first contact with Singal;

viii.  2/20 – Cunningham and Ghishan promote Munish Bansal as future CEO of FTE, fraudulently concealing that Singal has identified and recommended him and stating instead that they and Alex Szkaradek have identified him;

ix.    3/25/20 – Ghishan email describes his conversation with Bansal, saying he would be a "good fit;"

x.     4/16/20 – Email ~~correspondece~~correspondence shows Singal reaching out to an FTE shareholder about Bansal (and forwarding the underlying 1/30/20 email to him);

xi.    4/17/20 – Cunningham and Ghishan are privy to and support Singal and TTP8's transfer of 500,000 shares of FTE common stock to Defendant Innovativ (owned and controlled by Defendant Coleman), for which attorney Ronald J. Logan provides the legal opinion (4/17/20);

xii.   9/25/20 – Bansal's employment commences after months of advocacy by Cunningham, Ghishan and Goodwin;

xiii.  10/1/20 – Bansal's employment announced on Form 8K. (https://www.sec.gov/Archives/edgar/data/1122063/000149315220018679/form8-k.htm); in his short time, Bansal works almost exclusively to advance the interests of Singal, the Szkaradeks and the fraud and racketeering conspiracy and manages to fire employees not loyal to them, namely Eric Taylor, among myriad other acts designed to sabotage the company;

xiv.   11/ /20 – Cunningham, Ghishan and Goodwin (and at times Bansal) begin to negotiate an amendment of the initial Vision transaction, always seeking to recuse other FTE directors and advocating for the interests of the Szkaradeks and other members of the conspiracy over those of other FTE shareholders;

xv.    2/12/21 – Cunningham and Ghishan are issued 150,000 shares of FTE common stock each, which they would later contribute to Defendants' attempt to take over FTE by joining the other Defendants in making *ultra vires* amendments to FTE's bylaws;

xvi.    4/2/21 – The Second Amendment to Vision Purchase Agreement is signed, after months of negotiations by Cunningham, Ghishan and Goodwin on behalf of the ~~the~~ Szkaradeks and other members of the conspiracy;

xvii.    4/15/21 – Bansal's separation is announced (https://www.sec.gov/Archives/edgar/data/1122063/000149315221009575/form8-k.htm);

xviii.    5/3/21 – Cunningham, Ghishan and Goodwin, on their own initiative, organize meeting with potential Nevada bankruptcy counsel for FTE, which only they attend, where they and Harris advocate to put FTE, and all its subsidiaries, into bankruptcy, despite there being no legitimate interest in, or legal basis to, do so; (Cunningham continues to advocate for bankruptcy even after countless attorneys and other advisors counsel against it);

xix.    7/13/21 – After months of Cunningham, Ghishan and Goodwin stating that Singal was about the settle with the SEC on very favorable terms, Singal enters into a consent judgment with the SEC, agreeing to a bar from the securities industry and approximately $7M in restitution payments;

xx.    8/25/21 – Ghishan resigns from FTE board pursuant to separation agreement (attached);

xxi.    11/10/21 – Cunningham, the last of the three initial co-conspirators remaining on the board, is told of the Szkaradeks' attempts to transfer their FTE common shares, preferred equity and promissory notes to other members of the conspiracy, namely, Defendant Innovativ and Defendant Majique Ladnier (Singal's wife);

xxii.    12/21/21 – Cunningham is told of Innovativ's demand to inspect FTE's books and records;

xxiii.    1/ 22 – Starting in early 2022, Cunningham is aware that FTE is preparing to sue Singal and the Szkaradeks (and possibly Innovativ) and to erect defenses to any countersuit and discloses these facts to Tom Coleman, Innovativ's President, and other members of the conspiracy;

xxiv.    1/28/22 – Cunningham participates in a highly confidential FTE board call where litigation with Singal, the Szkaradeks and other members of the conspiracy is discussed and discloses this highly confidential information to Coleman and other members of the fraud and racketeering conspiracy, as Cunningham himself admits on February 3, 2022 and Coleman also admits in a sworn affidavit on March 17, 2022;

