# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FTE NETWORKS, INC.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>SUNEET SINGAL, TTP8, LLC, FIRST CAPITAL MASTER ADVISOR, LLC, MAJIQUE LADNIER, DANISH MIR, KHAWAJA ZARGHAM BIN AAMER, THOMAS COLEMAN, INNOVATIV MEDIA GROUP, INC., JOSEPH F. CUNNINGHAM, PETER K. GHISHAN, STEPHEN M. GOODWIN, and BRUCE M. FAHEY<br><br>　　　　Defendants. | Case No. 1:22-cv-05960-JHR |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

WHITE AND WILLIAMS LLP
Shane R. Heskin
Alex. D. Corey
7 Times Square, Suite 2900
New York, NY 10036
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 3

   I.   Background on FTE and the Moving Defendants ............................................................ 3

   II.   The Moving Defendants' Scheme To Fraudulently Take Over FTE ................................. 5

       a.   Step 1: Acquire An Initial Ownership Interest in FTE Through
           Fraudulently Selling Real Property to FTE with Undisclosed
           Legal Liabilities..................................................................................................... 5

       b.   Step 2: Consolidate Control of FTE By Accumulating Ownership of
           FTE's Shares through Moving Defendants Illicit and Secretive Transfers
           In Violation of the Vision Purchase Agreement .................................................... 10

       c.   Step 3: Use The Illicitly Acquired FTE Shares, Along With Fraudulently
           Voting the FC REIT Shares, To Purportedly Pass *Ultra Vires* Amendments
           to FTE Bylaws that would give Moving Defendants Control Over FTE .................. 11

ARGUMENT ...................................................................................................................... 13

   I.   Legal Standard .......................................................................................................... 13

   II.   FTE Has Stated A RICO Claim Against Moving Defendants........................................... 14

       a.   Moving Defendants Knowingly Misrepresent FTE's RICO 1962(c) Claim ................ 14

       b.   FTE Has Adequately Pled Predicate Acts................................................................. 15

       c.   FTE Has Alleged A Closed-Ended Pattern of Racketeering Activity ......................... 19

       d.   FTE Has Adequately Alleged A Distinct Enterprise ................................................. 21

       e.   FTE Has Alleged Concrete Damages......................................................................... 22

   III.   FTE Has Adequately Alleged RICO Conspiracy Against All
       Moving Defendants ................................................................................................... 23

   IV.   FTE Has Established Jurisdiction Over Moving Defendants........................................... 27

   V.   FTE Has Adequately Alleged Fraud Against Singal ...................................................... 28

   VI.   FTE Has Adequately Alleged Tortious Interference Against Singal............................... 31

   VII.   Non-Moving Defendant Coleman Was Properly Served................................................ 32

   VIII.   The Szkaradeks Are Not Indispensable Parties............................................................. 34

   IX.   Jurisdiction For This Action Resides With This Court, Not Delaware............................ 36

   X.   FTE Has Adequately Pled Cunningham Breached His Fiduciary Duty ........................... 37

CONCLUSION................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Angermeir v. Cohen*,
   14 F. Supp. 3d 134 (S.D.N.Y. 2014).................................................................22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).......................................................................................13

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007).......................................................................................13

*Boyle v. United States*,
   556 U.S. 938 (2009).................................................................................20, 21

*BrandAid Mktg. Corp. v. Biss*,
   03 Civ. 5088 (WHP), 2008 U.S. Dist. LEXIS 4036 (S.D.N.Y. Jan. 22, 2008) .......................29

*Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*,
   137 S. Ct. 1773 (2017)...................................................................................27

*Carvel Corp. v. Noonan*,
   3 N.Y.3d 182 (2004) ......................................................................................31

*Cedar Swamp Holdings, Inc. v. Zaman*,
   487 F.Supp.2d 444 (S.D.N.Y. 2007)..................................................................21

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158 (2001).......................................................................................21

*Center Cadillac v. Bank Leumi Trust Co.*,
   808 F. Supp. 213 (S.D.N.Y. 1992) ...............................................................17, 18

*Childers v. New York & Presbyterian Hosp.*,
   36 F. Supp.3d 292 (S.D.N.Y. 2014)...................................................................13

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
   187 F.3d 299 (2d Cir. 1999)........................................................................19, 20

*Constellation Bank, N.A. v. C.L.A. Management Co.*,
   94 Civ. 0989 (RPP), 1995 U.S. Dist. LEXIS 1105 (S.D.N.Y. Jan. 30, 1995) .................18, 26

*Cosmas v. Hassett*,
   886 F. 2d 8 (2d Cir. 1989)...............................................................................16

*D'Addario v. D'Addario*,
    901 F.3d 80 (2d Cir. 2018)............................................................................14

*Daly v. Llanes*,
    30 F. Supp. 2d 407 (S.D.N.Y. 1998)..............................................................27

*De La Fuente v. FDIC*,
    332 F.3d 1208 (9th Cir. 2003) .......................................................................39

*Dornberger v. Metropolitan Life Ins. Co.*,
    961 F.Supp. 506 (S.D.N.Y. 1997) ................................................................29

*Elsevier Inc. v. W.H.P.R., Inc.*,
    692 F.Supp.2d 297 (S.D.N.Y. 2010).............................................................22

*Environmental Servs. v. Recycle Green Servs.*,
    7 F. Supp. 3d 260 (E.D.N.Y. 2014) ..............................................................18

*FDIC v. Delaney*,
    2:13-CV-924 JCM, 2014 U.S. Dist. LEXIS 90147 (D. Nev. July 2, 2014) ...........................37

*First Capital Asset Mgmt. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004)..........................................................................23

*George v. Prof'l Disposables Int'l, Inc.*,
    221 F. Supp. 3d 428 (S.D.N.Y. 2016)...........................................................32

*Guzman v. Johnson*,
    137 Nev. 126 (Nev. 2021).............................................................................38

*In re Sumitomo Copper Litig.*,
    995 F. Supp. 451 (S.D.N.Y. 1998) ...............................................................17

*Kottler v. Deutsche Bank AG*,
    607 F. Supp. 2d 447 (S.D.N.Y. 2009)...........................................................21

*Mastercard Int'l, Inc. v. Visa Int'l Servs. Ass'n*,
    471 F.3d 377 (2d Cir. 2006)..........................................................................34

*Metromedia Co. v. Fugazy*,
    983 F.2d 350 (2d Cir. 1992)..........................................................................20

*Morrow v. Black*,
    742 F. Supp. 1199 (E.D.N.Y. 1990) .............................................................26

*N.Y. Dist. Council of Carpenters Pension Fund v. Forde*,
    939 F.Supp.2d 268 (S.D.N.Y. 2013)........................................................22, 23

*New York v. O'Hara*,
    652 F. Supp. 1049 (W.D.N.Y. 1987) ................................................................................24

*Pavlov v. Bank of N.Y. Co.*,
    25 Fed. Appx. 70 (2d Cir. 2002) .....................................................................................20

*Rice v. Resurgent Capital Servs., L.P.*,
    15 CV 6319, 2017 U.S. Dist. LEXIS 20932 (E.D.N.Y. Feb. 13, 2017) ................................36

*Rinaldi v. NICE Ltd.*,
    19-CV-424 (LGS) (KNF), 2020 U.S. Dist. LEXIS 69403 (S.D.N.Y. Apr. 20,
    2020) ..............................................................................................................................32, 36

*Rose v. Different Twist Pretzel, Inc.*,
    123 A.D.3d 897 (2d Dep't 2014) ....................................................................................30

*Spira v. Nick*,
    876 F. Supp. 553 (S.D.N.Y. 1995) ..................................................................................17

*Spool v. World Child In'tl Adoption Agency*,
    520 F. 3d 178 (2d Cir. 2008)............................................................................................16

*STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*,
    648 F.3d 68 (2d Cir. 2011)...............................................................................................29

*Trautz v. Weisman*,
    819 F. Supp. 282 (S.D.N.Y. 1993) ..................................................................................26

*United States CFTC v. Paron Capital Mgmt., LLC*,
    C 11-4577 CW, 2012 U.S. Dist. LEXIS 49154 (N.D. Cal. Apr. 6, 2012).............................33

*United States v. Jost*,
    9 F. Supp. 3d 303 (W.D.N.Y. 2014) ................................................................................33

*United States v. Turkette*,
    452 U.S. 576 (1981)........................................................................................................21

*United States v. Zichettello*,
    208 F.3d 72 (2d Cir. 2000)...............................................................................................23

*Weir v. Cenlar FSB*,
    2018 WL 3443173 (S.D.N.Y. July 17, 2018) ...................................................................21

*Wilson v. Austin*,
    CV 11-4594, 2012 U.S. Dist. LEXIS 123067 (E.D.N.Y. June 25, 2012) .............................34

*Ysin Brake Corp. v. Motocar Parts of Am., Inc.*,
    13 Civ. 9223, 2014 WL 2560616 (S.D.N.Y. June 6, 2014)...................................................29

**STATUTES**

18 U.S.C.

    § 1962................................................................................................................3, 14
    § 1962(c)................................................................................................13, 14, 16, 21
    § 1962(d)...........................................................................................3, 4, 14, 22, 23

Cal. Code Civ. Proc. § 415.20 ..............................................................................32

**OTHER AUTHORITIES**

FRCP Rule 9 ....................................................................................................17, 22

FRCP Rule 8(a) ......................................................................................................22

FRCP Rule 12(b)(5) ...............................................................................................33

FRCP Rule 19(a)(1) ...............................................................................................34

Local Civil Rule 7.1 ...............................................................................................35

Plaintiff FTE Networks, Inc. ("FTE") respectfully submits this Memorandum of Law in opposition to Defendants' Suneet Singal ("Singal"), TTP8, LLC ("TTP8"), First Capital Master Advisor, LLC ("FCMA"), Majique Ladnier ("Ladnier"), Innovativ Media Group, Inc. ("Innovativ"), and Thomas Coleman ("Coleman," collectively, "Moving Defendants") motion to dismiss the Complaint and Defendant Joseph F. Cunningham's ("Cunningham") motion to dismiss the Complaint's causes of action alleged against Cunningham for RICO conspiracy and breach of fiduciary duty (collectively, the "Motions").

## PRELIMINARY STATEMENT

Defendants bring motions to dismiss a complaint of their own imagination, not the Complaint pled against them by FTE.  Neither Moving Defendants nor Cunningham even attempt to grapple with the actual facts alleged by FTE in their motion papers; Moving Defendants' papers are entirely devoid of even a statement of facts, and Cunningham's papers contain merely a single paragraph concerning his position as an FTE board member, while ignoring all the detailed and overwhelming allegations concerning the conduct triggering this lawsuit.  Moving Defendants and Cunningham avoid these well-pled allegations because they are fatal to their Motions.

Defendants cannot hide from the facts.  The ringleader of their conspiracy, Suneet Singal ("Singal"), is a habitual fraudster, and has been and continues to be the subject of enforcement actions by various federal agencies, including the SEC and U.S. Attorney's Office, all relating to separate criminal schemes he and his co-Defendants, such as his wife Ladnier and their company TTP8, separately engaged in.  The present action concerns Singal and his criminal Enterprise's latest scheme to take over FTE through a series of illicit and hidden transfers of FTE stock secured through a fraudulent sale of real estate properties and Singal's own fraudulent representation that TTP8 had extinguished millions of dollars of FTE's debt.

