Electronically Filed
2/27/2023 7:34 PM
Steven D. Grierson
CLERK OF THE COURT

1  **LEX DOMUS LAW**
   Daniel S. Cereghino, Esq., SBN 11534
2  Brandi M. Planet, Esq., SBN 11710
   1712 Tesara Vista Place
3  Las Vegas, Nevada 89128
   Telephone: (702) 533-4661
4  Facsimile: (702) 472-8605
5  dan@lexdomuslaw.com
   brandi@lexdomuslaw.com
6  *Attorneys for Defendants*

7                    **DISTRICT COURT**

8                **CLARK COUNTY, NEVADA**

9  INNOVATIV MEDIA GROUP, INC., a
10 Wyoming corporation;                    Case No.  A-22-849188-B

11        Plaintiff,                        Dept. No.: XXXI

12 v.                                       **DEFENDANT FTE NETWORK'S**
                                            **OPPOSITION TO PLAINTIFF**
13 FTE NETWORKS, INC., a Nevada corporation; **INNOVATIV'S MOTION FOR**
   LATERAL U.S. CREDIT OPPORTUNITIES       **SUMMARY JUDGMENT ON SPECIAL**
14 FUND, LP; RICHARD DE SILVA; DOES I-X;   **DAMAGES**
15 ROE Entities, I-X,                       **Hearing Date: March 14, 2023[1]**
                                            **Hearing Time: 8:30 a.m.**
16        Defendants.

17

18        Defendant FTE NETWORKS, INC. ("FTE") by and through its attorneys of record,

19 Daniel S. Cereghino, Esq. and Brandi M. Planet, Esq. of Lex Domus Law, hereby submits its

20 Opposition to Plaintiff INNOVATIV MEDIA GROUP, INC.'s ("Plaintiff") Motion for Summary

21 Judgment on Innovativ's Special Damages (the "Motion").

22 / / /

23 / / /

24 / / /

25 / / /

26

27 ─────────────────────
   [1] March 14 is the currently set hearing date.  The parties, however, have recently submitted a
28 stipulation and order to continue that hearing to a later date.  As of the time of this filing, however,
   the Court had not yet approved that stipulation and noticed the continued hearing date.

1    This Opposition is made based on the following Memorandum of Points and Authorities,

2    the pleadings and papers on file in this action and any oral argument of counsel at the related

3    hearing.

4         Dated this 27th day of February, 2023.

5                                    **LEX DOMUS LAW**

6

7         By:*/s/ Daniel Cereghino*
                Daniel Cereghino, Esq., SBN 11534
                Brandi M. Planet, Esq., SBN 11710

8                1712 Tesara Vista Pl.
                Las Vegas, NV 89128

9                *Attorneys for Defendants*

10

11                        **MEMORANDUM OF POINTS AND AUTHORITIES**

12   **I.     INTRODUCTION**

13        The present Motion is just the latest of Plaintiff's calculated efforts to keep one step ahead

14   of the truth and (the correct application of) the law by burying FTE and this Court under improper

15   papers dealing with peripheral issues.  While there are procedural reasons for denying Innovativ's

16   Motion, there are, much more importantly, substantive grounds to deny it.

17        Most specifically, **Innovativ never was a valid FTE shareholder**.

18        This Court has, in fact, already made the legal determination that "**valid**" shareholder status

19   is a precondition to the availability and enforcement of any rights under NRS 78, including the right

20   to demand inspection of FTE's shareholder list under NRS 78.105.

21                 Under NRS § 78.105, a party may inspect a corporation's articles of
                   incorporation, bylaws, and stock ledger **if** a proper demand is made,
22                 **that party is a valid stockholder** of the corporation for six months
                   prior to the demand, and the party's demand is made for a proper
23                 purpose.

24

25   See June 30 Order, already on file, at ¶ 38 (emphasis added).

26        Thus, that Innovativ was never a **valid** FTE shareholder has massive legal consequences for

27   this case.  In fact, that truth has case dispositive impacts because **all** of Innovativ's claims are

28   predicated on that single premise of Innovativ's status as a valid FTE shareholder.

1    But because the truth is that Innovativ was **never** a **valid** FTE shareholder, it never had any

2    right to either: (1) demand inspection of FTE's shareholder list; (2) demand FTE hold an election

3    of directors; or (3) attempt to amend FTE's bylaws by majority shareholder consent.  And most

4    specific to Innovativ's present Motion, because it was never a valid FTE shareholder, it never had

5    any right to **any** relief under NRS 78, including any right to any purported "damages" related to

6    any of its shareholder-dependent acts.

7    This Court must deny Innovativ's current Motion.

8    **II.     STATEMENT OF PERTINENT FACTS**

9        **a.  Background to Innovativ's pending Motion**

10    On March 3, 2022, Plaintiff Innovativ commenced this action.  See Complaint, already on

11    file.[2]

12    **Each** of Innovativ's initial claims for relief was predicated on its claimed status as a valid

13    FTE shareholder. See id.

14        • Innovativ's NRS 78.345 claim was premised on its alleged entitlement, *as a*

15            *shareholder*, to demand an election of directors.  See id. at ¶¶ 33-38.

16        • Innovativ's NRS 78.105 claim turns on its alleged entitlement, *as a shareholder*, to

17            inspect FTE's shareholder list.  See id. at ¶¶ 39-46.

18        • Innovativ's declaratory relief claim, the central gravamen of the entire case, turns

19            on its (and its co-conspirators') alleged entitlement, *as a shareholder*, to amend

20            FTE's bylaws. See id. at ¶¶ 47-54.[3]

21    In prior proceedings in this case, which for the reasons set forth below contained false

22    misrepresentations by Innovativ to this Court as to its status as a *valid* FTE shareholder, this Court

23

---

24   [2] Innovativ's co-plaintiffs, Antoni and Alex Szkaradek, have already been dismissed from this case.
     They, too, are not valid FTE shareholders, albeit for different reasons than Innovativ.

25

26   [3] Innovativ also asserted a "claim" for "injunctive relief." See id. at ¶¶ 55-60. However, that is not
     a legally valid claim, but merely a **remedy** available to a party that prevails on a legally cognizable
     claim.  See Rivard-Crook v. Accelerated Payment Techs., Inc., 2012 U.S. Dist. LEXIS 175162, *6,
27   2012 WL 6138229 (injunctive relief is not an independent cause of action) (citing State Farm Mut.
     Auto. Ins. Co. v. Jafbros Inc., 109 Nev. 926, 860 P.2d 176, 178 (1993)).  In any event, that "claim"
28   is equally predicated on Innovativ's purported status as a valid and proper FTE shareholder.

1    ordered FTE to turn over its shareholder list information pursuant to NRS 78.105. See June 30
2    Order, at ¶ 42, and 9:7-12.

3         Innovativ subsequently sought leave to amend its Complaint for two purposes: (1) to allege
4    "special damages" in the form of attorney's fees; and (2) the appointment of a receiver over FTE.
5    This Court denied as to the latter, but allowed amendment as to the special damages issue. See
6    Court Minutes, entered November 7, 2022, already on file.  While Innovativ abandoned its NRS
7    78.345 election claim based on this Court's June 30 Order (see id. at ¶ 31 ("Innovativ has not
8    alleged that it independently has a sufficient percentage of FTE stock to demand and obtain relief
9    under the Election Statute.")), it reiterated its other claims for relief: (1) an NRS 78.105 shareholder
10   list inspection demand *as an alleged FTE shareholder*; and (2) a declaratory relief claim, *as an*
11   *alleged FTE shareholder*, on the validity of its attempted bylaws amendment. See generally,
12   Amended Complaint ("State Am. Comp."); see also n.3 (regarding its reasserted but still legally
13   invalid "injunctive relief" claim).

14        Innovativ now seeks to leverage its fraudulently obtained preliminary relief under the NRS
15   78.105 inspection claim to seek another improper determination, this time an order as to FTE's
16   liability for Innovativ's allegedly incurred (but entirely unsupported) attorney's fees as special
17   damages under that statute.

18        **b. Substantive background regarding Innovativ's lack of standing**

19        The following facts are undisputed because Innovativ itself either formally admitted as
20   much in its pleadings before this Court (or the U.S. District Court for the District of Nevada) or
21   adduced and relied on documents demonstrating as much.

22   • Innovativ did not own a single FTE share until May 2020.[4]

23   • But Innovativ did not acquire a single one of its 500,000 purported shares from FTE
24     directly, but instead, acquired every one of them from TTP8, LLC.[5]

25   ────────────────

26   [4] See Case No. 2:22-cv-01184-JCM-EJY, Innovativ Media Group, Inc. et al. v. Beys, et al.,
     Amended Complaint [ECF 34] ("Federal Am. Comp."), at ¶ 43 ("Innovativ purchased … shares of
27   FTE stock … in May 2020.").

28   [5] See id. ("from TTP8").  As a reminder, TTP8 is Innovativ's co-plaintiff in Case No. 2:22-cv-
     01184-JCM-EJY, Innovativ Media Group, Inc. et al. v. Beys, et al.; see also June 30 Order, at ¶ 27.

- For its part, TTP8 did not own a single FTE share until "October or November 2019."[6]

- TTP8 obtained its claimed FTE shares, from which it conveyed to Innovativ its shares, by way of a single debt cancellation transaction directly with FTE.[7]

- For reasons entirely unrelated to this case (or Messrs. Beys or De Silva), FTE's board of directors and management experienced great change at approximately the same time as this FTE-TTP8 transaction.

- On October 18, 2019, Messrs. Beys and De Silva were appointed as FTE directors for the first time. Also at the same time, Messrs. Ghishan and Cunningham (Innovativ's and TTP8's allies in its attempted bylaws amendment) were appointed as FTE directors.[8]

- On October 22, 2019, Mr. Steve Goodwin, a Singal-sponsored nominee (and thus, obviously, an ally with Innovativ and TTP8 in the attempted bylaws amendment) was appointed as interim FTE Chief Executive Officer.[9]

- Also on October 22, 2019, or less than a week after Beys' and De Silva's involvement as directors, FTE held a special board meeting at which TTP8's principal, Mr. Singal: (1)

---

[6] See Federal Am. Comp., at ¶ 85.