xxv.    2/3/22 – Cunningham and Ghishan are signatories to the purported bylaws amendment, sent through Innovativ's Nevada counsel;

xxvi.    3/11/23 – Cunningham joins co-Defendants and co-conspirators FCMA (controlled by Singal), Innovativ (controlled by Ladnier), TTP8 (signed on behalf of Ladnier), Alex Szkaradek and Goodwin to purportedly pass amendments to FTE's bylaws, despite Cunningham's then-detailed knowledge of the fraud these co-signors employed to obtain the millions of FTE shares that were used to purportedly pass these bylaws; and

xxvii.    3/12/23 – FTE's board, consisting of Cunningham, Beys and de Silva, have a meeting to discuss and vote on cancelling the more than 4.1 million shares FTE transferred to TTP8 upon discovery that Singal's and TTP8's representation they had cancelled FTE's debt held by TBK and Suwyn was false. Despite full knowledge of this fraud, Cunningham voluntarily abstains from voting to cancel the shares issued to TTP8 as a result of the fraud.

**Innovativ/Tom Coleman Fraudulent Conduit for Singal**

i.    4/12/19 – Tom Coleman, President of Innovativ, has preexisting relationship with Singal, as shown in an LOI's Notices provision (https://contracts.justia.com/companies/global-tech-industries-group-inc-6687/contract/66625/);

ii.    4/17-5/19/20 – Innovativ and Coleman receive 500,000 FTE common shares from Singal's entity TTP8, for which attorney Ronald J. Logan provides the legal opinion;

iii.    11/10/21 – Innovativ and Coleman attempt to receive 11,031,688 shares from the Szkaradeks as a part of a series of transactions also involving Singal's wife, Defendant Majique Ladnier, and all of the Szkaradeks' common and preferred equity and debt of FTE;

iv.    12/21/21 – Innovativ and Coleman make demand to inspect FTE's books and records;

v.    1/18/22 – Coleman, through his attorney, falsely represents to FTE that his company IMG had acquired 11,031,688 shares of FTE common stock from the Szkaradeks—the very shares the Szkaradeks were to "immediately" transfer to the FC REIT as part of the Vision Purchase Agreement—in an unlawful attempt to gain access to FTE's books and records.

vi.    1/22 – Coleman solicits Ferguson to sign onto the Defendants' *ultra vires* amendments to FTE's bylaws, but Ferguson refuses;

~~v.~~vii.    1/22 – As set forth in Coleman's March 17, 2022 affidavit, Innovativ and Coleman receive highly confidential information from Cunningham from FTE's board meeting in mid-January 2022, including one meeting in particular on

January 28, 2022, forming the basis for the purported bylaws amendment 4 business days later;

vi. viii.    2/3/22 – Innovativ, speaking for purported majority of FTE shareholders, purports to amend FTE's bylaws to prohibit certain corporate acts, which Cunningham, a sitting FTE director and co-conspirator who had been privy to FTE's highly confidential decision-making, had unlawfully disclosed to him;

vii. ix.    3/17/22 – Coleman provides an affidavit in a related litigation in Nevada, in which he admits that Cunningham provided highly confidential information to him. *See* Ex. H G.

x.    3/11/23 – Coleman, through signing on behalf of Innovativ as its President, joins the co-Defendants and co-conspirators FCMA (controlled by Singal), TTP8 (signed on behalf of Ladnier), Alex Szkaradek, Cunningham and Goodwin to purportedly pass amendments to FTE's bylaws.