The scheme began during an October 2019 FTE board meeting, attended by Singal and fellow co-conspirators, including Singal's hand-picked board insiders Cunningham and Ghishan, and fellow co-conspirator Goodwin, who was appointed at Singal's urging, as FTE's interim CEO. At this meeting Singal, joined by other conspirators, offered FTE the opportunity to purchase a portfolio of real estate properties that Singal fraudulently represented were worth $500 million when, in fact (as Singal knew) was virtually worthless due to an underlying rent-to-own scheme that was gaining attention of consumer protection groups and state attorney generals. The other shoe of the initial fraud involved Singal's false promise to extinguish FTE's debt, using his company TTP8, in exchange for millions of shares FTE's common stock—which Singal again knew was false and, in fact, never occurred.

After securing millions of shares FTE's common stock from these fraudulent deals, Moving Defendants began illicitly transferring the shares among themselves in a series of predicate acts that both violated FTE policy and restrictions in the underlying purchase agreement for the real estate portfolio. When Cunningham learned that FTE intended to sue Singal and other co-conspirators and institute a "poison pill" (as Cunningham referred to it) to prevent this bourgeoning coup that Moving Defendants were planning, Cunningham disclosed that information to Coleman in violation of FTE's policies and his fiduciary duty. Upon receiving this insider information, Moving Defendants and Cunningham pooled their fraudulently obtained FTE shares, including over 11 million shares promised to one of Singal's victims, to pass *ultra vires* amendments to FTE's bylaws such that Moving Defendants and Cunningham would take over FTE.

In doing so, as set forth below, Moving Defendants and Cunningham, with Singal as their ringleader and culpable person, formed RICO enterprise with the agreed conspiracy to unlawfully take over FTE, and committed other torts, such as fraud and tortious interference with contract, as

well as Cunningham's breach of his fiduciary duty.  All these claims have been well-pled by FTE, often with supporting documents attached to the Complaint, which Moving Defendants and Cunningham simply ignore.  The Motions are meritless and should be denied in full.

## STATEMENT OF FACTS

Moving Defendants' Motion papers are devoid of facts.  As demonstrated below, the Complaint more than adequately pleads Plaintiff's First and Second Causes of Action for RICO violations, 18 U.S.C. § 1962, and conspiracy, 18 U.S.C. § 1962(d), respectively, Third Cause of Action for fraudulent inducement, Fourth Cause of Action for tortious interference.  *See* [DE 1-1] (the Complaint) ¶¶ 132-191. Cunningham's Motion papers only consist of one paragraph of irrelevant facts without refuting those germane to FTE's Fifth Cause of Action for his breach of fiduciary duty.

## I.    Background on FTE and the Moving Defendants

FTE is a Nevada corporation that used to provide innovative, technology-oriented solutions for smart platforms, network infrastructures and building, and provides end-to-end design, construction management, build and support solutions for state-of-the-art networks, data centers, residential, and commercial properties and services for Fortune 100/500 companies.  [DE 1-1] ¶ 51.  In or about February 2019, FTE was hit with a bombshell that its former CEO Michael Palleschi and former CFO David Lethem had orchestrated a fraudulent scheme to hide the deteriorating financial condition of the company and to embezzle millions of the company's funds to pay for personal luxury items and self-enrichment.  *Id.* ¶ 37.

Moving Defendant and conspiracy ring-leader, Singal, is a well-documented financial fraudster.  *Id.* ¶ 2.  On December 16, 2019, Singal was charged by the SEC for fraud and racketeering schemes that he orchestrated between September 2015 and March 2018 that targeted a real estate investment trust ("FC REIT") and a business development company.  *Id.* ¶ 6.  In the

fraud involving FC REIT, Singal purported to contribute 12 hotels that he did not own to close a business deal related to FC REIT that personally benefitted him, and then proceeded to make numerous material misrepresentations in public filings concerning FC REIT's ownership of the hotels.  *Id.*  For that fraud, Singal was hit with a 10-year ban from the securities industry and a $7 million fine.[1]  *Id.* ¶ 2.  In April 2022, Singal was charged by the U.S. Attorney for the Eastern District of California for multiple counts of wire and mail fraud in an unrelated scheme.[2]  *Id.* ¶ 2.

Singal perpetrated his past and instant fraudulent schemes through ready and willing co-conspirators, including his wife, Ladnier, and TTP8, which is owned and controlled by Singal and Ladnier.  *Id.* ¶ 16.  For instance, Singal used Ladnier to accept FTE's shares when he himself could not do so without violating FTE's policy and contractual protections.  *Id.* ¶ 100.  These transfers were affected through their company TTP8, which was also used to accept FTE stock on other occasions over the relevant time period.  *Id.* ¶¶ 104-11.  Ladnier also created companies for the purpose of accepting transfer of FTE stock in order to bypass FTE's prohibition on Singal owning any FTE stock.  *Id.* ¶ 120-22.  Singal also controls Moving Defendant FCMA, which was used, like TTP8, to accept, hold, and transfer FTE shares during the relevant time period in order circumvent FTE's ban on Singal receiving additional FTE shares.  *Id.* ¶¶ 153-56.

Moving Defendants Coleman and Innovativ, a company owned and controlled by Coleman, are other actors in Singal's scheme.  *Id.* ¶ 16.  Like TTP8, Singal relied on Coleman and Innovativ to accept, hold and transfer FTE shares in order to circumvent FTE's prohibition on Singal owning any FTE shares.  *Id.* ¶¶ 100-3.  During the relevant time period, TTP8 and other co-

---

[1] For more information, see https://www.sec.gov/litigation/litreleases/2019/lr24691.htm ; *see also*, [DE 1-1] Ex. A

[2] As alleged by Federal prosecutors, Singal "engaged in a scheme to make false representations in order to include financing companies to provide funds to certain companies" that Singal lied about owning.  *See* https://www.justice.gov/usao-edca/pr/el-dorado-hills-man-indicted-fraud-against-merchant-cash-advance-companies.

conspirators, including non-parties Alex and Antoni Szkaradek (the "Szkaradeks"), transferred FTE shares to Innovativ, which were then pledged along with other FTE shares held by other co-conspirators in an attempt to unlawfully change FTE's by-laws such that the Moving Defendants and Cunningham would assume control of the company. *Id*. ¶¶ 110-11, 120-27.

Cunningham was one of Singal's and the Moving Defendants' inside men on FTE's board formed in the wake of the former CEO and CFO scandal. *Id*. ¶ 52. Cunningham used his position on FTE's board to advocate on Singal's behalf and always supported proposals made by Singal and other co-conspirators, including (i) agreeing to transfer more than 4 million FTE shares to Singal as consideration for Singal's fraudulent representation that TTP8 had extinguished certain amounts of FTE's debt (which Cunningham knew or should have known to be false); and (ii) advocating for FTE to purchase a portfolio of real estate properties pitched by Singal and other co-conspirators (which Cunningham knew to be toxic due an illegal rent-to-own scheme). *Id*. ¶¶ 58-69, 116, 170. Cunningham also provided confidential insider information about FTE to the Moving Defendants—in direct violation of FTE's policy—to assist their conspiracy to take over FTE, including informing Coleman that FTE was planning on suing Singal and Coleman's company Innovativ and that it would adopt a so-called "poison pill" defense to prevent the Moving Defendants from attempting a coup against FTE. *Id*. Ex. G (Coleman Declaration) ¶¶ 13-14.

## II.     The Moving Defendants' Scheme To Fraudulently Take Over FTE

### a.      Step 1: Acquire An Initial Ownership Interest in FTE Through Fraudulently Selling Real Property to FTE with Undisclosed Legal Liabilities

After FTE discovered the aforementioned fraud by its former CEO and CFO, it formed a new board of directors, several of whom, including Cunningham, had close personal ties to Singal that were not fully disclosed to FTE. *Id*. ¶¶ 52-53. On October 22, 2019, Singal used his connection with Cunningham to secure an invitation to the first meeting of FTE's newly

-5-

constituted board, where he pitched the portfolio of properties owned by the Szkaradeks through their company Vision Property Management, LLC (the "Vision Portfolio").  *Id*. ¶¶ 39-45.  At this meeting, Singal represented that the Vision Portfolio consisted of approximately 3,500 properties across 46 states, with a value of $350 million, including $82 million in debt.  *Id*. ¶ 59.

To further convince FTE to buy the Vision Portfolio, Singal offered to retire millions of dollars of FTE's debt and promised to help facilitate a new fundraising channel through the exchange of FTE stock.  *Id*. ¶ 45.  To that end, FTE approved Singal's proposal to purchase and retire millions of dollars' worth of FTE's debt in exchange for 4,193,684 shares of FTE.  *Id*. ¶ 58.  Cunningham advocated strenuously for FTE to agree to Singal's proposal to advance the conspiracy by helping Singal acquire as much FTE stock as possible.  *Id.* ¶ 170 i-vi.  Singal even tainted this simple transaction with fraud: on December 9, 2019, FTE learned that these shares had already been issued to Singal and that the issuance was in violation of SEC and NYSE listing rules.  *Id*. ¶ 60.  As a result, on December 11, 2019, the NYSE suspended trading of FTE stock and several days later began the process to de-list FTE's stock.  *Id*. ¶¶ 62-66.  Consistent with Singal's *modus operandi*, this debt-cancellation transaction was also fraudulent in that Singal's company, TTP8, did not actually discharge any of the debt as promised, and therefore received the 4,193,684 shares of FTE for no consideration to FTE.  *Id*. ¶ 104.

On December 16, 2019, just days before FTE was scheduled to close on the purchase of the Vision Portfolio, and days after TTP8 received millions in FTE stock based on the fraudulent representation in had discharged millions of FTE's debt, the SEC announced it had filed securities fraud charges against Singal for the fraud he perpetrated against FC REIT involving, among other things, selling properties to FC REIT that he did not own.  *Id*. ¶ 47.  Cunningham had likely already known about these pending charges, but feigned surprise to conceal his ties to Singal.  *Id.* ¶ 64.

FTE immediately instituted a "firewall" between itself and Singal, directing all members of FTE's board, including Cunningham, and management not to have any communications with Singal, either directly or through affiliates, regarding FTE's business. *Id*. ¶ 47.

In order to salvage the Vision Portfolio deal following the SEC's charges, the Szkaradeks misrepresented to FTE that Singal was merely a broker, and would not be involved in the transaction after it closed. *Id*. ¶ 48. The Szkaradeks and Singal further sought to save the transaction by fraudulently promising that Singal's finder's fee compensation would be given to FC REIT to compensate the victim of Singal's fraud. *Id*. ¶ 49. Singal emphasized this fraudulent promise by making a December 20, 2019 press release whereby he pledged $100 million in FTE shares (later changed to 11,031,688 FTE shares), that were to be his compensation as broker of the Vision Portfolio deal, to compensate FC REIT. *Id*. ¶ 50.