[7] See id. at ¶¶ 83 ("TTP8 and/or Singal had assumed approximately $3,900,000 million of FTE's outstanding debt owed to other parties in exchange for the issuance of 20% of FTE's stock to TTP8."), 84 ("TTP8 did, in fact, assume approximately $3-$4 million of FTE's debt."), 85 ("TTP8 became a shareholder of record of FTE in October or November 2019.").
      The Court will note that Innovativ did not make these allegations "on information and belief." See id. The Court will further note that Innovativ and TTP8 are co-plaintiffs in Case No. 2:22-cv-01184-JCM-EJY. Still further, the Court will note that Innovativ and TTP8 have the same counsel in Case No. 2:22-cv-01184-JCM-EJY and, therefore, Innovativ and its counsel both necessarily have actual knowledge (or should have known about) the absolute falsity of TTP8's allegations regarding its acquisition of FTE shares and, thus, equally, the falsity of its own allegations that it is a valid FTE shareholder. See NRCP 11; NRS 18.010(2)(b); NRS 7.085.

[8] See Federal Am. Comp., at ¶¶ 49, 73 ("In October 2019, …, [Defendant] De Silva appointed himself a director of FTE [and] also appointed [non-party] Beys, [non-party Joseph] Cunningham and non-party Peter Ghishan ("Ghishan") as directors."). (Though a non-party in this particular case, Innovativ has sued Mr. Beys in two separate but related federal cases in Nevada: (1) 2:22-cv-01184-JCM-EJY, Innovativ Media Group, Inc. v. Beys, et al.; and (2) 2:22-cv-01362-CDS-VSF, Innovativ Media Group, Inc. v. FTE Networks, Inc., et al..)

[9] See Declaration of Michael Beys, Esq., a true and correct copy of which is attached hereto as Exhibit "A"; see also State Am. Comp., at Exh. 1.

proposed to FTE that TTP8 acquire certain debt held by certain third parties (TBK 327 Partners (Mr. Ferguson) and Suwyn Investments); and (2) proposed a transaction whereby, in exchange for cancelling such debt that TTP8 would acquire, FTE would issue TTP8 shares of its common stock.[10]

- Also at that time, Mrs. Maria Fernandez, FTE's General Counsel, was on a leave of absence for maternity leave and, thus, in her absence, the newly constructed board (and in particular Messrs. Beys and De Silva, who had no prior relationship with Singal) placed special reliance upon the diligence and loyalty of Mr. Goodwin, the interim CEO who did have a prior relationship with Singal.[11]

- Messrs. Goodwin, Ghishan, and Cunningham are (and apparently always were) the allies of – or, otherwise stated, co-conspirators with – Innovativ and TTP8 (Mr. Singal) in their attempted coup to perpetrate a fraud on and thereafter plunder FTE.[12]

- On November 15, 2019, as interim CEO, and within only a month of Beys' and De Silva's appointments as FTE directors, Mr. Goodwin unilaterally approved the issuance of more than 5 Million shares to TTP8 in relation to the as yet stricly **conditionally approved** FTE-TTP8 debt cancellation transaction.[13]

- Mr. Goodwin, however, failed to inform the board that TTP8 had not yet provided sufficient proof of its legally enforceable right, title, and interest in the debt in satisfaction of the conditions for the issuance of any FTE shares to TTP8.[14]

/ / /

---

[10] See October 22, 2019 Meeting Minutes, a true and correct copy of which is attached hereto as **Exhibit "B"**; see also, e.g., Federal Am. Comp. [ECF 34], at ¶¶ 83-85.

[11] See Exh. A, Beys Declaration.

[12] See State Am. Comp., at Exh. 1 thereto (noting all three of their signatures as shareholders along with Innovativ and TTP8 as to the purported but invalid bylaws amendment vote); see also, e.g., Federal Am. Comp. [ECF 34], at ¶ 74 ("Singal introduced Cunningham to De Silva …").

[13] See Exh. B, October 22, 2019 Meeting Minutes; see also November 15, 2019 Share Issuance Authorization, a true and correct copy of which is attached hereto as **Exhibit "C."**

[14] See Exh. A, Beys Declaration.

1   • Mr. Goodwin did not inform or seek approval from the FTE directors (or FTE's
2      shareholders) about this issuance.[15]

3   • That issuance unilaterally approved by Mr. Goodwin violated SEC restrictions and caused
4      the NYSE delisting complained of by Innovativ and TTP8 in another action, not against Mr.
5      Goodwin, but against the newly arrived and entirely reliant Messrs. Beys and De Silva.[16]

6   • Only on December 9, 2019, several weeks thereafter, did the FTE board (or at least
7      those not conspiring with TTP8) learn for the first time of Mr. Goodwin's unilateral
8      and unauthorized share issuance to TTP8 and, the very next day, on December 10,
9      2019, I directed FTE to self-report this violation to the relevant authorities.[17]

10  • On December 13, 2019, still operating in reliance on Mr. Goodwin's material
11     omissions, as well as TTP8's (and Mr. Singal's) repeated representations as to
12     TTP8's good and legal marketable title to the subject debt, FTE believed that the
13     only defect as to the FTE-TTP8 transaction at that time was the amount of FTE
14     shares to be issued to TTP8.[18]

15  • Also developing contemporaneously in the fall of 2019 was another Singal-induced
16     transaction, this time a substantially more significant real estate transaction with the
17     Szkaradeks, which had a material closing date in late December 2019.[19]

18  • On December 16, 2019, the SEC charged Suneet Singal.[20]

19  _____

20  [15] See Exh. A, Beys Declaration.

21  [16] See e.g., Federal Am. Comp. [ECF 34], at ¶¶ 6, 10, 105-107.

22  [17] See Exh. A, Beys Declaration.

23  [18] See Exh. A, Beys Declaration; see also Rescission and Note Exchange Agreements, true and
24  correct copies of which are attached hereto as **Exhibit "D,"** at § 4.3.

25  [19] See e.g., Federal Am. Comp. [ECF 34], at ¶¶ 4, 68, 73, 81-85, 109 (among others).

26  [20]  See https://www.sec.gov/litigation/litreleases/2019/lr24691.htm; https://thediwire.com/sec-charges-
27  former-first-capital-reit-ceo-with-defrauding-investors-and-
    bdc/#:~:text=December%2017%2C%202019%20The%20Securities%20and%20Exchange%20C
28  ommission,Trust%20Inc.%2C%20a%20non-traded%20real%20estate%20investment%20trust.
    Mr. Singal was thereafter effectively convicted (by agreeing to significant penalties) and, even

1     •  As the Vision transaction was much more significant, and because by all appearances (but
2        for TTP8's misrepresentations assisted by Mr. Goodwin's material omissions) the FTE-
3        TTP8 debt cancellation transaction had already validly closed, FTE turned its attention to
4        that Vision transaction, including, specifically, an appropriate mechanism to protect itself
5        and FC REIT from the influence of Mr. Singal.[21]

6     •  FTE has recently confirmed, however, that TTP8 and Mr. Singal fraudulently
7        misrepresented TTP8's legal rights to any of the subject debt underlying its acquisition of
8        any and all of its claimed FTE shares.[22]

9     In other words, ***and in undisputed fact***, TTP8 **never** had **any** legal right, title, and interest
10 in **any** of the debt based on which it acquired **all** its claimed FTE shares (and still does not). And,
11 therefore, because Innovativ admittedly and undisputedly only acquired its claimed shares from
12 TTP8's pile of fraudulently obtained shares, it too **never** properly owned a single FTE share (and
13 still does not).

14  ///
15  ///
16  ///

17  ———————————

18 worse, has yet again been indicted. See https://www.sec.gov/litigation/litreleases/2021/lr25145.htm (July 21, 2021: "SEC Obtains Final
19 Judgment for more than $7 Million and bars former CEO and Board Chairman [Suneet Singal] from the securities industry."); https://www.justice.gov/usao-edca/pr/el-dorado-hills-man-
20 indicted-fraud-against-merchant-cash-advance-companies (April 18, 2022: "El Dorado Hills man [Suneet Singal] indicted for fraud against merchant cash advance companies.").

21  In stark contrast, the Court will note that, neither Beys nor De Silva have **ever** been called into question by the SEC, or any other regulatory agency, nor has FTE in the approximately three
22 years in which it has been directed by them, including as to the Vision or Benchmark transactions
23 referenced therein. See Exh. A, Beys Declaration.

24 [21] See e.g. Federal Am. Comp. [ECF 34], at ¶¶ 133, 134, 173, 174,

25 [22] See e.g. id. at ¶¶ 83-85; see also Exh. D, Note Exchange Agreement, at § 4.3. (FTE is also in the process of obtaining declarations from Messrs. Ferguson and Suwyn confirming Singal and TTP8
26 fraudulently misrepresented TTP8's legal right, title, and interest to these debt holdings. FTE will
27 supplement these papers with such declarations once they are obtained.) These and the other above-
described facts, as supported by the adduced admissible and undisputed evidence, now clearly
28 demonstrate the validity of FTE's fraud allegations. See June 30 Order, at ¶ 41 ("FTE has not proven or established its allegations with regards to fraud ***at this juncture***." (Emphasis added.)).

- 8 -

1    III.    **LEGAL ANALYSIS**

2         a.    **APPLICABLE STANDARD**

3         In evaluating the instant Motion, this Court must determine whether: (1) there is a purely

4    legal basis for adjudicating the special damages claim; and (2) that the facts as supported by

5    admissible evidence lead to only one reasonable conclusion. See e.g., NRCP 56; see also Wood v.

6    Safeway, Inc., 121 Nev. 724, 730-31, 121 P.3d 1026, 1030-31 (2005). Moreover, a moving party

7    must competently meet its initial burden on each issue placed before the Court before the non-

8    moving party has any responsive obligation of its own. See e.g., id. at 1031, n.13; NRCP 56(e).

9    And the failure by the moving party to meet its burden means there is no responsive obligation on

10   the part of the non-movant and, thus, is an independent and proper basis for denial of the related

11   motion. See Las Vegas Metro. Police Dep't. v. Coregis Ins. Co., 127 Nev. 548, 553, 256 P.3d 958,

12   961 (2011) (citing Cuzze v. Univ. & Cmty. Coll. Sys. of Nev., 123 Nev. 598, 602, 172 P.3d 131,

13   134 (2007)). Still further, the evidence before the Court must be viewed in the light most favorable

14   to the non-movant, in this case, FTE. See id.