**Bruce Fahey**

i.    Fahey has a criminal history of bribery: https://www.buchwaldcapital.com/PDF/McCann_article_Deal_032906.pdf https://www.nytimes.com/1998/03/27/nyregion/bid-rigging-case-engulfs-an-elite-who-built-the-interiors-of-offices.html;

ii.    He is at it again;

iii.    Fahey holds 400,000 shares of FTE common stock pursuant to a purported consulting agreement given to him by Palleschi and Lethem (both of whom are currently under indictment in the Southern District of New York for their own defrauding of investors and embezzlement);

iv.    In late 2019, the FTE board nullified the consulting agreement (and the underlying shares); Fahey was advised of this nullification but has refused to return the shares;

v.    On May 4, 2022, Fahey, in an attempt to extort money from Plaintiff in violation of the Hobbs Act, 18 U.S.C. § 1951, sends the following email to the CEO of FTE, Michael P. Beys (a former Assistant U.S. Attorney for the Eastern District of New York):

"We are shareholders of FTE Networks Inc. FTE has not updated it's required 10ks and10Qs, along with no apparent concern or responsibility for same… Creating, once again, the need for shareholders to suspect new wrongdoings. The promises and projections you made after the acquisition of US Home Rentals, have resulted in nothing, along with no followup, leaving shareholders with no liquid value. The March 25, 2022 communication referenced legal issues and

,once again, provided essentially no details. Is the clawback of [one prior FTE] asset one of those issues? … We have also learned, not from you, but rather from publicly available information, that FTE is defaulting on obligations. Additionally, in Pennsylvania a receiver may be appointed. this ongoing shareholder abuse and complete lack of corporate governance creates an atmosphere of suspicion and we will not be denied accountability. … We, along with of other shareholders. totaling millions of shares, demand financials and a shareholder meeting."

vi.     On May 6, 2022, Fahey, once again in an attempt to extort money from Plaintiff in violation of the Hobbs Act, 18 U.S.C. § 1951, sends the following email to two FTE shareholders threatening them with baseless personal civil litigation:

"You are soon to learn that you are named by the plaintiff in the Nevada lawsuit vs FTE. The term I am told is co conspirator. I believe that is specific to you []. The [Nevada] plaintiff is deep pocketed and planning to take very aggressive and well planned measures to cause the liquidation of FTE . You [] will now be swept up in this and need to defend yourselves in Nevada and everywhere else you will be pursued. i.e. Federal bankruptcy court. This process is also going to have press coverage. Personally, I will have no problem watching you pay for your never-ending defense and continued exposure, including depositions and the press. Actually, I will get a good laugh out of it. … There is however a potential for a global solution ,which will allow you [] to continue with your agreement. … It's fairly simple, [you] must give up all [your] interest in FTE. This would allow the abused shareholders a chance at small recovery through the liquidation process. … My relationship with the [Nevada] plaintiff and my specific skill sets makes this path only available  through me as adviser/ consultant. … If interested , each of you will pay a 250k fee to me. 75k each as deposit the balance at settlement closing. … Otherwise, you guys can continue as defendants and knock the crap out of each other for years to come. I am good either way."

vii.    On information and belief, Fahey's extortionate and unlawful threats above were made in conspiracy with, and at the direction of, Singal and other co-conspirators.

~~171.~~207.     Plaintiff has been and will continue to be injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d).

~~172.~~208.     The injuries to the Plaintiff directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, the loss of its stock, monetary damages on monies paid to the Enterprise,

diminution in value of its business, loss of goodwill, and opportunity costs due to the lost value of its money and stock.

~~173.~~209.         Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

~~174.~~210.         Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages, plus costs and attorneys' fees from the Defendants.

**THIRD CAUSE OF ACTION**
**(Fraudulent Inducement and Fraud against Singal)**

~~175.~~211.         Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

~~176.~~212.         Singal in conjunction with the Szkaradeks have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to fraudulently induce Plaintiff into entering into the Vision Purchase Agreement (originally and as amended).