Over the next two weeks until the closing on December 30, 2019, the Vision Portfolio deal was restructured to ensure that no consideration would go form FTE to Singal, Ladnier, TTP8 or other family members and affiliates. Rather, any amounts payable to Singal would instead be paid directing to FC REIT, the victim of one of Singal's prior fraudulent schemes. *Id*. ¶ 69; *see also* Complaint Ex. D (the Vision Purchase Agreement) [DE 1-1] § 4.7(b) ("Sellers agree not to transfer any of the Equity Consideration to Suneet Singal . . . nor any family member or affiliate or associate . . . of Singal"). As part of due diligence, FTE relied on a report from Collateral Analytics that evaluated the Vision Portfolio using comparisons from various geographic areas of the properties. *Id*. ¶ 70. The Szkaradeks hid from these valuers the existence of state attorney general and other government investigations, as well as bourgeoning consumer class-action lawsuits, that the Szkaradeks were facing heading into the closing as a result of a fraudulent rent-to-own scheme

they perpetrated on the Vision Portfolio tenants.  *Id*. ¶¶ 70-71.[3]  In doing so, the Szkaradeks

violated numerous provisions of the Vision purchase agreement that was entered into between FTE

and Vision on December 30, 2019 (the "Vision Purchase Agreement"), including:

> Section 3.4, <u>Capitalization; Indebtedness</u>: "The Equity Interests are free and clear of all Liens."
>
> Section 3.14, <u>Litigation</u>: (a) [S]ince January 1, 2015, there have not been any Legal Proceedings pending, or to the knowledge of the Sellers, threatened (i) against or by the Company, (ii) against or by the Sellers relating to the Company or regarding any of their assets or properties, or (iii) against or by the Sellers or the Company that challenges or seeks to enjoin, prevent or otherwise delay, the Transaction or the other transactions contemplated by this Agreement or any of the Transaction Documents.   To the knowledge of the Sellers, no event has occurred or circumstance exists that could reasonably be expected to give rise to, or serve as the basis for, any Legal Proceeding.
>
> (b) [S]ince January 1, 2015, the Company is not and has not (i) been in default under or in breach of any Order, (ii) received any written notification or communication from any Governmental Body asserting that the Company is not in compliance with any Order or (iii) been party or subject to any Order.  There are no unsatisfied judgments, penalties or awards affecting the Company or any of its properties, rights, or assets.
>
> Section 3.15, <u>Compliance with Laws; Permits</u>: [T]he Company and the Business are, and since January 1, 2015, has complied with, in each case in all material respects, all applicable Laws, including without limitation with respect to mortgage lending, consumer protection, seller financing, installment sale contract, purchase money mortgage, contract for deed, and lease with option to purchase Laws . . . [S]ince January 1, 2015, none of the Companies has received any written notification or communication from any Governmental Body asserting that the Company is not in compliance with any applicable Law, including without limitation with respect to mortgage lending, consumer protection, seller financing, installment sale contract, purchase money mortgage, contract for deed, and lease with option to purchase Laws.

[DE 1-1] (Complaint) Ex. D (Purchase Agreement) §§ 3.14-15, 3.4.

---

[3] FTE was aware that the Pennsylvania Attorney General had filed a complaint against the Szkaradeks for the rent-to-own scheme which was publicly announced on or about October 10, 2019.  [DE 1-1] ¶ 40. FTE did not, however, know that this was just one of several actions that were developing in 2019 and the first half of 2020.  *Id*. ¶ 73.  The undisclosed further liabilities were so severe that the Szkaradeks started the process of retaining bankruptcy counsel for Vision before devising their scheme with Singal to dump the Vision Portfolio (and all its undisclosed liabilities) onto FTE.  *Id*. ¶¶ 41-43.

In order to facilitate the closing of the Vision Purchase Agreement, FTE formed US Home Rentals, LLC ("USHR") to run the Vision Portfolio. [DE 1-1] ¶ 83. Singal identified an individual whom he wanted to run USHR, Munish Bansal ("Bansal"), and had the Szkaradeks push FTE to hire Bansal as USHR's CEO to manage the Vision Portfolio, which FTE acquiesced to on September 25, 2020. *Id*. ¶ 85. Cunningham strenuously pushed for Bansal to be appointed as well, who then proceeded to violate the "firewall" by engaging in regular communication with Singal. *Id.* ¶¶ 113-14. Around this time, Vision's former property manager, Eric Taylor ("Taylor"), attempted to inform FTE that the Vision Portfolio was grossly underwater, and was not worth what had previously been represented by Singal and the Szkaradeks. *Id*. ¶ 86. Bansal and FTE's board members tied to Singal, including Cunningham, disputed Taylor's allegations and Bansal retaliated by firing Taylor on November 23, 2020. *Id*. ¶ 87.

In early 2021, FTE began selling a portion of the Vision Portfolio properties to help cover the expenses needed to run the Portfolio, at which point FTE realized the properties were effectively radioactive to the market due to the fraudulent rent-to-own scheme, and the growing number of state attorney general and consumer fraud complaints. *Id*. ¶ 94. These revelations, coupled with the NYSE de-listing due to Singal's aforementioned fraud in failing to disclose his receipt of FTE shares, was the impetus for the April 2, 2021 amendments to the Vision Purchase Agreement, which provided that, among other things, that the Szkaradeks were to "immediately" transfer 11,031,688 of FTE shares to FC REIT as compensation for the fraud it suffered at the hands of Singal (the "FC REIT Shares"). *Id*. ¶¶ 96-97; *see also Id*. Ex. F (Amended Vision Purchase Agreement) § 1.5. Importantly, as a material part of the amendments—and as part of the overriding Singal "firewall" in effect since December 2019—the Szkaradeks were prohibited from transferring any of their shares to Singal, family members, or affiliates, such as Ladnier and TTP8.

-9-

    **b.**    **Step 2: Consolidate Control of FTE By Accumulating Ownership of FTE's shares through Moving Defendants' Illicit and Secretive Transfers In Violation of the Vision Purchase Agreement**

Unbeknownst to FTE at the time the Vision Purchase Agreement was amended, Singal's, the Szkaradeks', the Moving Defendants', and Cunningham's plan to unlawfully take over FTE was already underway, and this scheme would continue unabated despite FTE's preventative measures of amending the Vision Purchase Agreement to preclude the Szkaradeks transferring FTE shares to Singal and his affiliates. For instance, a year earlier in May 2020, Singal had already transferred 500,000 of his FTE shares to co-conspirators and Moving Defendants Innovativ and Coleman (who owned and controlled Innovativ). *Id*. ¶ 110. Cunningham supported this transfer. *Id*. ¶ 170 xi. These shares were part of the 4,193,684 FTE shares that Singal's and Ladnier's company, TTP8, received in late 2019 as consideration for Singal fraudulent representation that TTP8 satisfied certain amounts of FTE's pre-existing debt. *Id*. ¶ 104. Cunningham supplied Moving Defendants with highly confidential information about FTE, in violation of the "firewall," in order to facilitate these transfers and keep them hidden. *Id*. ¶ 101.

In or around May 2020, TTP8 transferred another 702,000 of its original 4,193,684 shares of FTE stock to Khawaja Zargham bin Aamer, a TPP8 employee, purportedly as payment for certain deferred compensation. *Id*. ¶ 107. That same month, TTP8 transferred another 891,556 of its FTE shares to Danish Mir, another TTP8 employee, also purportedly as payment for certain deferred compensation. *Id*. ¶ 108. Then, in May 2020 as well, TTP8 distributed 1,790,188 of its FTE shares to Ladnier, pursuant to a stock distribution agreement. *Id*. ¶ 109. By June 2020, TTP8 retained only 310,000 FTE shares of the original 4,193,684, with the balance being transferred among Moving Defendants and other conspirators. *Id*. ¶ 111. Separately, on February 12, 2021, Cunningham accepted 150,000 shares of FTE common stock, which would subsequently be voted

to advance his and the Moving Defendants' conspiracy to take over FTE using illicitly acquired FTE shares.  *Id.* ¶¶ 123-127, 170 xv.

In November 2021, Moving Defendants and the co-conspirators engaged in another round of illicit transfers of FTE shares to fraudulently circumvent the Vision Purchase Agreement's prohibition on Singal and his affiliates holding additional shares of FTE.  This included:  (i) a November 10, 2021 common stock purchase and sale agreement between Innovativ (owned and controlled by Coleman) and the Szkaradeks, whereby Singal and TTP8 transferred FTE shares to Innovativ (the "Innovativ Agreement"); and (ii) a November 10, 2021 membership interest purchase agreement between the Szkaradeks and EEME LLC, an entity controlled by Ladnier (the "Ladnier Agreement").  *Id.* ¶ 120.  The Innovativ Agreement purported to transfer 11,031,688 FTE shares to Innovativ, and the Ladnier Agreement purported to transfer FTE notes and preferred stock to Ladnier in exchange for membership interest in an entity owned by Ladnier, EEME LLC.  *Id.* ¶¶ 121-22.  As Singal, Ladnier, and Coleman knew, these transfers and agreements violated several provisions of law including, among other things, the prohibition on Singal and his affiliates obtaining FTE shares as proscribed by the Vision Purchase Agreement.  *Id.* ¶ 123.  Cunningham had contemporaneous knowledge of all of these illicit transfers, yet said nothing to the other FTE board members in order to advance the conspiracy.  *Id.* ¶ 170 xxi.  Moving Defendants subsequent acts to follow these transfers revealed they were part of any overarching conspiracy for the Moving Defendants and Cunningham to take over FTE.

### c.  Step 3: Use The Illicitly Acquired FTE Shares, Along With Fraudulently Voting the FC REIT Shares, To Purportedly Pass *Ultra Vires* Amendments to FTE Bylaws that would give Moving Defendants Control Over FTE

On or about February 3, 2022, Moving Defendants and Cunningham, along with other co-conspirators, by and through Innovativ's attorney, sent a letter to FTE in which the Moving Defendants, Cunningham, and other co-conspirators, purportedly constituting "a majority-in-

interest of the shareholders of FTE," asserted they had voted to change FTE's bylaws.  [DE 1-1] Ex. B.  This purported "majority" of FTE shareholders included Moving Defendants Ladnier, FCMA (signed by Singal as Manager), TTP8 (signed by Ladnier on its behalf), and Innovativ (signed by Coleman in his capacity as CEO).  *Id.* ¶ 126.  Coleman testified in a declaration that he coordinated this take-over attempt with Cunningham.  [DE 1-1] Ex. G.  Notably, in attempting to pass these amendments, Moving Defendants, Cunningham, and their co-conspirators claimed to speak for, and exercise control over, the 11,031,688 FC REIT Shares in FTE that the Szkaradeks were obligated to transfer to FC REIT as compensation for being victimized by Singal's fraud.  *Id.* ¶ 127.  FC REIT has categorically denied any participation or authorization of its FTE shares to be voted in favor of the Moving Defendants' purported changes to FTE's bylaws.  *Id.*

Cunningham, as FTE's board member, had full knowledge of FTE's "firewall" and Vision Purchase Agreement restrictions on Singal and his affiliates, such as his wife Ladnier, receiving FTE shares.  *Id.* ¶¶ 47-48, 65, 99-100.  He also knew that half of the FTE shares the Szkaradeks were to receive under the Vision Purchase Agreement were to be immediately transferred to FC REIT, not held by the Szkaradeks and voted for their own purposes.  *Id.* ¶¶ 12, 49-50, 69, 97.  Nevertheless, Cunningham joined Singal, his affiliates, such as his wife Ladnier, TTP8 and the Szkaradeks, in their voting of the FC REIT Shares to further the conspiracy to take over FTE while knowing that these Defendants and co-conspirators were relying on illicitly obtained FTE shares to achieve these goals. *Id.* ¶¶ 125-27.  When confronted after FTE received this letter, Cunningham admitted he had been sharing confidential information with the Moving Defendants in violation of the "firewall."  *Id.* ¶¶ 128-29.  Coleman confirmed this fact in a sworn declaration as well.  *Id.* ¶ 130.  The confidential information concerned FTE's plan to sue Singal, the Szkaradeks and Innovativ (Coleman's company), *Id.* ¶ 170 xxiii, as well as FTE's plan of issuing a class of super

voting convertible stock to protect itself form an attempted takeover by Singal and the Szkaradeks, as confirmed by Coleman's own sworn testimony. *Id.* Ex. G ¶ 13. Coleman testified that it was the receipt of this confidential information, in violation of the "firewall", that spurred the conspiracy to immediately thereafter attempt to amend FTE's bylaws such that Moving Defendants, Cunningham and other conspirators would take over. *Id.* ¶ 14.