15        However, in presenting its summary judgment or other motions seeking relief from the

16   Court, a movant is not entitled to intentionally mislead the Court as to their qualifications for relief

17   under certain statutes reserved exclusively for specific types of persons, namely valid and proper

18   "shareholders." See e.g., NRS 78; see also NRCP 11; NRS 18.010(2)(b); NRS 7.085; EDCR 7.60.

19        c.    **THERE ARE NUMEROUS BASES ON WHICH INNOVATIV'S MOTION MUST BE DENIED**

20             *i. Innovativ is **not** entitled to any relief predicated on shareholder status*

21        The most glaring defect in Innovativ's Motion – or, more accurately, in its entire case – is

22   that it is **not** and never was a valid FTE shareholder. See Federal Am. Comp. [ECF 34], at ¶¶ 43,

23   83-85; Exh. D, Note Exchange Agreement; see also n.22 (regarding Ferguson and Suwyn

24   Declarations).

25        The issue is not simply and formalistically whether Innovativ is listed in FTE's books as a

26   "stockholder of record." No, the more important, *substantive* issue is whether Innovativ obtained

27   its position on FTE's stock ledger **validly** or, as in this case, through an extended fraudulent scheme

28   to usurp control over and plunder the entity. This Court already recognized this as a critical, ***but***

1    *as yet undetermined* issue.  See June 30 Order, at ¶¶ 38, 41 ("FTE has not proven or established its

2    allegations with regards to fraud *at this juncture*."  (Emphasis added.)), 42.  This Court should not

3    now ignore its prior, correct analysis in favor of blindly exalting form over substance and thereby

4    allowing itself to be a pawn in Innovativ's and TTP8's (and Szkaradeks') fraudulent scheme.

5          There is no genuine dispute that TTP8 only obtained its FTE shares through the single, Note

6    Exchange Agreement transaction with FTE.  See Federal Am. Comp., at ¶¶ 83-85; Exh. D, Note

7    Exchange Agreement.

8          There is also no genuine dispute that TTP8 (and its principal, Mr. Singal) perpetrated a

9    fraud on FTE in obtaining its shares (with the assistance of its co-conspirators, Messrs. Goodwin,

10   Ghishan, and Cunningham).  See nn.10-18, 22 supra.

11         As a matter of law, then, TTP8 never had marketable legal or equitable title to a single FTE

12   share, including, but not limited to, those it subsequently conveyed to its co-conspirator Innovativ

13   in furtherance of their improper scheme to plunder FTE for their own gain.  See id.; n.22 supra

14   (regarding Ferguson and Suwyn Declarations); Federal Am. Comp. [ECF 34], at ¶ 43; see also

15   Aptix Corp. v. Quickturn Design Sys., 269 F.3d 1369, 1375 (Fed.Cir. 2001) (citing Keystone Driller

16   Co. v. General Excavator Co., 290 U.S. 240, 244-45, 78 L. Ed. 293, 54 S. Ct. 146 (1933) (quoting

17   Pomeroy, Equity Jurisprudence (4th ed.) § 397 (emphasis added))).   "The governing

18   principle is 'that whenever *a party* who, as actor, seeks to set the judicial machinery in

19   motion and obtain some remedy, has violated conscience, or good faith, or other equitable

20   principle, in *his* prior conduct, then … the court will refuse … to acknowledge *his* [claimed

21   property rights.]"  See id. (emphasis in original).

22         In fact, just as with the FC-RET situation (wherein, as a result of yet another fraud

23   by Mr. Singal, a trust for FC-RET's benefit was inserted into the Vision Purchase

24   Agreement for certain FTE shares[23]), the proper legal effect of TTP8's and Mr. Singal's

25   Note Exchange Agreement-related fraud is that TTP8, far from having marketable legal

26   right, title, and interest in the associated shares, can only be determined to hold those ill-

27   gotten shares in trust for the original (and still existing) debtholders (or that such shares are

28
_____
[23] See e.g., June 30 Order, at ¶ 13.

1 | legally void leaving the prior debt intact, the election being at those debtholders' discretion).

2 | See e.g., Stonecifer v. Yellow Jacket Silver Mining Co., 3 Nev. 38, 45 (1867).[24]

3 | Therefore, Innovativ in turn, as the subsequent transferee of these fraudulently obtained

4 | shares, does not legally or equitably have any enforceable rights in a single FTE share. See n.22

5 | supra (regarding Ferguson and Suwyn Declarations); Stonecifer, 3 Nev. at 45. This is especially

6 | so where the evidence will also show that Innovativ itself (and Mr. Coleman, its principal) was a

7 | part of the broader scheme to defraud and plunder FTE. See n.22 supra (regarding Ferguson

8 | Declaration).

9 | Thus, as a matter of law (and equity), Innovativ never had (and still does not have) proper

10 | legal standing to: (1) make its February 2022 demand to inspect FTE's shareholder list (or attempt

11 | to amend its bylaws); (2) subsequently sue FTE (or any of its directors or other, legally valid

12 | shareholders); or (3) most specific to the instant Motion, obtain any relief of any kind under NRS

13 | 78, a statutory scheme reserved exclusively for valid shareholders, including, but not limited to, an

14 | award for any form of "damages," whether attorney's fees or not.[25]  See June 30 Order, at ¶ 38;

15 | NRCP 17(a) (requiring a "real party in interest" and not a fraudulent one with no legally enforceable

16 | rights); see also Aptix Corp., 269 F.3d at 1375 (citing Keystone Driller Co., 290 U.S. 240

17 | (quoting Deweese v. Reinhard, 165 U.S. 386, 390, 41 L. Ed. 757, 17 S. Ct. 340 (1897))).[26]

18 |

---

19 | [24] Any other outcome materially alters FTE's financial position without any legally valid basis by
20 | materially changing FTE's equity structure by recognizing the TTP8 shares (approximately 20%
of the entire equity) while simultaneously leaving intact millions of dollars in debt owed by FTE
21 | to third-parties. This simply cannot be allowed by judicial fiat based on such undisputed evidence
of fraud by TTP8 (and Innovativ, and Messrs. Goodwin, Ghishan, and Cunningham).
22 |

23 | [25] Innovativ cannot resort to a "bona fide purchaser" argument to distance itself from TTP8's fraud.
First, Innovativ has never alleged its bona fide purchaser status. See generally, Complaint; State
24 | Am. Comp.. Second, at the very least, a material and genuine fact question exists as to whether or
not Innovativ is truly a bona fide purchaser given that the evidence will show that Innovativ and
25 | Mr. Coleman have actively worked with TTP8 and Mr. Singal in respect to these very claimed
shares. See n.22 supra (regarding Ferguson Declaration).
26 |

27 | [26] "A court of equity acts only when and as conscience commands; and, if the conduct of the plaintiff
be offensive to the dictates of natural justice, then, whatever may be the rights he possesses, and
28 | whatever use he may make of them in a court of law, he will be held remediless in a court of equity."

***ii. Special damages are not available to Innovativ because, as a non-shareholder, it did not have "no other choice but to litigate."***

Innovativ itself cited authority – with its own added emphasis – that a precondition to "damages" under NRS 78.105 is that "the plaintiff had **no other choice** but to litigate." See Innovativ's Motion, at 4:23-27 (citing Mitchell v. Nype, Docket No 80693, 2022 WL 4482024, *4 (Nev.) (emphasis added)).[27] The Mitchell court otherwise described this precondition as being satisfied only where "litigation is **absolutely necessary**." See id. at *8 (emphasis added). In this instance, there were at least two (2) reasons that Innovativ had other choices but litigation in this case.

First, Innovativ did not provide a sufficiently detailed affidavit in support of its demand. See e.g., Cenergy Corp. v. Bryson Oil & Gas P.L.C., Case No. CV-N-87-113-ECR, 662 F.Supp. 1144, 1146 (D.Nev. 1987). All Innovativ provided was a conclusory statement with **zero** description of its supposed purpose: "The inspection and copying of the stock ledger … is not desired for a purpose that is in the interest of a business or object other than the business of the Company." See Complaint, at Exh. 2, Affidavit, at ¶ 1; but compare Cenergy Corp., 662 F.Supp. at 1146.[28] Much like in motion practice, the corporation's obligations do not trigger unless and until the demanding party sufficiently meets its burden by way of a legally compliant supporting affidavit. See generally, id.

Second, and more dispositively, Innovativ was not even a valid shareholder at the time of its demand – and still is not. Thus, as a matter of law, it had numerous alternatives vis-à-vis FTE, including, but not limited to: (1) first properly and validly obtaining an FTE share; and/or (b) electing to follow the law and not conspire with TTP8, Singal, Goodwin, Ghishan, and Cunningham in their fraudulent and improper attempt to plunder FTE for their own benefit.

---

[27] Though Innovativ did not identify it as such, the Mitchell case is unpublished.

[28] "The purpose of this demand is to permit the Stockholder to consider communicating with its fellow stockholders on matters relating to their mutual interest as stockholders, and to enable the stockholder (should it determine to do so) to consider soliciting proxies from its fellow stockholders in connection the next meeting of stockholders, including to solicit proxies with respect to the election of directors of the Company or other matters to be voted on by the Stockholders."

- 12 -

1    Third, it is obvious – or at the very least an open fact question – that Innovativ already had

2    the shareholder list even prior to its demand to FTE based on its admitted and undisputedly

3    evidenced collusion and conspiracy with FTE insiders, including at least, Messrs. Goodwin,

4    Ghishan, and Cunningham.  See State Am. Comp., at Exh. 1 thereto (noting all three of their

5    signatures as shareholders along with Innovativ and TTP8 as to the purported but invalid bylaws

6    amendment vote); see also, e.g., Federal Am. Comp. [ECF 34], at ¶¶ 10 ("Although Beys and De

7    Silva refused to respond to Innovativ's inquiries, FTE's sole remaining independent director,

8    Joseph Cunningham ("Cunningham"), did respond **and provided Innovativ with information**

9    **about FTE**" (emphasis added)), 74 ("Singal introduced Cunningham to De Silva …"), 193

10   ("Innovativ then attempted to contact FTE's directors.  Ultimately, **Innovativ was able to speak**

11   **with Cunningham**." (Emphasis added.)).