~~177.~~213.         By and through each of the Szkaradeks' business relationships with one another and Singal, their close coordination with one another in the affairs of the Vision portfolio, each knew the status and nature of the Vision portfolio, including liens, encumbrances, and ongoing litigation.  Moreover, through the same connections and coordination, each knew that each other were engaged in a conspiracy to fraudulently induce Plaintiff into the Vision Purchase Agreement (originally and as amended) providing negative equity.

~~178.~~214.         The Szkaradeks, in conspiracy with Singal, agreed to facilitate, conduct, and participate in the conduct, management, or operation of Vision's affairs in order to procure millions of dollars in exchange for a portfolio of extremely compromised properties.  In particular, the Szkaradeks, in conspiracy with Singal, were a knowing, willing, and active participant in Vision and its affairs, and each shared a common purpose, namely, the orchestration, planning,

preparation, and execution of the scheme to solicit and collect upon their fraudulent misrepresentations, including the Purchase Agreement.

179. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of Vision's affairs in order to commit fraud.

180. The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

215. Separate, but in parallel to the Vision Purchase Agreement Fraud, during the October 2019 FTE board meeting, Singal proposed that his company, TTP8, would satisfy or otherwise discharge several million dollars' worth of FTE's pre-existing debt memorialized by various promissory notes held by TBK and Suwyn in exchange for receiving a large amount of FTE's shares.

216. FTE's officers and board, in particular Goodwin, Ghishan and Cunningham, enthusiastically supported this proposal, and on October 22, 2019, FTE's board conditionally approved the deal to exchange shares of FTE common stock in return for TTP8 cancelling approximately $3,900,000 in FTE debt held by TBK and Suwyn.

217. On or about November 15, 2019, Goodwin unilaterally approved the transfer of 5,468,379 shares of FTE common stock to TTP8, doing so without advising or obtaining approval thereof from the FTE board, based on Singal's representation that TTP8 had discharged the debt held by TBK and Suwyn.

218. On or about December 9, 2013, FTE learned of Goodwin's unilateral decision to transfer these shares to TTP8, and subsequently demoted Goodwin, who maintained that the subsequent violation of NYSE's registration and disclosure rules for failing to register and disclose this transfer was a good faith mistake.

219.   On or about December 13, 2019, in reliance on Singal's steadfast representations that TTP8 had discharged the approximately $3,900,000 debt held by TBK and Suwyn, FTE entered into a rescission agreement concerning the prior issuance of 5,468,379 FTE shares to TTP8 and entered into a superseding note exchange agreement ("Note Exchange Agreement") adjusting TTP8's consideration from 5,468,379 FTE shares to 4,193,684 shares of FTE common stock.

220.   As part of this restructured agreement, FTE relied on Singal's and TTP8's representations that they had cancelled FTE's debt held by TBK and Suwyn, which was memorialized in the superseding Note Exchange Agreement.  A copy of the Note Exchange Agreement is attached hereto as Exhibit K.

221.   Singal's representation that his company, TTP8, had extinguished FTE's debt held by TBK and Suwyn was knowingly and intentionally false, as confirmed by declarations from each of these entities' principals which both confirmed that while Singal and TTP8 showed purported interest in discharging FTE's debt, neither transaction between TTP8, on the one hand, and either TBK or Suwyn, on the other, was ever consummated, leaving FTE still fully obligated to the debt held by TBK and Suwyn, respectively.  *See* Exs. H and I.

222.   As a result of Singal's fraud, FTE lost ownership of 4,193,684 shares of its common stock for no consideration.

223.   As described above, Singal and TTP8 would go on to transfer this fraudulently obtained 4,193,684 shares of FTE common stock to other Defendants as part of the broader conspiracy to take over FTE through the passing of *ultra vires* amendments to FTE's bylaws on February 3, 2022, and again on March 11, 2023.

181.224.        Plaintiff has been and will continue to be injured in their business and property by reason of the Defendants'Singal's fraud, in an amount to be determined at trial.

~~182.~~225.      The injuries to Plaintiff were directly, proximately, and reasonably caused by these fraudulent misrepresentations and conspiracy to commit fraud.