The *ultra vires* amendments to FTE's bylaws, if the Moving Defendants' and Cunningham's scheme was successful, would have resulted in self-enrichment and undone FTE's policy and contractual protections to ensure habitual fraudster Singal did not take over FTE. *See* [DE 1-1] Ex. B § 3.1(a) (giving the Moving Defendants and Cunningham full power over the issuance of FTE shares); § 6.5 (removed restriction on the transfer of FTE shares without Moving Defendants' and Cunningham's consent); and § 9.1 (gave Moving Defendants exclusive power to further amend the bylaws). The Moving Defendants' representation that they constituted the "majority-in-interest" was, of course, false because without the fraudulently included FC REIT Shares, not to mention the illicit accumulation of FTE shares in violation of the Vision Purchase Agreement and the more than 4.1 million FTE shares TTP8 acquired through the fraudulent debt-cancellation transaction, the Moving Defendants and Cunningham fall far short of a majority ownership of FTE. [DE 1-1] ¶ 127.

## ARGUMENT

### I.    Legal Standard

On a motion to dismiss for failure to state a claim under 12(b)(6), a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving parties. *See Childers v. New York & Presbyterian Hosp.*, 36 F. Supp.3d 292, 301 (S.D.N.Y. 2014). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## II.    FTE Has Stated A RICO Claim Against Moving Defendants

### a.    Moving Defendants Knowingly Misrepresent FTE's RICO 1962(c) Claim

Moving Defendants misstate facts to create confusion as to FTE's pleadings where there is

none.  *See* Moving Defendants Memorandum of Law in Support of Motion to Dismiss ("Defs.

Memo.") at 5 (falsely claiming that FTE has conceded that its RICO claim applies only to Singal).

Moving Defendants deliberately mis-represent FTE's statements in its letter motion practice to

suggest that FTE has conceded that its RICO claims are only against Singal.  *Id*. at 5 (citing FTE's

letters at [DE 42 and 52]).  The text of FTE's letters explicitly refutes this falsehood.  [DE 42]

("FTE brings claims for (i) 18 U.S.C. § 1962 against Suneet Singal as head of a criminal RICO

Enterprise; (ii) conspiracy under 18 U.S.C. § 1962(d) against all Defendants"); [DE 52] (same).

Moving Defendants go on to argue that "FTE fails to allege that any Responding Defendant

other than Singal had a role in directing the affairs of the alleged enterprise."  Defs. MOL. at 6.

This is, of course, immaterial as the record clearly reflects that FTE is only asserting its 18 U.S.C.

§ 1962(c) claim (First Cause of Action) against Singal, *see* [DE 42 and 52], and the Complaint, as

Moving Defendants concede, adequately alleges that Singal is the "mastermind of the Enterprise"

and that he is "responsible for the day-to-day operations."  [DE 1-1] ¶ 141.  Consequently, FTE

has satisfied the pleading standard for its RICO 1962(c) claim against Singal by the very caselaw

cited by Moving Defendants.  *See, e.g.*,  Defs. Memo. at 5 (citing *D'Addario v. D'Addario*, 901

F.3d 80, 103 (2d Cir. 2018) (a person violates section 1962(c) only if he "had some part in directing

the enterprise's affairs")).  There is simply nothing to dismiss with respect to FTE's First Cause of

Action because Moving Defendants' entire argument is premised on a deliberate misstatement of

the scope of this Cause of Action.

-14-

### b.      FTE Has Adequately Pled Predicate Acts

Moving Defendants next argue that the "Complaint is devoid of specific factual allegations of dates, parties, locations and contents of the fraudulent mail and wire communications, as well as why each communication was fraudulent."  Defs. Memo. at 7.  This argument is entirely inconsistent with the Complaint's plain statements, which identify a plethora of mail and wire fraud acts engaged by Moving Defendants, including, but not limited to: (1) TTP8's transfer of 500,000 shares of FTE stock to Innovativ between April 17, and May 19, 2020; (2) Innovativ's and Coleman's attempt to receive 11,031,688 FTE shares on November 10, 2021 from the Szkaradeks in violation of the Vision Purchase Agreement; (3) as set forth in Coleman's own affidavit, Innovativ's and Coleman's receipt of highly confidential information from Cunningham concerning FTE in violation of the "firewall" and Vision Purchase Agreement in January 2021; (4) Ladnier's and the Szkaradeks' November 10, 2021 purchase agreement whereby Ladnier received FTE preferred shares from the Szkaradeks, in violation of the Vision Purchase Agreement; and (5) Moving Defendants and Cunningham purporting to amend FTE's bylaws through fraudulently voting the FC REIT Shares along with other shares acquired in violation of the Vision Purchase Amendment via an interstate letter dated February 3, 2022.  [DE 1-1] ¶¶ 120-131, 170.

As the Complaint alleges, and as confirmed by the attached exhibits, such as the February 3, 2021 purported FTE bylaws amendments and the necessary transferring of ownership of FTE's shares among the Moving Defendants, Moving Defendants committed these predicate acts through the use of interstate mail and wires.  *Id*. ¶¶ 157-59.  The Complaint explains in detail how these FTE stock transfers and disclosures of confidential information to Singal's affiliates, like Innovativ and Coleman, were wrongful and fraudulent because they violated (i) FTE's "firewall" policy prohibiting confidential information going to Singal and his affiliates; (ii) violated the share

transfer restrictions on FTE stock to Singal and his affiliates; (iii) violated a Pennsylvania state court order enjoining the Szkaradeks from transferring FTE's shares to Moving Defendants; and (iv) fraudulently voted the FC REIT Shares without FC REIT's authorization and consent.  *Id*. ¶¶ 47, 65-69, 99-101, 105, 120-131.  The Complaint also alleges how Moving Defendants tried to hide these transfers, by, for example, creating shell companies, so that their overarching fraudulent scheme to takeover FTE would not be discovered.  *Id*. ¶ 100.

When comparing what the Complaint actually alleges, as opposed to Moving Defendants' deliberate mischaracterization thereof, to applicable pleading standard for predicate acts of wire fraud and mail fraud, including the case law Moving Defendants reply upon, it is clear that FTE has adequately alleged this RICO element.  *See Spool v. World Child In'tl Adoption Agency*, 520 F. 3d 178, 185 (2d Cir. 2008) ("Allegations of predicate mail and wire fraud acts ' should state the contents of the communications, who was involved, and where and when they took place, and should explain why they were fraudulent") (citations omitted); *Cosmas v. Hassett*, 886 F. 2d 8, 11 (2d Cir. 1989) (similar).

Moving Defendants' further arguments that FTE has not alleged "the minimum of two [predicate acts] per defendant necessary to sustain the RICO claim" is baseless because, again, FTE has only alleged its RICO 1962(c) claim against Singal, and there are at least eight predicate acts alleged against Singal.  [DE 1-1] ¶¶ 66, 104, 170 (On October 22, 2019, Singal falsely promises he will secure FTE additional funding in exchange for 4,193,684 FTE shares, which he subsequently fails to disclose to the NYSE, resulting FTE's stock being de-listed); ¶¶ 9-10, 45 (Singal knowingly misrepresented the liabilities facing the Vision Portfolio in communications to FTE's board); ¶ 50 (On December 20, 2019, Singal issues a press release through interstate mail and wire falsely pledging to transfer his consideration from the Vision Purchase Agreement, a

promise FTE relied upon before closing); ¶¶ 107-09 (Singal and Ladnier, directing their company, TTP8, to transfer FTE shares under false pretenses to other Moving Defendants in three separate occasions on May 2020); ¶ 114 (Singal had clandestine interstate communications with Bansal in December 2020 in violation of the FTE firewall); ¶¶ 126-27 (February 3, 2022, Singal, with the other Moving Defendants, fraudulently attempts to vote the FC REIT Shares without FC REIT's authorization and well as other FTE shares accumulated through illicit transfers to make *ultra vires* amendments to FTE's bylaws).    These uses of mail, wires, and interstate telephone communications to further the overarching fraudulent scheme to take over FTE constitute violations of 18 U.S.C. §§ 1341 and 1343, *United States v. Hasenstab*, 575 F.2d 1035, 1038-40 (2d Cir. 1978), and therefore constitute RICO predicate acts.  *See* 18 U.S.C. § 1961.

At bottom, the predicate acts concern Singal and the co-conspirators making transfers of FTE shares under false pretenses, for an illicit and undisclosed purpose to take over FTE.  These acts conflicted with promises Singal made and other Moving Defendants knew of and/or were bound by, such as FTE's "firewall" policy, restrictions in the Vision Purchase Agreement, and by court injunction.    They were effectuated by interstate mail and wires of the documents memorializing these stock transfers and interstate telephone conversations made in connection therewith.  FTE has therefore satisfied its heightened pleading standard for wire and mail fraud as they were used by Singal and the Moving Defendants as a "master plan to defraud."   *In re Sumitomo Copper Litig*., 995 F. Supp. 451, 456 (S.D.N.Y. 1998) (upholding RICO claim under rule where "[i]n cases in which plaintiff claims that the mails or wires were simply used in furtherance of a master plan to defraud, the communications need not have contained false or misleading information themselves.  In such cases, a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule

9(b)"); *see also*, *Spira v. Nick*, 876 F. Supp. 553, 558-59 (S.D.N.Y. 1995) ("Indeed, the scheme need not contemplate the use of the mails as an essential element.  It is sufficient if use of the mails to further the scheme is reasonably foreseeable"); *Center Cadillac v. Bank Leumi Trust Co.*, 808 F. Supp. 213, 229 (S.D.N.Y. 1992) ("[T]he complaint need not specify the time, place and content of each mail communication where the nature and mechanics of the underlying scheme is sufficient detailed, and it is enough to plead the general content of the misrepresentation without stating the exact words used"); *Gregory v. American Guild of Musical Artists*, 91 Civ. 6751 (SWK), 1993 U.S. Dist. LEXIS 6971, *29 n. 5 (S.D.N.Y. May 21, 1993) ("With respect to defendants' remaining RICO arguments, the Court finds that plaintiffs have pled the predicate acts of mail and wire fraud sufficiently to defeat a motion to dismiss.  The allegations that the defendants used the mail and telephone in furtherance of their scheme . . . must be taken as true for the purposes of this motion").