12   Innovativ's Motion must be denied.

13                    ***iii.  Nor can special damages be awarded simply because they have been***

14                    ***pleaded***

15   Most certainly, a damages analysis is not reducible simply to whether or not Innovativ

16   pleaded them: "Innovativ … specially plead its attorney fees and costs as damages[.]  Accordingly,

17   Innovativ now moves for summary judgment and asks this Court for an order confirming that

18   Innovative is entitled to recover its attorney fees and costs[.]"  See Innovativ's Motion, at 2:14-17

19   (emphasis added).

20   While NRS 78.105 makes a broad reference that a plaintiff may claim "all damages," that

21   does not mean that such damages are to be blindly rubber-stamped.  Succeeding on a claim for

22   special damages requires that such damages must be "**proven at trial**" and "**by competent**

23   **evidence**."  See Pardee Homes v. Wolfram, 444 P.3d 423, 426 (Nev. 2019) (emphasis added); see

24   also Sandy Valley Assocs. v. Sky Ranch Estates Owners Ass'n, 117 Nev. 948, 960, 35 P.3d 964,

25   971 (2001), *receded from on other grounds by* Horgan v. Felton, 123 Nev. 577, 170 P.3d 982

26   (2007).  "Because a litigant seeking to prove attorney fees as special damages must do so **at trial**

27   … the district court erred by concluding that respondents were entitled to special damages despite

28

1   failing to prove them at trial." <u>See</u> <u>Chi. Title of Nev. v. Chtd. Holdings ex rel. Ritter</u>, 486 P.3d

2   1293 (Nev. 2021) (emphasis added).

3       Innovativ tries to circumvent its obligations by asserting that FTE's liability can be

4   adjudicated now, with the actual quantitative analysis left for a simple prove-up hearing at a later

5   date. <u>See</u> Innovativ's Motion, at 5:20-23. Special damages, as an essential element of a claim, are

6   not to be left for such perfunctory proceedings, and Innovativ has not met its initial burden on that

7   particular procedural point for its failure to cite to a single authority for that procedural approach.

8   <u>See generally, id.</u> (And this, of course, is separate from the substantive issue – the "justice" issue

9   in this case, which this Court is supposed to pursue and protect – that neither TTP8 nor Innovativ

10  were **ever** properly shareholders and, thus, are entitled to **no relief whatsoever** under NRS 78.

11      Moreover, the Nevada Supreme Court expressly cautioned ***against*** such a broad recognition

12  of attorney's fees as damages: "[T]o the extent <u>Sandy Valley</u> has been read to broadly allow

13  attorney fees as special damages whenever the fees were a reasonably foreseeable consequence of

14  injurious conduct, **we disavow such a reading**." <u>Pardee Homes v. Wolfram</u>, 444 P.3d 423, 426

15  (Nev. 2019) (emphasis added).

16  **IV.   CONCLUSION**

17      Innovativ is attempting to use fraud and an intentionally disjointed litigation plan to slip a

18  series of unjust issues and determinations past this Court. This Court must not be so led astray.

19  This Court is, instead, at a crossroads. Does it continue to overlook the interests of "justice" in

20  favor of Innovativ's falsities or does it apply the brakes to the runaway legal train unleashed by

21  Innovativ in favor of proceeding with caution and an eye to discovering the truth? The evidence,

22  which Innovativ, TTP8, Singal, Goodwin, Ghishan, and Cunningham all conspired to hide from

23  newly involved Beys and De Silva is now available, and more importantly, undisputedly

24  demonstrates Innovativ has no legal right to **any** relief under NRS 78. <u>See</u> June 30 Order, at ¶¶ 38,

25  41, 42.

26  / / /

27  / / /

28  / / /

1    This Court must deny Innovativ's current Motion and allow for further and proper

2  proceedings in this case.

3    Dated this 27th day of February, 2023.

4                                    **LEX DOMUS LAW**

5

6                        By:/s/ *Daniel Cereghino*
                           Daniel Cereghino, Esq., SBN 11534
                           Brandi M. Planet, Esq., SBN 11710

7                          1712 Tesara Vista Pl.
                           Las Vegas, NV 89128

8                          *Attorneys for Defendants*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2023 I electronically filed the foregoing **DEFENDANT FTE NETWORK'S OPPOSITION TO PLAINTIFF INNOVATIV MEDIA GROUP'S MOTION FOR SUMMARY JUDGMENT AS TO SPECIAL DAMAGES** and service was made on all counsel of record and/or parties via the Court's electronic filing system.

/s/   *Daniel Cereghino*
An employee of Lex Domus Law

# EXHIBIT "A"

1

**DISTRICT COURT**

2

**CLARK COUNTY, NEVADA**

3

4

INNOVATIV MEDIA GROUP, INC., a Wyoming corporation;

5

Plaintiff,

6

v.

7

8

FTE NETWORKS, INC., a Nevada corporation; LATERAL U.S. CREDIT OPPORTUNITIES FUND, LP; RICHARD DE SILVA; DOES I-X; ROE Entities, I-X,

9

10

Defendants.

**DECLARATION OF MICHAEL BEYS, ESQ. IN SUPPORT OF FTE NETWORKS' OPPOSITION TO INNOVATIV'S MOTION FOR SUMMARY JUDGMENT AS TO SPECIAL DAMAGES**

11

12

I, MICHAEL BEYS, ESQ., declare as follows:

13

1.      I am over the age of 18 years old and, unless stated to be on information and belief,

14 have personal knowledge of the facts as set forth herein and could and would competently testify

15 thereto if called upon to do so.

16

2.      I am the interim Chief Executive Officer of FTE Networks, Inc. ("FTE").

17

3.      I was first appointed interim CEO in mid-December 2019 following the SEC

18 violations caused at FTE by Mr. Goodwin's erroneous issuance of more than 20% of FTE common

19 stock to TTP8, LLC (which issuance was in purported consideration for TTP8's agreement to

20 cancel certain debt owed by FTE).

21

4.      Prior to that appointment as interim CEO, on approximately October 18, 2019, I was

22 appointed as an FTE director.

23

5.      Before that, my law firm had been engaged as FTE's litigation counsel for a few

24 months, since August 2019, but such engagement ended in December 2019 with my appointment

25 as CEO.

26

6.      Also on October 18, 2019, the same date as my appointment as an FTE director,

27 Messrs. Ghishan and Cunningham were appointed as FTE directors.

28

7.      Both were nominated by Suneet Singal.

8.      On or about October 22, 2019, Mr. Steve Goodwin, who was sponsored by Suneet Singal, was appointed interim CEO for FTE.  Mr. Goodwin also had no prior relationship to FTE before this October 2019 appointment.

9.      On or about that same date, and less than a week after my own first involvement with FTE, I participated in a special board meeting whereat TTP8's principal, Mr. Singal: (1) proposed to FTE that TTP8 acquire certain debt held by certain third parties (TBK 327 Partners and Suwyn Investments); and (2) proposed a subsequent related transaction whereby, in exchange for cancelling such debt that TTP8 had still to acquire, FTE would issue TTP8 shares of its common stock.  See October 22, 2019 Meeting Minutes, a true and correct copy of which is attached to FTE's Opposition as Exh. B.

10.     I and the rest of the FTE board **conditionally** approved the proposed transaction, obviously subject to TTP8's actual and legally valid acquisition of the subject debt from the original debtholders.  See id.

11.     At this same time, FTE's General Counsel, Maria Fernandez, Esq., was on a leave of absence for maternity leave purposes.

12.     Mr. Goodwin knew about Mrs. Fernandez' absence at this time and, thus, that she would not be available to appear at the October 22, 2019 special board meeting dealing with TTP8.

13.     On or about November 15, 2019, Mr. Goodwin, as FTE's interim CEO, unilaterally approved, without advising or obtaining approval from the FTE board or FTE's shareholders via majority consent, the issuance of more than 5 Million shares of FTE's common stock to TTP8 in furtherance of the above-referenced, **conditional** debt cancellation agreement.  See November 15, 2019 Share Issuance Authorization, a true and correct copy of which is attached to FTE's Opposition as Exh. C.

14.     I and other FTE directors (or at least those not complicit in TTP8's and Mr. Singal's fraudulent activities) only learned of the improper and erroneous share issuance to TTP8 on December 9, 2019.

15.     I have recently reviewed internal corporate records confirming that Mr. Goodwin failed to inform the FTE board that TTP8 had failed to satisfy the conditions for the transaction,

2

1    including the provision of sufficient documentation demonstrating TTP8's good and legal
2    marketable title to the subject debt as the time of these November 15, 2019 share issuances. (FTE
3    asserts that these internal records are protected by the attorney-client privilege. As such, upon
4    request of the Court, FTE will provide true and correct copies thereof for *in camera* review.)

5          16.    Mr. Goodwin, as interim FTE CEO, also failed to advise the FTE board that the
6    amount of shares that he unilaterally authorized to be issued to TTP8 on November 15, 2019 would
7    violate SEC restrictions and New York Stock Exchange ("NYSE") rules.

8          17.    Immediately after learning of Mr. Goodwin's unauthorized and violative share
9    issuance to TTP8 and, the next day, on December 10, 2019, I directed FTE to self-report to the
10   relevant authorities.

11         18.    On or about December 12, 2019, Mr. Goodwin was demoted and I replaced him as
12   interim CEO.

13         19.    Still operating in reliance on Mr. Goodwin's material omissions, as well as TTP8's
14   (and Mr. Singal's) express representations as to TTP8's good and legal marketable title to the
15   subject debt, I believed the only required and proper corrective action as to the FTE-TTP8
16   transaction was a revision of the amount of FTE shares to be issued to TTP8.

17         20.    As such, on December 13, 2019, I approved on behalf of FTE the Rescission and
18   Note Exchange Agreements altering the amount of FTE common stock shares to be issued to TTP8
19   in consideration for TTP8's cancellation of the subject debt. See Rescission and Note Exchange
20   Agreement, true and correct copies of which are attached to FTE's Opposition as Exh. D.