~~183.~~226.      Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting ~~Defendants'~~Singal's unlawful activities.

### FOURTH CAUSE OF ACTION
**(Tortious Interference with Contract)**

~~184.~~227.      Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

~~185.~~228.      The Vision Purchase Agreement expressly provides that no FTE stock may be transferred directly or indirectly to Singal, his family members, or his affiliates.

~~186.~~229.      The April 2021 Amendment included a similar prohibition, consistent with FTE's long-standing "firewalling" of Singal because of the SEC's securities fraud charges against him.

~~187.~~230.      Singal was at all relevant times fully aware of these contractual prohibitions and the "firewall."

~~188.~~231.      Despite these clear prohibitions, the Szkaradeks and Singal conspired with each other to tortiously interfere with these contracts by surreptitiously transferring 11,~~-~~031,688 shares of FTE (which were promised to be transferred to the primary victims of Singal's SEC fraud, the shareholders of the FC REIT), to Singal, his family and/or his affiliates through the use of sham Wyoming shell companies, as well as Defendants Innovativ and TTP8.

~~189.~~232.      Specifically, the Szkaradeks, in conspiracy with Singal, have agreed to transfer 11,031,688 of their own FTE common shares to Defendants Innovativ and Coleman, co-conspirators of Singal that are acting in concert with Singal, his family members and/or affiliates.

190.233.      The transfer of these FTE shares is a direct breach of both the Purchase Agreement, the April 20202021 Amendment and the general "firewalling" of Singal resulting from the SEC's serious securities fraud charges against him.

191.234.      If Singal, his affiliates, and family members are not disgorged of these FTE shares and/or enjoined from receiving any further FTE shares, FTE and its shareholders will be irreparably harmed by allowing Singal to possess and/or control a contractually prohibited equity interest in FTE, even though he is currently under a federal indictment for wire and mail fraud, has been banned from the securities industry for a period of ten years, and is prohibited from acting as an officer or director of a public company.  Simply put, Singal and his affiliates must not be allowed to have any association with or control over the affairs of FTE.

### FIFTH CAUSE OF ACTION
**(Breach of Fiduciary Duty as against Goodwin, Ghishan and Cunningham)**

192.235.      Plaintiff repeats and re-alleges the allegations above.

193.236.      As officers and/or directors of FTE, a fiduciary relationship existed between FTE, Goodwin, Ghishan and Cunningham.

194.237.      As officers and/or directors of FTE, the parties had a relationship of trust and confidence whereby Goodwin, Ghishan and Cunningham were bound to exercise the utmost good faith and undivided loyalty toward FTE throughout the relationship.

195.238.      As described in detail above, Goodwin, Ghishan and Cunningham breached their fiduciary duties to FTE.

239.    Specifically, on February 3, 2022, Goodwin and Cunningham breached their fiduciary duties by conspiring with Defendants and other co-conspirators to pass *ultra vires* amendments to FTE's bylaws such that the conspirators would gain effective control over the company.

240.    Then again, on March 11, 2023, Goodwin and Cunningham attempted a second *ultra vires* amendment to FTE's bylaws, joined by Defendants and co-conspirators.

241.    By March 11, 2023, both Goodwin and Cunningham had detailed knowledge that their co-signors of these second *ultra vires* amendments, such as FCMA, TTP8, and Alex Szkaradek, had secured their FTE shares through fraud perpetrated in connection with the Vision Purchase Agreement and Singal's and TTP8's fraudulent representation that it had extinguished FTE's debt held by TBK and Suwyn.

242.    Moreover, during the course of the conspiracy to take over FTE by passing these *ultra vires* amendments to FTE's bylaws, Cunningham divulged highly confidential information to co-conspirators, such as Innovativ's President Coleman, concerning FTE's anticipated litigation against Singal, the Szkaradeks and Innovativ, as well as FTE's intention to prepare defenses to prevent the very takeover Defendants were planning.