Cunningham offers no unique arguments as to how the Complaint fails to allege his participation in the conspiracy, instead adopting the above discredited arguments of the Moving Defendants.  *See* Memorandum of Law in Support of Cunningham's Motion to Dismiss ("Cunningham Memo.") at 3-4.  The Complaint does, in fact, allege sufficient predicate acts against Cunningham, including, but not limited to:  (a) mail fraud in the form of the February 3, 2022 attempted bylaws amendment Cunningham signed along with the other Moving Defendants and co-conspirators where, as Cunningham knew, the Szkaradeks fraudulently purported to vote the FC REIT shares; and (b) using wires, specifically telephone calls with Coleman, to advance this fraud by revealing confidential information concerning FTE's plans to sue Singal, the Szkaradeks, and Coleman's company Innovativ, and FTE's plan to protect itself from the coup through a poison pill.  [DE 1-1] ¶¶ 12, 47-50, 65-69, 97-100 and Ex. G ¶¶ 13-14.  Cunningham's agreement to join the conspiracy is confirmed by his own signature on the *ultra vires* amendments

that self-evidences that Singal and his affiliates, such as his wife Ladnier, had violated FTE's "firewall" and the Vision Purchase Agreement restriction on their receipt of FTE's shares.  [DE 1-1] ¶¶ 12, 47-50, 65-69, 97-100, 123-127.

Cunningham also knew that the Szkaradeks purported to vote the FC REIT Shares in support of these *ultra vires* bylaw amendments that he joined, a clear violation of the Vision Purchase Agreement he negotiated.  *Id*.  Moreover, Cunningham knowingly advanced the conspiracy by alerting the Moving Defendants, through contemporaneously undisclosed telephone conversations with Coleman, alterting him that FTE planned to sue Singal, the Szkaradeks and Coleman's company Innovativ, *Id*. ¶ 170, and that FTE was planning on thwarting the coup attempt before it could begin by adopting a "poison pill", as described by Cunningham.  *Id*. Ex. G (Coleman Decl.) ¶¶ 12-14.  As Coleman testified, Cunningham's divulgence of this confidential information spurred Moving Defendants and Cunningham to purportedly pass the unlawful amendments to FTE's bylaws.  *Id*. Ex. G ¶¶ 12-14.  These well-pleaded overt predicate acts that advanced the conspiracies goals is sufficient to sustain the RICO conspiracy charge against Cunningham.  *Constellation Bank, N.A. v. C.L.A. Management Co.*, 94 Civ. 0989 (RPP), 1995 U.S. Dist. LEXIS 1105, at *17 (S.D.N.Y. Jan. 30, 1995) ("The complaint must allege facts from which it can be inferred defendants consciously agreed to engage in a RICO conspiracy.  A defendant's agreement may be manifested by an assent 'to commit predicate acts of racketeering"); *Environmental Servs. v. Recycle Green Servs.*, 7 F. Supp. 3d 260, 275 (E.D.N.Y. 2014) ("[I]t is not necessary for the conspiratorial agreement to be express, so long as its existence can plausibly be inferred from words, actions, and the interdependence of activities").

### c.    FTE Has Alleged A Closed-Ended Pattern of Racketeering Activity

Moving Defendants next argue that FTE failed to allege a "resulting pattern of racketeering activity, let alone a pattern that amounts or poses a threat of continued criminal activity."  Defs.

Memo. at 8.  In doing so, Moving Defendants completely ignore the body of case law concerning allegations of close-ended racketeering activity, which FTE adequately alleges.  *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 299, 242 (2d Cir. 1999) ("The continuity necessary to prove a pattern can be either 'closed-ended continuity,' or 'open-ended continuity.'").  "To satisfy closed-ended continuity, the plaintiff must prove 'a series of related predicates extending over a substantial period of time . . . this Court has never held a period of less than two years to constitute a 'substantial period of time.'" *Id.*

Here, FTE has sufficiently alleged a closed-ended pattern of predicate acts.  The predicate acts began with Singal's fraud perpetrated on FTE's board on October 22, 2019, by falsely representing that the Vision Portfolio had a value of $500 million while failing to disclose the fact that Vision had already contemplated bankruptcy due to bourgeoning legal troubles over Vision's unlawful rent-to-own scheme.  [DE 1-1] ¶ 45, 54.  At this same time, Singal committed further fraud by falsely promising to satisfy certain amounts of FTE's existing debt in exchange for FTE shares, and his failing to properly disclose the share issuance to the NYSE resulting in FTE's stock being de-listed.  *Id.*  The last predicate act occurred on February 3, 2022, when Singal, the Moving Defendants, other Defendants and co-conspirators falsely represented themselves to constitute a majority of FTE's shareholders by, among other things, fraudulently purporting to vote the FC REIT Shares that belong to FC REIT, to change FTE's bylaws.  [DE 1-1] Ex. D.  Consequently, the predicate acts spanned a period of 2 years, 3 months and 12 days.  In that time, the Enterprise committed numerous other predicate acts including fraudulently promising that the FC REIT Shares would be transferred to FC REIT and transferring FTE's shares among Singal's affiliates (i.e., the Moving Defendants) in violation of FTE's "firewall," the Vision Purchase Agreement, and the injunction issued by the Pennsylvania state court.  [DE 1-1] ¶¶ 47, 65-69, 99-101, 105,

120-131.  Consequently, FTE has adequately alleged a closed-ended racketeering pattern under well-established legal precedent set by the Second Circuit.  *Cofacredit*, at 242 (finding plaintiff established closed-ended continuity where predicates began in early 1988 and continued through late 1990); *Metromedia Co. v. Fugazy*, 983 F.2d 350, 369 (2d Cir. 1992) (similar closed-ended finding based on predicate acts over two years).

### d.      FTE Has Adequately Alleged A Distinct Enterprise

Moving Defendants also contend that FTE's 1962(c) RICO claim "fails because it does not establish an enterprise distinct from the alleged racketeering activity."  Defs. Memo. at 9.  Moving Defendants have once again misconstrued RICO law.  Here, FTE has alleged an "associated-in-fact" Enterprise consisting of Singal, TTP8, FCMA, and Innovativ with a common purpose to fraudulently takeover FTE.  [DE 1-1] ¶¶ 133-140.   For RICO purposes, an association-in-fact "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  *Boyle v. United States*, 556 U.S. 938, 945 (2009).  As the Supreme Court has made clear, a RICO enterprise may be formed "solely for the purpose of carrying out a pattern of racketeering acts," so long as it embodies the requisite structure to make it an enterprise.  *Id*. at 942.  The Second Circuit follows this approach.  *See, e.g.*, *Pavlov v. Bank of N.Y. Co.*, 25 Fed. Appx. 70, 71 (2d Cir. 2002) ("We have repeatedly found a sufficient enterprise where the complaint alleges a group without centralized hierarchy formed for the sole purpose of carrying out a pattern of racketeering acts").  This District follows this approach.  *See, e.g.*, *Cedar Swamp Holdings, Inc. v. Zaman*, 487 F.Supp.2d 444, 452 (S.D.N.Y. 2007) ("The Court recognizes that the RICO statute was intended to cast a wide net and that even loosely affiliated

individuals with little organizational structure can constitute an enterprise where the group exists solely for the purpose of carrying out a pattern of racketeering activity").[4]

FTE adequately alleged racketeering activity, *see supra* § II(b), and alleged an Enterprise (Singal, FCMA, TTP8, and Innovativ) that is separate from the culpable person (Singal); FTE has satisfied the RICO pleading standard set by the Supreme Court in *Turkette* and *Boyle*.  *Turkette*, 452 U.S. 576, 583 (1981) (enterprise and racketeering activity are two separate elements); *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) ("[U]nder § 1962(c) one must allege and prove the existence of two distinct entities: (1) a person; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name").

### e.  FTE Has Alleged Concrete Damages

In a brazen downplay of the harm Moving Defendants have caused FTE, they argue that the "RICO claim fails because its claimed damages are speculative and not yet definite [given that the] relief FTE seeks primarily concerns the disposition of its shares from the Vision Portfolio transaction."  Defs. Memo. at 10. This completely ignores the tangible harm Singal has already caused FTE, including (i) fraudulently promising to lower FTE's debt in exchange for more than 4 million FTE shares, which Singal subsequently failed to disclose properly to the NYSE resulting in FTE's stock being de-listed; (ii) fraudulently inducing FTE to expend millions to purchase the Vision Portfolio while misrepresenting its value by hiding the existence of bourgeoning legal liabilities; (iii) fraudulently inducing FTE to part with its shares to the Szkaradeks as part of the Vision Portfolio fraud; and (iv) FTE having to incur attorney's fees to contest the coup attempted

---

[4] Notably, the case law relied on by Moving Defendants relies on RICO Supreme Case law pre-*Boyle*, namely *United States v. Turkette*, 452 U.S. 576, 583 (1981).  *See Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 458-59 (S.D.N.Y. 2009) (exclusively citing *Turkette* to rule that plaintiff failed to allege an enterprise separate and apart form the racketeering activity); *Weir v. Cenlar FSB*, 2018 WL 3443173, *21-22 (S.D.N.Y. July 17, 2018) (relying exclusively on *Kutter*).  As *Boyle* explained, *Turkette* <u>does not</u> support Defendants' proposition, but merely held that "the existence of an enterprise is an element distinct from the pattern of racketeering activity and proof of one does not necessarily establish the other.'" *Id*. at 947.

through Singal and Moving Defendants' attempt to change FTE's bylaws to put themselves in charge of the Company.  [DE 1-1] ¶¶ 66, 73-82, 161-62, 170.  All FTE must allege to state a civil RICO claim is "an injury to his 'business or property' that was proximately caused by the substantive RICO violation." *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F.Supp.2d 297, 309 (S.D.N.Y. 2010).  The millions in damages from the Vision Purchase Agreement, the resulting loss of stock, and incurring attorney's fees to stop the coup are all tangible and already realized; it is insulting for Moving Defendants to call these damages speculative.

### III.   FTE Has Adequately Alleged RICO Conspiracy Against All Moving Defendants

Moving Defendants' lazy contention that the "RICO conspiracy claim fails because the underlying RICO claim is deficient" has been debunked per Section II above.  Defs. Memo. at 11. Moving Defendants subsequent argument that the Complaint "states only the defendants conspired or agreed with one another to participate in the conduct of the enterprise, but 'fails to set forth sufficient facts to suggest how each of the defendants, through words or actions, reached an agreement'" is also unavailing.  Defs. Memo. at 12.  In making this argument, Moving Defendants argue that the RICO conspiracy claim is subject to the heightened FRCP Rule 9 standard,  Defs. Memo. at 13, another deliberate misstatement of the law.  *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 154-55 (S.D.N.Y. 2014) ("the Court analyzes the Complaint's allegations of a § 1962(d) conspiracy under the 'more liberal pleading requirements of Rule 8(a)").