21         21.    Notably, in those December 13, 2019 agreements, TTP8 again expressly represented
22   its good and legal marketable title to the subject debt. See id. at § 4.3.

23         22.    I would not have approved this transaction had I known that TTP8 and Mr. Singal
24   were fraudulently misrepresenting their right, title, and interest in the subject debt and had not
25   satisfied the conditions expressly imposed by the FTE board on October 22, 2019.

26         23.    On or about December 16, 2019, the SEC formally announced charges against Mr.
27   Singal for securities fraud.

28   ///

3

1    24.    I also would not have approved this transaction with TTP8 had I known that Mr.

2    Singal was subject to fraud-based SEC charges.

3    25.    I have since confirmed, via review of internal records and conversations with the

4    true, legal debtholders (TBK 327 Partners and Suwyn Investments) that TTP8 **never** closed on

5    either debt acquisition, and never provided any consideration at all (whether complete or partial)

6    related thereto and, thus, that they consider themselves to still be the true, legal holders of the

7    subject debt. (As noted in FTE's Opposition, FTE is in the process of obtaining declarations from

8    Messrs. Ferguson and Suwyn in relation thereto.  FTE will supplement its Opposition with said

9    declarations as soon as it receives them.)

10    26.    I have never personally been the subject of an SEC investigation or any other

11    criminal investigation of any sort.

12    I declare under penalty of perjury under the laws of the State of Nevada that the foregoing

13    is true and correct to the best of my knowledge.

14    Executed on February 27, 2023 in New York, New York County, New York.

15

16                                    _/s/ Michael Beys_

17                                    Michael Beys

18

19

20

21

22

23

24

25

26

27

28

4

EXHIBIT "B"

### MINUTES OF A SPECIAL MEETING OF
### THE BOARD OF DIRECTORS
### OF FTE NETWORKS, INC.

A special meeting of the Board of Directors (the "Board") of FTE Networks, Inc., a Nevada corporation (the "Company") was held on Tuesday, October 22, 2019, at 10:30 AM EDT, pursuant to waiver of notice, at the Company's offices at 237 West 35th Street, Suite 901, New York, NY 10001. The following persons, constituting all of the members of the Board and therefore, a quorum, were present:

> Michael P. Beys
> Joseph F. Cunningham, Jr.
> Richard de Silva
> Peter Ghishan

The following persons were present by invitation:

> Zar Aamer, TTP8
> Anthony Cassano, Lateral Investment Management
> Robert Friedel, Esq., Pepper Hamilton LLP (joined at 12:05 p.m. EDT)
> Steven M. Goodwin
> Danish Mir, TTP8
> Fred Sacramone, Benchmark Builders, Inc. (Observer)
> Ernest Scheidemann, Benchmark Builders, Inc. (Acting CFO)
> Suneet Singal, TTP8

Mr. Beys acted as Chairman of the meeting and called the meeting to order. Mr. Beys took roll and announced that a quorum was present. Mr. Ghishan acted as secretary of the meeting.





### Exchange of Promissory Notes

The Board considered the loans made by TBK 327 Partners (in part, as assignee from SRM Entertainment Group, LLC) (the "Lender") which are evidenced by those certain Promissory Notes issued by the Company dated January 23, 2014, May 16, 2014 and July 11, 2017 (the "Promissory Notes"). The Board discussed a proposal from Chris Ferguson, a former director of the company and current authorized representative of the Lender, to exchange the Promissory Notes for shares of the Company's Common Stock at an exchange rate of $0.43 per share. It was noted for the Board that there currently exists a disagreement between the Company and the Lender as to the total amount of indebtedness outstanding under the Promissory Notes.

Upon consideration of the Company's liquidity and current and projected capital needs, and upon motion duly made and seconded, the following resolutions were unanimously adopted:

WHEREAS, the Company has borrowed certain funds from the Lender as evidenced by the Promissory Notes, such borrowed amounts remain outstanding as of the date hereof and the Company is in default under the Promissory Notes;

WHEREAS, there exists a disagreement between the Company and the Lender as to the amount of indebtedness currently outstanding under the Promissory Notes;

WHEREAS, it is proposed that the Company agree to issue shares of Common Stock in exchange for cancellation of the indebtedness outstanding under the Promissory Notes at a rate of one share of Common Stock for each $0.43 of indebtedness cancelled and extinguished under the Promissory Notes (the "Note Exchange"); and

WHEREAS, in order to improve the Company's balance sheet, avoid further interest expense and obtain a waiver of the Company's default under the Promissory Notes, the Board deems it advisable and in the best interests of the Company and its stockholders to execute the Note Exchange as proposed by the Lender;

NOW, THEREFORE, BE IT RESOLVED, that the Board hereby authorizes and directs the Company's Interim Chief Executive Officer and Acting Chief Financial Officer, or either of

them, to determine the amounts outstanding under each of the Promissory Notes, with the authority to exercise discretion with respect to any ambiguities in the Promissory Notes and to negotiate the amount outstanding with the Lender to come to a reasonable agreement with respect to such amount (the "Final Note Amount"); and be it further

RESOLVED, that the Board hereby approves the Note Exchange such that, subject to the certification of the Company's Interim Chief Executive Officer or Acting Chief Financial Officer of the Final Note Amount, the Company will issue one fully paid and nonassessable share of Common Stock to the Lender for each $0.43 of indebtedness that is cancelled and extinguished under the Promissory Notes; and be it further

RESOLVED, that the Company be, and it hereby is, authorized to enter into and perform its obligations under such agreements, instruments and documents deemed necessary or advisable by the officers of the Company in connection with the Note Exchange (the "Transaction Documents"); and that the officers of the Company be, and they hereby are, and each of them acting singly hereby is, authorized, for and on behalf of the Company and in its name, to execute and deliver the Transaction Documents, with such changes therein as such officer, at his discretion, shall determine to be necessary, appropriate or advisable; and that the execution of any such Transaction Document by any such officer shall be conclusive evidence of such officer's approval of any such change to such Transaction Document and of the due authorization of the execution and delivery of such Transaction Document by this resolution; and be it further

RESOLVED, that, upon the satisfaction of the conditions set forth in the Transaction Documents with respect to the closing of the Note Exchange, the appropriate officers of the Company be, and they hereby are, authorized, for and on behalf of the Company and in its name, to execute and deliver to the Lender under the seal of the Company, stock certificates for that number of shares of Common Stock in the Lender's name issuable upon consummation of the Note Exchange; and that, following such sale and issuance, such shares of Common Stock shall constitute duly authorized, validly issued and outstanding, fully paid and nonassessable shares of Common Stock of the Company; and be it further

RESOLVED, that it is desirable that the issuance and sale of the shares of Common Stock be qualified or registered or exempted from qualification or registration in various states and under federal securities laws; that the officers of the Company be, and they hereby are, and each of them acting singly hereby is, authorized to determine the states in which appropriate action shall be taken to qualify or register or exempt from qualification or registration all or such number of the securities of the Company as such officers or officer may deem advisable; that such officers or officer hereby are authorized to perform, on behalf of the Company and in its name, any and all such acts as any such officers or officer may deem necessary or advisable in order to comply with the applicable federal laws and applicable laws of any such states and, in connection therewith, to execute and file all requisite papers and documents, including, but not limited to, applications, reports, surety bonds, irrevocable consents and appointments of attorneys for service of process; and that the execution by any such officers or officer of any such paper or document or the doing by any of them of any act in connection with the foregoing matters shall conclusively

establish their authority therefor from the Company and the approval and ratification by the Company of the papers and documents so executed and the action so taken; and be it further

**RESOLVED**, that the appropriate officers of the Company shall prepare and file with the SEC a Current Report on Form 8-K (or other applicable form) disclosing the sale and issuance of unregistered shares of Common Stock as required pursuant to the rules of the SEC and the NYSE American securities exchange; and be it further

**FURTHER RESOLVED**, that each of the officers of the Company, or any one of them, be authorized to take any and all actions and execute any and all documents in such form as shall be consistent with these resolutions and which shall be, in the discretion of such officers, necessary and appropriate to carry out the intent of such resolutions.



There being no further business before the Board, upon a motion duly made and seconded, the Board adjourned the meeting at 12:25 p.m. EDT.

Date: October 22, 2019

Respectfully submitted,

Peter Ghishan,
Secretary of the meeting

# EXHIBIT "C"

SUN NETWORKS, INC
COMMON STOCK

RESOLVED: THE BOARD OF DIRECTORS OF THE ABOVE CAPTIONED COMPANY HAS TAKEN ALL ACTION REQUIRED BY LAW TO AUTHORIZE AND INSTRUCT NEVADA AGENCY AND TRANSFER COMPANY, THE STOCK TRANSFER AGENT FOR THE ABOVE CLASS OF STOCK FOR THE ABOVE COMPANY, TO ISSUE THE SHARES DESCRIBED BELOW AND INCREASE THE OUTSTANDING SHARES ON THE BOOKS OF THE COMPANY. IN THIS REGARD, UNLESS OTHERWISE NOTED AS AN ADDITIONAL ISSUE BELOW, THE COMPANY HAS RECEIVED ALL CONSIDERERATION NECESSARY TO SUPPORT THE ISSUANCE OF THE SHARES DESCRIBED BELOW AND WHEN ISSUED SUCH SHARES SHALL BE FULLY PAID, NON-ASSESSABLE, DULY AUTHORIZED AND VALIDLY ISSUED.

ISSUANCE INSTRUCTIONS

TTP8          4,421,852          11/15/19  Restricted

COST BASIS PER SHARE FOR THIS ISSUANCE: $ 0.74403

See Attached List for Additional Issues

*The company understands and agrees that instructions directing the original issuance of shares as free trading must be accompanied by an opinion of counsel opining on the availability of claim exemption and legality and validity of the issuance.  Otherwise all certificates representing shares issued shall bear restrictive legends.

THESE INSTRUCTIONS SHALL INCREASE THE NUMBER OF SHARES OUTSTANDING BY 4,421,852 SHARES.