243.    Indeed, Innovativ has confirmed as much in its pleadings in a separate lawsuit Innovativ and TTP8 brought against FTE in the District of Nevada, where Innovativ admitted in its amended complaint that Cunnnigham provided Innovativ with highly confidential information.

244.    Cunningham also breached his fiduciary duty of care and loyalty by refusing to join fellow board members, Beys and de Silva, in voting to cancel the transfer of the of 4,193,684 FTE shares to TTP8 during the board meeting and vote thereon on March 12, 2023.

245.    At the time of the March 12, 2023, as Cunningham knew, FTE had gotten confirmation from both TBK and Suwyn that TTP8 had not, contrary to Singal's and TTP8's representations to the board over the course of October through December 2019, and in the Note Exchange Agreement, retired the FTE debt as it promised.

246.    Nevertheless, Cunningham refused to join his fellow board members in voting to cancel TTP8's ownership of the 4,193,684 FTE shares it had fraudulently acquired for no justification other than to further advance the conspiracy to take over FTE.

~~196.~~247.    As a direct result of these breaches of fiduciary duty, FTE was proximately damaged by, among other things, the loss of its stock, monetary damages on monies paid to Defendants, diminution in value of its business, loss of goodwill, and opportunity costs due to the lost value of its money and stock.

~~197.~~248.    In addition, FTE has suffered damages by incurring attorneys' fees and costs associated with the breaches of fiduciary duty.

### SIXTH CAUSE OF ACTION
### (Breach of Contract Against TTP8)

249.    Plaintiff repeats and re-alleges the allegations above.

250.    On or about October 22, 2019, Singal proposed to FTE's board that his company, TTP8, would be willing to cancel approximately $3,900,000 of FTE's debt, held by TBK and Suwyn, in exchange for receiving a large amount of FTE's common stock, which the board conditionally approved.

251.    On or about November 15, 2019, Goodwin, acting unilaterally and without advising or obtaining approval from FTE's board, issued 5,468,379 shares of FTE common stock to TTP8, based on representations by TTP8 and Singal that TTP8 had retired the aforementioned debt.

252.    On or about December 9, 2019, FTE's board learned of Goodwin's unilateral decision, which he protested was made in good faith, and self-reported this violation of NYSE registration and disclosure rules to the NYSE.

253.    Thereafter, on or about December 13, 2019, based on Singal's and TTP8's continuing representation that TTP8 had discharge the aforementioned debt held by TBK and

Suwyn, FTE and TTP8 entered into a valid and binding modified note exchange agreement (the "Note Exchange Agreement"). Ex. K.

254.    Pursuant to the Note Exchange Agreement, TTP8 represented that:

TTP8 is the holder, by purchase and assignment, of (i) a promissory note dated December 8, 2016 issued by [FTE] to Suwyn Investments LLC, with an aggregate of $3,339,365 of principal and accrued interest outstanding as of November 3, 2019 (as amended to date, the '***Suwyn Note***') and (ii) three promissory notes issued by [FTE], or issued by a subsidiary of [FTE] and guaranteed by [FTE], payable (either as the original payee or by assignment) to [TBK] 327 Partners, LLC, issued on January 23, 2014, May 16, 2014 and July 11, 2017, respectively, with an aggregate of $580,000 of principal and accrued interest outstanding as of November 8, 2019 (as amended to date, the '***327 Notes***,' and together with the Suwyn Note, the '***Promissory Notes***').

*****
**4.3 Title to Promissory Notes**.  TTP8 has good and marketable title to the Promissory Notes and has not sold, transferred, conveyed, pledged, encumbered or otherwise disposed of any of the Promissory Notes, or any interest in the Promissory Notes, and not third party has any claim of any nature with respect to the Promissory Notes.

Ex. K at 1, § 4.3 (emphasis in original).