"To establish a RICO conspiracy, a plaintiff must plead that a defendant agreed to participate in the affairs of the enterprise through a pattern of racketeering activity." *N.Y. Dist. Council of Carpenters Pension Fund v. Forde*, 939 F.Supp.2d 268, 282 (S.D.N.Y. 2013).  A "defendant's agreement to join a conspiracy can be inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of wrongdoing."  *Id.* at 282; *see also United*

*States v. Zichettello*, 208 F.3d 72, 100 (2d Cir. 2000) ("To be convicted as a conspirator, one must be shown to have possessed knowledge of only the general contours of the conspiracy"); *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) ("RICO conspiracy charges under § 1962(d) are less demanding: A conspirator must intend to further an endeavor which, if completed, would satisfy the elements of a substantive criminal offense, but it suffices that [defendant adopted] the goal of furthering or facilitating the criminal endeavor").

FTE has adequately alleged a RICO conspiracy against the Moving Defendants and Cunningham.  First and foremost, Moving Defendants and Cunningham confirmed their own knowledge and participation in the conspiracy to fraudulently take-over FTE, and in the process all committed a predicate act, by signing onto the *ultra vires* amendments to FTE's bylaws.  [DE 1-1] Ex. B.  These amendments were fraudulent because they (a) impermissibly included the FC REIT Shares that were never the Szkaradeks' or any other Defendants' to vote; (b) included shares Innovativ (owned and controlled by Coleman) received from the Szkaradeks on November 10, 2021, in violation of the amended Vision Purchase Agreement and a court injunction; and (c) included shares Ladnier received from the Szkaradeks on November 10, 2021, in violation of the amended Vision Purchase Agreement.  [DE 1-1] ¶¶ 120-27.  Nevertheless, (i) Ladnier signed onto the fraudulent bylaw amendments in her individual capacity as an FTE shareholder and on behalf of TTP8; (ii) Singal signed on behalf of FCMA (as its manager); (iii) Coleman signed on behalf of Innovativ (as its CEO); and (iv) Cunningham signed in his individual capacity, thereby demonstrating each Moving Defendant and Cunningham agreed to further this conspiracy in a well-pled predicate act.  *Id*. Ex. B at 3.

The February 3, 2022 *ultra vires* amendments to FTE's bylaws was just the last step in the Moving Defendants' and Cunningham's over two-year long conspiracy; their plans had been

hatched and set into motion much earlier.  In October 2022, Singal launched the scheme by knowingly falsely representing to FTE's board that (a) the Vision Portfolio had a value of $500 million (when, in fact, Vision was on the verge of bankruptcy due to impending legal troubles); and (b) that Singal had extinguished FTE's pre-existing debt held by certain non-parties.  *See* [DE 1-1] ¶ 45, 58-59, 104; *see also*, *New York v. O'Hara*, 652 F. Supp. 1049, 1054 (W.D.N.Y. 1987) (sustaining challenge to amend RICO complaint premised on predicate acts of defrauding the government in contract negotiations).  FTE relied on Singal's fraudulent statement that he discharged FTE's debt and approved his unearned consideration of 4,193,684 shares of FTE stock. [DE 1-1] ¶ 58.  Singal accepted these shares, transferred through mail and wires, and immediately committed another fraudulent act by failing to register or disclose these shares properly, as required by NYSE listing rules, prompting NYSE to de-list FTE.  *Id*. ¶¶ 60-72.

Within a few months of the December 30, 2019 closing on the Vision Purchase Agreement, the other Moving Defendants began playing their part in the conspiracy to takeover FTE.  In May 2020, Singal and Ladnier's company, TTP8, began distributing the FTE shares Singal secured through falsely representing he discharged FTE's debt to other Moving Defendants and their co-conspirators, including to Ladnier individually and to Innovativ, the company owned and controlled by Coleman.  [DE 1-1] ¶¶ 107-110.

On April 2, 2021, the Vision Purchase Agreement was amended to, among other things, increase the restriction on the Szkaradeks transferring any FTE shares to Singal or his affiliates (i.e., the Moving Defendants).  *Id*. ¶ 116; *Id*. Ex. F § 1.4(b)(ii) ("Sellers agree not to distribute, sell or otherwise transfer any of the Equity Consideration to Suneet Singal ('Singal') or any immediate family member or affiliate of Singal").  But the Szkaradeks and Moving Defendants proceeded to do just that.  Specifically, on November 12, 2021, the Szkaradeks agreed to transferred 11,031,688

shares of FTE common stock to Innovativ (Coleman's company) through execution of a purchase and sale agreement that was sent via interstate wires to the parties and FTE.  [DE 1-1] ¶¶ 120-121. On November 12, 2021, as well, the Szkaradeks also executed a membership interest purchase agreement with another entity controlled by Ladnier, whereby the Szkaradeks would illicitly transfer further "Equity Consideration" to Singal's wife—in violation of the Vision Purchase Agreement—in the form of FTE's debt and preferred stock.  *Id*. ¶¶ 120-22.  Not only were these transfers in violation of the Vision Purchase Agreement, they also violated a Pennsylvania court order which enjoined the Szkaradeks from transferring any of the consideration they received as part of the Vision Purchase Agreement.  *Id*. ¶ 123.

Every receipt and transfer of FTE's shares by and between the Moving Defendants had a purpose, as each of the Moving Defendants used these shares, including the FC REIT Shares belonging to FC REIT, to attempt to pass the *ultra vires* amendments to FTE's bylaws such that the Moving Defendants would take control of FTE.  It is disingenuous for Moving Defendants to argue, for example that "the [conspiracy] claim fails against Innovativ and Coleman because it does not allege specific facts evidencing their agreement to participate in a conspiracy", Defs. Memo. at 13, where Coleman gave sworn testimony that he was the impetus behind the coup attempt.  [DE 1-1] Ex. H ¶ 14 ("My conversation with Cunningham led me to organize a group representing what I believe is a majority of the other stockholders, and we amended the bylaws to prohibit the current Board from attempting to execute their plan").  It is not a coincidence that every one of these "other stockholders" have direct ties to Singal and his wife Ladnier, including their shared company TTP8 and FCMA (managed by Singal) all of whom comprise the Moving Defendants.  [DE 1-1] Ex. B at 3.  Cunningham, for his part, also had significant pre-existing ties to Singal.  [DE 1-1] ¶¶ 52-54.  As did the other signors Goodwin and Ghishan.  *Id*.

Thus, the Complaint adequately alleges that all of the Moving Defendants participated in transfers of FTE's shares between one-another from October 2019 through February 3, 2022, when they collectively pooled together these shares to make *ultra vires* amendments to FTE's bylaws. Moving Defendants' participation in these well-pled, highly insular, and illicit transfers, which violated FTE's "firewall", the Vision Purchase Agreement, and court orders, and culminated in an attempted realization of the conspiracy's overall goal to take over FTE, adequately sets forth a claim for RICO conspiracy. *Constellation Bank, N.A. v. C.L.A. Management Co.*, 94 Civ. 0989 (RPP), 1995 U.S. Dist. LEXIS 1105, *17 (S.D.N.Y. Jan. 30, 1995) (denying motion to dismiss RICO conspiracy where the plaintiff "allege[d] facts from which it can be inferred that defendants consciously agreed to engage in a RICO conspiracy"); *Trautz v. Weisman*, 819 F. Supp. 282, 289 (S.D.N.Y. 1993) (A RICO conspiracy may be manifested by an assent "to commit predicate acts of racketeering . . . Plaintiffs need not allege that each defendant actively committed a predicate act; *Morrow v. Black*, 742 F. Supp. 1199, 1208 (E.D.N.Y. 1990) ("The defendant's agreement may be inferred from circumstantial evidence of his status in the enterprise and his knowledge of the wrongdoing").

## IV.   FTE Has Established Jurisdiction Over Moving Defendants

Because FTE has demonstrated the validity of its First Cause of Action for RICO violations against Singal and Second Cause of Action for RICO conspiracy against all Moving Defendants and Cunningham, there is no merit to Moving Defendants' contention that "[a]bsent a viable RICO conspiracy claim, FTE has not satisfied its burden of making a *prima facie* showing of jurisdiction over Responding Defendants." Defs. Memo. at 14.  In making this argument, Moving Defendants again make false statements to this Court that the "Complaint expressly alleges that each Defendant resides in, was incorporated in, or has a principal place of business in a state other than New York." Defs. Memo. at 14.  Defendant Bruce Fahey is a New York resident, [DE 1-1] ¶ 28,

-27-

and that is sufficient for jurisdiction over all Defendants. *Daly v. Llanes*, 30 F. Supp. 2d 407, 412 (S.D.N.Y. 1998) ("A district court has been afforded personal jurisdiction under [RICO] only over a single defendant in a RICO action, in the district which that defendant resides, has an agent, or transact his or her affairs"); *see also*, *National Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 86 F. Supp. 2d 137, 141 (E.D.N.Y. 2000) ("RICO's venue and service provisions . . . evidence Congress' intent to facilitate trial of all participants in a RICO conspiracy in a convent district in a single civil action").

Moreover, Singal perpetrated the initial fraud that launched the entire scheme at the FTE board meeting held in New York on October 22, 2019, where he both misrepresented the value of the Vision Portfolio while hiding the known legal liabilities, and falsely represented that TTP8 would extinguished FTE's debt in order to secure over 4 million of FTE's shares so that the conspiracy could begin.  [DE 1-1] ¶¶ 54-59, 170.  Thus, by the very case law Moving Defendants cite for their jurisdictional argument, jurisdiction is established.  Defs. Memo. at 15 (citing *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 137 S. Ct. 1773, 1780 (2017) ("In other words, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation").

## V.     FTE Has Adequately Alleged Fraud Against Singal

Moving Defendants contend that FTE has failed to allege a fraud and/or fraudulent inducement claim against Singal because it has "not alleged (1) that Responding Defendants made any false representations or omissions; (2) that FTE relied on any false representation or omissions; and (3) that FTE has been damaged."  Defs. Memo. at 16.  Again, this is a preposterous argument when compared to the well-pled Complaint.

The Complaint alleges that Singal made several false representations and omissions in his dealing with FTE, first and foremost being that on October 22, 2019, at the FTE board meeting in New York, "Singal represented that Vision's portfolio of properties had a then existing book value in excess of $500 million." [DE 1-1] ¶ 45. The Complaint goes on to list several aspects of the Vision Purchase Agreement that Singal misrepresented to FTE, including that (a) "[a]lthough the brick-and-mortar value of the portfolio was arguably $350 million . . . it was not disclosed that the majority of the properties in the portfolio, which were subject to a national lease-to-own scheme . . . were unsellable and virtually impossible to collect rent from"; (b) "No disclosure was made of pending homeowner complaints in Michigan, Ohio and numerous other states to their respective AGs"; and (c) "Fraudulently misrepresented that Singal was merely a one-time broker in the transaction, while concealing the very basis of the relationship between the Szkaradeks and Singal as partners and co-conspirators." *Id*. ¶ 78. In addition to fraud involving the Vision Purchase Agreement, the Complaint also alleges that Singal fraudulently represented to the FTE board during that same meeting that he had agreed to pay off millions of FTE's unsecured debt. *Id*. ¶¶ 58, 104. Singal also fraudulently represented to FTE and the public in a December 20, 2019 press release that he would give his consideration under the Vision Purchase Agreement to his securities fraud victim FC REIT. *Id*. ¶ 50.