I, THE UNDERSIGNED, AM A QUALIFIED AND DULY ELECTED OFFICER OF THE ABOVE NAMED COMPANY, AND I DO HEREBY CERTIFY THAT: (1) THE ABOVE NAMED COMPANY IRREVOCABLY INDEMNIFIES, HOLDS HARMLESS AND SHALL DEFEND NEVADA AGENCY AND TRANSFER COMPANY AND ITS OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS AGAINST ANY AND ALL CLAIMS FOR ACTIONS TAKEN BY THE ABOVE COMPANY REGARDING THE ABOVE RESOLUTION; (2) THIS IS A TRUE AND CORRECT COPY OF A RESOLUTION ADOPTED BY THE COMPANY'S BOARD OF DIRECTORS ON THE BELOW DATE, AND THAT THE SAID RESOLUTION HAS NOT BEEN IN ANY WAY RESCINDED, ANNULLED, OR REVOKED BUT THE SAME IS STILL IN FULL FORCE AND EFFECT; (3) THE SHARES SUBJECT TO THIS RESOLUTION HAVE BEEN ALLOTTED AND THAT THE CORPORATION HAS RECEIVED THE FULL CONSIDERATION FOR SUCH SHARES AND THAT SUCH SHARES ARE THEREFORE FULLY PAID AND NON-ASSESSABLE; AND (4) THE ABOVE NAMED COMPANY RELIEVES NEVADA AGENCY AND TRANSFER COMPANY FROM ANY AND ALL LIABILITIES IN CONNECTION WITH THIS TRANSACTION.

X _____          Stephen M. Grodwin

OFFICER'S SIGNATURE          OFFICER'S NAME PRINTED

CEO          11/15/19

TITLE OF OFFICER          DATE

## FTE NETWORKS, INC.
## COMMON STOCK

RESOLVED: THE BOARD OF DIRECTORS OF THE ABOVE CAPTIONED COMPANY HAS TAKEN ALL ACTION REQUIRED BY LAW TO AUTHORIZE AND INSTRUCT NEVADA AGENCY AND TRANSFER COMPANY, THE STOCK TRANSFER AGENT FOR THE ABOVE CLASS OF STOCK FOR THE ABOVE COMPANY, TO ISSUE THE SHARES DESCRIBED BELOW AND INCREASE THE OUTSTANDING SHARES ON THE BOOKS OF THE COMPANY. IN THIS REGARD, UNLESS OTHERWISE NOTED AS AN ADDITIONAL ISSUE BELOW, THE COMPANY HAS RECEIVED ALL CONSIDERERATION NECESSARY TO SUPPORT THE ISSUANCE OF THE SHARES DESCRIBED BELOW AND WHEN ISSUED SUCH SHARES SHALL BE FULLY PAID, NON-ASSESSABLE, DULY AUTHORIZED AND VALIDLY ISSUED.

ISSUANCE INSTRUCTIONS

TTP8          1,046,527          11/5/19    Restricted

COST BASIS PER SHARE FOR THIS ISSUANCE: $ 0.62000

See Attached List for Additional Issues

*The company understands and agrees that instructions directing the original issuance of shares as free trading must be accompanied by an opinion of counsel opining on the availability of claim exemption and legality and validity of the issuance. Otherwise all certificates representing shares issued shall bear restrictive legends.

THESE INSTRUCTIONS SHALL INCREASE THE NUMBER OF SHARES OUTSTANDING BY 1,046,527 SHARES.

I, THE UNDERSIGNED, AM A QUALIFIED AND DULY ELECTED OFFICER OF THE ABOVE NAMED COMPANY, AND I DO HEREBY CERTIFY THAT: (1) THE ABOVE NAMED COMPANY IRREVOCABLY INDEMNIFIES, HOLDS HARMLESS AND SHALL DEFEND NEVADA AGENCY AND TRANSFER COMPANY AND ITS OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS AGAINST ANY AND ALL CLAIMS FOR ACTIONS TAKEN BY THE ABOVE COMPANY REGARDING THE ABOVE RESOLUTION; (2) THIS IS A TRUE AND CORRECT COPY OF A RESOLUTION ADOPTED BY THE COMPANY'S BOARD OF DIRECTORS ON THE BELOW DATE, AND THAT THE SAID RESOLUTION HAS NOT BEEN IN ANY WAY RESCINDED, ANNULLED, OR REVOKED BUT THE SAME IS STILL IN FULL FORCE AND EFFECT; (3) THE SHARES SUBJECT TO THIS RESOLUTION HAVE BEEN ALLOTTED AND THAT THE CORPORATION HAS RECEIVED THE FULL CONSIDERATION FOR SUCH SHARES AND THAT SUCH SHARES ARE THEREFORE FULLY PAID AND NON-ASSESSABLE; AND (4) THE ABOVE NAMED COMPANY RELIEVES NEVADA AGENCY AND TRANSFER COMPANY FROM ANY AND ALL LIABILITIES IN CONNECTION WITH THIS TRANSACTION.

X _____               Stephen M. Goodwin

**OFFICER'S SIGNATURE**                    **OFFICER'S NAME PRINTED**

CEO                                        11/15/19

**TITLE OF OFFICER**                       **DATE**

# EXHIBIT "D"

## NOTE EXCHANGE AGREEMENT

This Note Exchange Agreement (this "*Agreement*") is made and entered into as of December 13, 2019,

by and between FTE Networks, Inc., a Nevada corporation (the "*Company*"), and TTP8, LLC, a

Delaware limited liability company ("*TTP8*").

### RECITALS

WHEREAS, TTP8 is the holder, by purchase and assignment, of (i) a promissory note dated December 8,

2016 issued by the Company to Suwyn Investments LLC, with an aggregate of $3,339,365 of principal

and accrued interest outstanding as of November 3, 2019 (as amended to date, the "*Suwyn Note*") and (ii)

three promissory notes issued by the Company, or issued by a subsidiary of the Company and guaranteed

by the Company, payable (either as the original payee or by assignment) to 327 Partners, LLC, issued on

January 23, 2014, May 16, 2014 and July 11, 2017, respectively, with an aggregate of $580,000 of

principal and accrued interest outstanding as of November 8, 2019 (as amended to date, the "*327 Notes*,"

and together with the Suwyn Note, the "*Promissory Notes*");

WHEREAS, TTP8 desires to surrender to the Company the Promissory Notes for cancellation (including

any and all interest accruing thereon) in exchange for 4,193,684 shares of the Company's common stock,

par value $0.001 per share ("*Common Stock*"), on the terms and conditions set forth herein; and

WHEREAS, the Company desires to issue and sell the shares of Common Stock to TTP8 in exchange for

the cancellation of the Promissory Notes on the terms and conditions set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises, representations,

warranties, and covenants hereinafter set forth and for other good and valuable consideration, the receipt

and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **AGREEMENT TO EXCHANGE PROMISSORY NOTES.**

      1.1    **Exchange.** Upon and subject to the terms set forth in this Agreement, at the Closing (as defined herein), TTP8 agrees to surrender to the Company for cancellation the Promissory

Notes in exchange for Four Million One Hundred Ninety-Three Thousand Six Hundred Eighty-Four (4,193,684) shares of Common Stock (the "*Shares*").

      **1.2**    **Cancellation of Promissory Notes**. Subject to the terms and conditions of this Agreement, TTP8 hereby agrees as follows: (a) all indebtedness owed to the holder of the Promissory Notes, including any interest accrued and any fees, penalties or other amounts accrued thereunder through the date of Closing, shall be fully satisfied by the issuance of the Shares to TTP8; (b) upon the issuance of the Shares to TTP8, the Promissory Notes shall be deemed automatically cancelled and of no further force or effect and (c) effective upon the Closing, TTP8 hereby releases and discharges the Company from any and all claims TTP8 or its predecessors in interest may now have, or may have in the future, arising out of, or related to, such Promissory Notes..

      **2.**    **CLOSING, DELIVERY AND PAYMENT.**

      **2.1**    **Closing**. The closing of the exchange of the Promissory Notes for the Shares to be issued by the Company under this Agreement (the "*Closing*") shall take place telephonically and/or remotely by exchange of signature pages at 1:00 p.m. on the business day following the satisfaction (or waiver) of all of the conditions to closing set forth in Section 5 hereof, or at such other time or place as the Company and TTP8 may mutually agree (such date is hereinafter referred to as the "*Closing Date*").

      **2.2**    **Delivery**. At the Closing, subject to the terms and conditions hereof, the Company will deliver to TTP8 the Shares by means of book entry direct registration system, against delivery of the Promissory Notes for cancellation as provided in Section 1.2.

      **3.**    **REPRESENTATIONS AND WARRANTIES OF THE COMPANY.** The Company hereby represents and warrants to TTP8 as of the Closing Date as set forth below:

      **3.1**    **Organization, Requisite Authority**. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada. The Company has all requisite corporate power and authority to execute and deliver this Agreement, to issue and sell the Shares, and to carry out the provisions of this Agreement.

      **3.2**    **Authorization**. All corporate action on the part of the Company, its officers, directors and shareholders necessary for the authorization, execution and delivery of this Agreement, the performance of all obligations of the Company hereunder at the Closing and the authorization, sale, issuance and delivery of the Shares pursuant hereto have been taken. This Agreement, when executed and delivered, will be a valid and binding obligation of the Company enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and general principles of equity that restrict the availability of equitable remedies (the "*Enforceability Exceptions*"). The Company has obtained all consents, permits, or waivers necessary for the consummation of the transactions contemplated by this Agreement, other than the approval of a supplemental listing application to be filed with respect to the issuance of the Shares hereunder (the "*SLAP*") and except as otherwise expressly set forth herein.

      **3.3**    **Offering Valid**. Assuming the accuracy of the representations and warranties of TTP8 contained in Section 4.4 hereof, the offer, sale and issuance of the Shares will be exempt from the registration requirements of the Securities Act of 1933, as amended (the "*Securities Act*"), and will have been registered or qualified (or are exempt from registration and qualification) under the registration, permit or qualification requirements of all applicable state securities laws. No "bad actor" disqualifying event described in Rule 506(d)(1)(i)-(viii) of the Securities Act (a "*Disqualification*

2

*Event*"), is applicable to the Company or, to the Company's knowledge, any officer or director of the Company, except for a Disqualification Event as to which Rule 506(d)(2)(ii-iv) or (d)(3), is applicable.