255.    The Note Exchange Agreement further provided that "TTP8 agrees to surrender to [FTE] for cancellation the Promissory Notes in exchange for Four Million One Hundred Ninety-Three Thousand Six Hundred Eighty-Four (4,193,684) shares of Common Stock." *Id*. at 1-2.

256.    On or about December 13, 2019, FTE performed its obligations under Note Purchase Agreement by emailing issuance instructions to its then-transfer agent, Nevada Agency & Transfer Company ("NATCO") to convey the 4,193,684 shares of FTE common stock to TTP8.

257.    TTP8 materially breached the Note Exchange Agreement by failing to cancel the defined Promissory Notes held by TBK and Suwyn, as confirmed by the declarations submitted by these entities' managers annexed hereto. Exs. H and I.

258.   As set forth in Ferguson's and Suwyn's declarations, both TBK and Suwyn were, at the time the Note Exchange Agreement was entered into, and remain the holders of the Promissory Notes held by TBK and Suwyn.  *Id.*

259.   TTP8 utterly and deliberately failed to perform its obligations under the Note Exchange Agreement by failing to actually acquire the Promissory Notes it purportedly cancelled in exchange for receiving 4,193,684 shares of FTE common stock, and its representations therein have proven to be false.

260.   FTE was harmed by TTP8's breach of the Note Exchange Agreement by losing 4,193,684 shares of its common stock for no consideration, and while remaining obligated at all times on the debt owed to both TBK and Suwyn.

261.   As a direct and proximate result of TTP8's breach of the Note Exchange Agreement, FTE has been further harmed by TTP8's use of the 4,193,684 shares of FTE's common stock it received to further Defendants' conspiracy to unlawfully take control over FTE through attempting to pass *ultra vires* amendments to FTE's bylaws.

262.   In addition, FTE has suffered damages by incurring attorneys' fees and costs associated with TTP8's breach of the Note Exchange Agreement.


**PRAYER FOR RELIEF**

**WHEREFORE**, FTE demand judgment in its favor against Defendants, jointly and severally, and seek a judgment:

a)    Enjoining Singal, his affiliates, ~~and~~ family members, and Defendants from receiving any of FTE common or preferred shares of stock, including, but not limited to, the 11,031688 shares of FTE common stock designed for the FC REIT;

b)  Enjoining Singal and the other Defendants from any involvement in the affairs of FTE;

b)c)  Enjoining Singal and TTP8 from transferring any FTE common or preferred shares of stock to Innovativ, his family members, or affiliates;

c)d)  Disgorging all FTE shares of stock possessed by Singal, TTP8, his family members, and affiliates and directing those shares to be returned to FTE;

d)e)  Disgorging all FTE shares of stock possessed by all Defendants, and directing those shares to be returned to FTE;

e)f)  Awarding compensatory, direct, consequential, and treble damages, including prejudgment interest, in an amount to be determined at trial;

e)g)  Requiring Defendants to pay Plaintiffs'Plaintiff's attorneys' fees and costs; and

d)h)  Any further relief deemed appropriate by the Court.

Dated: May 10, 2022April 28, 2023

**WHITE AND WILLIAMS LLP**

By:_____

Shane R. Heskin, Esq.
Alex D. Corey, Esq.
7 Times Square, Suite 2800
New York, NY 10036
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for FTE Networks, Inc.*

## **VERIFICATION**

I, Michael P. Beys, Chief Executive Officer of FTE Networks, Inc., am an attorney at law and am authorized to execute this Verification.  I hereby certify that on behalf of FTE, I have read the Amended Complaint that has been drafted by my counsel.  The factual statements contained therein are true and correct to the best of my knowledge, information and belief although the language is that of my counsel, and, to the extent that the foregoing document is that of counsel, I have relied upon counsel in making this Verification.

I affirm that the foregoing statements are true under penalty of perjury.


_____
Michael P. Beys


Dated: _____

30365677v.130490368v.1