The Complaint explains that FTE relied on these several fraudulent representations. FTE alleges that "[w]ithout knowing the full extent of Vision's then existing and future liabilities . . . FTE closed on the Vision portfolio on December 30, 2019." *Id*. ¶ 73. FTE believed it could enforce its "firewall" against Singal and his affiliates because Singal promised FTE that he would not be involved in the transaction post-closing and that his consideration would be used to make FC REIT whole. *Id*. ¶¶ 48-50, 67-69, 78. The Complaint also alleges how FTE issued 4,193,684 shares of

FTE common stock to TTP8 in reliance on Singal's false representation that TTP8 had acquired and would discharged millions of dollars of FTE's debt. *Id.* ¶ 104. Consequently, the Complaint adequately alleges that FTE reasonably relied on Singal's representations concerning the Vision Portfolio's value, his intention to convey any consideration to FC REIT, and his representation that he had extinguished millions in FTE's unsecured debt. *See*, *e.g.*, *Ysin Brake Corp. v. Motocar Parts of Am., Inc.*, 13 Civ. 9223, 2014 WL 2560616, at *7 (S.D.N.Y. June 6, 2014) (finding fraud adequately pled when plaintiff relied on an incorrect statement from a company's office that the company was in strong financial health); *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011) (Ruling that because reliance "involves many factors to consider and balance, no single one of which is dispositive," it is "a question of fact for the jury rather than a question of law for the court").

FTE has also adequately alleged it was harmed. As a result of Singal's misrepresentations concerning the Vision Portfolio, the millions FTE spent, and millions more in liabilities it assumed, to purchase these properties was wasted, because it has "learned that it could not sell a vast majority of the properties due to injunctions, stop orders, and other actions taken by state AGs and consumer protection groups[.]" [DE 1-1] ¶ 95. Separately, Singal's false representation that he would extinguish FTE's debt resulted in FTE foregoing over 4 million of its common stock for no consideration. *Id.* ¶ 104. FTE has sufficiently alleged it was damaged by Singal through the loss of its stock without consideration and loss of its economic monetary resources by purchasing the Vision Portfolio while Singal hid the unmarketability of the properties. *BrandAid Mktg. Corp. v. Biss*, 03 Civ. 5088 (WHP), 2008 U.S. Dist. LEXIS 4036, *14 (S.D.N.Y. Jan. 22, 2008) ("BrandAid has proven that it suffered an injury as a result of the Defendants' fraud—namely; the loss of 23.5 million shares and control of the company"); *Dornberger v. Metropolitan Life Ins. Co.*, 961

F.Supp. 506, 544 (S.D.N.Y. 1997) ("Plaintiff has adequately pled pecuniary loss so as to state a claim for damages on the basis of fraud").  Consequently, FTE has adequately alleged all elements of its fraud claim against Singal.

## VI.   FTE Has Adequately Alleged Tortious Interference Against Singal[5]

Moving Defendants next assert that FTE's tortious interference claim against Singal fails because the "Complaint does not allege" the elements of this claim.  Defs. Memo. at 18.  Under New York law, the "elements of a cause of action to recover damages for tortious interference with a contract are the existence of a valid contract, the defendant's knowledge of that contract, the defendant's intentional and improper procuring of a breach, and damages."  *Rose v. Different Twist Pretzel, Inc.*, 123 A.D.3d 897, 898 (2d Dep't 2014).  The Complaint alleges each of these elements: (i) a valid contract, i.e., the Vision Purchase Agreement, [DE 1-1] ¶ 185; (ii) that Singal knew of this Agreement because he pitched it to FTE, was subject to the firewall created therein prohibiting his or his affiliates receipt of FTE's shares, and his announcement of the Agreement and public promise to convey his consideration to FC REIT, *Id.* ¶¶ 45-50, 187; (iii) that Singal, individually and through his company TTP8, conspired to breach the Vision Purchase Agreement by inducing the Szkaradeks to transfer their FTE shares to TTP8 and his wife, Ladnier, in violation of the Agreement; *Id.* ¶¶ 120-123, 188-90; and (iv) damages in the form Singal using the FTE stock he induced the Szkaradeks to transfer to him and his affiliates, in violation of the Agreement, to attempt to fraudulently take over FTE.  *Id.* ¶¶ 125-127, 191.  Moving Defendants' claim that these damages are "speculative" and "lack factual specificity" is a deliberately narrow and misleading reading of the Complaint and ignores that Moving Defendants already attempted to, and maintain

---

[5] Defendants contend that FTE has changed its position as to who its tortious interference claim is alleged against. Defs. Memo. at 17-18.  This is false.  FTE's October 14, 2022 pre-letter motion spoke to the "Singal Defendants" arguments opposing this claim because these defendants filed their pre-letter motion in together, [DE 28], whereas later letters explained that this claim is only asserted against Singal.

they successfully, took over FTE through using the FTE shares Singal induced the Szkaradeks to transfer to him, TTP8 and his wife, Ladnier, to purportedly pass amendments to FTE's bylaws such that Moving Defendants would retain all decision-making authority. *Id.* ¶¶ 120-127.

Moving Defendants also argue, without legal support, that "[w]ith respect to procuring the breach of contract, FTE must allege wrongful means such as physical violence, fraud, misrepresentation, or threat of legal action." Defs. Memo. at 19. Tellingly, none of the cases Moving Defendants cite to lend any support to such a high pleading bar for wrongful inducement. Rather, New York's highest Court has explained that "where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations **even if the defendant was engaged in lawful behavior**." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189-190 (2004) (emphasis added). The Complaint alleges that Singal wrongfully induced the Szkaradeks to breach the Vision Purchase Agreement through the creation of "sham Wyoming shell companies" and conspiring to reward the Szkaradeks for these breaches by transferring the few valuable properties in the Vision Portfolio back to the Szkaradeks after the execution of the Vision Purchase Agreement. *Id.* ¶ 83-95; 188. FTE has adequately alleged tortious interference against Singal.[6]

## VII.    Non-Moving Defendant Coleman Was Properly Served

Moving Defendants argue that "Coleman should be dismissed because he never waived service and FTE never bothered to properly serve him." Defs. Memo. at 20. Coleman has obviously seen a copy of the Complaint as he brings this Motion along with other Moving Defendants who do not dispute they were properly served, including Innovativ, where Coleman

---

[6] Moving Defendants make a final absurd argument that "Singal cannot tortiously interfere with the Purchase Agreements because FTE implicit claims that he was an intended third-party beneficiary of the agreement." Defs. Memo. at 20. The fact that the Vision Purchase Agreement contained multiple provisions to ensure that no consideration would ever go to Singal or his affiliates completely neuters this argument. *See* [DE 1-1] Ex. F § 1.4.

serves as CEO.  Defs. Memo. at 20-21; [DE 1-1] Ex. B at 3 (Coleman signing *ultra vires* FTE bylaws amendments as Innovativ's CEO).  As reflected on the docket, a copy of the Complaint was served on November 8, 2022, at 430 Westridge Drive, Watsonville, CA 95076, the business offices for Demand Brands, an investment company focusing on the recreational marijuana space. [DE 40].  The process server left the pleadings with an individual named Dean Trinn, who confirmed when receiving the package that Coleman worked there, *id.*, which is supported by public records.  *See* https://www.bloomberg.com/profile/person/20699469.  FTE also served the Complaint at the only other known address for Coleman, 9601 Wilshire Boulevard, Suite 1109, Beverly Hills, CA 90210.  [DE 50].  California law provides that service can be made by serving a copy of the summons and complaint on the individual's "usual place of business."  Cal. Code Civ. Proc. § 415.20.

The only contention that Coleman has not been served comes from his attorney's statements.  *See* Defs. Memo. at 21-22; [DE 44].[7]  In the face of a valid affidavit of service reflecting Coleman was served at his place of business, indisputable service on Coleman's company Innovativ, and the obvious fact that Coleman has seen the Complaint by making substantive arguments for its dismissal with this Motion and in pre-motion letters, there is no basis for Coleman's dismissal based on his uncorroborated statement that he was not served.  This is particularly true since FTE's affidavit of service must be construed "in the light most favorable to

---

[7] Rather than submit a declaration from Coleman, Moving Defendants purportedly submit a Declaration of Dean Trinh in which the declarant purportedly contradicts his statements to the process server that Coleman worked at Demand Brands and that he could accept service for him.  *See* Defs. Memo. Ex. B.  The authenticity of this Declaration is dubious, however, because it is introduced impermissibly as an exhibit to Moving Defendants' memorandum of law, and therefore is improper and should not be considered.  *Rinaldi v. NICE Ltd.*, 19-CV-424 (LGS) (KNF), 2020 U.S. Dist. LEXIS 69403, at *3 (S.D.N.Y. Apr. 20, 2020) ("SAP attached, improperly, an exhibit to its memorandum of law.  The Court observed that SAP and Rinaldi made factual assertions through their respective memoranda of law; but a memorandum of law is not evidence . . . and cannot substitute for the affidavit requirement outlined in Local Civil Rule 7.1(a)(3).  As Rinaldi's motion to compel does not comply with the court's Local Civil Rules, granting it is not warranted").

the non-moving party." *George v. Prof'l Disposables Int'l, Inc.*, 221 F. Supp. 3d 428, 443 (S.D.N.Y. 2016). Indeed, Federal law compels this Court to reject Coleman's argument as it is made without an affidavit supporting his claim he was not served.[8] *United States v. Jost*, 9 F. Supp. 3d 303, 307 (W.D.N.Y. 2014) (denying motion to dismiss for lack of service where "there has been no sworn statement submitted contradicting the process server's affidavit, nor has defendant set forth any facts supporting her claim that service was not made"); *Griffin-Nolan v. Providence Wash. Ins. Co.*, 5:04-CV-1453 (FJS/GJB), 2005 U.S. Dist. LEXIS 12902, at *9 (W.D.N.Y. June 20, 2005) ("[C]ommon sense dictate that a motion to dismiss for failure to serve summonses requires a supporting affidavit, which Defendants have not provided").

## VIII.  The Szkaradeks Are Not Indispensable Parties

Moving Defendants next argue that the Complaint should be dismissed because "the Szkaradeks are necessary parties" as "FTE's requested relief largely targets the disposition of the Szkaradeks' FTE stock holdings received as consideration in the Purchase Agreements." Defs. Memo. at 22. As an initial matter, the Court should note that this argument confirms FTE's conspiracy against Moving Defendants, namely that they received FTE's shares from the Szkaradeks in violation of prohibitions under the Vision Purchase Agreement. FTE's requested relief seeks, among other things, disgorgement of shares held by Defendants back to FTE. [DE 1-1] at 44. Moving Defendants' argument that this would affect the "disposition of the Szkaradeks' FTE stock" is, therefore, an admission that Defendants received this FTE stock from the Szkaradeks in violation of the Vision Purchase Agreement. [DE 1-1] Ex. F. § 1.4 (Prohibiting the Szkaradeks from transferring any FTE stock to Singal, Ladnier, TTP8 or other Singal affiliates).

---

[8] Finally, even if Coleman's arguments are correct, he is not entitled to dismissal with prejudice as that relief is precluded under the Federal Rules for dismissal based on lack of service. *United States CFTC v. Paron Capital Mgmt., LLC*, C 11-4577 CW, 2012 U.S. Dist. LEXIS 49154, at *7 (N.D. Cal. Apr. 6, 2012) ("A court may dismiss the action without prejudice pursuant to Rule 12(b)(5)").