      **3.4** **NYSE American Supplemental Listing Application.** The Company has not received any communication, whether written or oral, from the NYSE expressing any concerns that may cause the NYSE American LLC (the "*Exchange*") not to the SLAP. TTP8 acknowledges that it has been informed of the current status of the listing of the Common Stock with the Exchange, including that the trading of the Common Stock on the Exchange has been halted, that the continued listing of the Common Stock is under review by Exchange compliance staff, and that the Common Stock is in jeopardy of being delisted.

      **4.** **REPRESENTATIONS AND WARRANTIES OF TTP8.** TTP8 hereby represents and warrants to the Company as follows:

      **4.1** **Organization, Requisite Authority.** TTP8 is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware. TTP8 has all requisite limited liability company power and authority to execute and deliver this Agreement, to deliver for cancellation the Promissory Notes in exchange for the Shares, and to carry out the provisions of this Agreement.

      **4.2** **Authorization.** All limited liability company action on the part of TTP8, its officers, directors and members necessary for the authorization, execution and delivery of this Agreement, the performance of all obligations of TTP8 hereunder at the Closing and the delivery of the Promissory Notes for cancellation in exchange for the Shares pursuant hereto have been taken. This Agreement, when executed and delivered, will be a valid and binding obligation of TTP8, enforceable in accordance with its terms, except as limited by the Enforceability Exceptions.

      **4.3** **Title to Promissory Notes.** TTP8 has good and marketable title to the Promissory Notes and has not sold, transferred, conveyed, pledged, encumbered or otherwise disposed of any of the Promissory Notes, or any interest in any of the Promissory Notes, and no third party has any claim of any nature with respect to the Promissory Notes.

      **4.4** **Investment Representations.** TTP8 understands that the Shares have not been registered under the Securities Act. TTP8 also understands that the Shares are being offered and sold pursuant to an exemption from registration contained in the Securities Act based in part upon TTP8's representations contained in the Agreement. TTP8 hereby represents and warrants to the Company as follows:

      **(a)** **Economic Risk.** TTP8 has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company so that it is capable of evaluating the merits and risks of its investment in the Company and has the capacity to protect its own interests. TTP8 understands that (i) it must bear the economic risk of this investment indefinitely unless the Shares are registered pursuant to the Securities Act, or an exemption from registration is available; (ii) the Company has no present obligation to register the Shares; and (iii) there is no assurance that any exemption from registration under the Securities Act will be available and that, even if available, such exemption may not allow TTP8 to transfer all or any portion of the Shares under the circumstances, in the amounts or at the times TTP8 might propose.

      **(b)** **Acquisition for Own Account.** This Agreement is made with TTP8 in reliance upon TTP8's representation to the Company, which by TTP8's execution of this Agreement, TTP8 hereby confirms, that the Shares to be acquired by TTP8 will be acquired for investment for TTP8's

own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that TTP8 has no present intention of selling, granting any participation in, or otherwise distributing the same.  By executing this Agreement, TTP8 further represents that TTP8 does not presently have any contract, undertaking, agreement or arrangement with any person or entity to sell, transfer or grant participations to such person or entity or to any third party, with respect to any of the Shares.  TTP8 has not been formed for the specific purpose of acquiring the Shares.

(c)    **Accredited Investor.**  TTP8 represents that it is an accredited investor within the meaning of Rule 501(a) Regulation D promulgated under the Securities Act.

(d)    **Company Information.**  TTP8 has had an opportunity to discuss the Company's business, management and financial affairs with directors, officers and management of the Company and has had the opportunity to review the Company's operations and facilities.  TTP8 has also had the opportunity to ask questions of and receive answers from, the Company and its management regarding the terms and conditions of this investment.  TTP8 confirms that it is familiar with the Company's business, management and financial affairs and that Company management has satisfactorily answered TTP8's questions regarding the same.

(e)    **Rule 144.**  TTP8 acknowledges and agrees that the Shares are "restricted securities" as defined in Rule 144 promulgated under the Securities Act as in effect from time to time and must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.  TTP8 has been advised or is aware of the provisions of Rule 144, which permits limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including, among other things: the availability of certain current public information about the Company, the resale occurring following the required holding period under Rule 144 and the number of shares being sold during any three-month period not exceeding specified limitations.

(f)    **Residence.**  The office or offices of TTP8 in which its investment decision was made is located at the address or addresses of TTP8 set forth in Section 6.3.

**4.5    No General Solicitation.**  Neither TTP8, nor any of its officers, directors, employees, agents or members has either directly or indirectly, including, through a broker or finder (a) engaged in any general solicitation, or (b) published any advertisement in connection with the offer and sale of the Shares.

**4.6    Disqualification.**  TTP8 represents that no Disqualification Event is applicable to TTP8, or to any party with whom TTP8 shares beneficial ownership of Company securities.

**5.    CONDITIONS TO CLOSING.**

**5.1    Conditions to Each Party's Obligations at the Closing.**  Each party's obligations in connection with the exchange of the Promissory Notes for the Shares at the Closing are subject to the satisfaction, at or prior to the Closing Date, of the following conditions:

(a)    **Legal Investment.**  On the Closing Date, (i) no order or legal prohibition issued by any governmental authority of competent jurisdiction or other valid legal restraint preventing the consummation of the transactions contemplated by this Agreement shall be in effect and (ii) there shall be no lawsuits or investigations, pending or threatened, involving or relating to the Promissory Notes or the Shares.

(b)      **NYSE American Supplemental Listing Application.**  The Company shall have filed the SLAP with the Exchange within one business day of the date of this Agreement, and the SLAP shall have been approved by the Exchange. This condition deemed to be satisfied, null and void in the event that the Company's Common Stock is delisted from the Exchange.

5.2      **Conditions to TTP8's Obligations at the Closing.**  TTP8's obligations to purchase the Shares at the Closing are subject to the satisfaction, at or prior to the Closing Date, of the following conditions:

(a)      **Representations and Warranties True; Performance of Obligations.** The representations and warranties made by the Company in Section 3 hereof shall be true and correct in all material respects as of the Closing Date with the same force and effect as if they had been made as of the Closing Date, and the Company shall have performed all obligations and conditions herein required to be performed or observed by it on or prior to the Closing.

5.3      **Conditions to Obligations of the Company.**  The Company's obligation to issue and sell the Shares at the Closing is subject to the satisfaction of the following conditions:

(a)      **Representations and Warranties True; Performance of Obligations.** The representations and warranties in Section 4 made by TTP8 shall be true and correct in all material respects at the Closing, with the same force and effect as if they had been made on and as of said date, and TTP8 shall have performed and complied with all agreements and conditions herein required to be performed or complied with by it on or before the Closing.

(b)      **Delivery of Promissory Notes.**  TTP8 shall have surrendered to the Company for cancellation the original copy of each Promissory Note, free and clear of all liens, pledges or other encumbrances.  In the event that TTP8 is unable to locate any such original copy, or if any such original copy has been mutilated or destroyed, TTP8 shall have delivered to the Company a lost note affidavit in form reasonably acceptable to the Company, which affidavit shall contain a customary indemnity in favor of the Company.

6.      **MISCELLANEOUS.**

6.1      **Successors and Assigns.**  This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and permitted assigns, but is not assignable by any party without the other party's prior written consent.

6.2      **Further Assurances.**  The parties shall execute such further documents, conveyances, assurances and instruments and take such further actions as may reasonably be necessary, proper or advisable to carry out the intent or purposes of this Agreement.  Each party hereto shall cooperate affirmatively with the other parties, to the extent reasonably requested by such other parties, to enforce rights and obligations herein and therein provided.

6.3      **Notices.**  Any notice or other communication provided for herein or given hereunder to a party hereto must be in writing, and: (a) sent by electronic mail; (b) delivered in person; (c) mailed by first class registered or certified mail, postage prepaid; or (d) sent by Federal Express or other overnight courier of national reputation, in each case addressed as follows:

If to the Company:

FTE Networks, Inc.
237 West 35th Street, Suite 806
New York, NY 10001
Attention: Legal Department Email: legal@ftenet.com

If to TTP8:

TTP8
2355 Gold Meadow Way, Suite 160
Gold River, CA 95670
Attention: Suneet Singal
Email: s@firstcapitalre.com

With a copy to:
Eiseman Levine Lehrhaupt & Kakoyiannis, P.C.
805 Third Avenue, 10th floor
New York , New York 10022
Attention: Eric Levine
Email: elevine@eisemanlevine.com

or to such other address with respect to a party as such party notifies the other in writing as above
provided. Each such notice or communication will be effective: (i) if given by electronic mail, then
when confirmation of successful transmission is received; or (ii) if given by any other means specified in
the first sentence of this Section 6.3, then upon delivery or refusal of delivery at the address specified in
this Section 6.3.

      **6.4**     **Headings**. The headings contained in this Agreement are for convenience of
reference only and do not form a part of this Agreement.

      **6.5**     **Governing Law**. This Agreement, including all disputes or controversies
arising out of or relating to this Agreement or the transactions contemplated hereby (including all claims,
whether sounding in contract, tort or otherwise), are to be governed by, and construed and enforced in
accordance with, the laws of the State of New York, without regard to its rules of conflict of laws.

      **6.6**     **Severability**. Any term or provision of this Agreement that is invalid or
unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such
invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and
provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions
of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be
unenforceable, the provision will be interpreted to be only so broad as is enforceable.

      **6.7**     **Construction**. If an ambiguity or question of intent or interpretation arises,
then this Agreement will be construed as drafted jointly by the parties hereto and no presumption or
burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the
provisions of this Agreement. The words "include", "including" and "or" mean without limitation by
reason of enumeration. Any reference to the singular in this Agreement will also include the plural and
vice versa.

**6.8** **Complete Agreement**. The terms of this Agreement are intended by the parties to be the final expression of their agreement with respect to the subject matter hereof and supersede all prior understandings and agreements, whether written or oral between the parties.

**6.9** **Expenses**. Each party shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of the Agreement.

**6.10** **Broker's Fees**. Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this Section 6.10 being untrue.

**6.11** **Counterparts; Electronic Transmission**. This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission (including in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Agreement.