Moreover, since FTE is only seeking disgorgement of the FTE stock held by Defendants, which do not include the Szkaradeks, the only way this relief could impact the Szkaradeks' stock is if it had been transferred to the Defendants, thereby extinguishing the Szkaradeks' rights in the stock.

Other than disgorgement of this stock, the other stock-related relief FTE seeks is to enjoin "Singal, his affiliates, and family members from receiving any of FTE common or preferred shares of stock" and to enjoin "Singal from transferring any FTE common or preferred shares or stock to Innovativ [and Coleman.]" [DE 1-1] at 44. This has no greater restrictions on the Szkaradeks' rights than what they agreed to under the original and amended Vision Purchase Agreement. [DE 1-1] Ex. B § 4.7(a)(iii) ("[N]o portion of such stock will be transferred, directly or indirectly, to a Singal Party"); Ex. F § 1.4 (similar). FTE's requested relief has nothing to do with impacting the disposition of any of the Szkaradeks' stock in FTE that they have not already disposed of themselves through illicit transfers to Moving Defendants.

Absent Moving Defendants' misleading characterization of FTE's requested relief, it becomes clear why the Szkaradeks are not necessary and indispensable parties. "A party is 'necessary' under [FRCP] Rule 19(a)(1) only if in that party's absence ' complete relief cannot be accorded among those already parties.'" *Mastercard Int'l, Inc. v. Visa Int'l Servs. Ass'n*, 471 F.3d 377, 385 (2d Cir. 2006) (citations omitted). While the Szkaradeks are indeed co-conspirators to the Enterprise alleged in the Complaint, they are not necessary to the relief sought therein because the Complaint adequately alleges a complete Enterprise with Singal as the "culpable person" directing and controlling the Enterprise. *See* [DE 1-1] ¶¶ 133-163. As set forth in Sections II and III above, FTE has sufficiently alleged its RICO claims against Moving Defendants and Cunningham which, if proven, would entitle it to damages sought in its Complaint, even without naming the Szkaradeks as part of the Enterprise. *Wilson v. Austin*, CV 11-4594 (SJF) (GRB), 2012

U.S. Dist. LEXIS 123067, at *19-20 (E.D.N.Y. June 25, 2012) ("If complete relief can be granted among existing parties by the district court, then a party is not necessary, even if there may be additional litigation in the future").

The entire premise of Moving Defendants' necessary parties argument turns on the false premise that this Action will prejudice the Szkaradeks' disposition of their stock holdings when, based on the plain language of FTE's requested relief, nothing of the sort will happen.  The only stock that will be impacted are those held by Defendants in this Action, and the fact that this stock was previously held by the Szkaradeks and transferred to Moving Defendants in breach of the Vision Purchase Agreement does not make the Szkaradeks necessary parties.

## IX.    Jurisdiction For This Action Resides With This Court, Not Delaware

Moving Defendants' final argument is that the "litigation in Delaware . . . compels dismissal" of this Action.  Defs. Memo. at 23.  In making this argument, Moving Defendants cite to a plethora of documents that are neither attached to Defendants' Memorandum, nor introduced in any other form.  *See id.* at 23-24 (making references to The Delaware Action complaint, a "State Corporate Case," and pleadings and an order in a "PA State Action", none of which were included in Defendants Memorandum of law, and there was no declaration or affidavit accompanying service of Defendants' Motion that introduced these cited documents).  Thus, it is extremely prejudicial for FTE to respond to Moving Defendants' argument, which relies on cryptic references to documents with defined terms that were not included in Moving Defendants' papers.  Indeed, Moving Defendants' failure to include these documents violates this District's Local Rules.  *See* SDNY Local Rule 7.1(3) ("[A]ll motion shall include the following motion papers: Supporting affidavits and exhibits thereto containing any factual information and portions of the record necessary for the decision of the motion").

"Courts in this Circuit have held that a moving party's failure to attach a memorandum of law and other supporting documents in accordance with Local Rule 7.1 is sufficient grounds to deny a motion." *Rice v. Resurgent Capital Servs., L.P.*, 15 CV 6319 (KAM)(CLP), 2017 U.S. Dist. LEXIS 20932, at *8 (E.D.N.Y. Feb. 13, 2017); *Rinaldi v. NICE Ltd.*, at *3 (denying motion filed by *pro se* party where he "did not to submit to the Court, in connection with the instant motion, 'supporting affidavits and exhibits thereto containing any factual information and portions of the record necessary for the decision of the motion.'").  Moving Defendants' fail to include the documents they rely on in making this jurisdictional argument, and it therefore must be disregarded entirely.

Notwithstanding this fatal defect, Moving Defendants' jurisdictional arguments that do not rely on missing documents are wholly without merit.  Moving Defendants argue, for instance, that Delaware jurisdiction is mandatory because that is provided for in the Vision Purchase Agreement. Defs. Memo. at 23.  Again, Moving Defendants fundamentally misconstrue the nature of this Action, which is not about a direct breach of the Agreement (indeed none of the Defendants are parties to the Agreement) but rather how Defendants conspired to take over FTE through a series of wire fraud and other predicate acts that culminated in passing *ultra vires* amendments to FTE's bylaws.  Moving Defendants' remaining contention is self-defeating, as they simultaneously concede that this Action was filed *before* the Delaware action yet argue that the Delaware action should take precedent under the first-filed rule.  Defs. Memo. at 24 ("FTE filed the Delaware Action after this case").  Moving Defendants cannot create a fictitious exception to the first-filed rule to defeat this Court's jurisdiction.  The argument is simply beyond the pale.

## X.     FTE Has Adequately Pled Cunningham Breached His Fiduciary Duty

Cunningham argues that FTE's Fifth Cause of Action for his breach of his fiduciary duty must be dismissed because "[u]nder Nevada's business judgment rule Plaintiff must not only allege

facts that rebut the presumption of good faith, but also that the director's alleged conduct amount to 'intentional misconduct, fraud, or knowing violation of the law.'"  Cunningham Memo. at 4 (citations omitted).  Cunningham argues the "Complaint does not even attempt to allege facts that would satisfy this high standard."  *Id*. at 4.  This is a disingenuous reading of the Complaint and should be disregarded as gaslighting.

The Complaint sets forth how FTE's board, which included Cunningham, responded to the news that Singal was charged by the SEC for fraud by instituting a "firewall . . .directing all members of FTE's board and management not to have any communications with Singal, either directly or through affiliates, regarding the company's business affairs."  [DE 1-1] ¶ 47.  The Complaint alleges that Cunningham knowingly and deliberately violated this policy by passing confidential information concerning FTE's plan on suing Singal, the Szkaradeks and Innovativ, and FTE's discussions to adopt changes to its voting shares.  *Id*. ¶¶ 65, 101, 113, 128-131, 170. These allegations are corroborated by Coleman's own affidavit.  *Id*. Ex. G ¶¶ 13-14.  This breach of FTE's "firewall" policy and misuse of confidential information constitutes "intentional misconduct" that satisfies Nevada law's standard for breach of fiduciary duty.  *FDIC v. Delaney*, 2:13-CV-924 JCM (VCF), 2014 U.S. Dist. LEXIS 90147, *10-11 (D. Nev. July 2, 2014) (sustaining breach of fiduciary duty claim against officers where "the complaint enumerates several [company] policies that defendants neglected to follow"); *LVR Holdings, LLC v. Brekka*, No. 58164, 2012 Nev. Unpub. LEXIS 1822, (Nev. Dec. 21, 2012) (affirming trial verdict based on breach of fiduciary duty by a director through his misuse of confidential information).

The Complaint also alleges how Cunningham breached his fiduciary duty owed to FTE by joining the Moving Defendants in their attempt to pass *ultra vires* amendments to FTE's bylaws that would give Cunningham and the Moving Defendants control over FTE.   Specifically, the

-38-

Complaint alleges that Cunningham was involved in the negotiation of the Vision Purchase Agreement, and thereby understood that Agreement's prohibition on (a) any FTE shares given as consideration therefrom being transferred to Singal or his affiliates; and (b) the requirement that the Szkaradeks immediately transfer half of the consideration, over 11 million FTE shares, to FC REIT.  *Id.* ¶¶ *Id.* ¶¶ 12, 47-50, 65-69, 97-100.  Despite this knowledge, Cunningham joined the Szkaradeks and the Moving Defendants efforts to use shares obtained in violation of the Vision Purchase Agreement—including shares obtained by Singal and his affiliates, such as his wife Ladnier and Innovativ/Coleman in violation of this Agreement and the Szkaradeks' improper voting of the FC REIT Shares—to fraudulently represent that Cunningham, Moving Defendants and other conspirators constituted a legitimate controlling majority of FTE.  *Id.* ¶¶ 123-129.  This fraud is substantiated not only by the allegations in the Complaint, but also in the February 3, 2022 letter Cunningham executed alongside Singal, Singal's wife Ladnier, and the Szkaradeks, which purported to change FTE's bylaws and was included as an exhibit to the Complaint.  *Id.* Ex. B.  As Cunningham acknowledges, fraud is a way to satisfy Nevada's "high standard" for rebutting the presumption that a director acted in good faith.  Cunningham Memo. at 4 (citing *Guzman v. Johnson*, 137 Nev. 126 (Nev. 2021)).  Thus, FTE has adequately alleged Cunningham breached his fiduciary duty not only by intentionally violating FTE's "firewall" policy, but also by knowingly joining the fraudulent efforts of the subjects of that "firewall" policy to take over FTE.

In light of the above, Cunningham's argument that the Complaint "does not contain a single allegation against [him] that supports the notion that he did anything other than discharge his duties as an independent director with the best interest of [FTE] in mind" is self-serving revisionist history.  Cunningham Memo. at 4. FTE, by company policy and by contractual obligations, took every step possible to prevent Singal and his affiliates from gaining control of the Company; and

Cunningham sabotaged these efforts by both divulging confidential information to the co-conspirators and, if that was not enough, joining them in the very coup FTE sought to prevent.

Cunningham's remaining argument that FTE has alleged no damages in connection with its breach of fiduciary duty claim is also unavailing.  Cunningham Memo. at 5.  FTE alleged that his fiduciary duty breach caused its damages in the form of "the loss of its stock, monetary damages on monies paid to Defendants" and other categories of costs and injuries.  [DE 1-1] ¶¶ 196-197.  Cunningham contributed to these damages, in violation of this fiduciary duty, by advocating FTE to enter into the Vision Purchase Agreement and supporting Singal's proposal for receipt of more than 4 million of FTE's common stock in exchange for purportedly retiring FTE's debt, all without disclosing his pre-existing close ties to Singal.  *Id.* ¶¶ 53-54, 116, 170; *De La Fuente v. FDIC*, 332 F.3d 1208, 1222 (9th Cir. 2003) ("It is well established that a person can breach a fiduciary duty by failing to disclose material information, even if not asked").

## <u>CONCLUSION</u>

For the reasons set forth above, neither Moving Defendants nor Cunningham have advanced any meritorious arguments which would support dismissal of any one of FTE's well-pled causes of action, and their Motions should be dismissed in their entirety.

March 31, 2023

Respectfully submitted,

**WHITE AND WILLIAMS LLP**

By:    _Shane R. Heskin_

Shane R. Heskin
Alex D. Corey
7 Times Square, STE 29
New York, NY 10036
(215) 864-7000
heskins@whiteandwilliams.com

-40-