[*Signature Page Follows*]

7

IN WITNESS WHEREOF, the parties have caused this Note Exchange Agreement to be executed as of the date first written above.

FTE NETWORKS, INC.

By: _____

Michael Beys
Interim Chief Executive Officer

TTP8, LLC

By: _____

Suneet Singal
Chief Executive Officer

## RESCISSION AGREEMENT

This Rescission Agreement (this "*Agreement*") is made and entered into on December 13, 2019, by and among FTE Networks, Inc., a Nevada corporation (the "*Company*"), and TTP8, LLC, a Delaware limited liability company ("*TTP8*").

### RECITALS

WHEREAS, TTP8 was the holder, by purchase and assignment, of (i) a promissory note dated December 8, 2016 issued by the Company to Suwyn Investments LLC, with principal and accrued interest outstanding equal to approximately $3.3 million as of the date hereof (as amended to date, the "*Suwyn Note*") and (ii) three promissory notes issued by the Company, or issued by a subsidiary of the Company and guaranteed by the Company, payable (either as the original payee or by assignment) to 327 Partners, LLC, issued on January 23, 2014, May 16, 2014 and July 11, 2017, respectively, with aggregate principal and accrued interest outstanding equal to approximately $0.6 million as of the date hereof (as amended to date, the "*327 Notes*," and together with the Suwyn Note, the "*Promissory Notes*");

WHEREAS, the board of directors of the Company (the "*Board*") approved the exchange (the "*Note Exchange*") of the Promissory Notes by TTP8 for shares of the Company's common stock, par value $0.001 per share ("*Common Stock*") at an exchange price per share to be not less than the greater of (a) $0.43 per share, the price on which the exchange transaction was negotiated between the principals of the parties, and (b) not less than the minimum amount that would prevent triggering the antidilution provisions of (i) the Company's outstanding Series A Preferred Stock and Series A-1 Preferred Stock and (ii) the warrant to purchase Common Stock held by Lateral U.S. Credit Opportunities Fund, L.P., such amount to be determined by the Company's Interim Chief Executive Officer in consultation with the Company's Interim Chief Financial Officer, provided that in no event would the number of shares of Common Stock issuable upon such exchange be equal to or greater than 20% of the number of shares outstanding on the date of the exchange (or such earlier date on which a binding agreement for such exchange were entered into), in order not to require shareholder approval under Section 713(a)(ii) of the NYSE American LLC Company Guide (the "*20% Rule*"); and provided further, that all required notifications to and filings with the NYSE American LLC (the "*Stock Exchange*") and the Securities and Exchange Commission would be timely made in connection with the Note Exchange;

WHEREAS, on November 15, 2019, with respect to the Note Exchange, the Company delivered instructions to its transfer agent to issue to TTP8 an aggregate of 5,468,379 shares of Common Stock (the "*Issued Shares*");

WHEREAS, subsequent to the issuance of the Issued Shares, the Company became aware that a miscalculation had been made with respect to the number of Issued Shares and that the Company had inadvertently violated Section 713(a)(ii) of the NYSE American LLC Company Guide (the "*20% Rule*") by issuing, without stockholder approval, common stock equal to 20% or more of then-outstanding stock for less than the greater of book or market value of the stock;

WHEREAS, the Company violated Section 301 of the NYSE American LLC Company Guide by virtue of having issued the Issued Shares without approval of a supplemental listing application for the Issued Shares by the Stock Exchange;

WHEREAS, in the Company's view because the issuance of the Note Exchange did not comply with the conditions imposed by the Board in connection with its approval thereof, the Company considers the Note Exchange to be void or voidable as a matter of law;

WHEREAS, TTP8 does not consider the Note Exchange to be void or voidable as a matter of law;

WHEREAS, on December 11, 2019, the Company notified the NYSE American of the inadvertent violation of the 20% Rule and agreed with the NYSE American that it would take appropriate steps to rescind the transaction with the cooperation and agreement of TTP8;

WHEREAS, concurrently with the execution of this Agreement, the Company and TTP8 are entering into a modified exchange agreement (**"Modified Exchange Agreement"**) with respect to the Promissory Notes pursuant to which TTP8 will be issued 19.9% of the Company's currently outstanding shares of Common Stock; and

WHEREAS, the parties hereto now desire to rescind the Note Exchange, effective as of November 15, 2019, and place the parties hereto in the same position had the Note Exchange not been effected.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein set forth, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    Rescission of Note Exchange.

(a)    The parties hereto hereby rescind and cancel the Note Exchange, effective as of November 15, 2019, and declare the Note Exchange and all legal effects arising therefrom to be null and void *ab initio*. Each of the parties hereto further agrees to take all such actions to place each such party in its respective position as if the parties had entered into the Note Exchange and the issuance of the Issued Shares had never occurred, including, without limitation, promptly executing, delivering and/or filing any and all instruments, documents, notices or other agreements that reflect or evidence the rescission hereunder.

(b)    Without limitation of the foregoing, the Company and TTP8 agree that the Issued Shares are hereby cancelled for no consideration (other than the rescission of the Note Exchange) and appropriate instructions shall be delivered to the Company's transfer agent with respect to such cancellation. The Company hereby agrees that the Promissory Notes remain in full force and effect as if the Note Exchange had never occurred, and interest continues to accrue unabated without regard to the Note Exchange.

(c)    The foregoing rescission shall be effective so as to allow the federal income tax doctrine of rescission to be applied thereto, and, each party hereto acknowledges and agrees that after giving effect to this Agreement, it has been returned to its situation existing immediately prior to the consummation of the Note Exchange.

2.    Representations and Warranties of TTP8. In connection with the transactions contemplated hereby, TTP8 represents and warrants, as of the date hereof, to the Company that:

(a)    TTP8 is duly formed, validly existing and in good standing as a limited liability company under the laws of Delaware and has all necessary power and authority to enter into, and perform its obligations under, this Agreement and the transactions contemplated herein. This Agreement constitutes the legal, valid and binding obligation of TTP8, enforceable in accordance with its terms, and the execution, delivery and performance of this Agreement by TTP8 does not and will not conflict with,

-2-

violate or cause a breach of any agreement or instrument to which TTP8 is a party or subject or any judgment, order or decree to which TTP8 is subject.

      (b)    TTP8 acknowledges that after giving effect to this Agreement, TTP8 has no enforceable rights or obligations with respect to the Note Exchange or the Issued Shares except as set forth in the Modified Exchange Agreement.

      (c)    TTP8 has good and marketable title to the Issued Shares and has not voted, sold, transferred, conveyed, pledged, encumbered or otherwise disposed of any of the Issued Shares or any interest therein, and no third party has any claim of any nature with respect to the Issued Shares.

The representations, warranties and covenants contained in this Agreement shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

      3.    Tax Treatment.  The parties hereto acknowledge and agree that (a) none of them has taken, or shall take, any material position for federal income tax purposes that is inconsistent with this Agreement and the rescission of the Note Exchange, and (b) each such party shall file his or its federal income tax returns for the year ending in 2019 in a manner consistent with this Agreement and the rescission of the Note Exchange, in each case in accordance with the terms of this Agreement.

      4.    Successors and Assigns.  This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and permitted assigns, but is not assignable by any party without the other party's prior written consent.

      5.    Further Assurances.  The parties shall execute such further documents, conveyances, assurances and instruments and take such further actions as may reasonably be necessary, proper or advisable to carry out the intent or purposes of this Agreement.  Each party hereto shall cooperate affirmatively with the other parties, to the extent reasonably requested by such other parties, to enforce rights and obligations herein and therein provided.

      6.    Notices.  Any notice or other communication provided for herein or given hereunder to a party hereto must be in writing, and: (a) sent by electronic mail; (b) delivered in person; (c) mailed by first class registered or certified mail, postage prepaid; or (d) sent by Federal Express or other overnight courier of national reputation, in each case addressed as follows:

        If to the Company:

        FTE Networks, Inc.
        237 West 35th Street, Suite 806
        New York, NY 10001
        Attention: Michael Beys
        Email: mbeys@blmllp.com

        If to TTP8:

        TTP8
        2355 Gold Meadow Way
        Suite 160
        Gold River CA 95670
        Attention: Suneet Singal

#56285974 v2

Email: s@firstcapitalre.com

or to such other address with respect to a party as such party notifies the other in writing as above provided. Each such notice or communication will be effective: (i) if given by electronic mail, then when confirmation of successful transmission is received; or (ii) if given by any other means specified in the first sentence of this Section 6, then upon delivery or refusal of delivery at the address specified in this Section 6.

7.     Headings. The headings contained in this Agreement are for convenience of reference only and do not form a part of this Agreement.

8.     Amendment and Waiver. This Agreement may be amended or modified only by an instrument in writing duly executed by the Company and TTP8. The waiver of any term of this Agreement is effective only by a written instrument executed by the party against whom the waiver is sought to be enforced. No waiver of any provision hereunder or any breach or default thereof shall extend to or affect in any way any other provision or prior or subsequent breach or default.

9.     Governing Law. This Agreement, including all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (including all claims, whether sounding in contract, tort or otherwise), are to be governed by, and construed and enforced in accordance with, the laws of the State of New York, without regard to its rules of conflict of laws.

10.     Severability. Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, the provision will be interpreted to be only so broad as is enforceable.

11.     Construction. If an ambiguity or question of intent or interpretation arises, then this Agreement will be construed as drafted jointly by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. The words "include", "including" and "or" mean without limitation by reason of enumeration. Any reference to the singular in this Agreement will also include the plural and vice versa.

12.     Complete Agreement. The terms of this Agreement are intended by the parties to be the final expression of their agreement with respect to the subject matter hereof and supersede all prior understandings and agreements, whether written or oral, including without limitation any prior employment agreement or offer letter between the Company and TTP8.

13.     Counterparts; Electronic Transmission. This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission (including in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Agreement.

[*signature page follows*]

#56285974 v2

The parties hereto have caused this Rescission Agreement to be executed as of the date first written above.

FTE NETWORKS, INC.

By:_____

Michael Beys
Interim Chief Executive Officer

TTP8

By:

Name:   Suneet Singal
Title:   Chief Executive Officer

*[Signature Page to Rescission Agreement]*